UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                        :

MIODRAG BELJAKOVIC,

                  Plaintiff,

    - against -

MELOHN PROPERTIES, INC.,

                  Defendant.

------------------------------------------------------------x

04 Civ. 3694 (RJH) (GWG)

**AFFIRMATION OF**
**WILLIAM D. HUMMELL, ESQ.,**
**IN SUPPORT OF DEFENDANT'S**
**MOTION *IN LIMINE* AND**
**OBJECTIONS TO EXHIBITS**

      **WILLIAM D. HUMMELL, ESQ.**, pursuant to 28 U.S.C. § 1746, subscribes and affirms the following is true under penalty of perjury:

      1.     I am a member of the firm of Kucker & Bruh, LLP ("K&B"), attorneys for defendant Melohn Properties, Inc. ("MPI"), in this civil action. I respectfully submit this affirmation in support of MPI's motion *in limine* and objections to exhibits, challenging proposed trial evidence and testimony suggested by plaintiff Miodrag Beljakovic ("Beljakovic"), which is being filed by MPI with the federal district court by delivery to Chambers of Judge Richard J. Holwell as directed in paragraph 3 ("¶ 3") of the Amended Trial Order dated September 26, 2007 ("9-26-07 Order"). By this motion, MPI requests an Order in advance of the commencement of trial which, based on the Federal Rules of Evidence and relevant case law, will exclude from the trial each of the documents proposed as a trial exhibit by Plaintiff (*i.e.*, listed in his portion of Section X of the Joint Pre-Trial Order ("JPTO")). I am familiar with this matter in my capacity as counsel.

      2.     The limited purpose of this submission is to attach and identify materials which are pertinent to this motion, and treated in the accompanying Brief in Support of Motion *In*

*Limine* and Objections to Exhibits, dated November 12, 2007.

        3.     Annexed hereto as **Exhibit "A"** are true copies of Beljakovic's proposed trial exhibits, listed in his portion of Section X of the JPTO. As explicated in MPI's accompanying Brief, the overwhelming bulk of those proposed trial exhibits are inherently inadmissible, unreliable, immaterial, not relevant, or inflammatory, and in any event would severely prejudice Defendant's right to a fair trial. For ease of reference, and as explained in said Brief, the proposed exhibits contained in Exhibit "A" hereto bear K&B's red-ink labels of various numbered categories of inadmissibility designated at the outset of said Brief. Those categories are the following:

1.    <u>Document concerns a claim previously adjudicated</u> which was determined against Beljakovic -- dismissal on the merits of precisely the same claim in a decision by the New York State Division of Human Rights on **January 28, 2000**.

2.    <u>Document concerns a claim previously adjudicated</u> which was determined against Beljakovic -- dismissal on the merits of precisely the same claim in a decision by the New York State Division of Human Rights on **December 14, 2001**.

3.    <u>Statute of Limitations</u> -- document concerns a stale claim, which is in repose.

4.    <u>Hearsay</u> -- out of court statement offered for the alleged truth of the matter.

5.    <u>Immaterial and Irrelevant</u> -- document does not concern Age.

6.    <u>Altered document</u> -- it contains handwritten notes, or redactions, by Beljakovic.

7.    <u>Self-Diagnosis</u> of an alleged medical condition.

8.    <u>Document concerns a request for an accommodation</u>, which is immaterial and irrelevant to an age discrimination claim.

        4.     Annexed hereto as **Exhibit "B"** is a true copy of Beljakovic's civil complaint in this action, filed on May 14, 2004.

        5.     Annexed hereto as **Exhibit "C"** is a true copy of the JPTO.

6. The Court is respectfully referred to the accompanying Brief In Support for a thorough statement of the legal principles which mandate preclusion in limine of plaintiff's proposed trial exhibits, trial witnesses, and anticipated trial testimony, discussed and treated therein.

7. Parenthetically, and as a procedural housekeeping matter, we respectfully note the following for the Court's information. The 9-26-07 Order initially designated November 12, 2007, as the date for filing these papers with Chambers, further designating November 19, 2007, as the date for filing any answering papers. Because November 12, 2007, unanticipatedly turned out to be a federal and state holiday (Veterans' Day) on which both this Court and New York State courts are closed, I personally called the Chambers of District Judge Holwell early in the morning of November 12 in the hope of locating someone who might be present so as to obtain his or her guidance as to whether the Court would be in session to receive the filing of the within motion. I was informed by Law Clerk Christopher Deal, Esq., that, due to the holiday and the Court's official closing on that day, the papers, including the motion *in limine*, were to be filed the following day, November 13, 2007, when the Court would be in session. Such advice was reiterated and confirmed by Mr. Deal after I apprised him that the trial in this action is scheduled for January 2008. After asking me the nature of the papers, receiving my response and then reviewing Chamber's computer records for this matter and the Court's description of the pre-trial papers discussed in ¶'s 3, 4 and 5 of the Order, Mr. Deal informed me that, rather than delivering these particular papers to Chambers on November 13 (which would require special arrangements beyond the usual court procedures requiring delivery to the U.S. Marshal for security screening), I should follow the usual protocol by delivering these papers to Chambers by delivering them to the U.S. Marshal (on the Worth Street side of the courthouse).

WHEREFORE, it is respectfully requested that the Court shall grant MPI's instant motion *in limine* and objections to exhibits in all respects, and that it also shall grant such other and further relief in favor of MPI as it may deem just and proper.

Dated: New York, New York
      November 12, 2007

WILLIAM D. HUMMELL
(WH-7071)

02

**MIODRAG BELJAKOVIC v. MELOHN PROPERTIES, INC.**
**04 CV 3694**
**United States District Court**
**Southern District of New York**

**Miodrag Beljakovic Document Exhibit List**

| | DATE WRITTEN | DESCRIPTION OF DOCUMENT | |
|---|---|---|---|
| #1 | 01/28/2000 | New York State Division of Human Rights Determination and Order After Investigation -- finding no probable cause to believe discrimination took place | 6 |
| #2 | 11/29/2000 | Letter of Reprimand from Robert Hammer to Beljakovic regarding improper uniform | 2,3,5 |
| #3 | 12/01/2000 | Letter of Reprimand from Robert Hammer to Beljakovic regarding playing the radio at work | 2,3,5 |
| #4 | 01/05/2001 | Letter from Beljakovic to Robert Hammer regarding letters of reprimand dated November 29, 2000 and December 1, 2000 | 2,3,4 |
| #5 | 01/15/2001 | Letter from Robert Hammer to Beljakovic regarding playing the radio, uniform, and making complaints to the Melohns | 2,3,5 |
| #6 | 02/05/2001 | Letter from Robert Hammer to Beljakovic regarding alleged sleeping on the job | 2,3,5, 4,6 |
| #7 | 02/11/2001 | Letter from Beljakovic to Robert Hammer in response to Robert Hammer's letter dated February 5, 2001 | 2,4,5,3 |
| #8 | 02/14/2001 | Letter from Local 32B-32J Union to Martha Melohn objecting to reprimand letters dated November 29, 2000 and December 1, 2000 | 2,4,5,3 |
| #9 | 07/06/2001 | Letter from Beljakovic to Melohn Properties requesting one month vacation beginning September 29, 2001 | 2,3,4,5 |
| #10 | 07/31/2001 | Letter from Beljakovic to Melohn Properties | 2,3,4,5 |

| | | regarding delay in decision regarding his request for vacation beginning September 29, 2001. | |
|---|---|---|---|
| #11 | 08/01/2001 | Letter from Rita Gregg to Beljakovic regarding remaining at the post until a replacement arrives | 3 |
| #12 | 08/05/2001 | Letter to Melohn Properties from Beljakovic replying to letter from Rita Gregg dated August 1, 2001 | 2,3,4,5 |
| #13 | 08/09/2001 | Letter from Robert Hammer to Beljakovic denying request for one month vacation beginning September 29, 2001 | 2,3,5 |
| #14 | 08/09/2001 | Letter from Robert Hammer to Beljakovic prohibiting letter writing to Mrs. Melohn | 2,3,5,6 |
| #15 | 09/02/2001 | Letter from Beljakovic to Robert Hammer replying to Robert Hammer's letter dated August 9, 2001 prohibiting letter writing to Mrs. Melohn | 2,3,4,5 |
| #16 | 09/07/2001 | Letter from Beljakovic to Robert Hammer in response to Robert Hammer's letter dated August 9, 2001 denying vacation time | 2,3,4,5,8 |
| #17 | 09/17/2001 | Letter of Reprimand from Robert Hammer to Beljakovic regarding insubordination and failure to perform duties | 2,3,56 |
| #18 | 04/08/2002 | St. Luke's Roosevelt Emergency Department Record | 3,4,5,7 |
| #19 | 02/27/2004 | EEOC Dismissal and Notice of Rights | None |
| #20 | 07/21/2004 | Letter from Stephen R. Rippon regarding good service of Beljakovic | 4,5 |
| #21 | 07/21/2004 | Letter from Denise Sassoon regarding good service of Beljakovic. | 4,5 |
| #22 | 07/22/2004 | Letter from Rabbi Uri Gordon regarding good service of Beljakovic | 4,5 |
| #23 | 07/27/2004 | Letter from Robert and Lila S. Rosenblum | 4,5 |

| | | regarding the good service of Beljakovic | |
|---|---|---|---|
| #24 | 07/30/2004 | Letter from Barbara Kristaponis regarding good service of Beljakovic | 4, 5 |
| #25 | 08/01/2004 | Letter from Rudi Lawrence and Blanche Foster regarding good service of Beljakovic | 4, 5 |
| #26 | 08/02/2004 | Letter from Ellie Morgenstern regarding good service of Beljakovic | 4, 5 |
| #27 | 08/03/2004 | Letter from Drs. Josephine Wright and Richard Gottlieb regarding good service of Beljakovic. | 4, 5 |
| #28 | 08/03/2004 | Letter from Richard Gordon regarding good service of Beljakovic | 4, 5 |
| #29 | 08/04/2004 | Letter from George Anthony Terzian regarding good service of Beljakovic | 4, 5 |
| #30 | 08/06/2004 | Letter from John Corigliano and Mark Adamo regarding good service of Beljakovic. | 4, 5 |
| #31 | 08/08/2004 | Letter from Doris B. Wallace regarding good service of Beljakovic | 4, 5 |
| #32 | 08/12/2004 | Letter from H. Lawrence King regarding good service of Beljakovic. | 4, 5 |
| #33 | 09/15/2004 | Letter from Kucker & Bruh, LLP to Beljakovic regarding Beljakovic's application for Workers' Compensation | 4, 5 |
| #34 | 10/04/2004 | Letter/Medical Report from Dr. James H. Frost regarding CT Scan of abdomen and pelvis of Beljakovic | 4, 5, 7 |
| #35 | 10/13/2004 | Letter from Robert Hammer to Beljakovic, Julio Peralta and Safet Kukaj regarding work schedule changes. | 5 |
| #36 | 10/14/2004 | Letter from Beljakovic to Joseph Helmreich regarding change in work schedule | 4, 5 |
| #37 | 10/15/2004 | Letter from Robert Hammer to Beljakovic and Julio Peralta regarding revision of previous work | 5 |

05

| | | schedule changes. | |
|---|---|---|---|
| #38 | 10/18/2004 | Letter from Beljakovic to Robert Hammer regarding change in work schedule | 4,5,7 |
| #39 | 10/28/2004 | Letter from Beljakovic to Robert Hammer in response to Robert Hammer's letter dated October 19, 2004 | 4,5 |
| #40 | 03/12/2005 | Letter from Beljakovic to Local 32B and 32J Union regarding harassment at work and change in work schedule | 4,5,8 |
| #41 | 03/15/2005 | City of New York Environmental Control Board Ticket for unkempt sidewalk at 365 West End Avenue. Fine amount: $100.00 | 4,5 |
| #42 | 03/17/2005 | Letter from Beljakovic to Environmental Control Board regarding sanitation ticket received on March 15, 2005 | 4,5,6 |
| #43 | 03/23/2005 | Letter from President of Service Employee's Union to Beljakovic replying to Beljakovic's letter dated March 12, 2005 | 4,5,8 |
| #44 | 04/08/2005 | Letter from Beljakovic to Environmental Control Board regarding sanitation ticket received on March 15, 2005. Second Request. | 4,5 |
| #45 | 04/11/2005 | Letter from General Counsel of Service Employee's Union to Beljakovic replying to Beljakovic's letter dated March 12, 2005 | 4,5 |
| #46 | 05/10/2005 | Letter from Beljakovic Local 32B and 32J Union regarding harassment at work and change in work schedule. Second Request. | 4,5,8 |
| #47 | 01/19/2006 | "Certification of Medical Care" from Dr. McHugh stating that Beljakovic may return to work on January 25, 2006 | 4,5,7 |
| #48 | 01/26/2006 | Letter from Dr. William J. McHugh stating that Beljakovic can return to work on January 30, 2006 | 4,5,7 |
| #49 | 02/08/2006 | Letter from Dr. McHugh to Robert Hammer stating that Beljakovic should not be shoveling snow but | 4,5,7 |

| | | can complete other job related tasks. | |
|---|---|---|---|
| #50 | 04/12/2006 | Letter from Beljakovic to Joseph Helmreich regarding harassment by Robert Hammer | 4,5,7 |
| #51 | 07/20/2006 | Letter from Beljakovic to Robert Hammer regarding taking days off and giving work days to ~~Lloyd Adolton~~ Felix Bermudez | 4,5 |
| #52 | 07/05/2006 | Letter from Beljakovic to Joseph Helmreich regarding work-related injuries and harassment by Robert Hammer. | 4,5,7 |
| #53 | 10/11/2006 | Letter from Beljakovic to President of Service Employee's Union regarding investigation of work schedule changes | 4,5,8 |
| #54 | 10/30/2006 | Letter from Beljakovic to Joseph Helmreich regarding thin winter coats as part of doorman uniform. | 4,5,7,8 |
| #55 | 12/27/2006 | Letter from Beljakovic to Joseph Helmreich regarding questions of who to report to since the death of Smail Ibricevic | 4,5,8 |
| #56 | 01/11/2007 | Letter from Beljakovic to Joseph Helmreich requesting to be returned to normal working hours | 4,5,8 |
| #57 | 01/17/2007 | Letter from Beljakovic to Joseph Helmreich regarding change in work schedules. | 4,5,8 |
| #58 | 01/31/2007 | Letter from Beljakovic to senior management at Melohn Properties regarding continued harassment by Robert Hammer and Hammer's attempts to prevent Beljakovic from attending the Workers' Compensation hearing. | 4,5,7 |
| #59 | 03/02/2007 | Letter from Beljakovic to Joseph Helmreich regarding Robert Hammer's attempt to prevent appearance at Workers' Compensation hearing | 3,2 4,5,8 |
| #60 | 03/16/2007 | Letter from Beljakovic to U.S. Department of Labor requesting an investigation as to working conditions at 365 West End Avenue. | 4,5,7,8 |
| #61 | 05/04/2007 | Letter from Beljakovic to senior management at | 2,3,4,5, 8 |

:07

| | | Melohn Properties regarding his hat and uniform. | |
|---|---|---|---|
| #62 | 07/19/2007 | Letter from Beljakovic to senior management at Melohn Properties regarding harassment by Noe Osorio. | 4,5,7 |
| #63 | 07/30/2007 | Letter from Beljakovic to senior management at Melohn Properties regarding harassment by Noe Osorio. | 4,5,7,8 |
| #64 | 10/10/2007 | Wall Street Journal Article:  "Job Strain Can Be Risk Factor For Subsequent Heart Attacks" by Ron Winslow.  Health Section D page D4. | 4,5,7 |
| #65 | UNDATED | Letter from Beljakovic to Mr. Helmreich regarding work schedule changes. | 4,5,8 |
| #66 | UNDATED | Letter from Jessica J. Josephson regarding good service of Beljakovic | 4,5 |

## PHOTGRAPHIC EXHIBITS

| | PHOTO DATE | PHOTO DESCRIPTION | |
|---|---|---|---|
| #67 | February 2007 | Photograph depicting ~~thin winter coat~~ *civilian cap* as part of doorman uniform | 5,8 |
| #68 | October 2006 | Photograph depicting unhealthy working conditions | 5,8 |

89

## Document List of Additional Exhibits

| EXHIBIT | DATE WRITTEN | DESCRIPTION OF DOCUMENT | |
|---------|--------------|-------------------------|---|
| # 69 | 12/30/1993 | Complaint to the U.S. Department of Labor against late payment of salaries. | 4, 5, 8 |
| # 70 | 6/26/2001 | Defentant's instructions to the satff Not to accept tenant's notes. | 4, 5 |
| # 71 | 2/24/2003 | Letter from Beljakovic to Melohn Properties regarding a health hazzard. | 4, 5, 8 |
| # 72 | 6/26/2003 | Letter from Beljakovic to Melohn Properties requesting a fan  for a lobby. | 4, 5, 8 |
| # 73 | 9/18/2003 | Melohn Properties memo barring a tenant to have roommate or sublet. | 4, 5 |
| # 74 | 1/5/2005 | Work schedule drafts by the late superintendent Smail Ibricevic, giving me to work three mornings, which was not accepted by the Defendant | 4, 5, 8 |

08.

STATE OF NEW YORK:  EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS

EXEC. LAW ART. 15
SDHR NO:
1B-E-A-98-2306102-A

+- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -+
| (State Division of Human Rights on the Complaint of)
|
|  Miodrag Beljakovic                          COMPLAINANT
|
|        --Against--
|
|  Melhohn Properties                          RESPONDENT
|
+- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -+

Federal Charge No: 16G980560

DETERMINATION AND ORDER AFTER INVESTIGATION

On August 05, 1998, Miodrag Beljakovic filed a verified complaint with the State Division of Human Rights charging the above-named respondent with an unlawful discriminatory practice relating to Employment, because of Age in violation of the Human Rights Law of the State of New York.

After investigation, and following review of related information and evidence with named parties, the Division of Human Rights has determined that, insofar as respondent Melhohn Properties is concerned, there is NO PROBABLE CAUSE to believe that the said respondent has engaged in or is engaging in the unlawful discriminatory practice complained of. This determination is based on the following:

The investigation revealed that the complainant was hired by the respondent as a Doorman on May 5, 1985.

The investigation revealed that the complainant was asked about his physical condition and his retirement plans on November 30, 1997, after he had indicated to other co-workers that he was not feeling well and was planning to retire.

The complainant could not recall any other instance of being questioned about his age or retirement plans. The Complainant was unable to cite any instance where he was written up by the respondent. The complainant was also unable to cite any other instance where he was harrassed by the respondent.

Determination: NPC NON-TITLE VII and NON-ADA (DET.18 - 08/92)    (1 of 2)
JXC/t3
01/28/00

6

**BEL 1**

SDHR NO: 1B-E-A-98-2306102-A          FEDERAL CHARGE NO: 16G980560

The complaint is therefore ordered dismissed and the file is closed.

Any party to the proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a notice of Petition and Petition <u>within sixty (60) days after service of this Determination.</u> A copy of this Petition and Notice of the Petition must also be served on all parties including General Counsel, State Division of Human Rights, 55 West 125th Street, New York, NY 10027. DO NOT FILE THE ORIGINAL PETITION AND NOTICE OF PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

PLEASE TAKE FURTHER NOTICE that a complainant who seeks state judicial review and who receives an adverse decision therein, may lose his or her right to proceed subsequently in federal court by virtue of <u>Kremer vs. Chemical Construction Co.,</u> 456 U.S. 461 (1982).

DATED AND MAILED:    **MAN 2 8 2000**          STATE DIVISION OF HUMAN RIGHTS

By _____
Paula Irby-Wynter
Regional Director

Determination: NPC NON-TITLE VII and NON-ADA (DET.18 - 08/92)    (2 of 2)
JXC/t3
01/28/00

10

# MELOHN PROPERTIES, INC.

## REPRIMAND

1995 BROADWAY
NEW YORK, NY 10023
(212) 787-2500

TO:      MIODRAG BELJAKOVIC, DOORMAN
FROM:    ROBERT HAMMER, AGENT
BLDG:    365 WEST END AVENUE
DATE:    NOVEMBER 29, 2000

You were not properly dressed in your uniform. You were wearing a red dotted tie instead of the black tie you were issued. You also wore a colored instead of a white shirt.

The sweater you wore is also not permitted.  If you wish to wear a sweater, you may do so under your shirt, so that it is not visible.

Cc:   RAB
      32BJ
      SUPT.
      PERSONEL FILE

MELOHN PROPERTIES, INC.
1995 BROADWAY
NEW YORK, NY 10023

MIODRAG BELJAKOVIC, DOORMAN
365 WEST END AV
NEW YORK, N.Y. 10024

2,3,5    BEL 2

# MELOHN PROPERTIES, INC.

11

1995 BROADWAY
NEW YORK, NY 10023
(212) 787-2500

## <u>REPRIMAND</u>

TO:      MIODRAG BELJAKOVIC, DOORMAN
FROM:    ROBERT HAMMER, AGENT
BLDG:    365 WEST END AVENUE
DATE:    December 1, 2000

After repeated warnings not to play the radio while on duty, and the actual removal of the radio, you were again playing the radio this day, as witnessed by Mr. Joseph Helmreich.

Cc:   RAB
      32BJ
      SUPT.
      PERSONEL FILE

MELOHN PROPERTIES, INC.
1995 BROADWAY
NEW YORK, NY 10023



MIODRAG BELJAKOVIC, DOORMA

365 WEST END AV

NEW YORK, N.Y. 100⊂,

2, 3, 5

**BEL 3**

12

Mr. Robert Hammer, Agent                             Elizabeth, N.J.  January 9, 2001
Melohn Properties, Inc.
1995 Broadway
New York, N.Y. 10023

Mr. Hammer

    I received from you two "reprimand" letters in  rapid succession, dated November 29, and December 1, 2000, copies of which were sent by you to the various authorities and one put in my personnal file. Needless to say, these false, discriminatory and harassing letters,  as part of a pattern to force me out from my job,  caused me a great deal of mental anguish and concern. This was the first time that I,  in 45 years of work for only four employers, received anything as degrading as this. Copies of both of your letters are enclosed for your ready reference.

    We met  the first time,  on Friday, November 24, in the lobby of our building, when  you told  me that my appearance at the work place was not up to your standards and expectations. I understood that, and was ready to comply with your dress code. However, five days later, and without an attempt to discuss this thing with me and hear my side of the story - you rushed to write  to me the first "reprimand" letter, with all the points you made being absolutely false. The facts of the matter are, Mr. Hammer,  that I was never "issued" a black tie or white shirt nor anybody ever asked me to wear them. My tight pants, which I received with the jacket, <u>five years ago</u>, were returned to the maker to be replaced and a new one was never sent to me despite of my repeated requests to get it. As for the merit of your demand to wear the sweater under the shirt, I leave it to the readers to judge. I never saw any mature man doing that.

    Your second letter is even more frivoluous. We always had  a radio at our station and all the doorman played it during their shifts to hear the news and check on the outside temperature or weather conditions. There is radio being played in the government offices, at the stations and even hospitals, as a stimulant of performance, and there was nothing unusual if we did the same thing.  There were no "repeated warnings" made to me not to play it. The radio we had was not mine, I did not put it there and why  was I the only one singled out to receive your  letter? As to how someone would be able to play a radio after it was removed, as you stated in your letter, would be something for you to explain further.

    When I complained to Mrs. Martha Melohn about your letters, she told me to "throw them in the garbage can" and allowed me to carry a small pocket radio, for which I thanked her. However, as a former bank executive, I know why "reprimand", i.e. "warning letters" are given to the employees. <u>For good order sake, I hereby demand that you immediately rescind both of your letters, pull them out from my personnel file and copies of your new letter send  to the same parties  your "reprimands" went to.</u>

                                 Respectfully,

                               Miodrag Beljakovic, doorman at
CC: Mrs. Martha Melohn                                    365 West End Ave, New York
       Messrs: Al and Leon Melohn

2,3,4          **BEL 4**

# MELOHN PROPERTIES, INC.

13

1995 BROADWAY
NEW YORK; NY 10023
(212) 787-2500

January 15, 2001

Miodrag Mike Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208

Re: Doorman Position
    365 West End Avenue
    New York, New York 10024

Dear Mr. Beljakovic,

We are in receipt of your letter of 1/9/01. Notwithstanding your protestations you must always be in correct uniform each day and you may never play the radio while on duty even if it is a small pocket radio.

Your advice to us that our warnings are frivolous smack of insubordination, which will not be tolerated.

Mrs. Martha Melohn is a tenant of the building as is Al and Leon Melohn. They are to be treated as tenants and your complaints should not be directed to them or their families. If your ever complain to them at their place of residence, you will receive a reprimand for harrassment of a tenant, their place of residence includes the entire building and public street nearby.

If you cannot maintain proper discipline and proper dress code then you cannot continue as a doorman.

2,3,5   BEL 5

This is clear and simple.

Very truly yours,
Melohn Properties

Robert Hammer,
Agent

Cc: RAB, Howard Rothchild
Supt.
Personel File
32BJ

# MELOHN PROPERTIES, INC.

15

1995 BROADWAY
NEW YORK, NY 10023
(212) 787-2500

February 5, 2001

Mike Beljakovic, Doorman
365 West End Avenue
New York, New York 10024

Dear Mr. Beljakovic:

We enclose a letter of complaint that we received about your sleeping on the lobby couch and being rude and failing to perform your job.

These are serious allegations which we intend to investigate.

Very truly yours,

Robert Hammer,
Agent

Encl.
RH/lcg

2,3,5
4,6          **BEL 6**

To whom it may concern,

Last Saturday a guest of mine was leaving my building with a lot of bags. The doorman Mike Beljakovic was sitting at the desk. She asked the doorman to help her with the door and he acted like he didn't see her. She asked again and he said "No, I don't know you." She said that she was a guest of                              He said he didn't know that apartment                                          . She pleaded with him that she had a lot of bags and she needed help getting a cab. He refused and told her she had a bad attitude and he would not help her.

When she told me about the incident I went downstairs to ask him about it. He said that she wasn't nice to him and he doesn't have to help anyone who isn't nice. I told him that was his job and people didn't have to be nice to him. He then said that getting a cab was not part of his job. When I asked about opening the door he laughed at me and walked away.

He is the most disrespectful, rude doorman in the building. He NEVER opens the door for anyone. Every morning when I leave for work he is asleep on the couch in the lobby or talking to the super. On several occasions he has turned away my dry cleaning for absolutely no reason.

When I complained to another doorman that he doesn't help me with my packages he said that Mike had told him that he was too old to carry peoples packages. However, when the Melohn's pull up he sprints out of the building to help them.

Everyone in the building complains about him. He does not do a single aspect of his job. He is also nasty and snobbish to every tenant. I have sent in complaints before and nothing has been done. I want him to be spoken to about his behavior on Saturday and everyday for that matter.

I will check back in one week to make sure he was reprimanded for his behavior.

Mr. Robert Hammer, Agent                    Elizabeth, N.J., February 11, 2001
Melohn Properties, Inc.
1995 Broadway, 14th Fl.
New York,N.Y. `0023

Mr Hammer

    I refer to your letter of February 5, 2001 and an enclosed complaint against my performance at the door, at 365 West End Avenue, New York. Copies of these are enclosed.

    I am sorry, but I do not comment on unsigned, doctored and untrue matters. Things of such an undignified nature, speak more loudly about those who wright them, than about the persons they are written about. A number of tenants who know me well, when I had shown this profanity to them, spoke about it with the utmost indignation. Some of them believe that this must have been written about someone else.

    There is no wonder why you paid attention to an obvious pack of lies. This is in line with your continuing discriminatory and harrassing campaign against me, bringing it to a very low level.

                               Respectfully.

                               Miodrag Beljakovic

CC: Mrs. Martha Melohn
    Mr. Al Melohn
    Mr. Leon Melohn
    Local 32B-32J
    Mr. Smail Ibricevic, Supt.

2,4,5,3    **BEL 7**



**32BJ**

**SEIU**

Leading the Way

18.

February 14, 2001

**Martha Melohn (Trustee)**
**c/o Melohn Properties Inc.**
**1995 Broadway**
**New York, NY 10023**

RE:   **365 West End Avenue**
       **Miodrag Beljakovic**

Gentlemen:

Please be advised that Local 32B-32J is objecting to the warning letters issued to the above captioned member on **November 29, 2000 and December 1, 2000.**

We contend that said warning letters contain inaccurate and untrue charges and accusations. Therefore, we request that they be stricken from the member's record and not be used against him/her in any future disciplinary actions.

In addition, the Union reserves the right to arbitrate the merit of the allegations contained in the warning letters, should you, at any future time, take actions against the employee as a result of the accusations contained in the warning.

This letter does not require response from the company and failure to respond does not constitute a waiver of any rights. In the event you wish to respond to this letter we request that you contact or mail the correspondence to the Supervisor of the District who is **Kyle Bragg.**

Sincerely,

Joanne Davis
Complaint Director

JSD/aa
opeiu/153

cc:   **Miodrag Beljakovic**
       **925 Park Avenue**
       **Elizabeth, NJ 07208**

District #6

2, 4, 5, 3

**BEL 8**

MICHAEL P. FISHMAN
President

KEVIN J. DOYLE
Vice President

HECTOR J. FIGUEROA
Secretary-Treasurer

KRYSTYNA ROSARIO
Secretary

DOMINICK BENTIVEGNA
Assistant Secretary

KYLE BRAGG
Assistant to the President

LOCAL 32BJ
101 Avenue of the Americas
New York, NY 10013-1906
212.388.3800

SERVICE EMPLOYEES
INTERNATIONAL UNION
AFL-CIO, CLC

Long Island Office:
3601 Hempstead Turnpike
Levittown, NY 11756
516.579.4020

New Jersey Office:
1416 Morris Avenue
Union, NJ 07083
908.964.1480

July 6, 2001

Melohn Properties Inc.
1995 Broadway - 14th floor
New York NY 10023

Gentlemen:

Re:  Vacation 2001

I will take one month's  vacation this year from September 29th to October 26th 2001, when I will travel to my native country of Serbia.

My late vacation this year is caused by my desire to attend the commemoration of the sixtieth anniversary of the death of my father, who was executed by the Nazis on October 21, 1941 along with 2,300 other citizens of the city of Kragujevac in Serbia.

Thanking you in advance for your kind understanding.

Sincerely,

Miodrag Beljakovic
Doorman
365 West End Avenue

cc:  Smail Ibrecevic, Superintendent
       AFL-CIO Local 32B and 32J

2, 3, 4, 5      BEL 9

Melohn Properties, Inc.                     Elizabeth, N.J.  July 31, 2001
1995 Broadway - 14th Fl.
New York, N.Y. 10023

Re:  Vacation 2001

Gentlemen:

With my letter of July 6, 2001, I requested your permission to take my this year vacation starting September 29 to October 25, 2001, so that I can attend the sixtieth year commemoration for my father, executed by the Nazis during the World War II.

At the conference we had at the NYS Human Rights Division, on July 26, 2001, your manager Mr. R. Hammer stated that my request for late vacation was not granted as yet. The late vacations are not in compliance with the existing Union and Company gidelines. At that time, he insulted memory of my father by stating that I am asking for a favor to attend some "festivity".*

In view of the above, and considering Mr. Hammer's overall nasty, discriminatory and hrrassing attitude toward me, please send me your written decision whether my vacation request is approved or not, so that I can buy my airplane ticket well in advance, when they are considerably cheaper, or not buy it at all if I am not allowed to go.

Thank you in advance for your prompt reply.

Sincerely,

CC: Mr.William Marshall,
      NYS Human Rights Division
      AFL-CIO Local 32B and 32 J          Miodrag Beljakovic
      Mr. Smail Ibricevic, Supt.           Doormn, at 365 W.E.A.

* According to the New College Edition of The American Heritage Dictionary, the word festivity is described as "1. Joyous feast, holiday, festival or celebration 2. The pleasure, joy and gaiety of a festival or celebration".

2, 3, 4, 5          **BEL 10**

# MELOHN PROPERTIES, INC.

**1995 BROADWAY**
**NEW YORK, NY 10023**
**(212) 787-2500**

August 1, 2001

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208

RE:    Doorman position
         365 West End Avenue

Dear Mr. Beljakovic:

Door men on duty may not leave their post until they are relieved by the next shift
to arrive.  Therefore, if your replacement is late or absent you must remain on duty
until the superintendent has been able to secure a replacement.   July 30th your
replacement was not available. The superintendent requested you to stay on duty,
however you refused.

Please be certain that this does not recur.

Very truly yours,

Rita Gregg
Assistant Manager

3    **BEL 11**

Melohn Properties, Inc.
1995 Broadway, 14th Fl.
New York, N.Y. 10023

Elizabeth, N.J., August 5, 2001

Gentlemen:

Once again, I received an untrue, malicious and harrassing letter, accusing me of breaking the existing company rules, when I actually did not do such a thing. Your letter of August 1, 2001, signed by Ms. Rita Gregg, Assistant Manager, is a continuation of standing campaign by Melohn Properties, Inc., to force me out from my job after 16 years of service, by a smear, vilifying and slanderous tactics. If you just took some time to examine the circumstances leading to the event of July 30, you would have come to an entirely different conclusion. But, this would defeat your purpose.

The facts are following. That Mr. Kenny Jenkins, a doorman, is taking a day off on Monday, July 30, for medical check-up at the Union, was known to the Office and the Superintendent since Friday, July 27. You were unable to find replacement for Kenny, because relief man are offered considerably lower salaries than the doormen are making. Julio Peralta, our coleague and a doorman, told me that he was available and waiting to be called to work, but nobody contacted him. There is a tendency lately to bypass Julio and find someone who is willing to work and you do not have to pay him overtime. A person willing to work for a low hourly wages is not easy to find particularly during Summer

I had no idea that Kenny was taking a day off until I came to work on Monday morning, July 30. As soon I saw Superintendent Smail I told him that Mrs. Mira Knezevic, mother of my best friend George Knezevic, from Douglaston, L.I. had died, and that I will have to go to the Funeral Home, in Little Neck, L.I., that evening, when service for her will take place and that the next day, on Tuesday, I would like to take day off, to attend her funeral, at 10 A.M., at Cedar Grove Cemetary, in Flushing. I had told the family when they called me, that I would be there. I know this family for over 40 years and was a guest at their house on many occassions. Since the decesed had only one son, she regarded me as her second son and told us that many times. It was my human obligation to pay respects to such a close family friend. Smail was very sympathetic and only then told me that Kenny was taking a day off that day. He promised to see if he can find someone to work that afternoon for Kenny and the following day for me.

Smail first informed Mr. Hammer about the poroblem and then, at his suggestion, called the supervisors from other buildings looking for someone from their staff willing to work, but found no one. He called the Office again, but to no avail. I told Smail that had I known that Kenny would not come, I could have brought a suit with me appropriate for Funeral home and stayed at least till 6 P.M., when he can replace me and work the rest of the shift. This way, I can stay only one hour till 4 p.m. and then go home to Elizabeth to change. Little Neck, N.Y., is not close to Elizabeth in N.J. and I would need two hours to go from one place to another. He agreed to that and I stayed till 4 p.m., when he replaced me. At least 30 people who know me and were at the funeral parlor that evening, can testify that I barely made it for the 8 o' clock service. Since Smail had an obvious problem finding anybody to work for the low hourly wages being offered, I

2, 3, 4, 5     **BEL 12**

told him before I left that I will have no choice but to excuse myself to the grieving family, and come to work the folloing day instead of going to the funeral. All this time, Julio was available to work, but you were not prepared to call him and pay him overtime. Had I known this, I would have called Julio to work and paid him out of my pocket the overtime he is entitled to get. Attending that funeral was very important to me and I will always regret that I was not there, when this valliant lady was put to rest.

In your letter, I am being chastized for going to the Funeral Home to pay respects to my dear friend, on my time off, and was even warned to be "certain that this does not reccur", as this was a major offense on my part. This is really too much. Three basic inaccuracies with your letter remain: (a) the replacement was available, but you did not want to pay Julio, (b) the Super never ordered me to stay on duty, but I offered to help him for one hour and (c) I never refused order to work as you are insinuating, since such an order was never given to me. Smail is a decent human being and did not want to put me through torture you were ready to put me through. How seriously I take my job shows that I decided not to take a day off that Tuesday, and go to the Flushing Cemetary, but instead stayed at work, which was extremely difficult for me to do.

In your letter of August 1, 2001 again, your intent to hurt me is quite obvious. I was standing next to Smail in the lobby when Mr. R. Hammer, Manager, called on Tuesday and asked him who worked for Kenny the previous day. When Smail told him that it was himself, since a close friend of mine died and I had to go, he gave him hell for not making me stay. Why keep me past my shift, and an evident desire to help by staying an hour longer, when he had Julio available and both of us would have to be paid overtime? Obviously, Mr. Hammer was retaliating against me for my complaint to the N.Y.S. Human Rights Division and wanted to make my life as miserable as he could.

This letter is harrasment of the worst sort, full of fabricated inaccuracies, surpassing all individual harm done to me heretofore. Such a dishonest practice is bound to fail ultimately.


CC: NYC Human Rights Division                                  Respectfully,
      AFL-CIO 32B and 32J
      Mr. Smail Ibricevic, Supt.

                                                                      Miodrag Beljakovic
                                                                      Doorman, 365 W.E.A.

# MELOHN PROPERTIES, INC.

24

1995 BROADWAY
NEW YORK, NY 10023
(212) 787-2500

August 9, 2001

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208

Dear Mr. Beljakovic:

We are in receipt of your request for time off starting September 29th to October 25th, 2001. The request is denied.

At the beginning of the vacation period you indicated that in lieu of taking your vacation you desired to be paid and would work through your vacation. Therefore the only basis for time-off would be an application for a leave of absence.

Very truly yours,

Robert Hammer, Agent

2, 3, 5                                    **BEL 13**

# MELOHN PROPERTIES, INC.

25

1995 BROADWAY
NEW YORK, NY 10023
(212) 787-2500

**CERTIFIED MAIL RETURN RECEIPT**

August 9, 2001

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208

Dear Mr. Beljakovic:

Your letter addressed to Mrs. Melohn has been given to me for reply.

We have previously written to you explaining that the Melohns are tenants in the building and your only relationship to the Melohns is that of a doorman. We remind you that there is a chain of command in the building management. If your superintendent cannot satisfy any complaint you may have you may wish to see your Union Delegate, or even write me, however we repeat <u>you may not write</u> the Melohns.

If you persist in doing so, it will result in disciplinary action.

Very truly yours,

Robert Hammer, Agent

2, 3, 5, 6

**BEL 14**

Melohn Properties Inc.                                    September 2, 2001
1995 Broadway, 14th Fl.
New York, N.Y. 10023

Attn: Mr. Robert Hammer, Agent

Gentlemen:

This is in reference to your letter of August 9, 2001 concerning a certain letter to Mrs. Melohn turned over to you for answer. I do not remember writting any letters addressed to Mrs. Melohn recently. Here again, you are distorting the facts to suit your needs and accusations against me, instead of addressing the real issues I am possing to my employer. As you know, I work for Melohn Properties, Inc. and not for Con Edison or Post Office and my replies to your letters or additional grievances are addressed to them. I do not see any problem here, except that you are treating it as one. I believe that it is very pretentious (if not illegal) for you to order me whom to write or not.

In pursuing relentessly your harrasing and discriminatory campaign against me by telling me that "the Melohns are tenants in the building and your only relationship to the Melohns is that of a doorman", you are actually applying double standards.

Mr. Al Melohn is not a tenant when he regularly tells me to do this or do that, or pass his orders to the Super or other doorman what he wants them to do. Almost every morning when I come in I am told by the previous doorman to wake him up at the certain time. Once he ordered me to polish a brass pole of the canapy when the outside temperature was over 90 degrees and there was a danger that I might fall from the ladder on which I had to climb several steps to do that. Other "tenants" do not give us such orders.

I respect the Melohn family as owners and tenants. To us as doormen they appear in both capacities, which is their right. Please explain, what is wrong if I write to them to get remedy for grievances I feel very strongly about in light of the fact that they are ones who sign my paychecks?

In order to avoid correspondence of this sort, please let me know to whom I should write in the future if I have employment problems which I think should be dealt with at the highest corporate level?

Respectfully,

Miodrag Beljakovic, doorman
at 365 W.E.A.

CC: Mr. Joseph Helmreich, Manager
AFL-CIO 32B-32J

2, 3, 4, 5                              **BEL 15**

27

Melohn Properties, Inc.                                    Elizabeth, N.J., September 7, 2001
1995 Broadway, 14th Fl.
New York, N.Y. 10023

Attn: Mr. Robert Hammer, Agent

Gentlemen:

    I refer to your letter of August 9, 2001 denying me my request for late vacation, from Sept. 29-October 26, 2001. Thanks to your insensitivity and evnident prosecutory attitude against me, I will not be able to attend commemoration of the sixtieth anniverasary of the death of my father, executed by the Nazi's on October 21, 1941.

    Worst of all, you are justifying your decision on the incorrect premise that by taking vacation money in May, I forfeited my right to go on vacation at all. When I asked the Superintendent for that money, I never "indicated that in leu of your vacation you desired to be paid and work through your vacation", as you indicated in your letter. To take money in advance and then go on vacation later is a practice most of us used over the years, and nobody ever questioned that.

    EVEN THIS YEAR, MY COLLEAGUE MR. LLOYD ADOLTON, PORTER, TOOK HIS MONEY IN MAY AND WENT ON A TWO-WEEK VACATION IN FLORIDA IN LATE AUGUST. YOU NEVER MADE AN ISSUE OF THAT.

    THEREFORE, YOU ARE DISCRIMINATING AGAINST ME, SIR.

    I certainly cannot ask for a leave of absence of three weeks this year and lose my right to get four months next year, which I intend to do.

Respectfully,

Miodrag Beljakovic,
doorman at 365 West End Avenue

CC: Mr. Joseph Helmreich, Manager
AFL-CIO Local 32B and 32J

2, 3, 4, 5, 8      **BEL 16**

# MELOHN PROPERTIES, INC.

28

1995 BROADWAY
NEW YORK, NY 10023
(212) 787-2500

**CERTIFIED MAIL RETURN RECEIPT**

September 17, 2001

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208

## REPRIMAND

Dear Mr. Beljakovic:

We are hereby reprimanding you for insubordination and failure to perform your doorman duties.

We intend to run our building the way we see fit.

If we decide, certain people like Mr. Al Melohn are to have special privileges like wake-up calls, that is our business only, and your duty to carry out.

You are also to carry-out any other commands by Mr. Al Melohn in conjunction with your doorman duties,..... that is your job.

If you don't do your job, you will be dismissed forthwith.

Further, your letters have a damaging effect on people's health. Please do not misunderstand my letter to you of August 9, 2001, you are not to write to anyone whatsoever at Melohn Properties with the exception of Robert Hammer. If you are unhappy, you can grieve with your Union Delegate. One more letter to anyone at Melohn will result in a summary dismissal.

Very truly yours,

Robert Hammer, Agent

2, 3, 5, 6                    **BEL 17**

29

# ST. LUKE'S-ROOSEVELT EMERGENCY DEPARTMENT RECORD - ROOSEVELT

| PATIENT | | | | |
|---|---|---|---|---|
| NAME BELJAKOVIC, MIODRAG | SEX M | AGE 72 | DOB 12/08/1929 | MR# 00004391983 | ACCT.# 424944643 |

ADDRESS 223 PARK AVENUE   CITY ELIZABETH   ST NJ   ZIP 07208   PHONE 908-353-6181   MS M

SS# 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   ACC. BY WA   ACCID/ILLNESS (DATE & TIME) 04/08/02 12:54P   HOSP# 9C00690   DATE IN 04/08/02   TIME IN 01:53P   DATE DUE 4/1/0   TIME OUT

EMERG. CONTACT BELJAKOVIC, MELISSA   451   PHONE 908-353-6181   CLERK IN IC6   CLERK OUT

EMPLOYER'S NAME MELON PROPERTIES   TELEPHONE NO.

| INSURANCE | FINANCIAL CLASS | DESCRIPTION | GROUP # | POLICY # |
|---|---|---|---|---|
| | PTB | MEDICARE | | 086341307a |
| | BL1 | BLUE CROSS/BLUE SHI | | 086341307 |
| | SF1 | SELF PAY | | |

TIME OF INITIAL EXAM    PRINT NAME ___ M.D.   USUAL SOURCE OF CARE/MD   ADDRESS/PHONE   ☐ NOTIFIED
AM PM

CHIEF COMPLAINT:

PAST HISTORY: SEE CPEP

MED:   SURG:

FAMILY HISTORY:

HISTORY AND PHYSICAL EXAM:

| IMMUNIZATION AND SKIN TESTING | DATE | DATE | DATE | DATE | DATE |
|---|---|---|---|---|---|
| DTP | | | | | |
| OPV OR IPV | | | | | |
| MMR | | | | | |
| HIB (TYPE) | | | | | |
| Tuberculin (Type) | | | DT Pediatric | | |
| TET-TOX (TT) | | | Td (Adult) | | |
| HEP B | | | | | |
| HBIG | | | GAM GLOB | | |
| VZIG | | | REGISTERED IN SCHOOL | | |
| OTHER | | | | | |

| | RDS | NL | ABN |
|---|---|---|---|
| SKIN | | | |
| E.N.T. | | | |
| EYES | | | |
| HEAD | | | |
| NECK | | | |
| CHEST | | | |
| HEART | | | |
| LUNGS | | | |
| ABD | | | |
| EXT. | | | |
| RECTAL | | | |
| GENITAL | | | |
| NEURO | | | |
| BACK | | | |

| LABORATORY | | | |
|---|---|---|---|
| ☐ CBC | #1 | #2 | |
| WBC | | | |
| HgB | | | |
| Hct | | | |
| Plts | | | |
| ☐ PT | ☐ PTT | | |
| ☐ Cultures | | | |
| ☐ T&C UNITS | | | |
| ☐ T+S | | | |
| ☐ VDRL | | | |

| ☐ URINE GLUC | |
|---|---|
| Bili | |
| Ketones | |
| Sp.gr | |
| Hgb | |
| pH | |
| Protein | |
| WBC ___ RBC ___ | |
| ☐ PREG ☐ POS ☐ NEG | |

| ☐ CHEM 6 | #1 | #2 |
|---|---|---|
| Na | | |
| K | | |
| CL | | |
| CO2 | | |
| GLU | | |
| BUN | | |
| ☐ CREAT | | |
| ☐ AMYLASE | | |
| ☐ CA | | |
| ☐ ADMIT | | |
| ISO'S CPK ___ LDH ___ % MB | | |

| ☐ BLOOD GAS | pH | pCO2 | pO2 | HCO3 | BiO |
|---|---|---|---|---|---|
| TIME | | | | | |
| TIME | | | | | |
| TIME | | | | | |

| ☐ PULSE OXIMETER | %SAT | INTERPRETATION |
|---|---|---|
| TIME | | ☐ HYPO ☐ NON 1 |
| | | ☐ HYPO ☐ NON 1 |

EKG: ___

3, 4, 5, 7

**BEL 18**

30

## ST. LUKE'S-ROOSEVELT
### EMERGENCY DEPARTMENT

| TRIAGE ASSESSMENT |
|---|

*TRIAGE TIME*

100004391885
BELJAKOVIC, MIODRAG
#    12    12/08/1929 451
1234944643 2002 APR -8 P 12: 54
04/08/02

**EMERGENCY DEPARTMENT TRIAGE ASSESSMENT**

PATIENT PLATE

PATIENT NAME *Beljakovic, Miodrag* (PRINT)  DOB *12 8129*  SEX ☐M ☐F  OLD CHART REQUESTED? ☐NO ☐YES TIME:

DISPOSITION CODES: ☐MED ED ☐FASTRACK ☐PEDS ☐PSY ☐L&D ☐DENTAL   LMP .   PAD CT.
☐EMERGENT ☐URGENT ☑NON URGENT   IMMUNIZATIONS CURRENT: ☐YES ☐NO  WEIGHT ___ Kg ___ lbs.

ALLERGIES: ___ ☑NKA  VIA: ☐AMB ☑WALK IN ☐POLICE  LAST Td

| VS | B/P | PULSE | ☐REG | RESP. | TEMP | ☐PO | O2 SAT | PF |
|---|---|---|---|---|---|---|---|---|
| | 190/96 | 108 | ☐IRRE | 20 | OK | ☐R | 97 | |

ONSET DATE:   ONSET TIME:
OBJECTIVE ASSESSMENT: A/OX3 ☑YES ☐NO  A/ACTIVE ☐ ☐YES ☐NO

**REASON FOR VISIT (SUBJECTIVE)** *incident at work, very upset, wants tranquilizer.*

MEDICATIONS: ∅

USUAL SOURCE OF CARE: ∅

HISTORY: ☐HTN ☐MI ☐COPD ☐SEIZURE ☐DM
☐SUBSTANCE ABUSE ☐ASTHMA ☑NONE

OTHERS:

INITIAL MD CONTACT  Time ___
☐ C-spine Clinically cleared : C-collar & Backboard Removed

*Pt speaks easily, appears cooperative*

PAIN DURATION ___
PAIN LOCATION ___ ☐NONE
RADIATES TO: ___
QUALITY ☐PRESSURE ☐SHARP ☐INTERVENTION
☐CRAMPING ☐DULL ☐HEAVY
☐CONSTANT ☐ACHE
OTHERS: ___

MD SIGNATURE ___

**INITIATION OF DIAGNOSTICS (Lab, Xray, EKG)**

RN ☐   MD ☐

NURSING ☐ICE PACK ☐WOUND CARE ☐EKG
INTERVENTION ☐SLING OTHERS: ___

TRIAGE SIGN ___ RN
TRIAGE PRINT ___ RN

| DIPSTICK | | MEDS GIVEN | | |
|---|---|---|---|---|

| URINE | SENT BY | TIME | | SENT BY | TIME SENT |
|---|---|---|---|---|---|
| C/S | | | CBC | | |
| PREG | | | CHEM7 | | |
| U/A | | | PT | | |

MD SIGNATURE ___

**RADIOLOGY PROTOCOLS**
INITIATED ☐YES ☐NO
AREA IMAGED ___
TIME ___

| | | | T & C | | |
|---|---|---|---|---|---|
| | | | LEVELS | | |
| | | | BETA HCG | | |
| | | | FS | | |

EKG CHECK BY: ☐TO ED
MD ___
TIME: ___

TIME TO ED TREATMENT
AREA:

**TRIAGE REASSESSMENT**

| TIME | B/P | PULSE | RESP. | TEMP. | O2 SAT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

| TIME | B/P | PULSE | RESP. | TEMP. | O2 SAT |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

SIGNATURE: ___ RN

EEOC Form 161 (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

31

## DISMISSAL AND NOTICE OF RIGHTS

To:  Miodraq Beljakovic
925 Park Avenue
Elizabeth, NJ 07208

From:  New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-A3-01820 | Spencer H. Lewis, JR, District Director | (212) 336-3620 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒ Other (briefly state)   **Charging Party is pursuing matter in State Court.**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Spencer H. Lewis, JR,_
Director

2-27-04
*(Date Mailed)*

Enclosure(s)

cc:  MELOHN PROPERTIES, INC.
Personnel Director
1995 Broadway 14th Floor
New York, NY 10023

None

**BEL 19**

32

July 21, 2004

Mr. Miodrag Beljacovic
925 Park Avenue
Elizabeth, NJ 07208-1131

Mike,

It is with great pleasure ...... and conviction that I write to you today to offer you my support in seeking a more tolerable situation at your place of work – 365 West End Avenue. This address has been my place of residence for approximately 13 years, and I have known you over that period of time in your capacity as doorman. I have known you to be a kind, personable, dedicated member of the staff and a great person. You have shown great consideration to me, my family, and my guests.

Since I have known you, you have conducted yourself professionally and have always shown great concern for those of us who live here. This is every bit as true today as it has been over the years that I have known you, and for that I am very grateful. I know many of my neighbors who feel the same way.

Mike, I am sorry that you are being pressured and treated poorly by the Melohn organization, but frankly, I am not surprised. My own experiences with them have been unnecessarily strained from the start. (I would be willing to elaborate on my personal experiences regarding their tactics if that would be useful to you.) While I love the building and the staff here I have found the treatment by Melohn Properties to be sub par, and often unfair and surprisingly aggressive.

Please contact me, Mike, if I can be of service to you in your efforts to seek fair treatment.

Sincerely,

Stephen R. Rippon
365 West End Avenue (11D)
New York, NY 10024
212-799-5781

4,5                                                        **BEL 20**

Denise Sassoon
365 West End Avenue 1E
New York, NY 10024

July 21, 2004

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208

Dear Mike,

Your steady employment and record of service speak for themselves. The service that I have come to expect from you has been consistent throughout the time that I have lived here. I'd like to personally thank you for the help you have given me over the years, and I know that I can continue to count on the same courteous and professional service I have always received. I admire your commitment to your job and look forward to your continued service in the years ahead.

Best wishes,

Denise Sassoon
Tenant 365 Apt. 1E

4,5            **BEL 21**

34

7/22/2004

365 West End Avenue, #904
New York, N.Y. 10024

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208

Dear Mike:

I was very saddened, and disturbed, to hear about the troubles with your employer,
Melohn Properties, Inc.

As you may or may not know, I too have had several negative interactions with them. I
have been forced to go to court, and have been hassled by them numerous times under
frivolous pretenses, such that in the first go-around, taking place between 1995 and 1996,
they settled out-of-court rather then proceed further. At present, we are still supposed to
meet with a Jewish court/"beit din" to adjudicate outstanding claims since the year 2001.

Mike, countless times numerous tenants in the building have all shared "nightmare"
stories about their interaction with Melohn Properties. I am certain that were everyone in
the building to band together and not fear the hassle or the threats of intimidation, and
tolerate/afford the legal costs, that Melohn Properties would settle very quickly rather
than have patterns of intimidation and frivolous complaints revealed before all, in public
and on the record.

I share this with you, "putting it out on the table", lest anyone reading this "reveal" that I
am hiding something. This is being shared so that no one should think I am hiding
anything, and to share that despite the above, what I share with you in this letter is as
honest and fair as honest and fair can be. Nothing I say is an iota away from the truth,
and can not be dismissed simply because I have been in prior legal tangles with Melohn
Properties. God knows how many people from our building that would disqualify were
that to be the standard.

Mike, since I moved in over ten years ago, you have been a steady and responsible
attendant as a doorman at 365 West End Ave. You regularly assist me with my luggage
and bags when I enter or exit the building with them, and regularly and consistently are
you helpful, lugging items to the elevator, and patiently waiting there for me until I pick
up my mail, holding my dry-cleaning as well. Frankly, I am also amazed at all you have
accomplished in your spare time, including recently completing writing a several-
hundred page book on the war earlier this century in your homeland. I, and tenants who
have been with me as we spoke with you about it, are all, when we speak afterwards in
the elevator, astonished and marvel at your accomplishments.

**BEL 22**

4,5

Mike, you regularly meet me with a smile and a kind verbal greeting, you stand with me chatting about topics of mutual interest, and you strike me as one of the most spry and physically-able 74 year-old men I have met.

In closing, Mike, it is both, while sadly not surprising, distressing to hear of the actions being taken against you, and ludicrous to think that there is any merit to them. I would hope that Melohn Properties would retreat from pressing forward with what strike me as baseless complaints. At the same time, you need to do this, for perhaps only in court will you finally be relieved of their harassment, and vindicated in your position and claim.

Mike, you are a terrific doorman, capable, competent, responsible, kind, engaging and helpful, especially with the physical tasks that being a doorman requires. I look forward to many years of interacting with you in your position as a doorman at 365 WEA.

Please do not hesitate to contact me if I can be of any assistance to you.

Sincerely,

Rabbi Uri Gordon
Director, The Jewish Teacher Corps
Tenant at 365 WEA, apt. #904

36

**DR. AND MRS. ROBERT ROSENBLUM**
**365 WEST END AVENUE**
**NEW YORK, NY 10024-6511**
**Tel/Fax 212-595-1179**

July 27, 2004

To Whom It May Concern:

As tenants at 365 West End Avenue since 1963, we have been blessed by the wise choices the landlords have made in hiring and maintaining many fine people as doormen. In fact, it has not been unusual for these men to work here for decades.

The dean of the present corps of doormen is Miodrag Beljakovic, who is known familiarly as "Mike." Because he has been at his post for about 20 years and remains a model, it is a pleasure to provide a reference for him.

Mike is totally reliable, helpful, and discreet. He can be trusted with keys, mail, messages, etc.—anything that falls within what one can expect from a person who guards the door and greets guests. Further, he can always be counted on to help load and unload heavy packages from elevator to automobile. Finally, he limits his conversation to matters that are not personal, though it is a treat to engage him in discussions that draw on his deep knowledge of history and politics.

It is our hope that he will continue in his present post for many more years.


Robert Rosenblum

Lila S. Rosenblum

4,5                    **BEL 23**

37

Barbara Kristaponis
365 West End Avenue #14C
New York, New York 10024

July 30, 2004

Miodrag Beljakovic
925 Part Avenue
Elizabeth, New Jersey 07208

Dear Mike,

I have been a tenant for more than twenty years in this building and have found you always to be reliable, trustworthy, responsible, and attentive to your duties as doorman at 365 West End Avenue. You have also been responsive, cordial, helpful, and respectful in your interactions with me, and in your interactions with other tenants, visitors, delivery persons, etc. that I have had occasion to observe. In addition, over the past few years, I have not noticed any change in your abilities or lessening of attention to me or to other tenants in your responsibilities as doorman for 365.

I thank you for your always-friendly disposition and look forward to your continued work here.

Sincerely,

Barbara Kristaponis

Barbara Kristaponis

4,5                     **BEL 24**

38

**Rudi Lawrence, Blanche Foster**
**365 West End Avenue, Apt. 104**
**New York NY 10024**

August 1, 2004

Miodrag (Mike) Beljakovic
925 Park Avenue
Elizabeth NJ 07208

Dear Mike:

RE: <u>Character Reference</u>

It gives us great pleasure to write a character reference on your behalf. I have been a tenant at 365 West End Ave., Apt. 104, since the early sixties; my sister has shared the apartment with me for more than a decade.

Over the years, without reluctance, you have been consistently considerate, courteous, honest, helpful and observant as a doorman of the building--A true gentleman, displaying traditional values with a Continental/European demeanor! Your proven ability to exercise good judgment is reassuring for the well-being of ourselves as tenants. Also, we have never seen any physical or mental impairment that could prevent you from performing the same duties of your job as always.

Very truly yours,

Rudi Lawrence

Blanche Foster

4, 5                         **BEL 25**

39

**Ellie Morgenstern**
**365 West End Ave. #603**
**New York, NY 10024**
**212-799-0153**

August 2, 2004

Re: Miodrag "Mike" Beljakovic

To whom it may concern:

I have lived at 365 West End Avenue for the entirety of Mike's tenure as doorman there. During this time, I have never had reason to question his willingness or ability to perform any of the duties associated with his position. He closely monitors the door, is courteous toward tenants and visitors, and does not hesitate to assist with luggage or deliveries. He is always in good humor and regularly goes out of his way to help — for example, calling on the intercom when he sees that a good parking space has become available.

Mike's performance on the job has been consistent throughout the years. To my knowledge, he is in good health; certainly, no problem has interfered with his physical or mental approach to work. And I have seen no indication that his capacities have declined in any way with age. He has never refused or appeared reluctant to help with any request I have made over the years, and I have never observed such an incident with any other tenant. In fact, unlike some younger doormen in the building, Mike is always on his post and attentive, never wandering off or talking on the phone.

Mike is an excellent and fully capable doorman, and I have no doubt that he will continue to be in the future.

Sincerely,

Ellie Morgenstern

4,5        **BEL 26**

40

Josephine Wright MD & Richard Gottlieb MD
3C
365 West End Avenue
NY, NY 10024

August 3rd, 2004

To Whom it May Concern:

Re: Mr. "Mike" Belkjavic

We have known Mr Belkjavic for the over 20 years we have lived in this apartment.

He is a courteous, diligent & competent doorman. We trust him totally & find him very helpful in all his capacities as doorman, and recommend him highly for continued employment.

In our experience of him he is fully competent physically, mentally, and professionally to fulfil the position requirements as doorman.

Yours truly

Josephine Wright & R McGottlieb

**BEL 27**

4,5

41

August 3, 2004

To Whom It May Concern:
Subject: Miodrag (Mike) Beljakovic

Ever since my arrival as a
tenant at 365 West End Avenue
(1991), Mike, as doorman, has been
an important asset to the efficient
running of the building. He remains
to the present day a very effective
doorman. He is continually helpful
and cheerful and goes out of his
way to be of service to the
tenants. My experience with Mike
has always been positive. He is an
extremely intelligent individual
with a highly pleasant personali

4.5    **BEL 28**

42

365 West End Avenue/6C
New York, NY 10024
August 4, 2004

Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208

Dear Mike:

I want to take this opportunity to thank you for all the many courtesies that you've extended to me all these years.

You're always available to help unload the car when I return from Connecticut with bags and loads of groceries. You help me so often when I'm loaded down with packages and you carry them to the elevator for me. When my daughter visits one weekend per month, you always help her unload the bags and her two cat cases from her car. And you always perform these tasks with a smile.

I cannot adequately express how much you're appreciated and how wonderful it is to have you greet me at the door and how you rush to open the door of my car service when I'm going to work.

Thank you so much, and God bless you.

Respectfully yours,

George Anthony Terzian

4,5          **BEL 29**


JOHN CORIGLIANO

365 west end avenue, new york 10024  •  voice 212.580.0512  •  fax 212.580.3061  •  valhallapr@aol.com

43

August 6, 2004

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ  07208-1131

Dear Mike,

Both Mark and I are happy to endorse your work at the door at 365 West End Avenue.  We've always found you courteous, attentive, careful, and efficient, whether managing the mail that arrives for us at home, screening our visitors, or helping us with luggage as we leave for this or that trip on our increasingly busy travel schedule. You've always appeared perfectly equal to the demands of the role, and both of us wish you continued success therein.

Yours,

John Corigliano
Mark Adamo

4,5          **BEL 30**

VALHALLA *productions, inc.*

44

**365 West End Avenue, Apt 11A**
**New York, NY 10024**

August 8, 2004

To Whom It May Concern:

I have known Mike (Miodrag Beljakovic) for 18 years, ever since he came to our apartment house as one of our doormen. He has always been unfailingly pleasant and helpful, performing all his duties as a doorman impeccably and willingly. He is especially appreciated by me and my family (and probably by other families in the  building} because of his love for children. My grandchildren invariably look forward to being warmly greeted by Mike as they come and go. Such social skills are not common among doormen but contribute in an important way to the positive atmosphere of the building.

Doris B. Wallace

4,5          **BEL 31**

**H. Lawrence King**
**365 West End Avenue**
**New York, NY 10024**

45

August 12th, 2004

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208-1131

Dear Mike,

I have lived in 365 West End Avenue for 28 years. In my recollection, this building has always been staffed with highly competent and personable people. I don't recall exactly when you started to be a doorman here, but I do know that you fit right in with, and complemented, this wonderful staff.

You have always been helpful, handing me any mail too large for my mailbox as I walked into the building and informing me when the mail had not yet been delivered. You anticipated my needs-- I didn't have to ask.

You opened the door for my wife, for others and for me; you took messages when necessary for people leaving or picking-up packages for me, and you were both spry and cheerful.

I never saw you hesitate to help anyone or have any physical hesitation or impairment because of your age or for any other reason. I always thought you were much younger than what you have told me.

My wife liked you and you also were compassionate and understood my sorrow when my wife died. People like you, who understand emotions, are rare and very important to retain.

I admire your intelligence and was especially impressed by your former career and high standing in the country where you were born when you showed me some of the material you had brought back from your vacation there.

I know of no reason for you to be made to leave your position here and hope you will be here for many years to come.

Sincerely,

H. Lawrence King

4,5                                    **BEL 32**

46

# Kucker & Bruh, LLP
### ATTORNEYS AT LAW

747 THIRD AVENUE
NEW YORK, NY 10017

212-869-5030
FAX 212-944-5818
www.kuckerandbruh.com

SAUL D. BRUH
ALAN D. KUCKER
PATRICK K. MUNSON
JAMES R. MARINO
NATIV WINIARSKY
JOSHUA C. PRICE
ANDREW B. BITTENS

JENNIFER A. ECKER
JOHN M. CHURNEFTSKY
MELISSA T. WOODWARD
JODI M. MATERNA
VICTORIA DANG
MYRON WINIARSKY
JASON S. GARBER

OF COUNSEL:
ABNER T. ZELMAN
WILLIAM D. HUMMELL
CATHERINE A. HELWIG†

†ALSO ADMITTED IN N.J.

September 15, 2004

Mr. Miodrag Beljakovic
927 Park Avenue
Elizabeth, New Jersey 07208

RE:    Physical Disability

Dear Mr. Beljakovic:

As you are aware, this office represents the owner Melohn Properties, Inc.   After reviewing your application for worker's compensation, it is apparent that you are claiming "you can no longer lift heavy objects."

As you are further aware your job duties at the building include lifting, carrying, pushing and other physically strenuous activity. As such your return to work will have to be preceded by a physician's letter permitting your resumption of all the duties associated with your job inclusive of "heavy lifting."

In accordance with this request you have a choice of submitting to a medical examination at the Health Center to determine the extent if any of your physical incapacity to perform your duties or a medical examination by a physician designated by Melohn Properties, Inc. at no cost to you.

In the event it is determined you will no longer be able to physically perform all your duties, without exception, you will be terminated for physical inability. Any termination benefits will be governed by the RAB agreement effective April 21, 2003. If you have any questions please refer them to this office.

Very truly yours,

Saul D. Bruh.

cc:    Robert Hammer
       Chaim Braun

4, 5                    **BEL 33**

SDB/jl

47



# TRINITAS
## DIAGNOSTIC IMAGING

415 Morris Avenue • Elizabeth, New Jersey 07208 ☎ Phone 908-351-7600 • Fax 908-351-4406

October 4, 2004

James H. Frost, MD
700 North Broad Street
Elizabeth, NJ 07208

Re:    Miodrag Beljakovic
       #79477
       DOB: 12/8/29
       Date Of Study: 10/1/04
       DD:   10/1/04

Dear Dr. Frost:

**CT SCAN OF THE ABDOMEN AND PELVIS:**
Precontrast axial images were obtained through the abdomen and pelvis. Repeat axial images were obtained following the oral and intravenous administration of contrast material.

There is a densely calcified stone within the gallbladder. The gallbladder is otherwise normally distended. A hypodense lesion is present within the periphery of the right lobe of the liver too small to characterize on this study. The spleen, pancreas, bilateral adrenal glands and kidneys are normal and nonfocal. There is no evidence of hydronephrosis.

The stomach and small bowel are normal. Small left greater than right inguinal hernias are present. The colon is normal. The urinary bladder and prostate gland are unremarkable. There are no focal masses or fluid collections within the pelvis.

The anterior abdominal wall is normal. There is no evidence of focal abdominal wall or subcutaneous mass. There is no evidence of hernia. The lung bases are clear.

**IMPRESSION:**
1. CHOLELITHIASIS.
2. CIRCUMSCRIBED HYPODENSE LESION TOO SMALL TO CHARACTERIZE ON THIS STUDY. FOLLOW-UP IS RECOMMENDED IN THREE TO SIX MONTHS TO CONFIRM STABILITY.
3. SMALL INGUINAL HERNIAS. THERE ARE NO MASSES OF THE ANTERIOR ABDOMINAL WALL. THERE ARE NO VENTRAL HERNIAS OR OTHER DEFECTS TO CORRELATE WITH REPORTED ABNORMALITY IN THE RIGHT ANTERIOR ABDOMINAL WALL BETWEEN THE LEVELS OF THE UMBILICUS AND RIGHT GROIN REGION.

Sincerely,

David Wirtshafter, MD

DW/tlh

4,5,7        **BEL 34**

48

10/13/04
To: Julio Peralta, Miodrag Beljakovic, Safet Kukaj

From: Robert Hamner

The following changes have been made to the 365 West End Ave schedule effective October 23, 2004.
The changes are mandatory.

| | Sat | sun | mon | tue | wed | thu | fri |
|---|---|---|---|---|---|---|---|
| Julio Peralta | 7am To 3pm | 7am to 3pm | 7am to 3pm | off | 7am to 3pm | off | 7am to 3pm |
| Mike Beljakovic | 3pm to 11pm | off | off | 7am to 3pm | 3pm to 11pm | 3pm to 11pm | 3pm to 11pm |
| Safet Kukaj | | | | | | | 7am to 3pm |

49

Mr. Joseph Helmreich, Manager                    Elizabeth, October 14, 2004
Melohn Properties, Inc.
1995 Broadway, 14th Fl.
New York, N.Y. 10024                             Re: Change of Work Schedule

Dear Mr. Helmreich

     As you know, I have been a doorman at Melohn Propertiers, Inc. building at 365 West End Avenue, almost 20 years. And, as every beginner, the first seven years I worked the nights and afternoon shifts, which are more streneous for everyone. Slowly, as one worker died and another left and new workers came, I worked my way up to the shift, starting four times in the morning, on Saturday, Monday, Tuesday and Friday (7 a.m.- 3 p.m.), and once, on Wednesday, the afternoon (3 p.m.-11 p.m.), THIS SCHEDULE WAS IN FORCE FOR OVER TEN YEARS.

     Suddenly, and without any reason known to me, yesterday, on Wednesday, October 13, when I started my afternoon shift, my coworker Julio Peralta came from the Office and brought us from Mr. Robert Hammer, Agent, a change of work shifts for Julio, myself and Sam Kukaj, a porter (who works only one day at the door). According to the new schedule, my work hours were changed to work only ONCE IN THE MORNING, Tuesday (7 a.m.- 3 p.m.) and FOUR TIMES IN THE AFTERNOON, Saturday, Wednesday, Thursday and Friday (3 p.m.-11 p.m.). A copy of the respective memo, effective October 23, 2004, is enclosed.

     How this will change a routine of my life, the one I was accustomed to over the years, and at the last leg of my work life, is quite evident.

     Therefore, I consider the above change of my work schedule as absolutly unjustified and a new, cruel case of HARASSMENT and RETALIATION by my employer, for filing complaint against them in Federal Court.

                                           Respectfully,

CC: Mr. Smail Ibricevic, Superintendent

                                      Miodrag Beljakovic
                                      925 Park Avenue
                                      Elizabeth, N.J. 07208-1131

50

# MELOHN PROPERTIES, INC.

1995 BROADWAY
NEW YORK, NY 10023
(212) 787-2500

October 15, 2004

TO: JULIO PERALTA & MIODRAG BELJACOVIC

FROM: ROBERT HAMMER, AGENT

RE: SCHEDULE CHANGE EFFECTIVE 10/22/04 AND CANCELLATION OF
CHANGES DATED 10/13/04. DISREGARD THE MEMO OF 10/13/04.
THE FOLLOWING MANDATORY CHANGES WILL TAKE EFFECT 10/22/04.

THE FRIDAY AND SATURDAY SCHEDULE BETWEEN EMPLOYEES PERALTA
AND BELJAKOVIC WILL BE REVERSED.

THE NEW SCHEDULE IS:

| NAME | FRIDAY | SATURDAY |
|---|---|---|
| JULIO PERALTA | 7:00 AM TO 3:00 PM | 7:00 AM TO 3:00 PM |
| MIODRAG BELJACOVIC | 3:00 PM TO 11:00 PM | 3:00 PM TO 11:00 PM |

cc: 32 BJ

5                    **BEL 37**

51

Mr. Robert Hammer, Agent                              Elizabeth, N.J., October 18, 2004
Melohn Properties, Inc.
1995 Broadwy, 14th Fl.
New York, N.Y. 10023

<u>RE: Change of Work Schedule</u>

Dear Mr. Hammer

 Following my complaint of October 14, 2004, my work schedule was changed again, assigning me to work three days in the afternoon instead of four, as ordered in your memo of October 13, 2004.  A copy of your new memo of October 15, 2004 is attached.

 The existing schedule, IN FORCE FOR MORE THAN TEN YEARS, can be changed, according to the Union rules, only in case of some hardship in the building, which we obviously do not have. FOR THE LAST FIVE YEARS THERE WERE NO PERSONNEL CHANGES EITHER. What caused this now, I would like to know? And, why am I being singled out with new work schedule which is absolutely unsuitable to me and would be altering all my home life?  Now, only several years before retirement, and at the time when I was hurt at work with hernia?

 This change, imposed on me to work three afternoons instead of one I worked until now, I perceive as retaliating, harassing and punishing and I hereby lodge my protest against it again.Therefore, I ask you to reconsider your decision and return us to the old schedule, which was agreed upon between us  and was never before done by the Office.

 Thanking you in advance for your kind consideration, I remain

            Respectfully,

CC: Mr. Joseph Helmreich, Manager
 Mr. Smail Ibricevic, Superintendent and   Miodrag Beljakovic
 AFL & CIO Union 32B & 32J     925 Park Avenue
            Elizabeth, N.J. 07208-1131

4,5,7  **BEL 38**

52

Mr. Robert Hammer, Agent                Elizabeth October 28, 2004
Melohn Properties, Inc.
1995 Broadway, 14th Fl.
New York, N.Y. 10023                     Re: Change of my Work Schedule

Dear Mr. Hammer

This is in response to your letter of October 19, 2004, by which you confirmed the change of my work schedule. I am in compliance with your order, but hereby would like to voice how I feel about this. To restate my previous position, I regard this change as discriminatory, harassing and retaliatory against me. It is also creating animosity among workers in the building. In my opinion, a duty of the Management is to smooth out the conflicts among the workers, if there are any (and we did not have them until now), and not to crete and fuel them. I do not want a confrontation with my colleagues and refuse to be drawn into it. But, I also have my civil and worker's rights to wory about.

The truth of the matter is quite different. The schedule we had in force for the past ELEVEN OR TWELVE YEARS was made at the request of Mr. Julio Peralta, my colleague. At that time, he wanted to go to the college and I voluntarily exchanged my Tuesday afternoon shift with him, giving him an opportunity to attend the morning classes. After only one semester, he dropped out of college, but never asked that we go back to the old schedule in which I worked two afternoons, Tuesday and Wednesday. The only thing he asked me occassionaly was that we exchange his Sunday morning shift, which I hesitated to do, because this is the time when I go to Church.

Now, Julio went to your office, the change was made and he brought us copies of a new work schedule. According to the change, MR. PERALTA WILL WORK FIVE DAYS IN THE MORNING, Saturday, Sunday, Wednesday, Thursday and Friday, with Monday and Tuesday, two consecutive days off. At the same time, I am ordered to work Saturday afternoon, Monday and Tuesday mornings, and Wednesday and Friday afternoon, with Sunday and Thursday, my two days off split up. So much for your "only consideration" in improving Julio's schedule, my "misreading of the situation", and that my complaints "could not be further (you meant farther) from the truth", as you indicated in your a/m latter.

Besides, Julio and myself, there are two more full-time doormen in our building, with less seniority than two of us. Maybe one of them, if asked, would have accepted the change of his shift to get to work one day during the day or afternoon, which would be a step up for them in preparation for a better shift when one of us leaves. Before changing the shift at my expense, you could have talked with the Superintendent who heretofore was making our schedules, but you ignored him completely as well. Finally, I would have accepted to work one more afternoon, in order to find an equitable solution for Julio, if I was asked. NO, MR. HAMMER, YOU DID NOT ASK ANYONE OF US, BUT ONLY CHANGED MY SHIFT ARBITRARILY, in line with the ongoing vendetta my employer is waging against me.

It is really touching how you suddenly became concerned with Julio's "lack of sleep" between the two shifts. This was known for years, and I never heard Julio complain about it. He often stays in the building after hours, in order to make some extra money from tenants, who ask him to go to

4,5

BEL 39

their apartments and attend to their pets or flowers while they are away. There is nothing wrong with that. Everyone is trying to make as much money as they can, in order to support their families and themselves. How come that now, when a bycicle of the owner's son is stolen in the building, this suddenly becomes an issue? Are you suspecting one of us in this outrage - so far very rare in our building?

To remind you, Sir, when the theft in the building occured, in early September, I WAS ON VACATION. And, now I am being penalized TO WORK THREE AFTERNOONS, as if I, or anyone of us, who works at the door, had anything to do with the theft. I believe that this incident is used only as a pretext for your squarring accounts with me, in a very petty and inhuman manner. How fair is it that I am put through this kind of mental torture, and weather this does or does not constitute a gross case of retaliation and harassment against me, we shall let someone else be the judge.

CC: Mr. Joseph Helmreich, Manager
    Mr. William D. Hummell, Esq.
    Mr. Peter Finn, RAB
    AFL & CIO Local 32B & 32J
    Mr. Smail Ibricevic, Superintendent

Respectfully,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208

54

Local 32B & 32J SEIU AFL CIO
101 Avenue of the Americas
New York, N.Y. 10213-0354

Elizabeth, N.J., March 12, 2005

Attn: Legal Department

Re: SS 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

Gentlemen:

    I am 75 years old employed as a doorman at 365 West End Avenue, New York, N.Y. 10024 for almost 20 years. In the last ten years, I had problems with my employer

            Melohn Properties, Inc.
            1995 Broadway- 14th Fl.
            New York, N.Y. 10024

who frequently discriminated, harassed and retaliated against me. We finally ended up in the Federal Court, where I have a case pending against them.

    However, after my case was filed and the litigation began, they continued to harass me and retaliated by changing my work schedule on October 23, 2004. There were no hardships in the building which, according to the Union rules, would have justified a change. Thus, instead of working one afternoon, on Wednesdays, and four times in the morning shift, as a second senior doorman in the building, I now work three afternoons (3 p.m.-11 p.m.), including Fridays and Saturdays and twice in the morning Mondays and Tuesdays (7 a.m.-3 p.m.). I am off on Thursdays and Sundays. This changed my whole way of life I was accustomed over the years. It prevents me from driving my wife home after work on Fridays, not to mention coming home late after midnight, after changing three ways of transportation.

    Another doorman, Mr. Julio Peralta, who has six years seniority over me, but is at least 20 years younger than myself and stays in the building for several hours after his shift anyway, doing odd jobs for some tenents,  was a beneficiary of this change. He now works five morning shifts and has Mondays and Tuesdays off.

    Up to now, the work schedules were made by the superintendent. This time, the change was made in the office, by Mr. Robert Hammer, Agent, under pretext that Mr. Peralta has to be given more time than 8 hours, betwen the two shifts on Saturdays and Sundays (the original schedule was made to suit  Mr. Peralta while he lived in the building). **Even though we have two other full time doormen with less seniority than me, this change was made solely at my expense.**

    Therefore, I am requesting that the Union take this matter up with my employer and return me to the same work-shift that I had  **for 11 years.**

    In expectation of you prompt action on my behalf, I remain

CC:  Mr. Joseph Helmreich, Manager
     of Melohn Properties, Inc.
     Smail Ibricevic, Superintendent

Respectfully,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208-1131

4, 5, 8

**BEL 40**

55

ENVIRONMENTAL CONTROL BOARD • NOTICE OF VIOLATION AND HEARING • FOR CIVIL PENALTIES ONLY
City of New York, Petitioner vs Respondent

LAST NAME (Print) _____ FIRST NAME _____ INITIAL ____ Sex ____

STREET ADDRESS ____ 365 West End Avenue

CITY ____ New York ____ STATE ____ NY ____ ZIP ____ 10024

TYPE OF LICENSE, PERMIT OR IDENTIFICATION NUMBER

- [ ] 1 Consumer Affairs License
- [ ] 2 Health Dept. License
- [ ] 3 Motorist Identification
- [ ] 4 Vehicle Plate
- [ ] 5 Meter Number
- [ ] 6 Soc. Sec. No.

- [ ] Cert. of Auth.
- [ ] 8 Build. Reg. No.
- [ ] 9 Telephone No.
- [ ] 10 Other

ISSUED BY
NYC

NOTICE ALSO SENT TO ____ FIRST NAME ____ INITIAL ____

LAST NAME (Print) NYCHC

STREET ADDRESS

CITY ____ STATE ____ ZIP

**The Respondent is charged with violation of Law/Rule**

Date of Offense 02/15/05   AM [ ] Time 850 PM [ ]   Borough ____   CB NO. 07   Violation Code ____

NYC ADMINISTRATIVE CODE/RULES OF THE CITY OF NEW YORK

- [ ] 1 "Air Code" Provisions
- [ ] 2 "Noise Code" Provisions
- [ ] 3 "Water Code" Provisions
- [ ] 4 "Sewer Code" Provisions
- [x] 5 Sanitation Provisions
- [ ] 6 General Vendor Provisions
- [ ] 7 Food Vendor Provisions
- [ ] 8 Transportation Provisions

OTHER CODES

- [ ] 9 Park Rules
- [ ] 10 Other
- [ ] 11 NYS Public Health Law
- [ ] 12 NYC Health Code Provisions
- [ ] 13 NYS VTL
- [ ] 14 Other

SECTION/RULE
16-118(2)

At [ ]   Front of [x]   Opposite [ ]   Place of Occurrence   365 West End Ave

DETAILS OF VIOLATION   Fail to clean 18 in into said
At TPO I did observe paper
napkins + trash stopped + candy
wrappers litter + litter plate
debris able to doorman scrip gateway

Property Removed [ ] Yes [ ] No   ALTERNATIVE SERVICE [x]
1-2 Family [ ]   Multiple Dwelling [x] 3   Commercial [ ]

Mail-In Penalty Schedule
$25 [ ] $50 [ ] $100 [ ] $250 [ ] Other [ ]   [ ] NO MAIL-IN PENALTY. YOU MUST APPEAR.
Vendor Multiple Offense Schedule (See Reverse Side) [ ] 9
See Date and Time Below:

Maximum Penalty For Violation
$300

8:30 AM   10:30 AM   1:00 PM   2:30 PM

Date of Hearing 29 Day Apr 5 [X] 200 ____

Proceedings will be held under authority of the N.Y.C. Charter, Section 1404, and the Rules of the City of New York at 15 RCNY Chapter 31.

WARNING: If you do not appear (or pay by mail if permitted) you will be held in default and subject to the maximum penalties permitted by law. Failure to appear or pay a penalty imposed may lead to suspension of your license or other action affecting licenses you now have or may apply for as well as the possibility of a judgment entered against you in Civil Court.

FURTHER INSTRUCTIONS ON REVERSE SIDE.

I am employee of the below agency, personally observed the commission of the civil violation charged above. False statements made herein are punishable as a class A Misdemeanor pursuant to section 210.45 of the Penal Law. Affirmed under penalty of perjury.

RANK (TITLE) SIGNATURE OF COMPLAINANT   SGT   REPORT LEVEL   141X017

COMPLAINANT'S NAME (Printed)   TAX REGISTRY NUMBER   AGENCY
C. Carson   911a-755-80

No. E 145 538 984

145 538 984

4,5

56

Environmental Contol Board          Elizabeth, N.J., March 17, 2005
Mail Adjudication Unit
66 John Street, 10th Floor
New York, N.Y. 10038

<u>Re: Sanitation ticket No. E 145 538 984</u>

Gentlemen:

     I was a doorman on duty in the building 365 West End Avenue, New York, N.Y. 10024, on Tuesday, March 15, 2005, about 9.00 a.m, when a sanitation officer came to me and immediately started to write a ticket, for sidewalk not being clean. While writing a ticket, a copy of which is enclosed, she told me that someone complained that the sidewalk was not clean. On a windy day when newspapers and other debris are flying around on the entire street, debries were in front of other buildings, some papers were on the sidewalk of our building as well. The ticket was given to me only. My explaining that I never received a ticket in the 20 years that I am a doorman in this building, that I clean my sidewalk all the time, that I did it in the morning when I came at 7 a.m. and that I would do it again when the wind subsided, did not help.

     This could have happened if there was not a strange history behind it. I filed complaints against my employer in Federal court about discrimination, harassment and retaliation in order to force me to retire. Since then, a pressure against me increased.  For example, about two months ago, a sanitation inspector came in his car, looked at my sidewalk and left. Several days later, the same inspector came again, looked at my sidewalk and commented: **" I do not know why some crazy people are calling that the sidewalk is not clean, when it is".** To the best of my knowledge, the inspectors only show up when I am at the door.

     Three days ago, on Monday, March 14, 2005,  I was out to lunch about 11 a.m., when a sanitation inspector came to **Mr. Lloyd Adolton**, a porter, who replaced me at the door during lunch time and told Lloyd, that someone called about the sidewalk and that he cannot give him a ticket because the sidewalk was clean.

     In view of the above, I would like the Santitation Department to look at its Log of incoming complaint-calls and give me the telephone numbers and names of the people who called them, claiming that the sidewalk in this building was not clean. If necessary, I would subpoena these records.

     I would appreciate it if you would void this ticket and provide me with the requested telephone numbers, so that I can take the appropriate legal action against this kind of vicious harassment.

CC:  Melohn Properties, Inc.                    Respectfully submitted,
       Attn: Mr. Joseph Helmreich, Manager
       Mr. Smail Ibricevic, Superintendent

                                       Miodrag Beljakovic
                                       925 Park Avenue
                                       Elizabeth, N.J. o7208

4, 5, 6

**BEL 42**



**32BJ**

**SEIU**

*Stronger Together*

SERVICE EMPLOYEES
INTERNATIONAL UNION
AFL-CIO, CLC

**MICHAEL P. FISHMAN**
President

**KEVIN J. DOYLE**
Executive Vice President

**HÉCTOR J. FIGUEROA**
Secretary-Treasurer

**KYLE BRAGG**
Vice President

**LENORE FRIEDLAENDER**
Vice President

**BRIAN LAMBERT**
Vice President

**KRYSTYNA ROSARIO**
Secretary

Online at:
www.seiu32bj.org

**Local 32BJ Headquarters:**
101 Avenue of the Americas
New York, NY 10013-1991
212.388.3800

**Westchester Office:**
140 Huguenot Street
New Rochelle, NY 10801
914.637.7000

**Connecticut Office:**
196 Trumbull Street, Suite 400
Hartford, CT 06103
860.560.8674
1.800.228.5253

**Long Island Office:**
2545 Hempstead Turnpike
Suite 300
East Meadow, NY 11554
516.579.4020

**New Jersey Office:**
560 Broad Street, 4th Fl.
Newark, NJ 07102
973.824.32BJ
1.866.5JANITOR

**Window Cleaners Division:**
101 Avenue of the Americas
20th Floor
New York, NY 10013
212.539.2901

**Theater, Amusement**
**& Cultural Division**
101 Avenue of the Americas
20th Floor
New York, NY 10013

March 23, 2005

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208-1131

Dear Brother Beljakovic:

I received your letter dated March 12, 2005 regarding your
workplace issue with your Employer, Melohn Properties, Inc.,
concerning a change of work schedule. I have asked Kyle Bragg,
Vice President, to review your complaint and provide a report to
my office.

Fraternally,

Michael P. Fishman
President

MPF:rg

cc:    Kyle Bragg, Vice President
        John Santos, District 6 Supervisor

4,5    **BEL 43**

58

Environmental Contol Board
Mail Adjudication Unit
66 John Street, 10th Floor
New York, N.Y. 10038

Elizabeth, N.J., March 17, 2005

**SECOND REQUEST**
**APRIL 8, 2005**

Re: Sanitation ticket No. E 145 538 984

Gentlemen:

I was a doorman on duty in the building 365 West End Avenue, New York, N.Y. 10024, on Tuesday, March 15, 2005, about 9.00 a.m, when a sanitation officer came to me and immediately started to write a ticket, for sidewalk not being clean. While writing a ticket, a copy of which is enclosed, she told me that someone complained that the sidewalk was not clean.  On a windy day when newspapers and other debris are flying around on the entire street, debries were in front of other buildings, some papers were on the sidewalk of our building as well. The ticket was given to me only. My explaining that I never received a ticket in the 20 years that I am a doorman in this building, that I clean my sidewalk all the time, that I did it in the morning when I came at 7 a.m. and that I would do it again when the wind subsided, did not help.

This could have happened if there was not a strange history behind it. I filed complaints against my employer in Federal court about discrimination, harassment and retaliation in order to force me to retire. Since then, a pressure against me increased.  For example, about two months ago, a sanitation inspector came in his car, looked at my sidewalk and left. Several days later, the same inspector came again, looked at my sidewalk and commented: **" I do not know why some crazy people are calling that the sidewalk is not clean, when it is"**. To the best of my knowledge, the inspectors only show up when I am at the door.

Three days ago, on Monday, March 14, 2005,  I was out to lunch about 11 a.m., when a sanitation inspector came to **Mr. Lloyd Adolton**, a porter, who replaced me at the door during lunch time and told Lloyd, that someone called about the sidewalk and that he cannot give him a ticket because the sidewalk was clean.

In view of the above, I would like the Santitation Department to look at its Log of incoming complaint-calls and give me the telephone numbers and names of the people who called them, claiming that the sidewalk in this building was not clean. If necessary, I would subpoena these records.

I would appreciate it if you would void this ticket and provide me with the requested telephone numbers, so that I can take the appropriate legal action against this kind of vicious harassment.

CC: Melohn Properties, Inc.
    Attn: Mr. Joseph Helmreich, Manager
    Mr. Smail Ibricevic, Superintendent

Respectfully submitted,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. o7208

4.5

**BEL 44**

59



Writer's Direct Dial: (212) 388-2128

April 11, 2005

Mr. Miodrag Beljakovic
925 Park Avenue
Elizabeth, NJ 07208-1131

Dear Brother Beljakovic:

    This is in further response to your letter of March 12, 2005. District 6 Agent Frank Monaco is investigating this situation, and is meeting with the Employer to address the shift changes that have been made in the building.

Very truly yours,

Larry Engelstein
General Counsel

LE:rg

cc:   Kyle Bragg, Vice President
John Santos, District 6 Supervisor
Frank Monaco, District 6 Delegate

SERVICE EMPLOYEES
INTERNATIONAL UNION
AFL-CIO, CLC

MICHAEL P. FISHMAN
President

KEVIN J. DOYLE
Executive Vice President

HÉCTOR J. FIGUEROA
Secretary-Treasurer

KYLE BRAGG
Vice President

LENORE FRIEDLAENDER
Vice President

BRIAN LAMBERT
Vice President

KRYSTYNA ROSARIO
Secretary

Online at:
www.seiu32bj.org

Local 32BJ Headquarters
101 Avenue of the Americas
New York, NY 10013-1906
212.388.3800

Office of the General Counsel

SEIU Local 32BJ
101 Avenue of the Americas
19th Floor

4,5   **BEL 45**

60

Local 32B & 32J SEIU AFL CIO
101 Avenue of the Americas
New York, N.Y. 10213-0354

Elizabeth, N.J., March 12, 2005

**Second Request**
**May 10, 2005**

Re: SS 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

Attn: Legal Department

Gentlemen:

I am 75 years old employed as a doorman at 365 West End Avenue, New York, N.Y. 10024 for almost 20 years. In the last ten years, I had problems with my employer

Melohn Properties, Inc.
1995 Broadway- 14th Fl.
New York, N.Y. 10024

who frequently discriminated, harassed and retaliated against me. We finally ended up in the Federal Court, where I have a case pending against them.

However, after my case was filed and the litigation began, they continued to harass me and retaliated by changing my work schedule on October 23, 2004. There were no hardships in the building which, according to the Union rules, would have justified a change. Thus, instead of working one afternoon, on Wednesdays, and four times in the morning shift, as a second senior doorman in the building, I now work three afternoons (3 p.m.-11 p.m.), including Fridays and Saturdays and twice in the morning Mondays and Tuesdays (7 a.m.-3 p.m.). I am off on Thursdays and Sundays. This changed my whole way of life I was accustomed over the years. It prevents me from driving my wife home after work on Fridays, not to mention coming home late after midnight, after changing three ways of transportation.

Another doorman, Mr. Julio Peralta, who has six years seniority over me, but is at least 20 years younger than myself and stays in the building for several hours after his shift anyway, doing odd jobs for some tenents, was a beneficiary of this change. He now works five morning shifts and has Mondays and Tuesdays off.

Up to now, the work schedules were made by the superintendent. This time, the change was made in the office, by Mr. Robert Hammer, Agent, under pretext that Mr. Peralta has to be given more time than 8 hours, betwen the two shifts on Saturdays and Sundays (the original schedule was made to suit Mr. Peralta while he lived in the building). **Even though we have two other full time doormen with less seniority than me, this change was made solely at my expense.**

Therefore, I am requesting that the Union take this matter up with my employer and return me to the same work-shift that I had **for 11 years.**

In expectation of you prompt action on my behalf, I remain

CC: Mr. Joseph Helmreich, Manager
of Melohn Properties, Inc.
Smail Ibricevic, Superintendent

Respectfully,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208-1131

4,5,8
**BEL 46**

61

WILLIAM J. McHUGH, M.D., P.A.
MICHAEL R. ZABOSKI, M.D.
ALBERTO LOPEZ, M.D.
JEAN PATTATHIL, M.D.
240 WILLIAMSON STREET, STE. 204
ELIZABETH, NJ 07202

(908) 355-8877

## CERTIFICATION OF MEDICAL CARE

Date _____ 1/19/06 _____

To whom it may concern:

This is to certify that _Andrey Belakovic_

_____

has been under medical care, and was:

☒ totally incapacitated

☐ partially incapacitated

from _12/24/05_ to _1/24/06_

May return to work/school _1/25/06_

with the following restrictions: _____

_____

Remarks _____

Signed _____

Histacount® Form #6137  800-645-5220    (1199)

4, 5, 7    **BEL 47**

62



**WILLIAM J. McHUGH, M.D., P.A.**
**MICHAEL R. ZABOSKI, M.D.**
**ALBERTO LOPEZ-SILVERO, M.D.**
**JEAN C. PATTATHIL, M.D.**

240 WILLIAMSON STREET, SUITE 204
ELIZABETH, NEW JERSEY 07202
Telephone (908) 355-8877
Fax (908) 355-6457

January 26, 2006

Robert Hammer
Malohn Properties
1995 Broadway
New York, New York 10023

RE: Beljakovic, Miodraj

Dear Sir:

As you are aware, Miodraj had an acute problem with spasm and pain in his neck and radiculopathy due to arthritis in the neck. He has made about a full recovery at this time, although he occasionally requires the use of a soft cervical collar.

He should be able to return to full duty on Monday, 30 January 2006. That would include carrying, luggage, walking about, and usual activities of his position. We will be following him medically and will stay in contact.

Respectfully,

William J. McHugh, MD

WJM:cl

4,5,7    **BEL 48**



63

**WILLIAM J. McHUGH, M.D., P.A.**
**MICHAEL R. ZABOSKI, M.D.**
**ALBERTO LOPEZ-SILVERO, M.D.**
**JEAN C. PATTATHIL, M.D.**

240 WILLIAMSON STREET, SUITE 204
ELIZABETH, NEW JERSEY 07202
Telephone (908) 355-8877
Fax (908) 355-6457

February 8, 2006

To: Robert Hammer

Dear Mr. Hammer,

I received your request on Miodrig Beljakovic. This man is 75 years old. I really do not believe that he should be shoveling snow. He has had this job for most of his life. If you are telling me that he cannot work because of his age, fine. I would understand. But I do not believe that he should be out shoveling snow or even pushing a snowblower. The routine activities of his position, he should be able to accomplish. He is still being follwed medically.

Sincerely,

William J. McHugh, M.D., P.A.

4,5,7    **BEL 49**

64

Mr. Joseph Helmreich, Manager                    Elizabeth, N.J., April 12, 2006
Melohn Propertiers, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

Dear Mr. Helmreich

     I am sorry to bother you again with one more encounter with your Mr. Robert Hammer, the Agent for Melohn Properties Inc. That man is not stopping with his retaliatory, harrasing and discriminatory moves against me, which are throwing even more flame on our anyway strained relations. In a delicate situation, with a court case between us pending, this is really too much.

     On April 11, 2006, about 10.15 a.m., when I was at the door in the building at 365 West End Avenue, New York, Mr. Robert Hammer came in. I greeted him politely as I do with all other incoming people. He asked me to call the Superintendent. I did it over the radio. While we were waiting for the Super to come, he told me that if I want to take a vacation the first two weeks in May, as I told the Super, I will have to write him a letter asking for approval. As we know, vacations are starting in May, its schedules are made by the Superintendent and then routinely approved by the Office. There was also nobody else who wanted to take his vacation at the same time. We never had problems with that. With his request to write him a letter and ask for his approval to take a vacation, Mr. Hammer just wanted to give me hard time and harass me.

     When the Super came, they talked about an apartment where some repairs were needed. The Super then went to the basement to take the necessary tools. I left the door in a small package room (which automathically locks) unlocked, since the Super went there looking for keys and I assumed that he might have to go there again for the others. After all, we were all there, and there was no possibility for anyone to come in and take something. I am always careful with that and stand nearby not only to secure things in that room, but in the whole open area where other valuables are , such as dry cleaning and packages which can not fit in that room lie around. In 21 years that I am with the Melohn Properties, Inc. nothing disappeared while I was on duty.

     While we were waiting for the Super to come with his tools, Mr. Hammer stood in front of me, pointed a finger at me and in a very loud voice said: <u>"This door has to be locked at all times. Do you understand that?"</u> The tenant, Mr. Richard Gordon PhD., who was standing near us, talking with some lady, hearing Mr. Hammer's shouting loudly, said to him: <u>"Sir, please do not yell. Treat that man with respect".</u> Only after being scolded, Mr. Hammer went in the nearby elevator. I was so upset and embarassed, my heart started beating faster, my blood pressure increased and I tought about going to see a doctor. Only a tranquilizer doctors prescribed me in connection with my heart condition I always cary with me calmed me down and I stayed until the end of my shift. Later on, Mr. Gordon asked me who was that man who talked to me with such rudeness.

     And than, the third thing in the same day. While leaving the building after 12 o' clock, Mr. Hammer told me in a very nasty and threatening tone: "I could not call the office for ten minutes, because your telephone was off the hook." I explained to him calmly that I just came back from my lunch hour and that I do not know anything about that.

4, 5, 7                    **BEL 50**

65

I appeal to you Mr. Helmreich to protect me from such unprofessional, harassing and disgraceful behavior of your Agent.

Respectfully,

Miodrag Beljakovic
925 Park Avenue
New York, N.Y. 07208

CC: Hon. Richard J. Holwell
U.S. District Court Judge
United States Court House
50 Pearl Street - Courtroom 17B
New York, N.Y. 10007
#04 Civ. 3694 (RJH)

William D. Hummel, Esq.
Kucker & Bruch, LLP, Attorneys at Law
747 Third Avenue, Suite 12A
New York, N.Y. 10017

Mr. Robert Hammer, Agent
Melohn Properties, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

Mr. Smail Ibricevic, Superintendent

66

Mr. Robert Hammer, Agent                    Elizabeth, N.J.,  March 20, 2006
Melohn Properties, Inc.
1995 Broadway, 14th Fl.
New York, New York, 10023

Dear Mr. Hammer

There seems to be no end to your persecutory attitude toward me, designed to force me from my job at Melohn Properties, Inc..With your letter of March 3, 2006, you just added another detail to it, with new inuendoes and twisting of facts so that this would suit your goal the best. To set the record straignt, here are some facts which contradict your allegations.

Mr. Felix Bermudez, a new part-time worker in the building, rasises four children as a single parent. On one occassion, recently, **you asked Mr. Smail Ibricevic, the Superintendent, in front of Mr. Lloyd Adolton, porter, if there is anyone of our other workers who could give Felix some of their time** in order to make him work more hours and make more money. When the Superintendent asked  me about it, I volunteered to give him my Saturday, and continue to work only four days hereafter. I told Mr. Bermudez about my willingness to help him out. **Is this why you are threatening to take a disciplinary action against me?**

The second point in your letter, quoting me as saying that I "do not wish to work that day" is no less inaccurate and malicious. On Saturday, March 4, 2006, I had a guest from abroad and wanted to take day off. In order to give the Superintendent enough time to find a replacement, I told him three days earlier about my desire to take that day off. **Because of your disapproval, I came to work that Saturday.** Other workers in the building who call in sick or ask for a day off only eight hours before are granted approval, but when I ask for a day off three days earlier, you make a "federal case" out of it. **Is this why you are threatening to take a disciplinary action against me as well?**

I was not making any serious mistakes in my work place for more than twenty years I worked for this employer. In view of  my sensitive relationship with the Melohn Properties, Inc. and my pending court case against them, I would be extra cautious not to make such a  mistake now either. **Therefore, your continued, unwarranted harassment is ill advised.** But, since this is a course you have chosen, I would like to thank you for further solidifying my case.

Respectfully,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208-1131

CC: Hon.Richard J. Holwell
       U.S. District Court Judge
       United States Court House
       500 Pearl Street - Courtroom 17B
       New York, N.Y. 10007

       William R. Hummel, Esq.
       Kucker & Bruch, LLP, Attorneys at Law
       Mr. Joseph Helmreich, Manager

4,5                                         **BEL 51**

67

Elizabeth, N.J. July 5, 2006

Mr. Joseph Helmreich, Manager
Melohn Properties, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

Dear Mr. Helmreich

    I am now in the process of filing two applications for Worker's Compensation benefits, since my injuries were incurred at work in the Lobby at 365 West End Avenue, where I am employed as a doorman. The injury of my spine due to the watching of monitors on my left side for years is confirmed by the X-Rays and Cat Scan pictures taken. Furthermore, I suffered a heart attack when I opened a door for a tenant and felt an intense chest pain, in December 2005 and I am now being treated by the two heart specialists. WCB case numbers 00623494 and 00623498.

    Last winter I had to wear a cervical collar and stay home on sick leave for more than a month beginning on December 26, 2005, by order of my physician Dr. William McHugh. Your Mr. Robert Hammer, Agent, asked my doctor for two letters in order to allow me to return to work. Since my heart problems occured just before I left for a sick leave and were medically confirmed with an ECCO test before I returned to work, I notified Mr. Smail Ibricevic, the Superintendent, about that and asked him to inform the Office.

    Due to these two injuries, I commenced a process of getting Workers Compensation through my attorney Mr. Frank L. Pellegrini, 350 Broadway, 10th Floor, New York, N.Y. 10013. Dr. Gideon Hedrich, M.D. Medical Director of Park Avenue Trauma Associates is treating me. To my consternation, Dr. Hedrich told me at the time of my last exam, that he could not get cooperation of Melohn Properties, Inc. who claim that they do not know anything about my injuries. How is this possible when I was granted a month of sick leave and Mr. Hammer has in his possession two letters of my doctor W. McHugh sent to him at his request, on the basis of which he permited me to return back to work, after attempting to prevent me to go back to my job?

    This is one more example of a cruel harassment and retaliation Mr. Hammer is engaging in against me. Please ensure that Dr. Hedrich gets all the documents he needs from Melohn Properties, Inc., my employer.

    Thank you for your cooperation.

Respectfully,

CC. Dr. Gideon Hedrich, M.D.
    Medical Director
    Park Avenue Trauma Associates

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.Y. 07208-1131    Hon.

Frank L. Pellegrini, Attorney at Law

4,5,7    **BEL 52**

68

Michael P. Fishman, President                    Elizabeth, N.J., October 11, 2006
Servive Employees Int'l Union 32BJ
101 Avenue of the Americas
New York, N.Y. 10013-1991

Dear Mr. President

Please refer to the attached copies of your letter of March 23, 2005 and a letter by Larry Engelstein, General Counsel, written on April 11, 2005, in which both of you promised an investigation about my complaint against my employer Melohn Properties, Inc., concerning the change of my work schedule. The change was contrary to the Union rules allowing such moves only in case of hardships, which was not the case.

18 months have passed, since I complained to the Union 32BJ, on March 12, 2005, about the malicious punishment inflicted on me by my employer, but I still work three evening shifts for the two past years, including Fridays and Saturdays, which is inconviniencing me and my family in many ways (a copy of my letter is enclosed). This was done despite of my 21 years of service and seniority over other two doormen whose shifts were not altered. No word that you had done anything on my behalf reached me so far.

**Is this as how my Union protects me from a cruel retaliation of my employer?** It is obvious why Melohn Properties, Inc. insists that complaints of their employees, not only for work-related matters, but also for violation of their Constitutional rights, be handled through the Union and not through the U.S. Courts where they belong.

Respectfully,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.Y. 07208-1131

CC: Mr. Joseph Helmreich, Manager
     Melohn Properties, Inc.
     1995 Broadway, 14th Floor
     New York, N.Y. 10024

4, 5, 8                    **BEL 53**

Mr. Joseph Helmreich, Manager                    Elizabeth, N.J., October 30, 2006
Melohn Propeprties, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

Dear Mr Helmreich

    Another winter is coming upon us at 365 West End Avenue, New York, N.Y., and we still have to wear the **nine-year old,** thin, short and ripped jackets which do not protect us much from the cold weather we are exposed to in the course of our work. Wearing such a jacket last December 2005, I suffered a heart attack when I opened the door for a tenant and was hit with the wave of cold air from the outside.

    In order to remedy this unfortunate and unhealthy situation, I shall appreciate it if the employer would provide us with warmer and longer winter coats, such as other doormen have in the surrounding buildings. I trust that the Superintendent and my colleagues in the building share my concern and would welcome a better coat to wear in the fothcoming winter.

    Thanking you in advance for your understanding and help, I remain

                                Respectfully yours,

CC: Messrs: Smail Ibricevic, Superintendent
        My colleagues employees
                          Miodrag Beljakovic, doorman
                          365 West End Avenue
                          New York, N.Y. 10024

4, 5, 7, 8                                        **BEL 54**

70

New York, N.Y., December 27, 2006

Mr. Joseph Helmreich, Manager
Melohn Properties, Inc.
1995 Broadway, 14th Fl.
New York, N.Y. 10023

Dear Mr. Helmreich

　　　More than two months after our former superintendent Smail Ibricevic was hospitalized and later died, on December 6, 2006, we workers in the building at 365 West End Avenue still do not know who is in charge of our overall operation and to whom do we report in the case of emergencies, a need to take a day off or orther problems. No written announcement by the Management to that effect was received by us to date.

　　　I know that it will be very hard to replace Smail and find a new super equaling his knowledge, dedication, sacrifice and obedience. But, we must have a super; someone who is in charge. The vacuum we have now, caused by Smail's unfortunate departure, Lloyd's retirement and a lack of workforce, is compromising the operation and security of the building, which might cause an unforseen and even dangerous conesequences.

　　　Sam Kukaj is doing an admirable job in temporary filling in for Smail, but his authority is limitted by the lack of a formal appointment and the precise specification of his authority and duties. Replacing Smail would also be a difficult proposition for any new person, unless he is given more workers to do the tremendous job he will be faced with.

　　　I trust that you will do your utmost to remedy this unfortunate situation and appoint a new super in our building as soon as possible.

Sincerely,

Miodrag Beljakovic, doorman
365 West End Avenue
New York, N.Y. 10024

CC: My colleagues in the building.

4,5,8    **BEL 55**

Fax: (212) 787-3500

Mr. Joseph Helmreich, Manager                     January 11, 2007
Melohn Properties, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

Dear Mr. Helmreich

    In view of the yesterday's personnel change in the building at 365 West End Avanue, New York, I hereby request to be returned to my previous doorman's shift, which I held for 11 years until two years ago. My orignimal shift was as follow: Monday and Tuestay morning (7 a.m.-3 p.m.), Wednesday afternoon (3 pm.- 11 pm., and Friday and Sarurday morning (7 am.-3 pm.), with Thursdays and Sundays off.

    However, my workhours on Friday and Saturday were abruptly changed in October 2004 and I was commanded to work Fridays and Saturdays afternoon intead of mornings, in order to accomodate a person with seniority who is not with us anymore.

    As the most senior employee in the building with almost 22 years of service, I believe that I deserve courtesy to be returned to the original schedule, working Friday's and Saturday's mornings.

    Thank you for your kind cooperation in this matter.

                        Respectfully,

                        Miodrag Beljakovic, doorman
                        365 West End Avenue
                        New York, N.Y. 10024

4,5,8          **BEL 56**

72

Mr. Joseph Helmreich, Manager                                    January 17, 2007
Melohn Properties, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

Dear Mr. Helmreich

      This is in reference to my letter of January 11, 2007, requesting to return to my previous work schedule and a further reference to Mr. R. Hammer's, Agent's response given to me over the telephone, on January 16, 2007, denying it. On that occassion, Mr. Hammer told me that as the most senior man of the workers at the building at 365 West End Avenue, I can take the shift of Mr. Julio Peralta, recently terminated, or remain in the shift I am now. This is final and I can not return to a shift previously held for 11 years.

      To understand the things a little better, let me remind you of some facts in the history of my employment with Melohn Properties, Inc. Since I was hired in May 1985, I went through all the shifts in my work place as the workload mandated. I worked nights for more than five years, then worked two nights, two afternoons and one morning for the next several years. Finally, I worked four days monings and one afternoon, for 11 years. The only benefit I had was that I never worked on Sundays, when I regularly attend the Church services (To accept now Julio's shift in its entirety would mean that I work Sunday mornings and not go to the Church anymore, which I did my entire life). The only drawback in my previous schedules was that I never had two days off consecutively, but I had no qualm about that.

      After I filed charges against my emloyer Melohn Properties, Inc. in May 2004, my work schedule was suddenly changed in retaliation, imposing on me to work Friday and Saturday afternoons instead of mornings. So, for the past two years and four months I had no social or cultural life in the days when families usually entertain guests, visit each other or attend important cultural events (Exhibit 1). Mr. Peralta, then a favorite of the the Management and some owners, and recently accused and fired by them as a thief, was used against me.

      Prior to that Mr. Peralta, while living in the building, worked at his request, Saturday afternoons and Sunday mornings, with only 8 hours between the two shifths, so that he can have more time for his other business dealings. Even though I was second with seniority among the workers, Mr. Hammer and Mr. Peralta used this 8 hour span to justify a change of my shift on Friday and Saturday, from mornings to afternoons, and practically ruined my personal life and inconvenienced me in many ways, without even discussing a change with me. Julio just brought a letter from Mr. Hammer to me and that was that.

      If this was not a question of retaliation against me, the whole legitimate problem with 8 hours span for Julio could have been handled differently. There were many combinations in which no workers would be hurt and Julio's shift changed. Now, the situation is even simpler. We have two porters positions open and a one of the new employees could be assigned to work on Saturday instead of Thursday as a doorman, which one of the porters did for years. Consequently, I would reluctantly accept to work three afternoons, including Thursday.

      Please review this matter once more, and make a decision which will be justified and satisfactory to all.

                                                Sincerely,

                                                                            4,5,8
                                          Miodrag Beljakovic, doorm: **BEL 57**

Melohn Properties, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

January 31, 2007

Attn: Senior Management

Gentlemen:

I am forced again to complain about the harassing, discriminatory, retaliating and humiliating actions your agent Mr. Robert Hammer is waging against me. The stress caused me by his wanton, vicious and hatefull behavior is assuming intolerable proportions, which my weak heart can barely take. After each episode I have to take tranqilizers.

The most recent incident ocurred late on Monday, January 29 and Tuesday, January 30, 2007. I had a hearing set by the New York State Workers Compensation Board, on January 30, 2007, for 3 p.m., concerning the two injuries in my workplace (Exhibit 1). Since I was working on the date of the hearing, until 3 pm., I decided to take a personal day which is allowed, and stay home preparing for the hearing. I informed Mr. Sam Kukaj, a man in charge, about my decision to take a personal day on Tuesday, January 30, and this was all I normally should have done.

When I came home later in the evening on Monday January 29, 2007, my wife informed me that Mr. Hammer had called my home and told her that they were not able to find replacement for me and that I have to come to work the following day (such a replacement was always found before and, since two employees had a day off on that Tuesday, it was available now as well). He also told her inaccurately that my hearing at NYSWCB, which should have been attended by their representative as well, was cancelled. As ordered, I went to work on Tuesday morning, with fever and redness on my face from a cold I was coming down with. When I called Mr. Joseph Gottlieb, a financial officer of the Company at 9 a.m. to tell him that I was at work and I am not taking a personal day, which is needed for him in preparing our payroll, he also told me that my hearing at the State Board was cancelled.

Once before, a hearing was postponed at the request of my employer, but I was notified about that by the Board. Since, I did not get anything official about the cancellation this time, I called my worker's compensation attorney to verify cancellation and he was enraged about that. He told me that if representatives of my employer do not want to attend, this is a matter of their choice, but our hearing is still on and I must come to that at 3 p.m. Otherwise, I will be found in contempt and my case would be jeopardized. Obviously, I had no choice, but to go there and find a replacement for me at the door for one hour, between 2-3 pm.. There were two other employees in the building and one of them could have come to the door. I would pay my replacement for working one extra hour for me. The second option was not to take a lunch hour of 45 minutes earlier as usual, but at 2.15 when I can leave and eat on the road the food I had with me. A person who would have replaced me for lunch at 11 a.m., would replace me then. We workers were doing

4, 5, 7        **BEL 58**

favors for each other all the time before and I told my two coworkers that I intend to take my lunch hour after 2 p.m. No one objected at the time.

Then suddenly, before 11 a.m., Mr. Hammer came to the building and sent via a new worker Mr. Avila an envelope to me with a letter specifying rules for all doormen (Exhibit 2). These rules were in force for all 22 years since I work for Melohn Properties, Inc. and I did not know why Mr. Hammer chose to hand them to me now again. As I was preparing to take a bite of the food I already had with me being careful that no visitors or tenants can see me eating, Mr. Avila came again to me and told me that Mr. Hammer and Sam want me to take my regular 45 minute lunch now and he will stay at the door until I come back. Again, I followed the order, went to our room in the basement and had lunch in 10 minutes. Mr. Hammer figured out that I had a quick lunch so that I can go for my hearing some time after 2 p.m.. He left the building ordering Sam and Pedro, that they can not replace me if I ask them to come to the door before 3 p.m.

When I called Sam and Pablo over the radio about 2.10 to come and see who can replace me for the next 45 minutes until the end of my shift, neither one of them dared to answer my call. Finally, Pedro came and told me that Sam and he can not replace me earlier by the order of Mr. Hammer. Having no choice and knowing that Pedro and Sam are aware that the door is not attended, I took a taxi at 2.15 p.m. and went to the hearing (Shortly before I left, Ms. Miriam, a housekeepr for Mrs. Martha Melohn, the owner, told me that she never before saw my face so red as it was then). During the day, I was taking increased doses of medication and antibiotics I always cary with me. Fortunately, a hearing did not last long and I went home to Elizabeth shortly after 5 p.m. still shaking from my illness and aggravation caused by Mr. Hammer. Since I am still sick, I called Sam, and told him that I would not be able to come to work today, for my afternoon shift 3 p.m.-11 p.m. and will seek medical help.

The above facts clearly show Mr. Hammer's deliberate obstruction of my appearance at the hearing ordered by the Government agency. While other employees are allowed to take a day off to watch Met's games and replace each other for other reasons (sometimes they pay each other to work their shifts), my rare and legitimate absence from work is treated by my managers as a "federal case". Now, Mr. Hammer wanted to prevent me from attending a hearing at the State agency, ordered me when and where I can eat and the time is probably coming when he would want to regulate my breathing time.

Therefore, I appeal to you once more to protect me from the ruthless and malicious behavior of your Agent, which is causing me unwarranted aggravation and injuries.

Respectfully,

Miodrag Beljakovic, doorman
at 365 West End Avenue,
New York

CC: United States Court of Appeals
    For the Second Circuit
    Thurgood Marshal U.S. Courthouse
    40 Foley Square
    New York, N.Y. 10007
    Docket No. 06-4760-cv.

Hon. Judge Richard J. Holwell
United States Courthouse
Southern District of New York
500 Pearl Street, Courtroom 17B
New York, N.Y. 10007

Case: 04 Civ 3694 (RJH)

William D. Hummell, Esq.
Kucker & Bruch, LLP, Atorneys at Law
747 Third Avenue, Suite 12A
New York, N.Y. 10017

76

March 2, 2007

Mr. Joseph Helmreich, Manager
Melohn Properties, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

Dear Mr. Helmreich

This is a follow up to my letter of January 31, 2007, addressed to the Senior Management of Melohn Properties, Inc., concerning an attempt of your Mr. Robert Hammer, the Agent, to prevent my appearence in front of the New York State Workers Compensation Board, on Tuesday, January 30, 2007. When I returned to work the following day, on Wednesday, a hat from my uniform was missing, and I had to work at the door in the cold days the whole month of February, wearing my civilian hat which obviously was not a part of the uniform. Some tenants ridiculed me for it and visitors asked me if I was really a doorman.

It is interesting to note that for the entire month neither Mr. Hammer (who once wrote to me a warning letter for not wearing a black tie), nor some members of the owner's family who live in the building (who usually notice smallest details), never asked me as to why I do not waer my regular hat. There were speculations among the workers that I was about to be fired for going to the Workers Compensation hearing and a zelous worker threw my hat in the garbage. Normally, an investigation should have been launched, but nothing was done to this day and I am still without a hat.

I regard the whole incident as the lowest point in my employer's discriminatory, retaliating and harassing campaign against me. Since I do not intend to leave my job soon as some people would want me to do, <u>I would appreciate it if you would see to it that a new uniform hat be provided for me as soon as possible.</u>

Thank you for your cooperation in this matter.

Respectfully,

Miodrag Beljakovic, doorman
365 West End Avenue
New York, N.Y. 10024

CC: Mr. Robert Hammer, Agent

**BEL 59**

2, 3, 4, 5, 8

77

Elizabeth, N.J., March 16, 2007

U.S. Department of Labor
201 Warick Street, Room 750
New York, N.Y. 10014

Gentlemen:

     I shall appreciate it if the United States Department of Labor undertakes an investigation of my case and working conditions existing in the building at 365 West End Avenue, New York, N.Y. 10024, where I work.

     I am 77 years old and employed as a doorman for 22 years by Melohn Properties, Inc., 1995 Broadway, 14th Floor, New York, N.Y. 10023. For the past ten years, they have applied a tremendous pressure on me to retire and I fought that in many different ways. Finally, after receiving a "right to sue" letter from the New York State Human Rights Commission, I brought my complaint to the United States District Court Southern District of New York, on May 27, 2004, (04 Civ. 3694 RJH), where it is still pending due to my employers legal juggling and appeals. As a result, their vendetta against me has intensified and relief is slow in coming.

     The case in point is that on October 2004, they retaliated against me by changing a previous shift which I held for 11 years by assigning me to work three afternoon shifts, 3 p.m.- 11 p.m., including Fridays and Saturdays. My argument that I have a seniority of 10 years over the next four doormen and that I should be returned to a previous shift at least to have some social life on Saturday afternoon, remained unheeded all this time, and my Union SEIU simply ignored my pleas for fairness as well. This gives a lot of room to the regulatory authorities to see what is going on.

     At this time, I do not want to overburden you with the numerous examples and documentation of what I went through with my employer, but I can produce that if necessary. Everytime their Agent Mr. Robert Hammer comes to the building and harasses me, I have to take medication (which I always carry with me) for stress. In order to curtail this torment, I applied to the New York State Workers Compensation Board to consider my physical injuries that I suffered in my workplace, as well.

     Hoping that the Department will soon take a just look at this case, I remain

Respectfully yours,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208-1131

CC: Melohn Properties, Inc.
    1995 Broadway, 14th floor
    Broadway, N.Y. 10023

4,5,7,8          **BEL 60**

78

Melohn Properties, Inc.                    Elizabeth, N.J., May 4, 2007
1995 Broadway, 14th Floor
New York, N.Y. 10023
Attn: Senior Management

Gentlemen:

As you know, I have been a doorman in your building at 365 West End
Avenue, New York, for the past 22 years. On January 30, 2007 I had an incident
with Mr. Robert Hammer, your Agent, when he tried to prevent me from going to
the hearing called by the New York State Workers Compensation Commission.
When I came back to work, a hat, a part of my uniform, was gone and I was forced
to wear my civilian cap in cold weather FOR THE PAST THREE MONTHS.

My unprofessional appearance at the door caused many tenants, vendors
and delivery man to make nasty comments on the account of the Owners and ridi-
cule the way I look. The entire Owners family, the Manager and the Agent of
the Company, see me in my civilian hat, which sharply contrasts with my flashy
uniform, but noone comments about it. Even Mr. Hammer, who once wrote me a
"warning letter" for wearing a tie which is not black, is now quiet when he sees me
in the doorman's uniform with a civilian hat on. They probably presume that I will
not need another hat since I will leave my job soon. I have news for everyone: I
do not intend to leave my job in the foreseeable future and before my complaint
against you, pending in the Federal Court, is settled.

In my letter of March 2, 2007, I complained about a "mysterous" disappea-
rance of my hat to Mr. Joseph Helmreich, the Manager, but he did not dignify my
concern with an answer or saw to it that I get my hat back. Obviously, this is a part
of the Owners new, petty, harassing, discriminatory and retaliatory design to force
me off my job which I always performed in a satisfactory manner.

Starting this Saturday, May 5, 2007 I will leave on my one-month vacation.
This will, I hope, provide sufficient time for those who removed my hat to get a
new one or retrieve the old one, so that I will not have to look ridiculous after my
return wearing my civilian hat again. Having people coming to the building asking
me if I am a doorman, or tenants pointing at my civilian hat and ridiculing my
unprofessional appearance, is quite embarassing and demeaning to me.

Respectfully,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208-1131

**BEL 61**

2,3,4,5,8

Melohn Properties, Inc.                    Elizabeth, N.J., July 19, 2007
1995 Broadway, 14th Floor
New York, N.Y. 10023

Attn: Senior Management

Gentlemen:

There is no end to your inquisitorial, inhumane and harassing practices, designed in forcing me to leave my job after 22 years of service. The latest incidents, of July 16 and 17, 2007, reminded me of the practices used in the concentration camps, where inmates were starved to death.

Your new superintendent Mr. Noe Osorio is a hero of this story. As soon as he came, he issued a memo reducing our lunch hour, from 45 minutes to 30 minutes in violation of the Union negotiated guidelines, and setting it to start at 11.30 a.m., instead of 11.00 a.m. we all used for years. I complained against that and pointed out in my letter to the Manager that the longer someone waits to eat might be harmful for those with low blood sugar. The Management must have gathered that this is my case. With my blood sugar of only about 80 I often get dizzy and have double vision if there is a wider span between my meels and have to take something sweet in order not to faint. Therefore, I told Mr. Osorio that I would like to have lunch at 11 a.m. (which is four hours after I start work at 7 a.m.) as I always had.

However, on Monday, July 16, 2007, Mr. Osorio, took Sam Kukaj, (a porter, who replaces me for lunch), to do work in the apartment 13C, at 11.10 a.m., and I saw them on the monitor going there with their tools. Even though this was not an emergency, Sam was allowed to come and replace me for lunch at exactly 12.20 p.m.. The next day, on Tuesday, June 17, the same thing happened. They went to do a small errand in the apartment 11A, at 11.15 a.m., and Sam came to replace me for lunch at 12.10 p.m.. Ten minutes before 12.00 noon, I saw them sitting on the ledge of a ramp and chatting for about 5 minutes (the time and the day is recorded on the monitor). Obviously, the Super was delaying Sam in order not to replace me earlier. I am absolutely sure that this would not happen if the new Super was not instructed to treat me in this manner. Workwise, whether Sam replaces me at 11 a.m. or an hour later, does not make any diference.

4,5,7                                      **BEL 62**

As the Court date when my complaints against you will be settled is approaching, you  seem to be increasingly  nervous, hateful and aggressive in your discriminatory, harassing and retaliatory tactics directed at me,  and denying me the most basic medical necessities.  I introduce this as a new piece of evidence and hope that the Court of Law would take a due notice of that at the upcoming trial.

Respectfully,

Miodrag Beljakovic
doorman at 365 W.E.A.

CC: Hon. Richard J. Holwell
United States District Judge
Southern District of New York
U.S. Courthouse
500 Pearl Street, Courtroom 17B
New York, N.Y. 10007-1312

William D. Hummell, Esq.
Kucker & Bruch, LLP Attorneys at Law
747 Third Avenue, , Suite 12A
New York, N.Y. 10017

81

**Melohn Properties, Inc.**
1995 Broadway, 14th Floor
New York, N.Y. 10024

Elizabeth, N.J., July 30, 2007

**Attn: Senior Management**

**Gentlemen,**

Your retaliation against me for filing a suit against the Management of Melohn Properties, Inc. in Federal Court, is intensifying lately. Your new superintendent, Mr. Noe Osorio, made several unwarranted moves against me, in two months since he was hired, without knowing much about me, my work history or reasons for my poor standing with you. If this was a condition for his employment, I feel sorry for the man.

Mr. Osorio's first act against me came in his letter dated July 16, 2007, in which he refers to my letter to the Manager concerning his decision to reduce the time from 45 to 30 minutes, we are allowed for breaks. In his letter, he permitted only me to take 45 minutes break, but denied that right to the others. Why this preferrential treatment? Because I am in Court with our employer? Furthermore, in this letter, he is entering a territory of the First Amendment of the U.S. Constitution, by "wishing" that I "refrain from corresponding with employees" and writing letters on their behalf. When he called me to his office to elaborate on the subject, he told me that I am not a shop steward (by seniority, work record and education I probably should be, but it is my tough luck that the Management does not recognize that) and have no right to talk in the name of the others. In my previous letter, it was nowhere stated that I represent anybody, but I simply indicated how the unfairness of my longer break would be viewed by the other employees. I can not consent to it.

To step up his confrontational attitude toward me, did not take long. On Friday, July 27, 2007, when I came to work at 3 p.m., he told me that I can not change before work in the package room near my work station anymore (which I did for the past 22 years), but to use the locker room in the basement as the other workers do. I WILL DO AS ORDERED, but I question the motives of that order. The reasons why I changed upstairs and not in the basement are purely practical and have nothing to do with my job performance: there is no stairway between the first floor and the basement so that I can change quickly at 11 p.m., when my three evening shifts end, and rush to get to the subway on time in order to catch the New Jersey Transit

4, 5, 7, 8    **BEL 63**

train. If on Saturdays I miss the 11.14 p.m. train, I have to wait for the next one until 12,07 a.m. (almost an hour) and do not get home until after 1 a.m. The other reason is that I carry with me all my heart medication and with my suit locked in the basement and elevators stuck on the upper floor, I do not know wheather I can get to the medication on time, in case I need it.

In a tradeoff for the priviledge of changing in the package room, I accepted a request from Mr. Ibricevic ( previous superintendent) when I was hired, that I take my off days separately (Thursdays and Sundays)) and not consecutivelly as mandated by the Union rules (as all other employees in the building have). In addition, I also accepted that, when working afternoons, to take the evening break at 5 p.m., (only 2 hours after I start work), which gives me after dinner more than 5 hours between the break and going home (not more than 5 hours of work between breaks is mandated by the U.S. Code). Since the Super is playing hardball with me, let me throw one in his court. I now insist to be given:

1) TWO CONSECUTIVE DAYS OFF in a week of work, and
2) dinner breaks in the evenings which WOULD NOT ENTAIL MORE THAN 5 HOURS OF WORK between breaks.

I hope that no further letters on these subjects will be necessary.

Respectfully,

Miodrag Beljakovic, doorman at
365 W.E. A.

CC: Mr. Noe Osorio, Superintendent

83

D4   Wednesday, October 10, 2007    WALL STREET JOURNAL

# Job Strain Can Be Risk Factor For Subsequent Heart Attacks

BY RON WINSLOW

For those back at work after a recent heart attack, here is something else to think about along with cholesterol, blood pressure and diet: the job.

A study by Canadian researchers being published today in the Journal of the American Medical Association, suggests workplace stress may be as hazardous to your heart health as smoking, high cholesterol and other conventional risk factors for cardiovascular disease.

A majority of those who suffer heart attacks during their working years return to work, other studies have found. The new report suggests that patients and employers alike would benefit from strategies to prevent the human, medical and productivity costs of a second heart attack.

The researchers enrolled 972 patients between 35 and 59 years old who returned to work after a first heart attack, and followed them for an average of six years. Those in high-stress jobs were 2.2 times as likely as those in low-stress posts to suffer a heart attack or be hospitalized for unstable chest pain called angina, which often is a precursor to a heart attack.

"It is a very important effect," said Michel Vézina, a researcher at Université Laval in Quebec and a co-author of the study. He deemed it "comparable" to the impact of tobacco smoking, high cholesterol and high blood pressure. Prevention efforts should go beyond changing individual living habits to "take into account the work environ-

ment," Dr. Vézina said.

While senior managers, for instance, may hold pressure-packed positions, the job-related threat to hearts may be significantly higher among their underlings scrambling to meet deadlines or on production lines.

Two characteristics define a high-stress job, Dr. Vézina said. One is a demand to do ever more tasks with less time and fewer resources. The second is an employee's lack of control over work procedures or lack of authority to make decisions. These conditions generally reflect the plight of lower-level workers and have been shown in numerous studies—most prominently in the long-running Whitehall study of British civil-service workers—to have a detrimental impact on health and longevity.

Previous research has linked job stress and first heart attacks. The new report is the largest to look at its impact on a second major episode.

"Job strain causes bad effects for the heart, no question about it," said Randal Thomas, a cardiologist at the Mayo Clinic in Rochester, Minn. Psychological distress triggers release of adrenaline and other "fight or flight" hormones, which under chronic conditions damage the heart, he noted.

Dr. Vézina and his colleagues are studying strategies to reduce stress for such workers. Encouraging a collaborative rather than competitive work environment is one possible approach, he said. Exercise, meditation and the ear of supportive friends and family can also help, JAMA says.

4,5,7    **BEL 64**

84

Melohn Properties, Inc.
1995 Broadway, 14th Floor
New York, N.Y. 10023

Dear Mr. Helmreich

     In view of the yesterday's personnel change in the building at 365 West End Avanue, New York, I hereby request to be returned to my previous doorman's shift, which I held for 11 years until two years ago. My orignial shift was as follow: Monday and Tuestay morning (7 a.m.-3 p.m.), Wednesday afternoon (3 pm.- 11 pm., and Friday and Sarurday morning (7 am.-3 pm.), with Thursdays and Sundays off.

     However, my workhours on Friday and Saturday were abruptly changed in October 2004 and I was commanded to work Fridays and Saturdays afternoon intead of mornings, in order to accomodate a person with seniority who is not with us anymore.

     As the most senior employee in the building with almost 22 years of service, I believe that I deserve courtesy to be returned to the original schedule, working Friday's and Saturday's mornings.

     Thank you for your kind cooperation in this matter.

Respectfully,

Miodrag Beljakovic, doorman
365 West End Avenue
New York, N.Y. 10024

4,5,8    **BEL 65**

85

Jessica J. Josephson
365 West End Avenue
Apt. 11-J/212-496-0533

To whom it may concern:

This is a letter to tell you what a terrific person Mike (Miovrag Beljakovic) is, and what a great doorman he is. His presence has been a great comfort to me and to many others. He is kind, helpful and thoughtful.

He always assists me with packages, bags and luggage. He doesn't let anyone in unless they have been cleared by the apartment lessee. His good humor, helpfulness and goodwill have been a boon to this building.

His age has not slowed him down. He is as helpful and active as people who are 30 years younger. Anyway, age should not be a reason for trying to get rid of him.

He makes us feel safe. He is kind to children and grownups alike, and his excellent thinking has prevented problems due to his experience.

I would like him to be our doorman until he wishes to leave, and not until. His presence in our building has been a very positive  influence, and his hard work has been impressive to all.

Sincerely yours,

Jessica J. Josephson
Apt 11-J

4,5    **BEL 66**

86





**BEL 67**

5,8

87





**BEL 68**

5,8

88

## CORRECTIONS

**on the Document Exibit List, filed with the JPTO:**

**Exhibit 51** – is dated March 20, 2007 and not April 20, 2007.
In addition: giving work days to Felix Bermudez, and not Lloyd Adolton

**Exhibit 67** – Description should be: Photograph depicting civilian cap with the doorman's uniform, and no winter coat

**Exhibit 68** – Description should be expanded to read: Photograph depicting unhealthy working conditions in front of the dorman's desk.

89

## Document List of Additional Exhibits

| EXHIBIT | DATE WRITTEN | DESCRIPTION OF DOCUMENT |
|---------|--------------|-------------------------|
| # 69 | 12/30/1993 | Complaint to the U.S. Department of Labor against late payment of salaries. |
| # 70 | 6/26/2001 | Defentant's instructions to the satff Not to accept tenant's notes. |
| # 71 | 2/24/2003 | Letter from Beljakovic to Melohn Properties regarding a health hazzard. |
| # 72 | 6/26/2003 | Letter from Beljakovic to Melohn Properties requesting a fan for a lobby. |
| # 73 | 9/18/2003 | Melohn Properties memo barring a tenant to have roommate or sublet. |
| # 74 | 1/5/2005 | Work schedule drafts by the late superintendent Smail Ibricevic, giving me to work three mornings, which was not accepted by the Defendant |

9 ⊕

The U.S. Department of Labor
Wage & Hour Division-District Office          New York, December 30, 1993
26 Federal Plaza
New York, N.Y. 10007

Re: Late Salary Payment

Gentlemen:

I am an employee of Melohn Properties, 1995 Broadway, New York,
N.Y. 10023 where I have worked as a doorman in their building at 365
West End Avenue for the past 8½ years. We receive our paychecks every
Friday, but they are made payable the following Tuesday, as evidenced
by the most recent pay stub, a copy of which is enclosed.

The practice of actually paying employees four days after the pay
period ends does not seem to me to be ethically and legally sound, and
certainly is at the great disadvantage of the employees, while giving
an opportunity of "unjust enrichment" to the employer. I asked several
years ago why this is being done and was told that this is "allowed for
bookkeeping purposes", so that businesses can check their entries before
money is disbursed. As we know, bookkeeping in most of the companies is
done nowadays by computers which process it in a matter of minutes and
not days and hours as once was the case. This renders the old argument
absolete.

Most other government and private employers have the same amount
of bookkeeping to do, but they pay their employees with the checks which
can be cashed the same day.

In view of the above, I would like to know your regulatory position
in this matter, and whether we are entitled to claim from employer the
interest for 208 days they use our weekly salary each year?

Thanking you in advance for your kind assistance in this matter,
I remain,

Very Truly Yours,

CC: Melohn Properties
    1995 Broadway, 14th Fl.
    New York, N.Y. 10023                    Miodrag Beljakovic
                                            20-65, 31st St.
                                            Astoria, N.Y. 11105
    Local 32 B
    Service Employees Union AFL-CIO
    101 Avenue of the Americas
    New York, N.Y. 10013

    Mr. Smail Ibricevic, Superintendent
    365 West End Avenue
    New York, N.Y. 10024

4,5,8          **BEL 69**

# MELOHN PROPERTIES

94

1995 BROADWAY
NEW YORK, NY 100:
(212) 787-2500

DATE:  JUNE 26, 2001

TO:    ALL SUPERINTENDENTS & STAFF

FROM:  ROBERT HAMMER

---

IT HAS COME TO MY ATTENTION THAT FROM TIME TO TIME TENANTS LEAVE NOTES WITH THE STAFF THAT RELATIVES OR FRIENDS WILL BE STAYING IN THEIR APARTMENTS AND INSTRUCTING THE STAFF TO ALLOW ENTRY TO SUCH PERSONS.

THIS IS TO ADVISE YOU THAT SUPERINTENDENTS & THE STAFF **ARE NOT** AUTHORIZED TO ACT FOR THE LANDLORD IN THESE MATTERS.  ALL SUCH NOTES MUST BE TURNED OVER TO MR. HAMMER **IMMEDIATELY**.

4,5    **BEL 70**

Mr. Joseph Helmreich, Manager
Melohn Properties, Inc          New York, February 24, 2003.                    92
1995 Broadway, 14th Fl.
New York, N.Y. 10023

Dear Mr. Helmreich

    We are recently confronted with a situation of great danger to the health of workers in the Melohn's building at 365 West End Avenue, New York. After 18 years of work in this building, I noticed the first time about two months ago that we have mice and rats in our basement The situation became particularly alarming when we saw them in our room where we change, eat and rest on our breaks.

    When cleaning after an exterminator came, Lloyd and Sam, the porters, found a dozen of dead mice behind the couch.

    As a result, no sane person would dare to go to change, eat or use a toilet in that room.One can be certain that the mice carrying all kind of deseases were walking on our table, couch and toilet we normally use every day. I personally did not go to that room for the past two weeks since a mouse ran over my shoe.

    What is the reason that they appeared at this time an investigation can perhaps establish. The fact, however, is that the room the workers use, with their metal lockers where they keep personal belongings was not painted since I came to work for Melohn as a doorman 18 years ago. Metal lockers in our room are rusty and have holes through which mice can easily get in. The door of the room is at least half an inch higher than the floor enabling mice to easily get in and out.

    Sharing a concern of other coworkers, to say nothing of families with children who live in the building, I shall appreciate it if you take immediate steps to remedy this unfortunate and unhealthy situation and to see that this room is sanitized.

    Thanking you in advance for your kind cooperation, I remain

Respectfully yours,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208

Tel: (908) 353-6181
Fax: (908) 289-1359

CC: Board of Health
    City of New York

4,5,8    **BEL 71**

93.

Melohn Properties, Inc.
1995 Broadway, 14th Floor                    Elizabeth, N.J., June 26, 2003
New York, N.J. 07208

Attn: Mr. Joseph Helmweige, Manager

Dear Mr. Helmweige

    As you know, Summer started this year with temperatures in mid-nineties, which is very hard for us at the door to endure without having an airconditioner or at least a fan in our work area. A prolonged exposure to excessive heat could cause us to faint or other serious health problems. At some points during hot days when I start getting dizzy, I have to cool myself by putting water on top of my head.

    For many years, Mr. & Mrs. Charles Gallagher, who live in the Penthouse, gave us their large fan during the Summer and this helped us to survive. Since they left, we do not have fan anymore. Seeing me in an unbearable situation yesterday (Wednesday afternoon), a kind-hearted tenant Ms. Ann Colonimos brought me her small fan and told me that we can have it for several days and then she will need it again. This is as how we are coping now.

    In view of the fact that Summer just began and more intense heat is coming, PLEASE SEE TO IT THAT WE GET A LARGER FAN THAT WE CAN USE IN THE YEARS TO COME. I am prepared to pay my share of the cost of the fan if we have to buy it.

    Thank you in advance for your understanding and prompt cooperation in this matter.

                                      Respectfully yours,

                                      M. Beljakovic, "Mike"
                                      Doorman at 365 West

CC: N.Y. Department of Labor                    End Avenue, New York, N.Y.
      Local 32B-J
      Mr. Robert Hammer, Agent
      Smail Ibricevic, Superintendent
      Mr. & Mrs. C. Gallagher
      Ms. Ann Colonimos

4,5,8

**BEL 72**

# MELOHN PROPERTIES, INC.

94

1995 BROADWAY
NEW YORK, NY 10023
(212) 787-2500

# *MEMORANDUM*

TO:      365 West End Avenue Staff

FROM:   Robert Hammer

DATE:   September 18, 2003

RE:     **Trudy Wenzel**
        **Apartment 901**

Please read this memo very carefully and sign the bottom of this memo that you have read and understand.

Trudy Wenzel does not have permission either to have a roommate or to sublet.

You **must** personally notify Robert Hammer immediately if anyone other than the tenant is seen using the apartment.

**Under no circumstances is anyone to occupy this apartment other than Trudy Wenzel.**

*I just come back from my vacation and did Not See Trudy Wenzel,*

_____

Mike Beljakovic

4,5    **BEL 73**

95

**WORK SCHEDULE**    Now 1-5-05

| NAME | POSITION | SAT | SUN | MON | TUES | WED | THURS | FRID |
|---|---|---|---|---|---|---|---|---|
| S. IBRICEVIC | SUPT. | OFF | OFF | 8-A.M. 4-P.M. | 8-A.M. 4-P.M. | 8-A.M. 4-P.M. | 8-A.M. 4-P.M. | 8-A.M. 4-P.M. |
| J. PERALTA | DOORMAN | 7-A.M. 3-P.M. | 7-A.M. | OFF | 7-A.M. 4-P.M. | 7-A.M. 3-P.M. | 7-A.M. 3-P.M. | 7-A.M. 3-P.M. |
| M. BELJAKOVIC | DOORMAN | 3-P.M. 11-P.M. | OFF | 3-P.M. 3-P.M. | 3-P.M. 3-P.M. | 3-P.M. 3-P.M. | OFF | 3-P.M. |
| K. JENKINS | DOORMAN | OFF | 11-P.M. 11-P.M. | 3-P.M. 11-P.M. | 11-P.M. 11-P.M. | 11-P.M. 7-A.M. | 7-A.M. | OFF |
| I. PEDZEPAGIC | DOORMAN | 7-A.M. 11-P.M. | 7-A.M. 11-P.M. | 7-A.M. 11-P.M. | 7-A.M. 11-P.M. | OFF | OFF | 11-P.M. 6-P.M. |
| A. LIOYD | PORTER | OFF | OFF | 8-A.M. 4-P.M. | 10-A.M. 6-P.M. | 10-A.M. 6-P.M. | 10-A.M. 6-P.M. | 8-A.M. 4-P.M. |
| S. KUKAY | PORTER & DOORMAN | 10-A.M. 6-P.M. | 10-A.M. 6-P.M. | 10-A.M. 6-P.M. | OFF | OFF | 3-P.M. 11-P.M. | 10-A.M. 6-P.M. |

**BEL 74**

4,5,8

90

## WORK SCHEDULE    NOW 1-6-05

| NAME | POSITION | SAT | SUN | MON | TUES | WED | THURS | FRID |
|---|---|---|---|---|---|---|---|---|
| S. IBRICEVIC | SUPT. | OFF | OFF | 8-A.M. 4-P.M. | 8-A.M. 4-P.M. | 8-A.M. 4-P.M. | 8-A.M. 4-P.M. | 8-A.M. 4-P.M. |
| J. PERALTA | DOORMAN | 7-A.M. 3-P.M. | 3-A.M. 11-P.M. | OFF | OFF | 7-A.M. 3-P.M. | 3-P.M. 11-P.M. | 3-P.M. 11-P.M. |
| M. BELJAKOVIC | DOORMAN | 3-A.M. 11-P.M. | OFF | 7-A.M. 3-P.M. | 3-P.M. 11-P.M. | 11-P.M. 7-A.M. | OFF | 7-A.M. 3-P.M. |
| J. JENKINS | DOORMAN | OFF | 7-A.M. 3-P.M. | 11-P.M. 7-A.M. | 11-P.M. 7-A.M. | 7-A.M. 7-A.M. | 11-P.M. 7-A.M. | OFF |
| R. REDZEPAGIC | DOORMAN | 11-P.M. 7-A.M. | 11-P.M. 7-A.M. | 7-A.M. 7-A.M. | 11-P.M. 7-A.M. | OFF | OFF | 11-P.M. 7-A.M. |
| L. LLOYD | PORTER | OFF | OFF | 8-A.M. 4-P.M. | 10-A.M. 6-P.M. | 10-A.M. 6-P.M. | 10-A.M. 6-P.M. | 8-A.M. 4-P.M. |
| i. KUKAY | PORTER* DOORMAN | 10-A.M. 6-P.M. | 10-A.M. 6-P.M. | 10-A.M. 6-P.M. | OFF | OFF | 3-P.M. 11-P.M. | 3-P.M. 11-P.M. 10-A.M. 6-P.M. |

97

# Several cases of transgression by the Defendant

The willingnes of Al Melohn to hurt me, can be seen from this trivial incident. We received our paychecks on Friday, November 30, 1998, but they cannot be cashed until four days later, the next Tuesday. Being in a need of money that day, I waited for someone from the family to come down and ask them to change a day, so that I can cash the check immediately. We all used to practice that occassionaly when we needed money. They all complied. This time, however, Al, when he appeared was in a different mood. When I asked him to change the date, he did it after asking which date to put, and handed me check back without any comments. When my lunch hour came and I went to the bank to cash my check, they flately refused. I was told that the date can not be changed by anyone even by the owners. I made them call the office and I called Al, but all found some excuse. It was obvious that Al Melohn called the bank and told them not to pay my check that day.

When the Melohn family finally took residence in the late 1998 ( now, two brothers have 13 children) our work increased tremendously, due to their constant and excessive demands for service, which include even a wake up call for Al Melohn. Even Superintendent is on the verge of a nervous breakdown, with high blood pressure, for which he once had to be hospitalized. Phisycally, I am still enduring all of this, but the scars of the emotional and physical abuse inflicted on me by my employers will certainly stay with me and shorten my life.

All I had done was not good for the Melohn's and they decided to get rid of me before they move in the building. At the end of 1997, Mr. Jack Freedman, then a manager, came to the building one Wednesday afternoon, the only day when I worked the second shift, and wanted to see me. He ordered the Super to replace me with someone at the door. Lloyd Adolton, a porter came, and we went to the center of the lobby where a couch and cheirs are. They sat on the couch and I sat on the chair opposite to them. Then, Mr. Freedman began: "MIKE, CAN YOU DO THIS JOB, ISN'T IT TOO MUCH FOR YOU?" - he asked me. I answered that I am in a good helath and if I did it all these years, why I wouldn't be able to do it now. I showelled snow, helped push containers with newspapers to the street, carried luggage for the tenants and their guests until we got a wagon and did all other straining jobs as well. THEN, HE ASKED ME WHEN I WAS PLANNING TO RETIRE. I answered that this will be when I reach Mr. Helmreich's age (a manager is at least 5 years older than me). Lloyd, who overheard my answer burst laughing aloud. Mr. Friedman got up and left. THEY DID NOT ASK ME ABOUT MY RETIREMENT SINCE THEN DIRECTLY; BUT DID EVERYTHING POSSIBLE TO MAKE ME LEAVE.

Several months later, I filed my complaint of dicrimination because of age with the State. When Melohn's office received an inquiry from them, Mr. Freedman came to me trying to retract everything he said.

2, 3, 4, 5, 7, 8

On April 23, 2001, Mr. Robert Hammer, the new manager, came to the building about 10 a.m. I greeted him and he went to look for Superintendent, Smail Ibricevic, as he usually does. They together then went to see some empty apartments, where painting and construction were under way. Shortly, after Mr. Hammer, Mr. Joseph Helmreich, the old manager of the building, also came in.

Then, about 10.30, they came to me together with Sam, the porter, and Smail told me that Mr. Hammer has something to talk to me downstairs in the office. Sam will replace me at the door while I am absent (This was the time when I expected Lloyd, another porter, to replace me to go for lunch). I complied and we all went downstairs. In the elevator, they talked among themselves about some business matters, while I tried to figure out why Mr. Hammer wanted to talk to me.

Once in the office, Mr. Hammer sat at the Super's desk, while I took a seat accross from him, and the Super next to me, on the left, close to the door. THEN STARTED THE GRILLING FOR A FULL TWO HOURS IN A POLICE LIKE FASHION:

"I want to ask you, Mike, about some tenants, whose leases are up for renewal, but we do not know who live in their apartments. You answer all my questions" - he commanded in a very firm tone. This sounded ominous to me; the Super was the one to inform them about the tenants.This was some kind of test for me to see whether I would tell them truthfully about some tenants they want to force out. At least five court cases of this sort were already going on. If I withold information or lie about some of them in order to protect the tenants - they would have reason to fire me "FOR CAUSE".

I told Mr. Hammer, that I never bothered with the whereabouts of the tenants, I am friendly with all of them and for all these years I am with Melohn's I had entered only several of their apartments. "Then we do not need doorman, who does not know their tenants" - he responded obviously irritated by my reluctance to talk about the people who live in the building.

"Who live in the Panthouse?" - he pressed me for an answer."The Gallagher family" - I answered quickly. "Do you see Rogers. Does he live there?" - he insisted. "I see him, but I do not know if he lives there", I continued. He exploded: "Jesus Christ, you insult my intelligence", AND SLAMMED HIS FIST AT THE TABLE IN ORDER TO SCARE ME."Who pays your salary?" - he continued. I kept quiet thinking what to do, to get up and go or subject muself to further mistretament.

Very calmly, I told him that he insults my intelligence and that I would like to consult my lawyer before we can continue this line of questioning and actual interogation. Realizing that he went too far with his threats, Mr. Hammer calmed down and continued to ask me in a more subdued way not only about the tenants whose leases were up for renewal, but all of them. During the interogation, Mr. Helmreich came in and listened, making only one remark: "He knows everything, but does not want to say it".

NONE OF THE OTHER FIVE DOORMAN OR PORTERS WERE ASKED BY MANAGEMENT ABOUT THE TENANTS WHEREABOUTS OR EXPOSED TO THE MISTREAT-MENT THAT I WAS. Obviously, they wanted me to say something about the tenants that they could later use in the courts againt them and create bad feeling among us. THEY KNOW EVERYTHING ABOUT WHO LIVES IN WHICH APARTMENT, BUT SINGLED ME OUT FOR THIS KIND OF ENTRAPMENT IN ORDER TO CATCH ME LYING AND FIRE ME FROM MY JOB.

My lunch hour was two hours overdue.

2,3,4,5,7,8

# AN INCIDENT ON FRIDAY, AUGUST 30, 2002

As I was preparing for my two weeks vacation about 2. p.m. there came Mrs. Martha Melohn and wanted to enter the front passengers elevator. Scott, an electrician with Lowell & Edvards, which company services a huge and luxurious apartment of her son Al, was waiting for elevator as well.. I was there pushing the elevator button, so that they can come in before the door closes.

Knowing that I will leave soon at 3 p.m., Scott, whom I know well for years, told me that he will see me again on Monday. "O, no, I will be on vacation" - I told Scott, before the door closed.

At the same time, I heard Mrs. Melohn telling Scott: "HE DOES NOT NEED VACATION. HE IS NOT DOING ANYTHING, BUT ONLY SITS AT HIS DESK". Of course, this was not true, since I am regarded as one of the best workers there.

When I saw Scott after my vacation, he told me that he could not believe what she told him about me.

I heard Mrs. Melohn badmouthing me on several other occassions. Very often, she talks about me to a Super in front of the building and I can hear only parts of their conversation.

WHEN SHE GOES OUT IN THE MORNING ABOUT 10 A.M. AND I GREET HER WITH "GOOD MORNING". IN 90% OF THE CASES SHE DOES NOT ANSWER ME AND JUST PASS BY.

SHE OBVIOUSLY WANTS TO FORCE ME OUT AND DOES NOT HIDE HER HATE FOR ME.


ON DECEMBER 23, 2003, ABOUT 10 A.M., CELIA, A BABY-SITTER FOR MRS. MELOHN'S SON AL BROUGH ME A WAGON WITH SEVERAL PACKAGES TO BE PUT IN MR. MELOHN'S CAR. ALL PACKAGES, EXCEPT ONE, WERE SMALL AND LIGHT WITH SOME POTS AND PENS LEFT AFETR A PARTY PREVIOUS EVENING.

WHEN PABLO, MR. MELOHN'S DRIVER CAME, WITH THE CAR, I TOOK WAGEN OUTSIDE AND TOLD HIM THAT THE BOXES ARE GOING IN HIS CAR . WHILE I HELD A WAGON AT THE CURB SO THAT IT DOES NOT FALL OVER, PABLO STARTED TO PUT PACKAGES IN HIS TRUNK WHERE HE WANTED IT.

WHILE PABLO WAS DOING THAT, MRS. MARTHA MELOHN CAME OUT AND STUD NEXT TO US OBVIOUSLY WAITING FOR PABLO TO FINISH THE JOB AND THEN SHE GO WITH HIM. AT THAT MOMENT, SHE MADE A COMMENT; "YOU SEE, PABLO, WE NEED A YOUNGER MAN WHO CAN HELP YOU".

THERE WAS NOTHING TO HELP HIM WITH, I DID NOT KNOW WHERE HE WANTED TO PUT THOSE PACKAGES, TWO OF US COULD NOT HAVE HANDLED THE SAME THING AND I STILL HAD TO HOLD A WAGON NOT TO GO OVER THE CURB.

THIS IS JUST ANOTHER CONFIRMATION OF HER CONTINUOUS INTENT TO HARRASS ME AND FORCE ME OUT FROM MY JOB.

2, 3, 4, 5, 7, 8

On Monday, May 5, 2003, at 7 a.m., I returned to work after my eye operation. Only 20 minutes later, Mrs. Melohn came down and went out for her morning walk. As usual, she ignored my "Good mroning" and just passed by. She returned about 8 a.m. together with Mr. Jay Lobel, she met outside.

About a half an hour later the intercome bell rang. I reckognized voice of Mrs. Melohn which was barely audible. I told her that I have difficulty in hearing her and asked her to talk louder or call me on the phone. "There is nothing wrong with the intercome, but you do not hear well" - she yelled at me in a much lauder voice I heard well. Obviously, she was not near intercome when she called me initially, or sho was talking in a low voice to be heard well at my end.

I asked her as how I can help her. "There is a man outside of my door ringing my bell and saying that he has a package to deliver to me. Who is he?" - she asked. I told her that nobody came with a package for her, which I would announce to her. She persisted that there is a man outside, and I told her that I will check and call her back.

Knowing that the outside gate was open since there are many construction workers around and there is a remote possibility that some of them went to her door, I closed the main door and took the elevator to the eight floor. There was nobody there. I went then to the seventh and nineth floors and checked the stairways on both sides and there was noone there as well. When I returned to my station, I called Mrs. Melohn to tell her that there was nobody close to her door and she has nothing to worry about.

Obviously agitated with my report, she snapped at me: "You want to tell me that I made the whole thing up just to put jou in trouble?". "No, Mrs. Melohn, I did not say that" - I said politely, and she cut our conversation on the intercome.

When she went to the office an hour later, she passed me without saying a word.


On August 17, 2004 about 9 a.m. when I was on duty, the intercom rang almost inaudibly and I answered. On the other side was Ms. Martha Melohn, the principal owner of the Melohn Properties, Inc. She was telling me something most of which I could not hear because of the poor state of the intercome system which replacement is long time overdue (every week, there are some repairs on it and at least five tenants have a problem with thir intercom at any time).

When I heard Mrs. Melohn talking, and knowing that she constantly blames me for not hearing well, I told her to talk a little bit louder so that I can help her. When she came closer to the intercome or spoke louder I heard her order to call the Super to come to her apartment. To underline her point of me not hearing well, Mrs. Melohn sent down to me her housekeeper to tell me the same thing.

I immediately called the Super and he went there. When he came down he was so upset at what he heard from Mrs. Melohn that "WE HAVE  DANGEROUS MAN WHO CAN NOT HEAR ANYTHING AT THE DOOR". When the Super told her about the state of the intercom, which she knows herself, she still insisted that I can not hear well and that as such am not fit to be a doorman.

About 3 p.m. the Super was with me when my replacement Mr. Kenny Jenkins came. I told him about the incident and asked him in front of the Super if he can hear her when she calls on the intercom. "Of course, not" was his answer.

2, 3, 4, 5, 7, 8

101

While pushing a heavy dumpster full of newspapers, to be collected by the Sanitation Department next morning, up the stiff ramp to the street on June 9, 2004, together with two other employees, Smail Ibricevic, the Superintendent and Lloyd Adolton, porter, I felt an intense pain in the area of the lower abdomen. When I saw my doctor, he diagnosed it as hernia and sent me to the specialist who can treat that. That was just prior to my one-month's vacation. Since a cat scan test could not be scheduled fast, but right after my vacation, they suggested that I wait and return to work after the final analysis is done. At the same time, I filed for workers compensation as it looked like I would not be able to work for longer periods of time.

The Defendant who seemed to be waiting for something like that to get rid of me, sent me a letter on September 15, 2004 through their attorney Kucker and Bruh, indicating that my return to work has to be preceeded by a physician's letter permitting resumption of all the duties inclusive of "heavy lifting". In case that "you will no longer be able to physically perform all your duties, without exception, you will be terminated for physical inability". No other doorman, to my knowledge, received a letter demanding "heavy lifting" as a precondition for doing the dooman's job. Instead of some concern for my health and extent of my injury, the Defendant maliciously threatened me with termination. When the results from the cat scan proved that I have small hernias on both sides, I was allowed by my doctors to return to work.

2,3,4,5,7,8

4102

During my regular daily work, I often have to handle the suitcases and packages of tenants and their guests weighing over 100 pounds. Some of them have sometimes 5-10 pieces at the same time. In addition to that I was occassionally called on Wednesdays, about 3 p.m., when I show up for work in the evening shift, by two of my colleagues to help them to push a container with newspapers and magazines up the stiff rump to the street, so that the newspapers can be collected by sanitation men the next day. So, the three of us always pushed it. The most of the time a container was so full that even its metal cover could not be put over it. This was strenous work, and each time when we came to the top of the hill to the street, my heart was pumping hard and I felt a slight discomfort. Doing this during the Summer hot days, was practically unbearable.

The container, made out from solid steel long time ago, with small rusted wheels, weighing empty at least 400 pounds, was difficult to move even on the even terrain. Filled with the newspapers and magazines, the container must weight at least 700-800 pounds. The owners did not bother to provide us with some truck which can pull it or a lift which can pull the container up the hill. I complained about it, but nothing happened. Their managers come to the building at almost daily to check whether some rooms are painted and ready for renting, or to boss us around for trivial things, but never bothered to look into the conditions their employees work in. As a result, the Superintendent Smail Ibricevic, got hernia, porter Lloyd Adolton had a spine operated and two doormen recently got hernia as well. Realizing what has happened, the Superintendent and porter Lloyd Adolton, now take the empty container up to the rump to the street and then bring newspapers with the handtruck and put them in it to make it ready for the morning pick up.

For years, every time we pushed that container to the street, I felt small pain in the area of lower abdomen. This pain recently started to intensify, and several days ago there apeared a lump on my right side. I promptly saw a doctor on August 13, and he confirmed that I have a hernia as well, sending me to the specialist whom I will see on September 2. How this all will end, I do not know, but my pain persists even though I can walk normally and go to work, where I do not lift or push anything anymore. Fortunately, in several days, I will start a one month vacation and during this time I will see what will happen and how I will have to deal with my hernia.

2, 3, 4, 5, 7, 8

103

Elizabeth, N.J., April 18, 2002

To the Tenants of
365 West End Avenue
New York, N.Y. 10024

Dear Tenant

During last week, I was overtaken by the tremendous support and love from about 30 of the tenents who heard that I was fired. Some of the ladies hugged and kissed me while the men congratulated me when they saw me on the door again. A number of you told me that you were organizing a picket line to ask that I return. Others offered to come to court and testify on my behalf if there is ever a need for that, and some suggested that I contact media, which certainly would be interested in the case. One tenant, who is familiar with the torturous practices I am exposed to by management , described me as " a cat with nine lives".

In response to your questions, I will now tell the full story.

There has been a consistent effort on the part of the Management at 365 West End Avenue during the past several years to force me into retirement. The reason for that is that I am 72 years old. Since December 2000, Mr. Robert Hammer, the new manager, wrote eight letters to me, accusing me of various disciplinary and other wrongdoings. I answered all of these accusations with facts, which clearly showed their malice, harrassment, intimidation and discrimination and they were not able to challenge any of my letters.

Unable to find any pretext to fire me, they brought in a tailor to take the meassurements for the uniforms for all of us. Mr. Hammer told me that I will look "like a Marshall" in it. Sure enough, a new and very flashy blue uniform with epolettes came more than a month ago, but only for me. You see me at the door in it. Even though the uniform is decent and many people like it, there are also the others who are laughing when they see me in it. The comments go from that I look like "Marshall Goering", "a doorman at the Atlantic City Casino", "a Captain of the Love boat", to "a Farakhans's body guard". Why this unoform was given only to me when the measurements of all the doorman were taken at the same time, I do not know? Maybe, someone thought that I would refuse to wear it, which would be a cause for my dismissal.

When all of this did not work, they went further. About a month ago, Mr. Hammer came to the building and asked me who lives in Apt. 1201. I replied: "Dr. and Mrs. Eisenberg". Then he went on telling me how Doctor signed an affidavit that he is the only one who lives there, and he wants me to sign a letter testifying that they live together. I knew that this was not of my concern or a part of my job, because we went trough similar requests several times before.

On Monday, April 8, 2002, soon after 11 a.m., Mr. Hammer called me and asked when Julio and Kenny work,. I told him that Kenny will be in that afternoon and Julio is off till Wednesday morning. He told me then that he will come to the building before the end of my shift so that I can sign a letter confirming that Mrs. Eisenberg's wife lives there. I told him calmly that prior to signing anything I will have to consult my attorney to see whether this is a part of my job.

He continued that he will come to the building for me to sign it, and if I refuse, I will be summarilly fired. "For insubordination people are shot during the war, and if they work fired in peace" - he said. I told him that he can do whatever he pleased, and I will see what my options are after he does that. The conversation ended with that he is coming to the building to fire me.While we talked, Lloyd was standing next to me to relieve me to go out for lunch. Before going out to buy something for lunch and have it in our room in the basement, I told him about the whole thing.

Even then I felt uncomfortable, but was able to go and buy food. When I came to the basement, I was not able to eat, was very upset and some dizziness set in. I really was afraid that I would get a heart attack. The only thing that I could have done, was to go upstairs, tell Lloyd that I

2, 3, 4, 5, 7, 8

do not feel well and have to rush to the hospital. He should tell this to Smail and see who can replace me until Kenny comes. When I was trough at the hospital, I will let them know what the results are. I quickly took a cab and went into the Emergency Room at the Roosevelt Hospital.

After registering, the nurse took me in her cubicle to take all the information and check my vital signs. When it came to the blood pressure, she repeated it and told me that my pressure was "up through the roof" and I would have to see a doctor. I asked her what was the pressure and she told me: 194/95. I told her that I normally do not have a high pressure. Two doctors then examined me, took my blood pressure again and told a nurse to give me a tranquilizer. After that I felt better. They told me that for a further control of my blood presure I should go to my regular doctor, and if I dont have a doctor to find one. I went home, and by the evening felt better.

From my home, I called Kenny to tell him what happened and that I will take a personal day and not work the next day, which was already arranged before this incident took place. He told me that he was asked to sign the same letter abot the Eisenberg's but he refused to do that as well. He was not fired, but I was. He told me, there was a letter to that effect in the drawer, and another, sealed letter, which Smail has, and is to give me when I show up. I better call Smail, Kenny suggested. I told Kenny that I am not going to call him, but if he wants me to come in the morning, on my day off, he should call me and ask me to come in. Smail called me shortly after, and told me that I was dimissed and that he has a letter for me. I told him that I will come in the morning to take that letter.

However, prior to going to the building, I went to the Union, where Mr. Frank Monaco, our District manager told me that not signing a letter Mr. Hammer wanted me to do, can not be grounds for dismissal. From there, I went to see an attorney, and he told me the same thing. When I went to the building and ran into Lloyd, he told me that a letter is not with Smail anylonger, since Mr. Joseph Helmreich, the manager, took it back. By that time, many people heard that I was fired, and some had read the letter which was left at the desk. Smail told me to come back to work on Wednesday afternoon, my next regular work day. That Friday, Mr. Helmreich came to the building, asked me what happened and I told him everything. He told me "Let old dogs sleep", and not to worry. I told him that is very easy for him to say that, but it is hard for me to live with it. Therefore, I will look for the best way as how to protect my health, my job and my interests.

As if all of this was not enough for Mr. Hammer, he came to the building a week later, on Monday, April 15, 2002, about 2 p.m., and threatened and harrassed me again. Obviously enraged that things did not go his way, he yelled and embarassed me in front of some people coming in or going out from the building in a loud and threatenening voice.

How this dispute with the Management, determined to force me to leave my job will end, I do not know. But I do know that I like my job, that I am able to do it, that tenants are satisfied with my performance, that work is good for me physically and that I tremendously enjoy association with many of you, educated, fair and friendly people the building is packed with. The more that they are pressuring me to leave, the more I am determined to stay and do my job.

Once more, I thank you all for the outpour of your support and friendship.

Sincerely yours,

Miodrag Beljakovic, "Mike"
925 Park Avenue
Elizabeth, N.J. 07208

# Exhibit B



UNITED STATES DISTRICT COURT **JUDGE HOLWELL**
SOUTHERN DISTRICT OF NEW YORK

*Miodrag Beljakovic*                      *Jury Trial Demanded*

NAME OF PLAINTIFF(S)

v.                          **COMPLAINT**

*Lohn Properties, Inc.*   04 CV 3694

NAME OF DEFENDANT(S)

      This action is brought for discrimination in employment
pursuant to *(check only those that apply)*:

—————   Title VII of the Civil Rights Act of 1964,
codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended
in 1972, 1978 and by the Civil Rights Act of 1991,
Pub. L. No. 102-166) (race, color, gender,
religion, national origin).
*NOTE: In order to bring suit in federal district court under
Title VII, you must first obtain a right to sue letter from the
Equal Employment Opportunity Commission.*

✓   Age Discrimination in Employment Act of 1967, as
codified, 29 U.S.C. §§ 621 - 634 (amended in 1984,
1990, and by the Age Discrimination in Employment
Amendments of 1986, Pub. L. No. 99-592, the Civil
Rights Act of 1991, Pub. L. No. 102-166).
*NOTE: In order to bring suit in federal district court
under the Age Discrimination in Employment Act, you must
first file charges with the Equal Employment Opportunity Commission.*

—————   Americans with Disabilities Act of 1990, as
codified, 42 U.S.C. §§ 12112 - 12117 (amended by
the Civil Rights Act of 1991, Pub. L. No. 102-166).
*NOTE: In order to bring suit in federal district court under
the Americans with Disabilities Act, you must first obtain a
right to sue letter from the Equal Employment Opportunity Commission.*

Jurisdiction is specifically conferred upon this United States District Court by the aforementioned statutes, as well as 28 U.S.C. §§ 1331, 1343. Jurisdiction may also be appropriate under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, and any related claims under New York law.

1.   Plaintiff resides at:

*925 Park Ave* , *Elizabeth* ,
Street Address            City

*Union* , *N.J.* , *07208* , *(908) 353-6181* .
County    State    Zip Code    Telephone Number

2.   Defendant(s) lives at, or its business is located at:

*1995 Broadway - 14th Floor* , *New York* ,
Street Address            City

*New York* , *N.Y.* , *10023* , *(212) 787-2500* .
County    State    Zip Code    Telephone Number

3.   The address at which I ~~sought employment or~~ was employed by the defendant(s) is:

*365 West End Avenue* ,
Street Address

*New York* , *New York* *N.Y.* , *10024* .
County    City    State    Zip Code

2

4.  The discriminatory conduct of which I complain in this action includes *(check only those that apply)*:

_____    Failure to hire me.

_____    Termination of my employment.

_____    Failure to promote me.

_____    Failure to accommodate my disability.

___✔___    Unequal terms and conditions of my employment.

___✔___    Retaliation

___✔___    Other acts (specify): *Forcing me to Leave*

*NOTE: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

5.  It is my best recollection that the alleged discriminatory acts occurred on: ___*as per attached statement*___ .
                                         *Date*

6.  I believe that defendant(s) *(check one)*

___✔___    is still committing these acts against me.

_____    is not still committing these acts against me.

7.  Defendant(s) discriminated against me based on my:

     *(check only those that apply and explain)*

[ ]  race _____     [ ]  color _____

[ ]  gender/sex _____     [ ]  religion _____

[ ]  national origin _____

[✔]  age __74__ .  My date of birth is: _12/8/1929_
                                              *Date*

[ ]  disability _____

*NOTE: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court.*

3

8.    The facts of my case are as follows:

_Statement is attached_

_____

_____

_____

_____

_____

_____

_____

(Attach additional sheets as necessary)

Note:        As additional support for the facts of your claim, you
             may attach to this complaint a copy of the charge filed
             with the Equal Employment Opportunity Commission, the New
             York State Division of Human Rights, or the New York City
             Commission on Human Rights.

9.    It is my best recollection that I filed a charge with the New

York State Division of Human Rights or the New York City Commission

on Human Rights regarding defendant's alleged discriminatory

conduct on: _2/5/03 & 4/7/03_____
                              Date

10.   It is my best recollection that I filed a charge with the

Equal Employment Opportunity Commission regarding defendant's

alleged discriminatory conduct on: _____.
                                            Date

4

**Only litigants alleging age discrimination must answer Question # 11.**

11. Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*,

      ✓     60 days or more have elapsed.

            less than 60 days have elapsed.


12. The Equal Employment Opportunity Commission (check one):

            <u>has</u> <u>not</u> issued a Right to Sue letter.

      ✓     <u>has</u> issued a Right to Sue letter, which I
received on ___3/1/04_____.
                                      *Date*

NOTE:    *Attach a copy of the Right to Sue Letter from the Equal Employment Opportunity Commission to this complaint.*


    WHEREFORE, Plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, costs, and attorney's fees.

_____
          *PLAINTIFF'S SIGNATURE*

Dated:  *5/14/04*_____

5

06/04/2004  15:02  2125565287  COURTHOUSE  NEWS NY  PAGE  07/33

- EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Miodraq Beljakovic<br>925 Park Avenue<br>Elizabeth, NJ 07208 | From: New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR § 1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | | Telephone No. |
|---|---|---|---|
| 16G-A3-01820 | **Spencer H. Lewis, JR,**<br>**District Director** | | **(212) 336-3620** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| ☐ | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| ☐ | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| ☐ | While reasonable efforts were made to locate you, we were not able to do so. |
| ☐ | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| ☐ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☒ | Other (briefly state)   **Charging Party is pursuing matter in State Court.** |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Enclosure(s)

_[signature]_

**Spencer H. Lewis, JR,**
**Director**

2-27-04

(Date Mailed)

cc:  MELOHN PROPERTIES, INC.
Personnel Director
1995 Broadway 14th Floor
New York, NY 10023

# FACTS ABOUT FILING
## AN EMPLOYMENT DISCRIMINATION SUIT
## IN FEDERAL COURT IN NEW YORK STATE

You have received a document which is the final determination or other final action of the Commission. This ends our handling of your charge. The Commission's action is effective upon receipt. Now, you must decide whether you want to file a private lawsuit in court. This fact sheet answers several commonly asked questions about filing a private lawsuit.

## WHERE SHOULD I FILE MY LAWSUIT?

Federal District Courts have strict rules concerning where you may file a suit. You may file a lawsuit against the respondent (employer, union, or employment agency) named in your charge. The appropriate court is the district court which covers either the county where the respondent is located or the county where the alleged act of discrimination occurred. New York State has four federal districts:

- The United States District Court for the Southern District of New York is located at 500 Pearl Street in Manhattan. It covers the counties of Bronx, Dutchess, New York (Manhattan), Orange, Putnam, Rockland, Sullivan, and Westchester.

- The United States District Court for the Eastern District of New York is located at 225 Cadman Plaza in Brooklyn and covers the counties of Kings (Brooklyn), Nassau, Queens, Richmond (Staten Island), and Suffolk.

- The United States District Court for the Western District of New York is located at 68 Court Street in Buffalo. It covers the counties of Allegheny, Cattaraugus, Chautauqua, Chemung, Erie, Genesee, Livingston, Monroe, Niagara, Ontario, Orleans, Schuyler, Seneca, Steuben, Wayne, Wyoming, and Yates.

- The United States District Court for the Northern District of New York is located at 100 South Clinton Street in Syracuse and covers the counties of Albany, Broome, Cayuga, Chanango, Clinton, Columbia, Cortland, Delaware, Essex, Franklin, Fulton, Greene, Hamilton, Herkimer, Jefferson, Lewis, Madison, Montgomery, Oneinda, Onandaga, Oswego, Otsego, Rensselaer, St. Lawrence, Saratoga, Schenectady, Schoharie, Tioga, Tompkins, Ulster, Warren, and Washington. This District Court's *pro Se* Attorney has offices at 10 Broad Street in Utica New York.

## WHEN MUST I FILE MY LAWSUIT?

Your private lawsuit must be filed in U.S. District Court within <u>90 days</u> of the date you receive the enclosed final action. Once this 90 day period is over, unless you have filed suit, you will have lost your right to sue.

(Over)

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --**    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you receive this Notice.** Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was mailed to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

### PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit **before 7/1/02 -- not** 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

### ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

## PARTIES

2. Plaintiff, MIODRAG BELJAKOVIC, a male born in former Yugoslavia, now

Serbia is now a (naturalized citizen of these United States since 1970), currently resident

the County of Union, State of New Jersey. I was a teacher in Serbia (former Yugoslavia)

prior to coming to the U.S. in 1959, where I worked in banking until 1985.

3. The defendant, MELOHN PROPERTIES, INC. (hereinafter "MELOHN") upon

information and belief, is a domestic corporation existing under the laws of the

State of New York.

## PRELIMINARY STATEMENT

4. This is a civil right action for declaratory relief, compensatory damages

and punitive damages and other relief, to redress discrimination in the terms

and conditions of employment arising out of defendant's hate, discrimination and harrassment

practices againt plaintiff.

## FACTUAL ALLEGATIONS

5. Plaintiff Miodrag Beljakovic is employed by the Defendent from May 1985

as a doorman in their building at 365 West End Avenue, New York, N.Y. 10024.

I was then 55 years of age and I am now 74.

6. During all this time I served in an exemplary fashion, had no latenesses

or undue absences and was well liked by both tenants and co-workers, many of whom

would like to come and serve as character witnesses in this case. I am still in a good health

and would like to continue to work.

7. The only person showing an open dislike toward me is Mrs. Martha Melohn,

the principal owner of Melohn Properties, Inc., and her son Alphonse who wants me to retire

because of my advanced age and exercises a tremendous pressure on me to acheive that.

06/04/2004  15:02   2125565287        COURTHOUSE  NEWS  NY                              PAGE  11/33

I complained three times to the New York State Human Rights Division, but they did not help me.

Why Mrs. Martha Melohn and her son Mr. Alphonse Melohn hate me, I do not know. The only reason I can think of is that I wrote several books (two of them in English) and they are afraid that I might write one about them and expose their unethical dealings in forcing tenants to leave, taking them unjustly to the court and singlehandedly deregulating the rents in this otherwise rent stabilized apartment house.

Below are examples of their mistreatment:

8.  On Monday, April 8, 2002, shortly  after 11 a.m. Mr. Robert Hammer, Agent for the Defendent, called on the telephone at the door where I was on duty and told me that he will come to the building before the end of my shift, so that I can sign a letter confirming that a wife of the tenant Dr. Edward Eisenberg lives in apartment 1201 with him. Knowing that the Defendent was attempting to evict that tenant, I told the Agent that I can not sign any such letter before consulting an attorney.

Obviously enraged, Mr. Hammer told me that he is coming to the building so that I sign that letter and, in case that I refuse, I will be summarily fired. During the whole conversation, Mr. Lloyd Adolton, a porter, who came to relieve me for lunch. stood next to me and heard my part of the conversation.

Throughtout the conversation I felt upset, but was able to go and buy food for lunch which I will eat in the employees room in the basement. When I came to the room, I was unable to eat, felt very upset, started shaking and some dizziness set in. I was affraid that this was the beginning of a heart attack. I ran opstairs and told Lloyd that I feel sick and that I have to rush to the hospital. He should notify the Super. I then took a taxi

2

05/04 2004  15:02   2125665287          COURTHOUSE NEWS NY                                  12/33

and went to the Roosevelt Hospital.

After registering, a nurse took me to her cubicle to take information and check my vital signs. When it came to the blood pressure, she checked it several times and told me that it was "up to the roof", and that I have to see a doctor. The pressure was 194/95. I told the nurse that I normally do not have a high blood pressure, and she commented that a stress can cause that. Two doctors examined me, took the blood pressure again and told the nurse to give me a tranquilizer. After taking it, I felt better. The doctors told me to continue to monitor blood pressure wih my doctor. The pressure for entire week was still high, but slowly started to go down to a normal level of 135-140/85/90 without any medication.

When I came home from the hospital I called doorman Kenny Jenkins who was at the door in the afternoon and told him what I went through. Kenny told me that he also refused to sign the letter brought by Mr. Hammer. He was not fired, but I was and there was a letter to that effect with the Supper. That letter was earlier on his desk and some people saw it. Kenny suggested that I should call the Super and arrange when to come and take it. Then I called the Super and he confirmed that I was dismissed and that he has a letter for me confirming that.

Next morning I went first to the Union Local 32B-J and a delegate Mr. Frank Monaco told me that a refusal to sign such a letter can not be a reason for dismissal. When I came to the building about noon I saw Lloyd, porter first, and he told me that a letter of my termination was not there anymore. Mr. Helmreich, the Manager, came and took the letter and that I should come to work the next day. The Super who came after that confirmed that a letter of my dismisal was taken back from him by Mr. Helmreich. I should come back to work on Wednesday.

3

When I appeared at work the following day, at least a dozen tenants came

to hug and kiss me and told me about their plan to make a collective protest against the

firing. Some wanted to set up a picket line. Many tenants familiar with the tortureous practice

I am exposed to by the Management offered to come to court and testify in my favor.

9. In an incident of age descrimination, on December 23, 2002, Celia, a baby-

sitter for Mrs. Melohn's son Al brought me a wagon with several packages to be

put in Mr. Melohn's car. All packages were small and light with some pots and pans,

left after a party they had theprevios evening. When Pablo Baez, Mr. Melohn's driver came

with the car I took the wagon outside and told him that the boxes have to be loaded in his car.

I continued to hold the wagen not to overturn at the curb while Pablo took packages

and put them in the car where he had a space.

At that moment, Mrs. Martha Melohn came out and stood next to us, obviously

wanting to go with Pablo when he finishes loading. While waiting, she made a comment:

"YOU SEE, PABLO, WE NEED A YOUNGER MAN WHO CAN HELP YOU".

Actually, there was nothing to help him with, since he knew where he wants to put small

packages in his car.

10. Mr. Robert Hammer, Agent for the Melohns wrote to me two letters ordering

me not listen to the radio at my work station, where a radio stood for years and all other

doormen listened to it throghout the day. Radio was always set at ABC News, which

carries Yankee's game in the evening  and Rush Limbaugh and Sean Hannity talk shows

during the day. That radio is still there and all other doormen are listening to it

except me. I followed the order and never put radio on for the last three years.

We all know that the last years were very crucial in New York. Due to this

4

discriminatory order I was not able to follow the fatefull 9/11 events, and the subsequent

anthrax danger while I handled mail at work, warning of the authorities about the

terrorist attacks and other biological threats, whether some crime is occuring in the

neighborhood and there is a danger for us or to answer question by the tenants about weather,

etc. I am still the only doorman in the building who cannot listen to the radio which is there.

Knowing that I can not listen to the radio, Mr. Al Melohn is sometimes laughing in

my face when he leaves in the morning, asking me what the radio says about the weather

that day.

11. With their letter of August 9, 2001, Mr. Robert Hammer, Agent for Melohn

Properties denied my request for vacation in October, so that I could attend the 60th

anniversary of the death of my father, who was executed by the Nazi's on October 21, 1941

in the City of Kragujevac, Serbia. Their position was that vacations are taken between

May and September. Other employees in the building are allowed to take their vacation

at will, even in December.

12. When I complained on several occassions to the Melohn Properties in

writing against various cases of their discrimination and misconduct against me, I

received a "Reprimand" letter by Mr. Hammer, telling me: "One more letter

to anyone at Melohn will result in a summary dismissal". I believe that this is

in violation of the Supreme Court decision that employees can complain to their employers.

13. Mrs. Melohn is not hiding her hate toward me:

a) When she goes out in the morning when I am at the door four times a week,

and I greet her with "Good morning", she regularly does not answer me and just passes

by. Very often, after passing me, she murmurs loudly inuendoes against me, good parts

5

of which I can hear. Other tenants seeing and hearing that are commenting on her rudeness. She talks to me only if she has a question or wants me to do someting.

b) When I returned from vacation this year on September 12, 2003, my wife told me that a tenant where I work, Mrs. Camp, wanted me to call her as soon as I come. I called Mrs. Camp and she told me that our friend Ms. Ellen Houck is getting married, and moving to North Carolina, she is giving a party for her on Sunday, September 14, before I even return to work, and that Ms. Houck insists that I come. On Sunday, I dressed well and went to the building. Mrs. Martha Melohn was sitting in the chair in the lobby next to Mr. Jennings, a doorman on duty. I greeted them both and while passing them to take the elevator on the far end of the corridor heard her loud comment telling to the doorman: "I HATE THAT MAN".

14. The most recently, on Friday and Saturday, December 5 and 6, 2003 there was a heavy snow storm in New York. While Melohns claim that I am, because of my age, weak to do my job, I showelled wet at least ten inches tick snow for hours on both of these days, while a new snowblowing machine in the basement conveniently had no gasoline and could not be used. Being aware of the danger of heart attack of an older person if he showels snow, the passerbys and tenants who saw me doing it, cautioned me to "take it easy" but the Melohns exibited no concern over it, but deliberately made me do what a new machine idly staying in the basement could have easily done.

15. By reason of such open discrimination, harassment and hatered in terms of words spoken and deeds taken against me by Plaintiff, the defendants caused me enormous mental anguish, depression, loss of sleep, ridiculing and injury in reputation in my work place. In the underlying case I was sent to the Emergency room of the Hospital

6

when my life was threatened. The malicious persecution and pressure on me is continuing
to this day and one can not know as how the next case will end. This clearly proves that
my remaing in employment of Defendants depends on a fair resolution of this case.

16. I charge my employer "Melohn" with intent to cause me a mental and physical
harm, which on April 8, 2002 was raised to a life-threatening level.

WHEREFORE, I pray that this Court:

1. declare the actions and conduct engaged in  by the
   defendant to be in violation of my rights;

2.  enjoin defendent from engaging in such conduct;

3. awarding judgement to me in an amount to be determined
   by the Court and trier of fact but no less than $ 300.000
   and apropriate exemplary damages to be determined
   at trial;

4. awarding me court costs and reasonable attorney fees;

5. awarding such other and further relief  as this
   Court may deem just and proper;

6. trial by jury demanded.

Dated: New York, New York
         May 14, 2004

Respectfully Submitted,

Miodrag Beljakovic
925 Park Avenue
Elizabeth, N.J. 07208

Tel: (908) 353-6181
Fax:(908) 289-1359

7

05/04/2004 15:03  2125665887        COURTHOUSE NEWS NY        PAGE 17/33

## AN INCIDENT ON FRIDAY, AUGUST 30, 2002

As I was preparing for my two weeks vacation about 2. p.m. there came Mrs. Martha Melohn and wanted to enter the front passengers elevator. Scott, an electrician with Lowell & Edvards, which company services a huge and luxurious apartment of her son Al, was waiting for elevator as well.. I was there pushing the elevator button, so that they can come in before the door closes.

Knowing that I will leave soon at 3 p.m., Scott, whom I know well for years, told me that he will see me again on Monday. "O, no, I will be on vacation" - I told Scott, before the door closed.

At the same time, I heard Mrs. Melohn telling Scott: "HE  DOES NOT NEED VACATION. HE IS NOT DOING ANYTHING, BUT ONLY SITS AT HIS DESK". Of course, this was not true, since I am regarded as one of the best workers there.

When I saw Scott after my vacation, he told me that he could not believe what she told him about me.

I heard Mrs. Melohn badmouthing me on several other occassions. Very often, she talks about me to a Super in front of the building and I can hear only parts of their conversation.

SHE OBVIOUSLY WANTS TO FORCE ME OUT AND DOES NOT HIDE HER HATE FOR ME.

Another case of harrassment by Mrs. Martha Melohn

On Monday, May 5, 2003, at 7 a.m., I returned to work after my eye operation. Only 20 minutes later, Mrs. Melohn came down and went out for her morning walk. As usual, she ignored my "Good mroning" and just passed by. She returned about 8 a.m. together with Mr. Jay Lobel, she met outside.

About a half an hour later the intercome bell rang. I reckognized voice of Mrs. Melohn which was barely audible. I told her that I have difficulty in hearing her and asked her to talk louder or call me on the phone. "There is nothing wrong with the intercome, but you do not hear well" - she yelled at me in a much lauder voice I heard well. Obviously, she was not near intercome when she called me initially, or sho was talking in a low voice to be heard well at my end.

I asked her as how I can help her. "There is a man outside of my door ringing my bell and saying that he has a package to deliver to me. Who is he?" - she asked. I told her that nobody came with a package for her, which I would announce to her. She persisted that there is a man outside, and I told her that I will check and call her back.

Knowing that the outside gate was open since there are many construction workers around and there is a remote possibility that some of them went to her door, I closed the main door and took the elevator to the eight floor. There was nobody there. I went then to the seventh and nineth floors and checked the stairways on both sides and there was noone there as well. When I returned to my station, I called Mrs. Melohn to tell her that there was nobody close to her door and she has nothing to worry about.

Obviously agitated with my report, she snapped at me: "You want to tell me that I made the whole thing up just to put you in trouble?". "No, Mrs. Melohn, I did not say that" - I said politely, and she cut our conversation on the intercome.

When she went to the office an hour later, she passed me without saying a word.

STATE OF NEW YORK:  EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS

EXEC. LAW ART. 15
SDHR NO:
1B-E-AO-03-2308739-

+-----------------------------------------------------+
| (State Division of Human Rights on the Complaint of) |
|                                                      |
| Miodrag Beljakovic                    COMPLAINANT    |
|                                                      |
|        - Against -                                   |
|                                                      |
| Melohn Properties, Inc.               RESPONDENT     |
|                                                      |
+-----------------------------------------------------+

## NOTICE

The Division has received your request to dismiss your complaint and annul election of remedies. A dismissal on the grounds that the election of remedies is annulled is intended for use where the parties plan to persue a Human Rights Law claim in state court, without a concurrent federal remedy.

You are informed that where a case is dismissed on the grounds that complainant's election of remedies is annulled, there is no tolling of the statute of limitations for the period of time that the complaint has been at the Division. The party's right to bring a lawsuit in court is limited by the statute of limitations in effect at the time the complaint was initially filed with the Division. Human Rights Law Sec. 297.9. The statute of limitations for bringing a Human Rights Law claim in state court is three years. Murphy v. American Home Products, 8 N.Y.2d 293, 307 (1983). Thus where a complaint is dismissed on the grounds that the election of remedies is annulled, any subsequent Human Rights Law action must be brought within three years from the original date that the discrimination occurred.

Where a complainant intends to pursue Human Rights Law claims in connection with federal anti-discrimination remedies, an administrative convenience dismissal may be requested from the Division.

Notice of Annulment
DNP/dnp
11/25/03

SDHR NO: 1B-E-AO-03-2308739-

If you have any questions about these matters, you are urged to consult an attorney. Although by this notice you are informed of pertinent aspects of the Human Rights Law, the Division cannot advise you as to the appropriate course of action for you to take should you wish a dismissal of your Division case. You may, of course, continue your case at the Division.

If the Division has not heard otherwise from you within twenty days of the date of this letter, your request for a dismissal on the grounds that your election of remedies is annulled will be processed.

Troy Johnson

Troy Johnson
Regional Director

Notice of Annulment
DNP/dnp
11/25/03

STATE OF NEW YORK:  EXECUTIVE DEPARTMENT
STATE DIVISION OF HUMAN RIGHTS

EXEC. LAW ART. 15
SDHR NO:
1B-E-AO-03-2308739-

```
+----------------------------------------------------------+
| (State Division of Human Rights on the Complaint of)     |
|                                                          |
|  Miodrag Beljakovic                    COMPLAINANT       |
|                                                          |
|        - Against -                                       |
|                                                          |
|  Melohn Properties, Inc.               RESPONDENT        |
|                                                          |
+----------------------------------------------------------+
```

## NOTICE

The Division has received  your request  to dismiss  your complaint
and annul election of remedies. A dismissal on the grounds that the
election of remedies  is annulled is intended  for use  where the
parties plan to persue  a Human  Rights Law  claim in  state court,
without a concurrent federal remedy.

You are informed that where a case is dismissed on the grounds that
complainant's election of remedies is annulled, there is no tolling
of the  statute of  limitations for  the period  of time  that the
complaint has been at the Division.  The party's  right to  bring a
lawsuit in court is limited by the statute of limitations in effect
at the time the complaint  was initially  filed with  the Division.
Human  Rights  Law  Sec. 297.9.  The  statute  of  limitations for
bringing a Human Rights Law claim  in state  court is  three years.
Murphy v. American Home Products,  8 N.Y.2d 293, 307  (1983). Thus
where a complaint is dismissed on the grounds that the  election of
remedies is annulled, any subsequent Human  Rights Law  action must
be brought  within  three years  from the  original date  that the
discrimination occurred.

Where a complainant intends to  pursue Human  Rights Law  claims in
connection  with  federal  anti-discrimination  remedies,  an
administrative convenience  dismissal  may  be requested  from the
Division.

Notice of Annulment
DNP/dnp
11/25/03

SDHR NO: 1B-E-AO-03-2308739-

If you have any questions about these matters, you are urged to consult an attorney. Although by this notice you are informed of pertinent aspects of the Human Rights Law, the Division cannot advise you as to the appropriate course of action for you to take should you wish a dismissal of your Division case. You may, of course, continue your case at the Division.

If the Division has not heard otherwise from you within twenty days of the date of this letter, your request for a dismissal on the grounds that your election of remedies is annulled will be processed.

*Troy Johnson*

Troy Johnson
Regional Director

Notice of Annulment
DNP/dnp
11/25/03

STATE OF NEW YORK:  EXECUTIVE DEPARTMENT          EXEC. LAW ART. 15
STATE DIVISION OF HUMAN RIGHTS                              SDHR NO:
                                                1B-E-AO-03-4607073-A

+-------------------------------------------------------+
| (State Division of Human Rights on the Complaint of)  |
|                                                       |
| Miodraq Beljakovic                    COMPLAINANT     |
|                                                       |
|            - against -                                |
|                                                       |
| Melohn Properties, Inc.               RESPONDENT      |
+-------------------------------------------------------+

              ADEA:  Federal Charge No: 16GA301820

I, Miodraq Beljakovic, residing at 925 Park Avenue, Apt.# PVT,
Elizabeth, NJ 07208, Tel. No. (908) 353-6181H, (212) 595-1920 (B)
charge the above-named respondent whose address is 365 West End
Avenue New York, NY 10024 Tel. No. (212) 595-1920 with an unlawful
discriminatory practice relating to Employment in violation of
Article 15 of the Executive Law of the State of New York (Human
Rights Law) because of Age and Opposing Discrimination.

Date most recent or continuing discrimination
took place 12/23/02.

    **The particulars are:**

1.    I am 73 years of age {D.O.B.12/08/29}. I have filed previous
complaints with the Division of Human Rights {1B-E-AO-01-4605882
and 1B-E-A-98-2306102}.

2.    On May 4, 1985 I was hired by the above named respondent as a
Doorman. My work performance, time and attendance have always been
satisfactory.

3.    I have been the target of harassment and age discrimination by
the building owner, Martha Melohn, approximately 60 years of age,
and her agents for several years now.

4.    On or about April 2002, I was terminated by the Robert Hammer,
Agent, 85 years of age, because I refused to sign a letter
regarding a tenant in the building. This decision was reversed by
Mr. Hermweige, Manager, approximately 83 years of age. Around this
same time the respondent brought in a tailor to measure me for a
Doorman uniform. The new uniform was a very flashy blue with
epaulets. I was the only Doorman wearing this uniform for about
three months. When I mailed a letter to the tenants about this and
other matters the other Doorman received the same uniform.

5.    On December 23, 2002, Martha Melohn, made a statement to the

Complaint: ADEA (INT.3) (1 of 2)
/czq
02/05/03

SDHR NO: 1B-E-AO-03-4607073-A        FEDERAL CHARGE NO: 16GA301820

driver, Pablo "Doe," which I believe was intended as harassment
towards me. She stated, "You see, Pablo, we need a younger man who
can help you." This occurred while Pablo was putting some boxes in
the car for a tenant and I was holding the wagon in which the
packages were brought out.

6.    Based on the foregoing, I charge the above named respondent
with an unlawful discriminatory practice related to employment for
treating me in a disparate manner because of my Age and retaliating
against me, in violation of the New York State Human Rights Law
Section 296.

Complaint: ADEA (INT.3) (Supplemental)
/czq
02/05/03

46

SDHR NO: 1B-E-AO-03-4607073-A        FEDERAL CHARGE NO: 16GA301820

" I have not commenced any other civil or criminal action, nor do I have an action pending before any administrative agency under any other law of this state based upon this same unlawful discriminatory practice."

I hereby authorize SDHR to accept this verified complaint as a filing under the Age Discrimination in Employment Act (ADEA) as amended (covers ages 40 years of age or older in employment). SDHR covers ages 18 years of age or older in employment.

_(Signature of Complainant)_

STATE OF NEW YORK        )    §:
COUNTY OF New York       )

Miodraq Beljakovic, being duly sworn, deposes and says: that he/she is the complainant herein; that he/she has read (or had read to him/her) the foregoing complaint and knows the content thereof; that the same is true of his/her own knowledge except as to the matters therein stated on information and belief; and that as to those matters, he/she believes the same to be true.

_(Signature of Complainant)_

Subscribed and sworn to before me
this 05th day of February, 2003

_(Signature of Notary Public)_

CARMEN QUINONES
Notary Public, State of New York
No. 01QU6071748
Qualified in Bronx County
Commission Expires March 25, 2006

Complaint: ADEA (INT.3) (2 of 2)
/czq
02/05/03

06/04/2004 15:08    2125865297    COURTHOUSE NEWS/NY    PAGE 26/33

47

STATE OF NEW YORK: EXECUTIVE DEPARTMENT          EXEC. LAW ART. 15
STATE DIVISION OF HUMAN RIGHTS                          SDHR NO:
                                                  1B-E-AO-03-4607073-A

+-----------------------------------------------+  NOTICE OF CONFERENCE
|                                               |          AND
|      STATE DIVISION OF HUMAN RIGHTS           |  PRODUCTION OF RECORDS
|          ON THE COMPLAINT OF                  |  (Investigation of
|                                               |  verified complaint)
| Miodraq Beljakovic          COMPLAINANT       |
|                                               |
|      --Against--.                             |
|                                               |
| Melohn Properties, Inc.       RESPONDENT      |
|                                               |
+-----------------------------------------------+

TO: Miodraq Beljakovic
    Apt. PVT
    925 Park Avenue
    Elizabeth, NJ 07208

YOU ARE HEREBY NOTIFIED to appear and attend before Paula
Irby-Wynter, the duly designated Regional Director herein of the
New York State Division of Human Rights, or his/her representative
David Powell, at his/her office at State Office Building, 163 West
125th, 4th Floor New York, NY 10027, on the 16 day of April, 2003,
at 10 A.M. for a conference in connection with the investigation in
the above-entitled proceeding wherein the respondent has been
charged with an unlawful discriminatory practice relating to
Employment in violation of Section 296 of the Human Rights Law. You
may bring a lawyer if you desire, but it is not necessary for you
to do so. However, the other side has been so advised. Please bring
with you all witnesses, books, papers, records and documents
pertaining to this matter, including:

This conference is for the purpose of conciliation.

Notice of Conference & Production of Records (INV.21) (2 of 3)
KMF/prw
02/19/03

SDHR NO: 1B-E-AO-03-4607073-A          FEDERAL CHARGE NO: 16GA301820

By: STATE DIVISION OF HUMAN RIGHTS

Dated: February 19, 2003    Paula Irby-Wynter
                            Paula Irby-Wynter
                            Regional Director

Human Rights Law (Executive Law, Article 15).
"section 295. General Powers and Duties of Division.
The division by and through the commissioner or his duly
authorized officer or employee, shall have the following
functions, powers and duties:
    7...Subpoena witnesses, compel their attendance,
administer oaths, take the testimony of any person under
oath, and in connection therewith, to require the production
for examination of any books or papers relating to any matter
under investigation or in question before the Division.
The Division may make rules as to the issuance of subpoenas
which may be issued by the Division at any stage of any
investigation or proceeding before it.

Notice of Conference & Production of Records (INV.21) (3 of 3)
KMF/prw
02/19/03

STATE OF NEW YORK:  EXECUTIVE DEPARTMENT                    EXEC. LAW ART. 15
STATE DIVISION OF HUMAN RIGHTS                                       SDHR NO:
                                                            1B-E-AO-03-4607073-A

```
+----------------------------------------------------+
| (State Division of Human Rights on the Complaint of)|
|                                                    |
|  Miodraq Beljakovic                    COMPLAINANT |
|                                                    |
|        - Against -                                 |
|                                                    |
|  Melohn Properties, Inc.               RESPONDENT  |
|                                                    |
+----------------------------------------------------+
```

## NOTICE

The Division has received your request to dismiss your complaint and annul election of remedies. A dismissal on the grounds that the election of remedies is annulled is intended for use where the parties plan to persue a Human Rights Law claim in state court, without a concurrent federal remedy.

You are informed that where a case is dismissed on the grounds that complainant's election of remedies is annulled, there is no tolling of the statute of limitations for the period of time that the complaint has been at the Division. The party's right to bring a lawsuit in court is limited by the statute of limitations in effect at the time the complaint was initially filed with the Division. Human Rights Law Sec. 297.9. The statute of limitations for bringing a Human Rights Law claim in state court is three years. Murphy v. American Home Products, 8 N.Y.2d 293, 307 (1983). Thus where a complaint is dismissed on the grounds that the election of remedies is annulled, any subsequent Human Rights Law action must be brought within three years from the original date that the discrimination occurred.

Where a complainant intends to pursue Human Rights Law claims in connection with federal anti-discrimination remedies, an administrative convenience dismissal may be requested from the Division.

Notice of Annulment
DNP/dnp
11/25/03

SDHR NO: 1B-E-AO-03-4607073-A          FEDERAL CHARGE NO: 16GA301820

If you have any questions about these matters, you are urged to consult an attorney. Although by this notice you are informed of pertinent aspects of the Human Rights Law, the Division cannot advise you as to the appropriate course of action for you to take should you wish a dismissal of your Division case. You may, of course, continue your case at the Division.

If the Division has not heard otherwise from you within twenty days of the date of this letter, your request for a dismissal on the grounds that your election of remedies is annulled will be processed.

Troy Johnson
Regional Director

Notice of Annulment
DNP/dnp
11/25/03

STATE OF NEW YORK:   EXECUTIVE DEPARTMENT                 EXEC. LAW ART. 15
STATE DIVISION OF HUMAN RIGHTS                                        SDHR NO:
                                                          1B-E-AO-03-4607073-A

+-------------------------------------------------+
| (State Division of Human Rights on the Complaint of) |
|                                                 |
| Miodraq Beljakovic                  COMPLAINANT |
|                                                 |
|      --Against--.                               |
|                                                 |
| Melohn Properties, Inc.             RESPONDENT  |
+-------------------------------------------------+

Federal Charge No: 16GA301820

DETERMINATION AND ORDER AFTER INVESTIGATION

On February 05, 2003, Miodraq Beljakovic filed a verified complaint with the State Division of Human Rights charging the above-named respondent with an unlawful discriminatory practice relating to Employment, because of Age and Opposing Discrimination in violation of the Human Rights Law of the State of New York.

Pursuant to Section 297.3 of the Law, the State Division of Human Rights finds that noticing the complaint for hearing would be undesirable and the complaint, therefore, is ordered dismissed on the grounds of administrative convenience for the following reason(s):

Processing the complaint will not advance the State's human rights goals because the complainant is pursuing his Human Rights Law claim in connection with federal anti-discrimination remedies in state court.

Determination: AC NON-TITLE VII and NON-ADA (DET.22 - 08/92)   (1 of 2)
DNP/dnp
12/16/03

SDHR NO: 1B-E-AO-03-4607073-A        FEDERAL CHARGE NO: 16GA301820

Section 297.9 of the Law provides that:
"... where the Division has dismissed such complaint on the grounds of administrative convenience, such person shall maintain all rights to bring suit as if no complaint had been filed."

Any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a notice of Petition and Petition <u>within sixty (60) days after service of this Determination.</u> A copy of this Petition and Notice of the Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, NY 10458. DO NOT FILE THE ORIGINAL PETITION AND NOTICE OF PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

PLEASE TAKE FURTHER NOTICE that a complainant who seeks state judicial review and who receives an adverse decision therein, may lose his or her right to proceed subsequently in federal court by virtue of <u>Kremer vs. Chemical Construction Co.,</u> 456 U.S. 461 (1982).

DATED AND MAILED:                          STATE DIVISION OF HUMAN RIGHTS

DEC 2 3 2003                                By _____
                                               Troy Johnson
                                               Regional Director

Determination: AC NON-TITLE VII and NON-ADA (DET.22 - 08/92)    (2 of 2)
DNP/dnp
12/16/03

05/04/2004 15:03    2125665207          COURTHOUSE NEWS NY                    PAGE 32/33

STATE OF NEW YORK:   EXECUTIVE DEPARTMENT          EXEC. LAW ART. 15
STATE DIVISION OF HUMAN RIGHTS                                SDHR NO:
                                                  1B-E-AO-03-2308739-

+------------------------------------------------------+
| (State Division of Human Rights on the Complaint of) |
|                                                      |
| Miodrag Beljakovic                    COMPLAINANT    |
|                                                      |
|       --Against--.                                   |
|                                                      |
| Melohn Properties, Inc.               RESPONDENT     |
|                                                      |
+------------------------------------------------------+

### DETERMINATION AND ORDER AFTER INVESTIGATION

On April 07, 2003, Miodrag Beljakovic filed a verified complaint with the State Division of Human Rights charging the above-named respondent with an unlawful discriminatory practice relating to Employment, because of Age and Opposing Discrimination in violation of the Human Rights Law of the State of New York.

Pursuant to Section 297.3 of the Law, the State Division of Human Rights finds that noticing the complaint for hearing would be undesirable and the complaint, therefore, is ordered dismissed on the grounds of administrative convenience for the following reason(s):

Processing the complaint will not advance the State's human rights goals because the complainant intends to pursue his Human Rights Law claim in state court.

Determination: AC NON-TITLE VII and NON-ADA (DET.22 - 08/92)    (1 of 2)
DNP/dnp
12/16/03

SDHR NO: 1B-E-AO-03-2308739-

Section 297.9 of the Law provides that:
"... where the Division has dismissed such complaint on the grounds of administrative convenience, such person shall maintain all rights to bring suit as if no complaint had been filed."

Any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a notice of Petition and Petition <u>within sixty (60) days after service of this Determination.</u> A copy of this Petition and Notice of the Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, NY 10458. DO NOT FILE THE ORIGINAL PETITION AND NOTICE OF PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

PLEASE TAKE FURTHER NOTICE that a complainant who seeks state judicial review and who receives an adverse decision therein, may lose his or her right to proceed subsequently in federal court by virtue of <u>Kremer vs. Chemical Construction Co.</u>, 456 U.S. 461 (1982).

DATED AND MAILED:

DEC 2 3 2003

STATE DIVISION OF HUMAN RIGHTS

By _____
Troy Johnson
Regional Director

Determination: AC NON-TITLE VII and NON-ADA (DET.22 - 08/92)  (2 of 2)
DNP/dnp
12/16/03

# Irma Herron

**Courthouse News Service**
**25-2105 River Drive South**
**Jersey City, New Jersey  07310**
**Ph. (212) 566-5288**
**Pager (917) 988-5286**

## FAX COVER SHEET

To: _____ Ed Miller _____        Fax No.: __212-592-1500__
Company: _Herrick, Feinstein_____        Ph. No.: __212-592-6176__

From: _____ Irma Herron _____        Ph. No.: __212-566-5288__
Company: _Courthouse News Service____

Date of fax: _6/4/04_____        Number of pages: ____33____

Message:  Attached is the complaint you requested (04 CV-3694).  If you have any questions
regarding the attached, please call.

**Please note that the attached complaint(s) is provided to you for the price of $35.00, plus a court copying fee
of .25 cents per page. A statement for services rendered will be submitted to you shortly.**

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

MIODRAG BELJAKOVIC,

              Plaintiff,

  - against -

MELOHN PROPERTIES, INC.,

              Defendant.

------------------------------------------------------x

OCT 1 9 2007

U.S.D.C. S.D.N.Y.
CASHIERS

**JOINT PRETRIAL ORDER**

04 Civ. 3694 (RJH) (GWG)

      This Joint Pre-Trial Order (hereinafter, the "JPTO") is being filed by plaintiff Miodrag

Beljakovic ("Plaintiff" or "Beljakovic") and defendant Melohn Properties, Inc. ("Defendant" or

"MPI") in compliance with the rules in Judge Richard J. Holwell's Individual Practices dated

November 19, 2004, and the directives in the Order issued by Judge Holwell on September 26, 2007

(the "9-26-07 Order"). The JPTO includes two components (Plaintiff's statements and Defendant's

statements) integrated within each of the 10 sections prescribed in the 9-26-07 Order.

      The customary practice is for plaintiff to go first, by delivering his portions of a draft JPTO to

defendant, who then returns his portions to plaintiff, who subsequently aggregates the components

and files them with the court. However, during the August 3, 2007 conference, Judge Holwell stated

that, because Plaintiff Beljakovic is *pro se*, Defendant MPI will go first, by delivering its preliminary

portions of a draft JPTO to Beljakovic so he can see what they look like, then, he will return his

JPTO statements to MPI, who will finalize its own JPTO statements and aggregate the two sets of

statements and file the finalized JPTO with the court clerk. Accordingly, on October 10, 2007, MPI

arranged for its preliminary portions of the JPTO to be delivered to Beljakovic; and (ii) in the

afternoon of October 12, 2007, he delivered Plaintiff's JPTO statements to MPI's attorneys.

i.    **The names, addresses (including firm names), and telephone and fax numbers of trial counsel.**

<u>Plaintiff's Statement</u>    Trial Counsel    Miodrag Beljakovic
                                                 (Plaintiff Pro Se)
                                                 925 Park Avenue
                                                 Elizabeth, N.J. 07208-1131
                                                 Telephone: 908-353-6181
                                                 Fax: (unknown to defendant)

<u>Defendant's Statement</u>    Trial Counsel:    William D. Hummell, Esq.
                                                  Kucker & Bruh, LLP
                                                  747 Third Avenue, 12th Floor
                                                  New York, New York 10017
                                                  Telephone: 212-869-5030
                                                  Fax: 212-944-5818

ii.    **A brief statement by plaintiff as to the basis of subject matter jurisdiction, and a brief statement by each other party as to the presence or absence of subject matter jurisdiction. Such statements shall include citations to all statutes relied on and relevant facts as to citizenship and jurisdictional amount.**

<u>Plaintiff's Statement</u>:

"This action is brought under the Age Discrimination in Employment Act of 1967 to put an end to current and redress past harassment and discrimination committed by the Defendant against the Plaintiff. The Plaintiff is a resident of the State of New Jersey. All causes of action arise out of actions that took place and continue to take place in the City, State and County of New York. The amount being sued for is $750,000.00."

<u>Defendant's Statement</u>:

a)    Plaintiff alleges he is a resident of New Jersey, which Defendant does not dispute. Defendant MPI is a New York corporation.

b)    Plaintiff alleges this civil action is brought under the Age Discrimination in Employment Act of 1967 (the "ADEA"). Defendant MPI disputes each allegation in which Plaintiff claims that MPI engaged in any misconduct, and MPI affirms it has not violated the

- 2 -

ADEA. However, MPI does not dispute the fact that federal district courts have subject matter jurisdiction over certain ADEA claims.

    c)    MPI filed a motion (9 U.S.C. §§ 3 and 4, 9 U.S.C. § 16(a)(1)(A) and (B), and 28 U.S.C. §1292(a)(1)) in which subject matter jurisdiction was challenged based on the exclusive grievance and arbitration provisions in the parties' collective bargaining agreement. The motion was denied by the district court. The U.S. Court of Appeals for the Second Circuit declined to consider the appeal due to procedural matters and never reached the merits of the case.

iii.    **A brief summary by each party of the claims and defenses that party has asserted which remain to be tried, without recital of evidentiary matter but including citations to all statutes relied on. Such summaries shall identify all claims and defenses previously asserted which are not to be tried.**

    **Plaintiff's Statement**:

    "BELJAKOVIC's Claims

BELJAKOVIC will prove at trial that the Defendant has violated the Age Discrimination in Employment Act of 1967 §623(a)(1), §623(a)(2), and §623(d) by threatening BELJAKOVIC's job for declining to perform acts outside the scope of his employment, i.e. signing letters regarding the residency of particular tenants to help MELOHN [MP] secure evictions against the tenants; making derogatory and humiliating comments about BELJAKOVIC"s age and alleged diminished physical abilities; instituting rules that applied only to BELJAKOVIC and not other, younger employees; unreasonably and arbitrarily denying vacation requests; issuing many unfounded letters of reprimand; and retaliating against BELJAKOVIC for filing and pursuing this claim. By taking these harassing actions, MELOHN hopes to constructively fire BELJAKOVIC by getting BELJAKOVIC to quit his job out of frustration, anger and humiliation."

**Defendant's Statement:**

Defendant MPI disputes each allegation in which Plaintiff claims MPI engaged in any misconduct. The relevant defenses asserted by MPI include (1-5 below):

1.    The Complaint fails to state a claim upon which relief can be granted, Plaintiff's action is barred by a collective bargaining agreement ("CBA"), [1] and *force majeure*:

    a.    MPI has not engaged in any age discrimination, and Plaintiff will not be able to prove any violation of the ADEA, the only federal or state law he alleges has been violated (29 U.S.C. §621; 29 U.S.C. §623).

    b.    Plaintiff's grievances are work rule issues. The CBA authorized reasonable work rules, which MPI applied fairly, without discrimination. Also, *force majeure*: MPI should not be liable for complying with New York ordinances and regulations (*e.g.*, maintenance of sidewalks and waste disposal).

    c.    Seniority systems for work assignments are protected by 29 U.S.C. §623(f); 29 C.F.R. §1625 (*e.g.*, 29 C.F.R. §1625.8(a)); 42 U.S.C. §2000e-2(h).

    d.    Plaintiff raised the same claims in prior administrative proceedings (State Human Rights Commission and EEOC) which were determined against him.

    e.    MPI has not dismissed or suspended Plaintiff from employment, MPI has not imposed any financial penalty on him, and MPI has not imposed any unreasonable burden on him.

    f.    Plaintiff has not suffered any actual damages.

---

[1]    As summarized in section iii.(c) of this JPTO, *supra*, Defendant MPI filed a motion for an Order to enforce the CBA arbitration clause (authorized by 9 U.S.C. §§ 3 and 4, 9 U.S.C. §16(a)(1)(A) and (B), and 28 U.S.C. §1292(a)(1)). This district court denied the motion. Subsequently, the U.S. Court of Appeals for the Second Circuit declined to consider an appeal due to procedural matters (ruling that the appeal could not proceed because there was no final appealable order) and never reached the merits of the case. MPI is aware of a similar motion for an Order to compel arbitration based on an arbitration clause identical to the clause in the instant CBA, which was made by a defendant employer accused of federal age discrimination in *Pyett v. Pennsylvania Building Company, et al.*, in the U.S. District Court (S.D.N.Y.) (04 Civ. 7536 (NRB); May 31, 2006), reported at 2006 U.S. Dist. LEXIS 35952. The motion in *Pyett* was denied by that district court. The defendant in *Pyett* subsequently appealed to the U.S. Court of Appeals for the Second Circuit, which, following briefing and oral argument, affirmed the decision of the district court (Case No. 06-3047-cv). However, it appears the defendant in *Pyett* has appealed from the Second Circuit decision to the Supreme Court of the United States. MPI reserves its right to rely on any decision rendered by the Supreme Court.

g.  Any adverse consequences were not caused by MPI.

h.  Claims alleged by Plaintiff in this federal action are precluded by workers' compensation claims he filed in New York State proceedings.

2.  Plaintiff's claims which are barred by the applicable statute of limitations should be dismissed.  (29 U.S.C. §626, including subsections (c), (d) and (e).)

3.  Plaintiff failed to exhaust the available remedies. Claims which were not properly filed in an administrative proceeding prior to a federal action are not justiciable. (29 U.S.C. §633.)

4.  The equitable doctrines of waiver and estoppel bar Plaintiff's action

5.  Plaintiff has alleged liability on the part of persons who are not owners of MPI.[2]

Plaintiff's age had nothing to do with how his employment performance was supervised by MPI in conformity with the CBA.  One example of a flawed claim is Plaintiff's allegation of discrimination because he did not receive the work schedule he preferred.  The same schedule was requested by fellow employee Julio Peralta (date of hire: October 1978), a doorman who had seven (7) additional years of seniority beyond Plaintiff (date of hire: 1985). The fact that Plaintiff was older than Mr. Peralta when he first was hired by MPI was not relevant for seniority for work assignments.  Seniority is based on length of service, not age, and a greater age does not permit an employee to "leap frog" over a senior fellow worker in choosing work assignments.

---

[2]  The defenses previously alleged by MPI which no longer are being asserted include the following:
  a.  Process was insufficient and service of process was insufficient
  b.  The Court is without personal jurisdiction over the defendant because no summons has been served, and the complaint has not been properly served
  c.  Plaintiff's action is barred by the applicable statute of frauds.
  d.  This court should decline to entertain or consider the claims of the Plaintiff because he has unclean hands.

iv.    **A statement by each party setting forth and calculating with specificity each element of damages sought with respect to each claim that remains to be tried.**

**Plaintiff's Statement:**

"Plaintiff seeks to recover $750,000.00 for damages regarding the past and continued harassment, threats, humiliation etc. committed by Defendants [sic]. Plaintiff's damages stem from emotional and other physical stresses resulting in serious health problems caused by Defendants' actions."

**Defendant's Statement:**

In his complaint, Plaintiff Beljakovic failed to adequately identify any actual damages suffered by him for which Defendant MPI has any liability (failure to state a valid claim under federal law). It is MPI's position that: (i) Plaintiff cannot satisfy his burden of proving MPI violated federal law; (ii) Plaintiff cannot satisfy his burden of proving he suffered actual damages; (iii) Plaintiff cannot satisfy his burden of proving a quantum of monetary damages allegedly suffered by him; (iv) Plaintiff cannot satisfy his burden of proving the alleged adverse consequences were caused by MPI; (v) Plaintiff is covered by a medical insurance plan which is paid by MPI, and any alleged medical damages were covered by such medical insurance plan; and (vi) Plaintiff has not been dismissed or suspended by MPI and Plaintiff continues to work and receive all benefits.

v.    **A statement by each party as to whether the case is to be tried with or without a jury, and the number of trial days needed.**

**Plaintiff's Statement:**

"Plaintiff BELJAKOVIC has demanded a trial by jury. A total of 5 days for trial are needed to present the Plaintiff's case."

**Defendant's Statement:**

Defendant MPI is willing to waive its right to a jury trial.
Number of trial days to present Defendant's case: <u>two days</u>.

vi.    **A statement by each party as to whether or not all parties have consented to trial of the case by a magistrate judge (without identifying which parties have or have not so consented.)**

**Plaintiff's Statement:**

"The parties have not consented to have this case tried by a magistrate judge."

**Defendant's Statement:**

All parties did not consent to trial of the case by a magistrate judge.

vii.    **Any stipulations or agreed statements of fact or law which have been agreed to by all parties.**

**Plaintiff's Statement:**

"The parties have not stipulated to any facts or law."

**Defendant's Statement:**

There are no stipulations or agreed statements of fact or law which have been agreed to by both parties.

viii.    A list of all witnesses, with a brief summary of the substance of each witness's testimony and an indication whether such witnesses will testify in person or by deposition. No witness not identified herein shall be permitted to testify in either party's case in chief absent good cause shown.

**Plaintiff's Statement:**

"BELJAKOVIC's Trial Witnesses

Below is a list of witnesses, all of whom the Plaintiff BELJAKOVIC intends to call 'live" at trial

as part of its case in chief. A brief statement of each witness' expected testimony appears under

each name. The Plaintiff BELJAKOVIC reserves the right to call those witnesses that may be

necessary to overcome evidence objections maintained by the Defendant at the time exhibits on

the Plaintiffs exhibit list are offered.

**"Martha Melohn, principal owner of Melohn Properties, Inc.**
  - company payroll policies; mistreatment of the Plaintiff; discrimination against the Plaintiff due to his age; company policies enacted to frustrate the Plaintiff and constructively fire him.

**"Alphonse Melohn, son of Martha Melohn**
  - attempts to have Plaintiff fired by former Superintendent; ordering extra duties for Plaintiff designed to make Plaintiff physically tire or resign; encouraging animosity and mistrust amongst employees; change of work hour schedules.

**"Joseph Helmreich, Manager of Melohn Properties, Inc.**
  - working conditions in the building; surreptitious inquiries about Plaintiff's claims, possible lawyers, etc; attempts to prevent Plaintiff from complaining about threatened termination for refusing to sign letters against tenants; receipt of numerous letters of complaint from Plaintiff and his lack of response to them.

**"Noe Osorio, Superintendent**
  - Instructions on how to treat the Plaintiff; shortening breaks against union contract rules; encouraging employees to avoid Plaintiff.

**"Robert Hammer, Agent of Melohn Properties, Inc.**
  - writing of reprimand letters; denial of vacation time for Plaintiff; orders regarding Plaintiffs letter writing to Martha Melohn; requests that Plaintiff sign letters against building tenants; attempt to cancel Workers' Compensation Board hearing and/or prevent Plaintiff from attending;

- 8 -

public verbal humiliation.

**"Frank Monaco, Delegate of District 6 Union 32B&J**
- complaints Plaintiff made to union; union attempts to assist Plaintiff.

**"Pablo Diaz, driver for Alphonse Melohn**
- comments made by Martha Melohn regarding Plaintiff's age and physical abilities.

**Lloyd Adolton, former porter**
- comments made by Jack Friedman, an agent, regarding Plaintiff's age and possible retirement timeline; witness to Plaintiff being made to do heavy labor; witness to sanitation inspector's claim of calls regarding unclean sidewalks.

**Julio Peralta, former Porter**
- witness to discrimination against the Plaintiff by the Defendants.

**Felix Bermudez, former porter**

The Plaintiff reserves the right to question any witness brought by the Defendant.

**<u>Defendant's Statement</u>:**

Defendant MPI is not required to introduce any person as a witness. The persons who may be voluntarily called to testify by MPI (live testimony), and the respective subjects, may include:

| | |
|---|---|
| **Joseph Gottlieb** — <br> (MPI management) | union contract, work rules, job performance of Beljakovic and other employees, historical events. |
| **Robert Hammer** — <br> (MPI management) | union contract, work rules, job performance of Beljakovic and other employees, historical events. |
| **Joseph Helmreich** — <br> (MPI management) | union contract, work rules, job performance of Beljakovic and other employees, historical events. |
| **Leon Melohn** - <br> (MPI management) | union contract, work rules, job performance of Beljakovic and other employees, historical events. |
| **Steve Redzepagic** - <br> (Bldg. Superintendent, <br> 47-50 Bedford Ave., <br> Brooklyn, NY) | work rules, supervision of MPI employees; historical events regarding Robert Hammer. |

**Josz Sherrez**     -          work rules, supervision of MPI employees; historical events
(Bldg. Superintendent,          regarding Robert Hammer.
 200 W. 15th St., NY, NY)

**Francisco Guzman**   -         work rules, supervision of MPI employees; historical events
(Bldg. Superintendent,          regarding Robert Hammer.
 301 W. 45th St., NY, NY)


Defendant MPI reserves its right to elicit testimony from other MPI employees, and from any

witness introduced by Plaintiff. MPI also reserves its right to elicit rebuttal testimony in response to

whatever testimony is offered by Plaintiff.


ix.    **A designation by each party of deposition testimony to be offered in its case in chief,
       with any cross-designations by any other party. Each party shall set forth any
       objections it has to deposition testimony designated by the other and the basis therefor.**

       <u>Plaintiff's Statement</u>:

       "No depositions were taken."

       <u>Defendant's Statement</u>:

       Neither party took any depositions. Therefore, there is no deposition testimony to be

designated.


x.     **A list by each party of exhibits to be offered in its case in chief, with one star indicating
       exhibits to which no party objects on grounds of authenticity, and two stars indicating
       exhibits to which no party objects on any ground. This shall include a description of
       each exhibit. The grounds for the objection to the admissibility of any exhibit shall be
       stated in summary form. Any objections not set forth in the pretrial order shall be
       considered waived absent good cause shown.**

       <u>Plaintiff's Statement</u>:

       "BELJAKOVIC'S Trial Exhibits

Attached as Exhibit A is a list of exhibits that the Plaintiff currently intends to offer in its case-in-

chief."

## MIODRAG BELJAKOVIC v. MELOHN PROPERTIES, INC.
### 04 CV 3694
### United States District Court
### Southern District of New York

### Miodrag Beljakovic Document Exhibit List

| | DATE WRITTEN | DESCRIPTION OF DOCUMENT |
|---|---|---|
| #1 | 01/28/2000 | New York State Division of Human Rights Determination<br><br>and Order After Investigation – finding no probable cause to believe discrimination took place |
| #2 | 11/29/2000 | Letter of Reprimand from Robert Hammer to Beljakovic regarding improper uniform |
| #3 | 12/01/2000 | Letter of Reprimand from Robert Hammer to Beljakovic regarding playing the radio at work |
| #4 | 01/15/2001 | Letter from Robert Hammer to Beljakovic regarding playing the radio, uniform, and making complaints to the Melohns |
| #5 | 02/05/2001 | Letter from Beljakovic to Robert Hammer regarding letters of reprimand dated November 29, 2000 and December 1, 2000 |
| #6 | 02/05/2001 | Letter from Robert Hammer to Beljakovic regarding alleged sleeping on the job |
| #7 | 02/11/2001 | Letter from Beljakovic to Robert Hammer in response to Robert Hammer's letter dated February 5, 2001 |
| #8 | 02/14/2001 | Letter from Local 32B-32J Union to Martha Melohn objecting to reprimand letters dated November 29, 2000 and December 1, 2000 |
| #9 | 07/06/2001 | Letter from Beljakovic to Melohn Properties requesting one month vacation beginning September 29, 2001 |
| | | |

| #10 | 07/31/2001 | Letter from Beljakovic to Melohn Properties regarding delay in decision regarding his request for vacation beginning September 29, 2001. |
| #11 | 08/01/2001 | Letter from Rita Gregg to Beljakovic regarding remaining at the post until a replacement arrives |
| #12 | 08/05/2001 | Letter to Melohn Properties from Beljakovic replying to letter from Rita Gregg dated August 1, 2001 |
| #13 | 08/09/2001 | Letter from Robert Hammer to Beljakovic denying request for one month vacation beginning September 29, 2001 |
| #14 | 08/09/2001 | Letter from Robert Hammer to Beljakovic prohibiting letter writing to Mrs. Melohn |
| #15 | 09/02/2001 | Letter from Beljakovic to Robert Hammer replying to Robert Hammer's letter dated August 9, 2001 prohibiting letter writing to Mrs. Melohn |
| #16 | 09/07/2001 | Letter from Beljakovic to Robert Hammer in response to Robert Hammer's letter dated August 9, 2001 denying vacation time |
| #17 | 09/17/2001 | Letter of Reprimand from Robert Hammer to Beljakovic regarding insubordination and failure to perform duties |
| #18 | 04/08/2002 | St. Luke's Roosevelt Emergency Department Record |
| #19 | 02/27/2004 | EEOC Dismissal and Notice of Rights |
| #20 | 07/21/2004 | Letter from Stephen R. Rippon regarding good service of Beljakovic |
| #21 | 07/21/2004 | Letter from Denise Sassoon regarding good service of Beljakovic. |
| #22 | 07/22/2004 | Letter from Rabbi Uri Gordon regarding good service of Beljakovic |

| #23 | 07/27/2004 | Letter from Robert and Lila S. Rosenblum regarding the good service of Beljakovic |
| #24 | 07/30/2004 | Letter from Barbara Kristaponis regarding good service of Beljakovic |
| #25 | 08/01/2004 | Letter from Rudi Lawrence and Blanche Foster regarding good service of Beljakovic |
| #26 | 08/02/2004 | Letter from Ellie Morgenstern regarding good service of Beljakovic |
| #27 | 08/03/2004 | Letter from Drs. Josephine Wright and Richard Gottlieb regarding good service of Beljakovic. |
| #28 | 08/03/2004 | Letter from Richard Gordon regarding good service of Beljakovic |
| #29 | 08/04/2004 | Letter from George Anthony Terzian regarding good service of Beljakovic |
| #30 | 08/06/2004 | Letter from John Corigliano and Mark Adamo regarding good service of Beljakovic. |
| #31 | 08/08/2004 | Letter from Doris B. Wallace regarding good service of Beljakovic |
| #32 | 08/12/2004 | Letter from H. Lawrence King regarding good service of Beljakovic. |
| #33 | 09/15/2004 | Letter from Kucker & Bruh, LLP to Beljakovic regarding Beljakovic's application for Workers' Compensation |
| #34 | 10/04/2004 | Letter/Medical Report from Dr. James H. Frost regarding CT Scan of abdomen and pelvis of Beljakovic |
| #35 | 10/13/2004 | Letter from Robert Hammer to Beljakovic, Julio Peralta and Safet Kukaj regarding work schedule changes. |
| #36 | 10/14/2004 | Letter from Beljakovic to Joseph Helmreich regarding change in work schedule |

| #37 | 10/15/2004 | Letter from Robert Hammer to Beljakovic and Julio Peralta regarding revision of previous work schedule changes. |
|-----|-----|-----|
| #38 | 10/18/2004 | Letter from Beljakovic to Robert Hammer regarding change in work schedule |
| #39 | 10/28/2004 | Letter from Beljakovic to Robert Hammer in response to Robert Hammer's letter dated October 19, 2004 |
| #40 | 12/13/2004 | Note from Dr. McHugh excusing Beljakovic from work due to neck injury. |
| #41 | 03/12/2005 | Letter from Beljakovic to Local 32B and 32J Union regarding harassment at work and change in work schedule |
| #42 | 03/15/2005 | City of New York Environmental Control Board Ticket for unkempt sidewalk at 365 West End Avenue. Fine amount: $100.00 |
| #43 | 03/17/2005 | Letter from Beljakovic to Environmental Control Board regarding sanitation ticket received on March 15, 2005 |
| #44 | 03/23/2005 | Letter from President of Service Employee's Union to Beljakovic replying to Beljakovic's letter dated March 12, 2005 |
| #45 | 04/08/2005 | Letter from Beljakovic to Environmental Control Board regarding sanitation ticket received on March 15, 2005. Second Request. |
| #46 | 04/11/2005 | Letter from General Counsel of Service Employee's Union to Beljakovic replying to Beljakovic's letter dated March 12, 2005 |
| #47 | 05/10/2005 | Letter from Beljakovic Local 32B and 32J Union regarding harassment at work and change in work schedule. Second Request. |
| #48 | 01/19/2006 | "Certification of Medical Care" from Dr. McHugh stating that Beljakovic may return to work on January 25, 2006 |
| | | |

| #49 | 01/26/2006 | Letter from Dr. William J. McHugh stating that Beljakovic can return to work on January 30, 2006 |
| #50 | 02/08/2006 | Letter from Dr. McHugh to Robert Hammer stating that Beljakovic should not be shoveling snow but can complete other job related tasks. |
| #51 | 03/20/2006 | Letter from Beljakovic to Robert Hammer regarding taking days off and giving work days to Lloyd Adolton. |
| #52 | 04/12/2006 | Letter from Beljakovic to Joseph Helmreich regarding harassment by Robert Hammer |
| #53 | 04/20/2006 | Letter from Beljakovic to Robert Hammer regarding taking days off and giving work days to Lloyd Adolton. |
| #54 | 07/05/2006 | Letter from Beljakovic to Joseph Helmreich regarding work-related injuries and harassment by Robert Hammer. |
| #55 | 10/11/2006 | Letter from Beljakovic to President of Service Employee's Union regarding investigation of work schedule changes |
| #56 | 10/30/2006 | Letter from Beljakovic to Joseph Helmreich regarding thin winter coats as part of doorman uniform. |
| #57 | 12/27/2006 | Letter from Beljakovic to Joseph Helmreich regarding questions of who to report to since the death of Smail Ibricevic |
| #58 | 01/11/2007 | Letter from Beljakovic to Joseph Helmreich requesting to be returned to normal working hours |
| #59 | 01/17/2007 | Letter from Beljakovic to Joseph Helmreich regarding change in work schedules. |
| #60 | 01/31/2007 | Letter from Beljakovic to senior management at Melohn Properties regarding continued harassment by Robert Hammer and Hammer's attempts to prevent Beljakovic from attending the Workers' Compensation hearing. |
|  |  |  |

| #61 | 03/02/2007 | Letter from Beljakovic to Joseph Helmreich regarding Robert Hammer's attempt to prevent appearance at Workers' Compensation hearing |
| #62 | 03/16/2007 | Letter from Beljakovic to U.S. Department of Labor requesting an investigation as to working conditions at 365 West End Avenue. |
| #63 | 05/04/2007 | Letter from Beljakovic to senior management at Melohn Properties regarding his hat and uniform. |
| #64 | 07/19/2007 | Letter from Beljakovic to senior management at Melohn Properties regarding harassment by Noe Osorio. |
| #65 | 07/30/2007 | Letter from Beljakovic to senior management at Melohn Properties regarding harassment by Noe Osorio. |
| #66 | 08/16/2007 | Note from Dr. McHugh stating that Beljakovic should wear cervical collar. |
| #67 | 08/22/2007 | Note from Dr. Gideon Hedrych stating that Beljakovic is required to wear cervical collar. |
| #68 | 10/10/2007 | Wall Street Journal Article: "Job Strain Can Be Risk Factor For Subsequent Heart Attacks" by Ron Winslow. Health Section D page D4. |
| #69 | UNDATED | Letter from Beljakovic to Mr. Helmreich regarding work schedule changes. |
| #70 | UNDATED | Letter from Jessica J. Josephson regarding good service of Beljakovic |

## PHOTGRAPHIC EXHIBITS

| | PHOTO DATE | PHOTO DESCRIPTION |
| --- | --- | --- |
| #71 | February 2007 | Photograph depicting thin winter coat as part of doorman uniform |
| #72 | October 2006 | Photograph depicting unhealthy working |

| | | conditions |
|---|---|---|

**Defendant's Statement**:

    (a) Regarding Plaintiff's documents:

    Defendant MPI objects to each of the documents which Plaintiff's has identified as an intended exhibit.  It appears each of the documents identified by Plaintiff is not admissible – many documents violate the hearsay rule; many documents are irrelevant; some documents have been altered; the photocopies of photographs are not accurate depictions.

    (b) Regarding Defendant's documents:

    Defendant intends to offer the following documents into evidence:

1.   Letter, dated **August 11, 1988**, authored by Miodrag Beljakovic ("Beljakovic") addressed to MPI in which he claimed he needed a 1-bedroom apartment because he just separated from his wife, and asked MPI for an apartment in the building in which he worked.

2.   Letter, dated **September 20, 1988**, authored by Beljakovic addressed to MPI in which he complained the company had denied his request for an apartment, claimed he would be remarrying soon and needs 2-bedroom apartment # 501, and threatened that, unless MPI reconsiders its denial, he will file a complaint with the Rent Stabilization Board accusing MPI of discrimination.

3.   Letter, dated **November 28, 1988**, authored by Beljakovic addressed to New York City Mayor Edward Koch in which he complained that MPI denied his request for an apartment in the building in which he worked, claimed he needed affordable housing, claimed he probably will marry again and needs more space, and alleged that MPI violated his "constitutional right of 'pursuit of happiness'," and "grossly endangers my well being in this City," and asked the Mayor to force MPI to give him an apartment.

4.   Letter, dated **May 20, 1990**, authored by Beljakovic addressed to MPI in which he claimed he needs a 1-bedroom apartment because it would be better for him than the studio in which he currently resides, and asked MPI for an apartment in the building in which he worked.

5.   Letter, dated **June 12, 1990**, authored by Beljakovic addressed to New York State Governor Mario Cuomo in which he complained that MPI denied his request for an apartment in the building in which he worked, claimed he needed affordable housing and asked the Governor to force MPI to give him an apartment.

6. <u>Letter</u>, dated **January 20, 1993**, authored by Diane Morrison (an attorney) addressed to MPI, in which she complained that MPI denied Beljakovic's request for an apartment in the building in which he worked, and accused MPI of unlawful discrimination related to Housing.

7. <u>Letter</u>, dated **February 19, 1993**, authored by Saul Bruh addressed to attorney Diane Morrison, copied to MPI, explaining, among other things, that her claims were not valid, and her January 20, 1993 letter was inconsistent with Beljakovic's prior position.

8. <u>Letter</u>, dated **June 29, 1993**, authored by Beljakovic addressed to MPI, in which he complained that MPI denied his request for an apartment in the building in which he worked, and accused MPI of unlawful discrimination related to Housing.

-----------------------------------

9. "<u>Complaint</u>" of Miodrag Beljakovic, dated **July 19, 1993**, filed with the New York State Division of Human Rights ("SDHR"), in which he accused MPI of unlawful discriminatory practice relating to Housing. (SDHR No.1B-H-A-93-4601804)

10. "<u>Letter</u>" dated **July 23, 1993**, by the SDHR notifying MPI of the existence of a complaint by Beljakovic alleging unlawful discrimination related to Housing, providing MPI with a copy, and requesting production by MPI of 1993 Rent Roll. (SDHR No.1B-H-A-93-4601804)

11. "<u>Determination and Order After Investigation,</u>" dated **October 29, 1993**, in which the SDHR dismissed on the merits (for lack of sufficient evidence and no probable cause) the Beljakovic complaint dated July 19, 1993, in which he had accused MPI of unlawful discriminatory practice relating to Housing. (SDHR No.1B-H-A-93-4601804)

-----------------------------------

12. <u>Letter</u>, dated **January 26, 1994**, authored by Beljakovic addressed to  New York Attorney General Oliver Koppell in which he complained that MPI denied his request for an apartment in the building in which he worked (prohibited by work rules), claimed he needed affordable housing and asked the Attorney General to assist him in forcing MPI to give him an apartment.

13. <u>Letter</u>, dated **March 1, 1994**, authored by Beljakovic addressed to the Rabbinical Court, Carlebach Synagogue, in which he criticized MPI for denying his request for an apartment in the building in which he worked, and requested the synagogue will force MPI to give him the apartment.

14.    <u>Letter</u>, dated **March 20, 1996**, authored by Beljakovic addressed to MPI, and copied to the SEIU union representative for Beljakovic, in which he complained that MPI denied his request for an apartment in the building in which he worked.

15.    <u>Letter</u>, dated **February 4, 1997**, authored by Beljakovic addressed to MPI in which he complained that MPI denied his request for an apartment in the building in which he worked.

------------------------------

16.    "<u>Complaint</u>" of Beljakovic, dated **August 5, 1998**, filed with the SDHR on August 11, 1998, in which he accused MPI of unlawful discriminatory practice relating to Employment, alleged to have violated:
Article 15 of the New York State Human Rights Law.
(SDHR No.1B-E-A-98-2306102-A; Federal Charge No. 16G980560)

17.    "<u>Notice of Charge</u>" dated **August 14, 1998**, by the Equal Employment Opportunity Commission ("EEOC"), notifying MPI of the existence of the Beljakovic complaint, and providing MPI with a copy.
(Now also known as "EEOC Charge No. 16G980560.")
(SDHR No.1B-E-A-98-2306102-A; Federal Charge No. 16G980560)

18.    "<u>Notice of Conference and Production of Records</u>" dated **November 17, 1998**, by the SDHR, instructing MPI to appear for a conference at the SDHR regarding the Beljakovic complaint, and providing MPI with a copy of the complaint.
(SDHR No.1B-E-A-98-2306102-A; Federal Charge No. 16G980560)

19.    "<u>Determination and Order After Investigation</u>," dated **January 28, 2000**, in which the SDHR dismissed on the merits (lack of probable cause) the Beljakovic complaint dated August 5, 1998, in which he accused MPI of unlawful discriminatory practice relating to Employment, alleged to have violated:
Article 15 of the New York State Human Rights Law.
(SDHR No.1B-E-A-98-2306102-A; Federal Charge No. 16G980560)

20.    "<u>Dismissal and Notice of Rights</u>," dated **February 23, 2000**, in which the EEOC adopted the findings of the SDHR, which had dismissed on the merits the Beljakovic complaint dated August 5, 1998 (EEOC Charge No. 16G-980560).
(SDHR No.1B-E-A-98-2306102-A; Federal Charge No. 16G980560)

------------------------------

21.    "<u>Complaint</u>" of Miodrag Beljakovic, dated **June 13, 2001**, filed on that day with the SDHR, in which he accused MPI of unlawful discriminatory practice relating to Employment, alleged to have violated:
New York State Human Rights Law and two federal statutes: Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act.
(SDHR No.1B-E-AO-01-4605882-A).

22.    "<u>Letter</u>" dated **June 13, 2001**, by Paula Irby-Wynter, SDHR Regional Director, notifying MPI of the existence of the Beljakovic complaint, and providing MPI with a copy.
(SDHR No.1B-E-AO-01-4605882-A; Federal Charge No. 16GA12062)

23.    "<u>Notice of Charge</u>" dated **June 13, 2001**, by the Equal Employment Opportunity Commission ("EEOC"), notifying MPI of the Beljakovic complaint and providing MPI with copy. (Now also known as "EEOC Charge No. 16GA12062.")
(SDHR No.1B-E-AO-01-4605882-A; Federal Charge No. 16GA12062)

24.    "<u>Answer</u>" dated **June 2001**, by Robert Hammer on behalf of MPI, replying to the Beljakovic complaint
(SDHR No.1B-E-AO-01-4605882-A; Federal Charge No. 16GA12062)

25.    "<u>Notice of Conference and Production of Records</u>" dated **July 16, 2001**, by Paula Irby-Wynter, SDHR Regional Director, instructing MPI to attend a conference at the SDHR regarding the Beljakovic complaint
(SDHR No.1B-E-AO-01-4605882-A; Federal Charge No. 16GA12062)

26.    "<u>Determination and Order After Investigation,</u>" dated **August 20, 2001**, in which the SDHR dismissed on the merits the Beljakovic complaint dated June 13, 2001 in which he accused MPI of unlawful discriminatory practice relating to Employment alleged to have violated: the New York State Human Rights Law and two federal statutes: Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act
(SDHR No.1B-E-AO-01-4605882-A; Federal Charge No. 16GA12062)

27.    "<u>Dismissal and Notice of Rights</u>," dated **December 14, 2001**, in which the EEOC adopted the findings of the SDHR, which had dismissed on the merits the Beljakovic complaint dated June 13, 2001 (EEOC Charge No. 16GA12062)
(SDHR No.1B-E-AO-01-4605882-A; Federal Charge No. 16GA12062)

--------------------------------

28.    "<u>2003 Apartment Building Agreement</u> Between Realty Advisory Board on Labor Relations Incorporated and Service Employees International Union, Local 32BJ AFL-CIO, which is the collective bargaining agreement for employer and employees at premises 365 West End Avenue, NY, NY 10023 (hereafter, "Premises 365 West End Avenue").

29. "2003 Resident Managers and Superintendents Agreement Assent," dated June 25, 2003, signed by MPI.

30. "2006 Apartment Building Agreement Between Realty Advisory Board on Labor Relations Incorporated and Service Employees International Union, Local 32BJ (effective April 21, 2006 to April 20, 2010), which is the collective bargaining agreement for employer and employees at premises 365 West End Avenue, NY, NY 10023 (hereafter, "Premises 365 West End Avenue").

31. "2006 Apartment Building Agreement," dated December 12, 2006, signed by MPI.

32. Memorandum, dated **October 27, 2004**, which summarizes the names of union employees at Premises 365 West End Avenue, their respective dates of hire and dates of birth.

33. Job Description, dated **January 1987**, for Doormen employed at Premises 365 West End Avenue.

34. Employee logs maintained weekly by MPI (weekly schedules with notations, **from January 3, 2003 to the present date**).

35. Reprimand, dated **November 29, 2000**, authored by Robert Hammer ("RH") addressed to Beljakovic, concerning violation of work rules by failing to wear the correct doorman uniform.

36. Reprimand, dated **December 1, 2000**, authored by RH addressed to Beljakovic, concerning violation of work rules by listening to radio during work.

37. Letter, dated **January 15, 2001**, authored by RH addressed to Beljakovic concerning violation of work rules by failing to wear correct doorman uniform and listening to radio during work.

38. Letter, undated (with a fax header dated **January 23, 2001**), authored by tenant Beth Sharret, who alleged Beljakovic was sleeping on the couch in lobby of Premises 365 West End Avenue, being rude and failing to perform his job.

39. Letter, dated **February 5, 2001**, authored by RH addressed to Beljakovic, concerning a letter of complaint from tenant Beth Sharret, who alleged his sleeping on couch in lobby, being rude and failing to perform his job.

40. Letter, dated **August 1, 2001**, authored by Rita Gregg addressed to Beljakovic concerning a complaint that he left his post prior to the arrival of his replacement.

41.  Letter, dated **August 9, 2001**, authored by RH addressed to Miodrag Beljakovic, which requested he send all future communications to his employer by addressing them to building management.

42.  Memorandum, dated **October 13, 2004**, authored by RH, which discussed the work schedules of Plaintiff and Julio Peralta.

43.  Memorandum, dated **October 15, 2004**, authored by RH, which discussed the work schedules of Plaintiff and Julio Peralta.

44.  Letter, dated **October 19, 2004**, authored by RH, which discussed the work schedules of Plaintiff and Julio Peralta.

45.  Letter, dated **November 30, 2004**, authored by RH addressed to Smail Ibrevic, concerning numerous work rule violations.

46.  Reprimand, dated **December 5, 2000**, authored by RH addressed to Julio Peralta, concerning violation of work rules by opening tenant letter boxes.

47.  Reprimand, dated **December 27, 2000**, authored by RH addressed to Kenneth Jenkins, concerning violation of work rules by being absent on a work day when not ill.

48.  Letter, dated **February 2, 2001**, authored by RH addressed to Smail Ibrevic, concerning failure to properly maintain equipment.

--------------------------------

49.  "Complaint" of Miodrag Beljakovic, dated **February 5, 2003**), filed on that day with the SDHR, in which he accused MPI of unlawful discriminatory practice relating to Employment, alleged to have violated:
New York State Human Rights Law.
(SDHR No. 1B-E-AO-03-4607073-A; also identified by the SDHR as "ADEA Federal Charge No. 16GA301820")

50.  "Notice of Conference and Production of Records" dated **February 19, 2003**, by SDHR Regional Director Paula Irby-Wynter, instructing MPI to attend a conference at the SDHR regarding the Beljakovic complaint.
(SDHR No. 1B-E-AO-03-4607073-A; ADEA Federal Charge No. 16GA301820)

51.  "Notice" dated **November 15, 2003**, by SDHR Regional Director Troy Johnson, addressed to Beljakovic, confirming the SDHR has received his request to dismiss his SDHR complaint [filed February 5, 2003] and annul his prior election of remedies.
(SDHR No. 1B-E-AO-03-4607073-A; ADEA Federal Charge No. 16GA301820)

52. "Determination and Order After Investigation," dated **December 16, 2003** in which the SDHR dismissed the Beljakovic complaint [February 5, 2003] in which he accused MPI of unlawful discriminatory practice relating to Employment alleged to have violated: the New York State Human Rights Law; said dismissal was "on the grounds of administrative convenience," purportedly "because the complainant is pursuing his Human Rights Law claim in connection with federal anti-discrimination remedies in state court."
(SDHR No. 1B-E-AO-03-4607073-A; ADEA Federal Charge No. 16GA301820)

53. "Dismissal and Notice of Rights," dated **February 27, 2004,** in which the EEOC notified Beljakovic that it was closing its file because the "Charging Party is pursuing matter in State Court." (EEOC Charge No. 16G-A3-01820)

--------------------------------

54. "Complaint" of Miodrag Beljakovic, dated **April 7, 2003,** filed with the SDHR, in which he accused MPI of unlawful discriminatory practice because of age relating to Employment, alleged to have violated:
New York State Human Rights Law.
(SDHR No. 1B-E-AO-03-2308739)

55. "Notice" dated **November 15, 2003,** by SDHR Regional Director Troy Johnson, addressed to Beljakovic, confirming the SDHR has received his request to dismiss his SDHR complaint [April 7, 2003] and annul his prior election of remedies.
(SDHR No. 1B-E-AO-03-2308739)

56. "Determination and Order After Investigation," dated **December 16, 2003** in which the SDHR dismissed the Beljakovic complaint [April 7, 2003] in which he accused MPI of unlawful discriminatory practice because of age relating to Employment alleged to have violated: New York State Human Rights Law; said dismissal was "on the grounds of administrative convenience."
(SDHR No. 1B-E-AO-03-2308739)

--------------------------------

57. Employee's Claim for Compensation (New York Workers' Compensation Board form), dated September 8, 2004, signed by Plaintiff Beljakovic.

58. MPI reserves its right to utilize any document which is introduced by Plaintiff Beljakovic during trial.

59. MPI reserves its right to introduce rebuttal documents as appropriate.

**FINAL COMMENTS**
**Regarding annexed Exhibit "A"**

As previously explained (on page 1, *supra*) Defendant MPI included within the 10

respective sections of the JPTO (*i.e.*, Joint Pre-Trial Order) all of the individual statements by

Plaintiff, each of which was placed in the corresponding location in the JPTO. In an excess of

caution, Defendant annexed to the JPTO, as Exhibit "A" hereto, a complete copy of Plaintiff's

entire 6-page document which was delivered to K&B on October 12, 2007.

Dated:  New York, New York
        October 15, 2007

                                        Yours, etc.

                                        _____
                                        William D. Hummell, Esq. (WH 7071)
                                        **KUCKER & BRUH, LLP**
                                        Attorneys for Defendant, Melohn
                                        747 Third Avenue, 12th Floor
                                        New York, New York 10036
                                        Telephone: 212-869-5030
                                        Fax: 212-944-5818

To:     Miodrag Beljakovic, Pro Se
        925 Park Avenue
        Elizabeth, New Jersey 07208
        Telephone: (908) 353-6181

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

MIODRAG BELJAKOVIC,

           Plaintiff,

    - against -

MELOHN PROPERTIES, INC.,

           Defendant.

---------------------------------------------------x

**04 CV 3694 (RJH) (GWG)**

**JOINT PRETRIAL ORDER**

Plaintiff MIODRAG BELJAKOVIC (hereafter "BELJAKOVIC") and the Defendant

MELHON PROPERTIES, INC. (hereafter "MELHON") hereby jointly set forth various

matters concerning the issues, documents and witnesses to be presented at trial of this

matter, now scheduled to commence on January 28, 2008 before the Honorable Richard

J. Holwell:

**I. Trial Counsel**

The Plaintiff BELJAKOVIC is appearing pro se.

        Miodrag Beljakovic
        925 Park Avenue
        Elizabeth, New Jersey 07208
        (908) 353-6181

Counsel for Defendant MELOHN:

        William D. Hummell, Esq.
        Kucker & Bruh, LLP
        747 Third Avenue, 12th Floor
        New York, New York 10017
        (212) 869-5030

## II. Subject Matter Jurisdiction

Plaintiff:  This action is brought under the Age Discrimination in Employment Act of 1967 to put an end to current and redress past harassment and discrimination committed by the Defendant against the Plaintiff.  The Plaintiff is a resident of the State of New Jersey.  All causes of action arise out of actions that took place and continue to take place in the City, State and County of New York.  The amount being sued for is $750,000.00.

Defendant:

## III. Summary of the Claims and Defenses of the Parties to be Tried

### A. BELJAKOVIC's Claims

BELJAKOVIC will prove at trial that the Defendant has violated the Age Discrimination in Employment Act of 1967  §623 (a) (1), §623 (a) (2), and §623 (d) by threatening BELJAKOVIC's job for declining to perform acts outside the scope of his employment, i.e. signing letters regarding the residency of particular tenants to help MELOHN secure evictions against the tenants; making derogatory and humiliating comments about BELJAKOVIC's age and alleged diminished physical abilities; instituting rules that applied only to BELJAKOVIC and not other, younger employees; unreasonably and arbitrarily denying vacation requests; issuing many unfounded letters of reprimand; and retaliating against BELJAKOVIC for filing and pursuing this claim.  By taking these harassing actions, MELOHN hopes to constructively fire BELJAKOVIC by getting BELJAKOVIC  to quit his job out of frustration, anger and humiliation.

B. MELHON'S Defenses

## IV. Damages

Plaintiff seeks to recover $750,000.00 for damages regarding the past and continued harassment, threats, humiliation etc. committed by Defendants. Plaintiff's damages stem from emotional and other physical stresses resulting in serious health problems caused by Defendant's actions.

## V. The Trier of Fact

Plaintiff BELJAKOVIC has demanded a trial by jury. A total of 5 days for trial are needed to present the Plaintiff's case.

## VI. Magistrate Judge

The parties have not consented to have this case tried by a magistrate judge.

## VII. Stipulation of Fact

The parties have not stipulated to any facts or law.

## VIII. Designation of Trial Witnesses

### A. BELJAKOVIC's Trial Witnesses

Below is a list of witnesses, all of whom the Plaintiff BELJAKOVIC intends to call "live" at trial as part of its case in chief. A brief statement of each witness' expected testimony appears under each name. The Plaintiff BELJAKOVIC reserves the right to call those witnesses that may be necessary to overcome evidence objections maintained by the Defendant at the time exhibits on the Plaintiff's exhibit list are offered.

**Martha Melohn, principal owner of Melohn Properties, Inc.**

- company payroll policies; mistreatment of the Plaintiff; discrimination against the Plaintiff due to his age; company policies enacted to frustrate the Plaintiff and constructively fire him.

**Alphonse Melohn, son of Martha Melohn**

- attempts to have Plaintiff fired by former Superintendent; ordering extra duties for Plaintiff designed to make Plaintiff physically tire or resign; encouraging animosity and mistrust amongst employees; change of work hour schedules.

**Joseph Helmreich, Manager of Melohn Properties, Inc.**

- working conditions in the building; surreptitious inquiries about Plaintiff's claims, possible lawyers, etc.; attempts to prevent Plaintiff from complaining about threatened termination for refusing to sign letters against tenants; receipt of numerous letters of complaint from Plaintiff and his lack of response to them.

**Noe Osorio, Superintendent**

- Instructions on how to treat the Plaintiff; shortening breaks against union contract rules; encouraging employees to avoid Plaintiff.

**Robert Hammer, Agent of Melohn Properties, Inc.**

- writing of reprimand letters; denial of vacation time for Plaintiff; orders regarding Plaintiff's letter writing to Martha Melohn;

requests that Plaintiff sign letters against building tenants; attempt to cancel Workers' Compensation Board hearing and/or prevent Plaintiff from attending; public verbal humiliation.

**Frank Monaco, Delegate of District 6 Union 32B&J**

- complaints Plaintiff made to union; union attempts to assist Plaintiff.

**Pablo Diaz, driver for Alphonse Melohn**

- comments made by Martha Melohn regarding Plaintiff's age and physical abilities.

**Lloyd Adolton, former porter**

- comments made by Jack Friedman, an agent, regarding Plaintiff's age and possible retirement timeline; witness to Plaintiff being made to do heavy labor; witness to sanitation inspector's claim of calls regarding unclean sidewalks.

**Julio Peralta, former porter**

- witness to discrimination against the Plaintiff by the Defendants.

**Felix Bermudez, former porter**

- witness to discrimination against the Plaintiff by the Defendants.

The Plaintiff reserves the right to question any witness brought by the Defendant.

B. MELOHN's Trial Witnesses

## IX. Designations of Deposition Testimony to be Offered at Trial

No depositions were taken.

**X. List of Trial Exhibits**

    **A. BELJAKOVIC's Trial Exhibits**

Attached as Exhibit A is a list of exhibits that the Plaintiff currently intends to offer in its

case-in-chief.

    **B. MELOHN's Trial Exhibits**