UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                :

MIODRAG BELJAKOVIC,           :

                Plaintiff,    :        04 Civ. 3694 (RJH) (GWG)

                                  :

  - against -                 :

                                  :

MELOHN PROPERTIES, INC.,     :

                Defendant.   :

                                  :
-------------------------------------------------------x

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION *IN LIMINE* AND OBJECTIONS TO EXHIBITS

Respectfully submitted,

**KUCKER & BRUH, LLP**
Attorneys for Defendant
Melohn Properties, Inc.

747 Third Avenue
New York, New York  10017
(212) 869-5030

By:    William D. Hummell, Esq.
       (WH-7071)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES                                                    ii

I.    INADMISSIBLE DOCUMENTS
      WHICH SHOULD BE EXCLUDED                                          2

Table of Categories/Reasons for Exclusion
of Proposed Exhibits by Beljakovic                                     2

DISCUSSION                                                              3

Categories 1 and 2                                                     3
Category 3                                                             7
Category 4                                                             11
Category 5                                                             11
Category 6                                                             14
Category 7                                                             15
Category 8                                                             16

Plaintiff's Proposed "Introductory Remarks"                           19

Unidentified Pages at End of Plaintiff's
Binder of Intended Trial Exhibits                                      20

II.   INADMISSIBLE TESTIMONY
      WHICH SHOULD BE EXCLUDED                                         21

III.  CONCLUSION                                                       25

Copies of Unpublished Decisions
Cited Herein                                                           TAB 1

TABLE OF AUTHORITIES

<u>Cases</u>                                                                    <u>Page(s)</u>

<u>Astoria Fed. Sav. & Loan Ass'n v. Solimino</u>,
501 U.S. 104, 111 L. Ed. 2d 96, 111 S. Ct. 2166 (1991)                         3, 6

<u>Baptist v. Bankers Indem. Ins. Co.</u>,
377 F. 2d 211, <u>cert. denied</u>,
389 U.S. 832, 88 S. Ct. 103, 19 L. Ed. 2d 92 (1967)                            11

<u>Berlitz Schools of Languages of America, Inc. v. Everett House</u>,
619 F. 2d 211 (2d Cir. 1980)                                                   5-6

<u>Bonton v. City of N.Y.</u>,
2004 U.S. Dist. LEXIS 22105, 2004 WL 2453603 (S.D.N.Y. Nov. 3, 2004)
[reproduced at end of brief]                                                   16

<u>Carmellino v. District 20 of the New York City Dep't of Educ.</u>,
2006 U.S. Dist. LEXIS 63705 (S.D.N.Y. Sept. 6, 2006)
[reproduced at end of brief]                                                   13, 17

<u>Carmody v. ProNav Ship Mgm't, Inc.</u>,
224 F.R.D. 111 (S.D.N.Y. 2004)
619 F. 2d 211 (2d Cir. 1980)                                                   11

<u>Castro v. New York City Bd. of Educ. Personnel Dir.</u>,
1998 U.S. Dist. LEXIS 2863 (S.D.N.Y. Mar. 11, 1998)
[reproduced at end of brief]                                                   13, 17

<u>Crady v. Liberty Nat'l Bank and Trust Co.</u>,
993 F.2d 132 (7th Cir. 1993)                                                   17

<u>D'Cunha v. Genovese/Eckerd Corp.</u>,
479 F. 3d 193 (2d Cir. 2007)                                                   12

<u>Deng v. Aramark Educ. Group, Inc.</u>,
2006 U.S. Dist. LEXIS 23460 (E.D.N.Y. Mar. 23, 2006)
[reproduced at end of brief]                                                   4, 6

<u>Francis v. Elmsford School Dist.</u>,
442 F. 3d 123 (2d Cir. 2006)                                                   4, 8

<u>Galabya v. New York City Bd. of Educ.</u>,
202 F. 3d 636 (2d Cir. 2000)                                                   13, 17, 18

TABLE OF AUTHORITIES, Cont'd

Cases | Page(s)

Ledbetter v. Goodyear Tire & Rubber Co., Inc.,
127 S. Ct. 2162 167 L. Ed. 2d 982 (May 29, 2007) — 7

LoSacco v. Tosto,
1998 U.S. App. LEXIS 12674 (2d Cir. May 11, 1998)
[reproduced at end of brief] — 11

MacMillan v. Aboff,
186 B.R. 35 (S.D.N.Y. 1995) — 14-15

Maharaj v. BankAmerica Corp.,
128 F. 3d 94 (2d Cir. 1997) — 5

Oscar Mayer & Co. v. Evans,
441 U.S. 750, 60 L. Ed. 2d 609, 99 S. Ct. 2066 (1979) — 8

Parklane Hosiery Co. v. Shore,
439 U.S. 322, 58 L. Ed. 2d 552, 99 S. Ct. 645 (1979) — 3

Perry v. Ethan Allen, Inc.,
115 F. 3d 143 (2d Cir. 1997) — 7, 8

Richardson v. New York State Dep't of Correctional Servs.,
180 F.3d 426 (2d Cir. 1999) — 17

Sherlock v. Montefiore Med. Ctr.,
84 F. 3d 522 (2d Cir. 1996) — 4, 8

United Air Lines, Inc. v. Evans,
431 U.S. 553, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977) — 7

United States v. Utah Constr. & Mining Co.,
384 U.S. 394, 16 L. Ed. 2d 642, 86 S. Ct. 1545 (1966) — 3

University of Tennessee v. Elliott,
478 U.S. 788, 92 L. Ed. 2d 635, 106 S. Ct. 3220 (1986) — 3

Wanamaker v. Columbian Rope Co.,
108 F.3d 462 (2d Cir. 1997) — 18

TABLE OF AUTHORITIES, Cont'd

<u>Case</u>                                                                                    <u>Page(s)</u>

<u>Zelnik v. Fashion Institute of Technology</u>,
464 F. 3d 217 (2d Cir. 2006), <u>cert. denied</u>,
127 S. Ct. 2062, 167 L. Ed. 2d 769 (2007)                                   18


<u>Other Authorities</u>

29 U.S.C. § 621                                                                      3
29 U.S.C. § 626                                                                      4, 8, 9, 10
29 U.S.C. § 633                                                                      8

42 U.S.C. § 12101                                                                   14

Fed. R. Evid. 401                                                                   19, 20, 21, 22, 23, 24
Fed. R. Evid. 402                                                                   11
Fed. R. Evid. 403                                                                   19, 20, 22, 23, 24
Fed. R. Evid. 701                                                                   15, 24
Fed. R. Evid. 702                                                                   15, 24
Fed. R. Evid. 801                                                                   11, 24
Fed. R. Evid. 1003                                                                  13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
MIODRAG BELJAKOVIC,                                         :
                                                            :          04 Civ. 3694 (RJH) (GWG)
                            Plaintiff,                      :
                                                            :
        - against -                                         :
                                                            :
MELOHN PROPERTIES, INC.,                                    :
                                                            :
                            Defendant.                      :
                                                            :
------------------------------------------------------------x

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION
### *IN LIMINE* AND OBJECTIONS TO EXHIBITS

This Motion In Limine by Defendant Melohn Properties, Inc. ("MPI" or "Defendant"),

which challenges proposed trial evidence and testimony suggested by Plaintiff Miodrag Beljakovic

("Beljakovic" or "Plaintiff"), is being filed with the federal district court by delivery to Chambers

of Judge Richard J. Holwell as directed in paragraph 3 ("¶ 3") of the Amended Trial Order dated

September 26, 2007 ("9-26-07 Order").  By this motion, MPI requests an Order in advance of the

commencement of trial which, based on the Federal Rules of Evidence and relevant case law, will

exclude from the trial each of the documents proposed as a trial exhibit by Plaintiff (*i.e.*, listed in his

portion of Section X of the Joint Pre-Trial Order ("JPTO"); see **Exhibit "C"** to the accompanying

Affirmation of William D. Hummell, Esq. In Support of Defendant's Motion In Limine, dated

November 12, 2007) which is inherently inadmissible, unreliable, immaterial, not relevant, or

inflammatory, and in any event would severely prejudice Defendant's right to a fair trial.  Similarly,

MPI prays that the requested Order in advance of trial will exclude from the trial the testimony

which, based on Plaintiff's statements in the JPTO and the documents he has identified as intended

- 1 -

exhibits, this Court reasonably can expect Plaintiff will attempt to present during the trial despite the fact it is inadmissible, unreliable, immaterial, not relevant, or inflammatory, and in any event would severely prejudice Defendant's right to a fair trial.

The balance of this brief is divided into two parts: (i) the first part (Section I) addresses the inadmissible documents proposed by Plaintiff; and (ii) the second part (Section II) addresses the anticipated inadmissible testimony by Plaintiff.

## I.  INADMISSIBLE DOCUMENTS WHICH SHOULD BE EXCLUDED

### A.  Table of Categories/Reasons for Exclusion of Proposed Exhibit by Beljakovich

For ease of review by the Court, MPI has organized the flawed documents proposed as trial exhibits by Plaintiff Beljakovic (**Exhibit "A"**) into eight categories (which are discussed in greater detail beginning on page 3 of this motion):

1. Document concerns a claim previously adjudicated which was determined against Beljakovic -- dismissal on the merits of precisely the same claim in a decision by the New York State Division of Human Rights on **January 28, 2000**.

2. Document concerns a claim previously adjudicated which was determined against Beljakovic -- dismissal on the merits of precisely the same claim in a decision by the New York State Division of Human Rights on **December 14, 2001**.

3. Statute of Limitations -- document concerns a stale claim, which is in repose.

4. Hearsay -- out of court statement offered for the alleged truth of the matter.

5. Immaterial and Irrelevant -- document does not concern Age.

6. Altered document -- it contains handwritten notes, or redactions, by Beljakovic.

7. Self-Diagnosis of an alleged medical condition.

8. Document concerns a request for an accommodation, which is immaterial and irrelevant to an age discrimination claim.

**B.** **Discussion**

**Categories 1 and 2** (Prior adjudications: January 28, 2001 and December 14, 2001)

The law does not permit a party to relitigate matters that were determined in a prior

adjudication. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 58 L. Ed. 2d 552, 99 S. Ct. 645 (1979).

This principle of law includes New York State Division of Human Rights ("SDHR") adjudications.

Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 111 L. Ed. 2d 96, 111 S. Ct. 2166

(1991). The Astoria case involved the similar circumstance of a plaintiff who filed a federal ADEA

lawsuit (29 U.S.C. § 621, et seq.) after losing prior EEOC and SDHR administrative proceedings.

The Supreme Court, quoting its prior decision in United States v. Utah Constr. & Mining Co., 384

U.S. 394, 16 L. Ed. 2d 642, 86 S. Ct. 1545 (1966), and citing others, in Astoria held:

> "When an administrative agency is acting in a judicial capacity and resolves disputed issues
> of fact properly before it which the parties have had an adequate opportunity to litigate, the
> courts have not hesitated to apply *res judicata* to enforce repose."[1] *United States v. Utah
> Constr. & Mining Co.*, 384 U.S. 394, 422, 16 L. Ed. 2d 642, 86 S. Ct. 1545 (1966). Such
> repose is justified on the sound and obvious principle of judicial policy that a losing litigant
> deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on an issue
> identical in substance to the one he subsequently seeks to raise. To hold otherwise would,
> as a general matter, impose unjustifiably upon those who have already shouldered their
> burdens, and drain the resources of an adjudicatory system with disputes resisting resolution.
> See *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 58 L. Ed. 2d 552, 99 S. Ct. 645
> (1979). The principle holds true when a court has resolved an issue, and should do so
> equally when the issue has been decided by an administrative agency, be it state or federal,
> see *University of Tennessee v. Elliott*, 478 U.S. 788, 798, 92 L. Ed. 2d 635, 106 S. Ct. 3220
> (1986), which acts in a judicial capacity.[2]

---

1 *Res judicata* is a "Rule that final judgment or decree on merits by court of competent jurisdiction is
conclusive of rights of parties or their privies in all later suits on points and matters determined in former suit. .
. . And to be applicable requires identity in thing sued for as well as identity of cause of action, of persons and
parties to action, and of quality in persons for or against whom claim is made." Black's Law Dictionary, West
Pub. Co. (4th ed., 1968) (citations omitted).

2 501 U.S. at 107-109. In Astoria, the Supreme Court ultimately did not apply collateral estoppel effect to
the prior administrative determination in the particular action before it; however, this was only because the
Astoria plaintiff (in marked contrast to plaintiff, Beljakovic) complied with the time requirement for filing a
federal ADEA lawsuit after dismissal of his administrative claims (*i.e.,* court action must be filed within 90
days from dismissal of administrative claims). *Id.*, 501 U.S. at 111-14. In the instant action, as is discussed,
Beljakovic failed to preserve a timely right to file suit on the age discrimination administrative claim dismissed

Relatedly, and as discussed more thoroughly in the discussion below regarding Category 3 (Statute of Limitations), a plaintiff who fails to timely file suit under the ADEA, within 90 days of the dismissal or termination of his prior administrative proceedings, is time barred from suing on those charges. See, e.g., Francis v. Elmsford School Dist., 442 F. 3d 123 (2d Cir. 2006); Sherlock v. Montefiore Med. Ctr., 84 F. 3d 522 (2d Cir. 1996); 29 U.S.C. § 626. Therefore, Beljakovic's failure to do so in connection with the administrative dismissals in January 2000 and December 2001 gives rise to two indisputable realities: (a) he cannot sue on any of the matters that were subjects of the proceedings which terminated in January 2000 and December 2001; and (b) the dismissal findings by the administrative tribunals in January 2000 and December 2001 have absolute, binding, and final res judicata effect insofar as he attempts to raise them again, improperly, in this lawsuit.[3]

A fair reading of Beljakovic's federal complaint reveals that its gravamen is comprised of the very same matters which were the subjects of his prior administrative proceedings, dismissed on January 28, 2000 and December 14, 2001, and collaterally estopped herein. This is evident from Beljakovic's attachment to the complaint of a copy of his February 5, 2003, SDHR charge, which regurgitates the same stale grounds dismissed in January 2000 and December 2001. That charge even begins with the proviso: "I have filed previous complaints with the Division of Human Rights . . ." See Deng v. Aramark Educ. Group, Inc., 2006 U.S. Dist. LEXIS 23460 at *12 (E.D.N.Y. Mar. 23, 2006) (finding it significant, in the ADEA plaintiff's disfavor, that he acknowledged his prior complaints of the same or similar alleged misconduct). That charge by Plaintiff Beljakovic goes on

---

on the merits on January 28, 2000, and failed to preserve a timely right to file suit on the age discrimination administrative claim dismissed on the merits on December 14, 2001. Under the Supreme Court's above-quoted policies, those prior administrative dismissals are res judicata for Beljakovic.

[3]    Beljakovic's commenced the instant federal action by filing a complaint dated May 14, 2004

to reiterate (yet again) his old and familiar grievances, which were disposed of in January 2000 and December 2001, to wit: alleged harassment in response to his refusal "to sign a letter regarding a tenant," and his displeasure with his assigned work uniform." It goes without saying that once the preclusive effect of *res judicata* as to those stale grievances has obtained, in accord with the foregoing authorities, a plaintiff may not avoid the finality of that effect by the mere expedient of alleging them again in a newly filed, redundant, administrative charge, and following it up with an equally expedient federal case within 90 days of dismissal of the improvidently filed redundant administrative claim. In other words, the policies of *res judicata* and finality of dispute resolution enunciated by the above-discussed authorities and part of our jurisprudence for time immemorial, would be subverted if a plaintiff could simply do what plaintiff Beljakovic has done here. Indeed, an ADEA case conceivably might never end, as the plaintiff, after every administrative and judicial dismissal, would just re-file, re-file, and re-file again, based on the same stale grievances which prior administrative tribunals already disposed of as non-supportive of any discrimination claim.

It is axiomatic that the Congress did not intend that its statutorily imposed 90 day deadline, for commencement of a civil action after an administrative ADEA claim is dismissed, could be rendered meaningless by a plaintiff's re-filing the same ADEA claim with an administrative agency in order to obtain a fresh dismissal, in a calculated attempt to re-start the clock for the previously expired 90 day deadline.

While Defendant submits that the foregoing conclusion is unassailable, both as a matter of logic and as a matter of law per the foregoing authorities, the following clarification by the Second Circuit is further illustrative of its truth: *Res judicata* operates "if the second cause of action requires the same evidence to support it and is based on facts that were also present in the first." Maharaj v. BankAmerica Corp., 128 F. 3d 94, 97 (2d Cir. 1997). See also Berlitz Schools of Languages of

America, Inc. v. Everett House, 619 F. 2d 211, 215 (2d Cir. 1980) ("Whatever legal theory is advanced, when the factual predicate upon which claims are based are substantially identical, the claims are deemed to be duplicative for purposes of *res judicata*."); Deng, supra at *12 (granting motion to dismiss ADEA claims on a finding that "[t]he factual allegations in Plaintiff's present complaint are no different" from those of his prior one). As observed, a prior, final, administrative disposition enjoys the same force and effect as a prior judicial disposition (in the absence of a timely filed subsequent federal action challenging said administrative disposition). E.g., Astoria Fed. Sav. & Loan Ass'n, supra.

Accordingly, each document included on plaintiff Beljakovic's list of intended trial exhibits (see his grid chart within annexed Exhibit "A") which concerns a matter identical in substance (see Parklane, supra) that was investigated and subsequently heard by the SDHR, and ultimately determined on the merits against Beljakovic, may not properly be raised by him as an alleged legal claim during his case-in-chief. Each of those flawed documents (labeled in red ink with the number 1 and/or 2 in Exhibit "A") should be stricken from Beljakovic's list of intended trial exhibits in Section X of the JPTO and excluded from trial.

The documents which fall within the above categories of matters relating to prior, dismissed, administrative proceedings as to which no further claim may be made, are any of plaintiff's proposed exhibits containing supposed substantive evidence,[4] which pre-date the proceedings that terminated on January 28, 2000, and December 14, 2001, and which, therefore, cannot form the

---

[4]    Beljakovic's proposed trial exhibit 1, while objected to subsequently, under Category 6 (altered document), is the New York State Human Rights Division's dismissal of plaintiff Beljakovic's 1998 charge. The document contains nothing supportive of Beljakovic's claims as it expressly dismissed the charges and ordered the file closed. Defendant MPI, therefore, did not include this proposed exhibit in this segment of the within discussion concerning inadmissibility under Categories 1 and 2 (previously adjudicated claims).

basis of claims today in this lawsuit. Those documents are Beljakovic proposed trial exhibits 2-10, and 12-17, spanning a time frame commencing November 29, 2000, and ending September 17, 2001. They should all be excluded as relating to matters which are absolutely barred from any further recourse as a matter of procedural law (*res judicata* administrative dismissals).

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PLAINTIFF'S PROPOSED TRIAL EXHIBITS 2-10, and 12-17 BE EXCLUDED, AS INADMISSIBLE MATTERS RELATING TO PRIOR, DISMISSED, ADMINISTRATIVE CLAIMS WHICH ARE *RES JUDICATA* INSOFAR AS PLAINTIFF BELJAKOVIC IS CONCERNED AND NO LONGER JUSTICIABLE HEREIN.

**Category 3** (Statute of Limitations).

A legal claim which is in repose, because it first accrued on a date beyond the applicable statute of limitations, should not be adjudicated in a trial. Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S. Ct. 2162, 2168, 167 L. Ed. 2d 982 (May 29, 2007) ("'A discriminatory act which is not made the basis of a timely charge . . . is merely an unfortunate event in history which has no present legal consequences.'") (quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977); see also Perry v. Ethan Allen, Inc., 115 F. 3d 143 (2d Cir. 1997) (affirming District Court's exclusion at trial of any evidence of employment discrimination which involved events prior to the expiration of the statute of limitations regarding such events, reasoning that "events earlier than January 1989 should have been excluded on the ground that they were too remote to have probative value") (*id.* at 150). The Second Circuit in Perry further stated:

> Absent a continuing violation, the statute of limitations ordinarily would have barred any recovery by Perry under Title VII or FEPA for harassment that occurred prior to July 1990; and the earliest harassment alleged by Perry in her EEOC charge occurred in June 1989. The Court allowed Perry to present evidence of an environment of sexual harassment, to the extent that she observed it, dating back to January 1989, *i.e.*, six months earlier than any harassment of Perry herself. . . . [I]t was well within the

- 7 -

court's discretion to conclude that events earlier than January 1989 should be excluded on the ground that they were too remote to have probative value.

(*Id.*) The statute of limitations for age discrimination claims is as follows: Section 14 (b) of the ADEA requires that where a State has its own age-discrimination statute, a federal ADEA claimant must first pursue his claim with the responsible state agency before filing in federal court. 29 U.S.C. § 633 (b); Oscar Mayer & Co. v. Evans, 441 U.S. 750, 60 L. Ed. 2d 609, 99 S. Ct. 2066 (1979).

Then, no suit may be brought under the ADEA "before the expiration of sixty days after proceedings have been commenced under the State law, unless such proceedings have been earlier terminated." 29 U.S.C. § 633 (b). The ADEA further provides, in § 626, as follows (emphasis added):

(d) Filing of charge with Secretary [Commission]; timeliness; conciliation, conference, and persuasion. No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Secretary [Commission]. Such a charge shall be filed--

(1) within 180 days after the alleged unlawful practice occurred; or

(2) in a case to which section 14(b) [29 USCS § 633(b)] applies, **within 300 days after the alleged unlawful practice occurred,** or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier.

\*      \*      \*

(e) Reliance on administrative rulings; notice of dismissal or termination; civil action after receipt of notice. Section 10 of the Portal-to-Portal Act of 1947 [29 USCS § 259] shall apply to actions under this Act. If a charge filed with the Commission under this Act is dismissed or the proceedings of the Commission are otherwise terminated by the Commission, the Commission shall notify the person aggrieved. **A civil action may be brought under this section by a person defined in section 11(a) [29 USCS § 630(a)] against the respondent named in the charge within 90 days after the date of the receipt of such notice.**

*See also* Francis v. Elmsford School Dist., 442 F. 3d 123 (2d Cir. 2006); Sherlock v. Montefiore Med. Ctr., 84 F. 3d 522 (2d Cir. 1996) (failure to file an ADEA federal lawsuit within 90 days from termination of prior administrative proceedings bars the assertion of such a lawsuit as to the matters

- 8 -

that were the subjects of those proceedings).  Beljakovic filed his civil complaint in this action on

May 14, 2004.  (See **Exhibit "B"** annexed to Hummell Affirmation dated November 12, 2007)

Tracking the history of his pre-suit administrative charges against defendant, the following becomes

clear:

Beljakovic filed a SDHR complaint on June 19, 1993, which was dismissed on October 29,

1993 (*See* Defendant MPI's trial exhibit 11 [Determination and Order After Investigation dated

10/29/93]).  He then filed another SDHR complaint on August 5, 1998, followed up by an EEOC

Notice of Charge dated August 14, 1998; both of which were dismissed, respectively, on January

28, 2000, and February 23, 2000 (See Defendant MPI's trial exhibits 16-17, 19-20 [Complaint dated

8/5/98; Notice of Charge dated 8/14/98; Determination and Order After Investigation dated 1/28/00;

and Dismissal and Notice of Rights dated 2/23/00]).  Beljakovic, thereafter, filed a SDHR complaint

on June 13, 2001, followed up by an EEOC Notice of Charge of even date; both of which were

dismissed, respectively, on August 20, 2001, and December 14, 2001 (Defendant MPI's trial

exhibits 21, 23, 26-27 [Complaint dated 6/13/01; Notice of Charge dated 6/13/01; Determination

and Order After Investigation dated 8/20/01; and Dismissal and Notice of Rights dated 12/14/01]).

At no time did Beljakovic file a federal action (the instant one) until May 14, 2004 – remotely long

after the statutorily mandated 90 days from EEOC dismissals and terminations referred to the

above-quoted provisions of ADEA (29 U.S.C. § 626 (e)) and factually referenced above.

Accordingly, any legal claim based on an event alleged to have occurred in connection with any of

the time frames encompassed by the foregoing administrative complaints and proceedings (plus 90

days from the last EEOC dismissal of December 14, 2001, *i.e.,* March 14, 2002) is absolutely time-

barred.  Plaintiff Beljakovic identified within his proposed trial exhibits a number of documents

which concern an alleged legal claim which, even if it was valid (which MPI disputes), in any event

would be time-barred.  Each of those flawed documents (labeled in red ink with the number 3 in

Exhibit "A") should be stricken from Beljakovic's list of intended trial exhibits in Section X of the

JPTO and excluded from trial.  Those documents consist of exhibits which, similar to the analysis

made in the preceding categories (1 and 2), span the time covered by the two prior dismissed SDHR

administrative proceedings: proposed trial exhibits 2-17.  However, they also include one exhibit

which post-dates the December 14, 2001, administrative dismissal: proposed trial exhibit 18 (St.

Luke's Roosevelt Emergency Department Record, dated April 8, 2002).  This document is included

in the preclusion requested by MPI because Beljakovic never filed any administrative claim on

anything relating to that exhibit within any of the time frames set forth in ADEA's time limitations

provision (29 U.S.C. § 626 [quoted above: 300 days from date of allegedly unlawful occurrence]).

As similarly observed previously, in the related context of *res judicata* regarding Categories

1 and 2, *supra*, to allow a time-barred plaintiff to simply re-file a new, redundant, administrative

proceeding and follow-up federal action based on evidence of events and occurrences which, by

virtue of limitations, were time-barred from substantive legal recourse, would be to evade the time

limitations promulgated in the applicable statute of limitations – in this case, 29 U.S.C. § 626.  As

observed above, the gravamen of Beljakovic's federal complaint is comprised of the very same

matters which were the subjects of his prior administrative proceedings, dismissed in January 2000

and December 2001, and collaterally estopped herein (see, supra, Category 1 and 2 discussion, and

citations therein).  Plaintiff's neglect to file timely federal actions as to those old charges,

challenging the prior administrative dismissals, is an absolute procedural death knell of those

charges.  They cannot be exhumed on the simple expedient of a redundantly filed, more recent,

administrative charge and follow-up federal case.  To allow that would be to allow the literal

perpetuity of a cause of action – a mockery of ADEA's limitations requirements.

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PLAINTIFF'S PROPOSED TRIAL EXHIBITS 2-18 BE EXCLUDED, AS INADMISSIBLE MATTERS RELATING TO OCCURRENCES AND EVENTS WHICH ARE TIME-BARRED FROM SUIT UNDER THE ADEA's STATUTE OF LIMITATIONS.

**Category 4** (Hearsay)

The law does not permit trial admissibility of out of court statements of a non-party-opponent to be offered for the truth of the matters asserted, as they fall within the inadmissible category of hearsay. Fed. R. Evid. 801, *et seq.* An overwhelming bulk of plaintiff's proposed trial exhibits consists of various letters from persons other than representatives of defendant (Plaintiff's Proposed Trial Exhibits 4, 6-10, 12, 15-16, 18, 20-34, 36, 38-66, and 69-74). As such, they are to be excluded at trial as inadmissible hearsay. E.g., Carmody v. ProNav Ship Mgm't, Inc., 224 F.R.D. 111 (S.D.N.Y. 2004) (letters of non-party-opponents excluded from trial evidence as inadmissible hearsay under Fed. R. Evid. 801, *et seq.*).

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PLAINTIFF'S PROPOSED TRIAL EXHIBITS 4, 6-10, 12, 15-16, 18, 20-34, 36, 38-66, and 69-74, BE EXCLUDED, AS INADMISSIBLE HEARSAY.

**Category 5** (Immateriality and Irrelevancy of Documents)

Materials which do not serve as probative support toward the establishment of any of the substantive elements of a claim or defense cannot be deemed relevant to the action and are, thereby, inadmissible at trial. E.g., LoSacco v. Tosto, 1998 U.S. App. LEXIS 12674 (2d Cir. May 11, 1998) (material excluded from trial on finding that it did not support the particular claim being pursued by the plaintiff); Baptist v. Bankers Indem. Ins. Co., 377 F. 2d 211 (same), cert. denied, 389 U.S. 832, 88 S. Ct. 103, 19 L. Ed. 2d 92 (1967). The concept is succinctly expressed in the Rule 402 of the

Federal Rules of Evidence thus: "Evidence which is not relevant is not admissible."

In the present matter, plaintiff has designated numerous exhibits which are irrelevant to the factors underlying the single solitary cause of action asserted by plaintiff in this action: discrimination based on age under the ADEA. Plaintiff's proposed exhibits bearing our Category 5 marking all deal with matters involving things for which plaintiff was supposedly "reprimanded" **having nothing whatsoever to do with his age**, such as plaintiff's wearing of an improper uniform for his doorman job (Exs. 2, 5, 54, 61); inappropriate playing of his radio at work (Exs. 3, 5); sleeping on the job (Ex. 6, 7); vacation schedule (Exs. 9, 10, 13, 16); working until arrival of replacement (Exs. 11, 12); inappropriate letter writing to Mrs. Martha Melohn (Exs. 4, 14, 15); insubordination and failure to perform his duties (Ex. 17); personal testimonials (Exs. 20-32, 72); workers' compensation application (Ex. 33, 52, 60, 61); various doctors' reports (and news article unrelated to him) (Exs. 18, 34, 38, 47-50, 52, 54, 58, 60, 62-64; his work schedule (Exs. 9, 10, 11-13, 16, 35-40, 42, 44, 46, 51, 53, 55-57, 60); City fines for unkempt sidewalk and sanitation violations (Exs. 41, 42, 44); snow removal (Ex. 49); his reporting requirements (Ex. 55); working conditions (Ex. 62-64); etc. The substantive standards for a *prima facie* showing of actionable age discrimination under the ADEA are well settled. In order to even remotely approach the factors which must be present in order to make a *prima facie* showing of actionable age discrimination under the ADEA, the plaintiff must prove: membership in the protected age group; sufficient qualifications for the job; an adverse employment action; and that said action occurred due to an intent to discriminate based on the plaintiff's age. E.g., D'Cunha v. Genovese/Eckerd Corp., 479 F. 3d 193 (2d Cir. 2007).

None of plaintiff's proposed exhibits, marked Category 5, go any distance at all in support of any one of the foregoing factors. Reprimands for improper uniform, radio playing, sleeping on the

job, etc., all relate to problems and issues which do not touch upon the employee's age.  Any

employee of any age can and, presumably, will, be reprimanded and dealt with for actions which,

objectively speaking, have nothing to do with the employee's age.  No evidence relevant to "age"

discrimination is found in any of those exhibits and, therefore, they must be excluded as completely

irrelevant to plaintiff's claims herein.  Insofar as plaintiff refers to workaday matters such as

difficulties involved in the job, whether due to the nature of the work or physical involvement

associated with the work; again, those are not indicative of invidious discrimination based on "age,"

*per se.*  To put it plainly, none of the aforementioned exhibits contains any reference to plaintiff's

age as a factor in any alleged adverse employment decision by defendant.  As far as anyone can tell,

they simply reflect plaintiff's overall dissatisfaction with his job – a perceived misfortune which the

ADEA was not legislated to remedy.

    As detailed more thoroughly below in our discussion of Category 8 (accommodation; not

discrimination), inconveniences and even hardships which an employee must encounter during the

course of employment, absent tangible adverse reductions in compensation and benefits of

employment, are simply not actionable under ADEA, as the purpose of that statute is to root out

invidious discrimination based on "age" and age alone.  See, e.g., Galabya v. New York City Bd. of

Educ., 202 F. 3d 636 (2d Cir. 2000); Carmellino v. District 20 of the New York City Dep't of Educ.,

2006 U.S. Dist. LEXIS 63705 (S.D.N.Y. Sept. 6, 2006); Castro v. New York City Bd. of Educ.

Personnel Dir., 1998 U.S. Dist. LEXIS 2863 (S.D.N.Y. Mar. 11, 1998).  Absent an actual, tangible,

adverse job consequence, circumstances which may be characterized as job disappointments and/or

disagreement with job performance evaluations, such as those alleged by plaintiff and reflected in

the foregoing exhibits, cannot form the basis of an age discrimination claim under the ADEA.  None

of the alleged job-related alleged difficulties reflected in the aforementioned exhibits evince any

federally-actionable age discrimination.  Significantly, the only anti-employment-discrimination legislation existing which imposes a "reasonable accommodation" requirement on an employer is the Americans With Disabilities Act (the "ADA") (42 U.S.C. § 12101, *et seq.*).  Neither ADEA, sued under herein, nor any other enabling statute such as Title VII of the Civil Rights Act of 1964 (apart from the ADA), requires an employer to ease job conditions so as to make the job more convenient and satisfactory to its employee.

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PLAINTIFF'S PROPOSED TRIAL EXHIBITS 2-7, 9-18, 20-32, 34-44, 46-58, 60-64, 72, BE EXCLUDED, AS INADMISSIBLE MATERIAL UNRELATED TO AGE-BASED ACTIONABLE DISCRIMINATION AND, THUS, NOT WITHIN THE BOUNDS OF EVIDENTIARY RELEVANCY.

**Category 6**  (Alterations to documents)

The various documents proposed by plaintiff as trial exhibits, which contain his handwritten alterations and modifications, cannot possibly be admissible as trial evidence.  Rule 1003 of the Federal Rules of Evidence clearly forbids the admission of proffered evidence consisting of duplicated material which does not reflect the original purported to be represented by the duplicate:

> A duplicate is admissible to the same extent as an original unless (1) a genuine issue is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

Copies of the January 28, 2000, SDHR determination and the February 5, 2001, letter from Robert Hammer to plaintiff Beljakovic which plaintiff desires to use as trial evidence, marred by his own handwritten personal notations (Exhibits 1 and 6), simply cannot gain admissibility at trial by virtue of the patent alterations, destroying authenticity, of course; but also, at a bare minimum, creating unfairness to defendant in the course of this jury trial.  See also MacMillan v. Aboff, 186 B.R. 35

- 14 -

(S.D.N.Y. 1995) (issue of party's alteration of evidentiary document was sufficient to support denial of summary judgment and the holding of a hearing on that issue).

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PLAINTIFF'S PROPOSED TRIAL EXHIBITS 1 AND 6 BE EXCLUDED, AS INADMISSIBLE COPIES OF MATERIAL WHICH LACK EVIDENTIARY RELEVANCY.

**Category 7** (Self-Diagnosis)

Plaintiff's proposed trial exhibit 34 consists of what is described as: "Letter/Medical Report from Dr. James H. Frost regarding CT Scan of abdomen and pelvis of Beljakovic." Other alleged medical information is part of proposed trial exhibits 18, 38, 47, 48, 49, 50, 52, 54, 58, 60, 62, 63, and 64. Apart from the patent hearsay problem underlying that letter, and the fact that it is unrelated to "age"-related issues, plaintiff apparently desires the admission of that letter so he can provide his own self-diagnosis which he, a lay person, derives therefrom. It is preposterous to propose such material as admissible evidence for that purpose because of the complete lack of any foundation for its admissibility. It is not an appropriate basis upon which plaintiff may "opine" concerning his medical state of being. Rule 701 of the Federal Rules of Evidence expressly preclude "opinion testimony by lay witnesses" "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 702, in turn, mandates that only a qualified expert, "by knowledge, skill, experience, training, or education, may testify" as to scientific, technical, or other specialized knowledge opinions. Mr. Beljakovic is not a qualified physician with the foundational expertise to opine on the import of the "Letter/Medical Report" he designates as Exhibit 34, "regarding CT Scan of abdomen and pelvis," nor is he qualified to give an expert opinion concerning any of the medical matters mentioned in proposed trial exhibits 18, 38, 47, 48, 49, 50, 52, 54, 58, 60, 62, 63, and 64. His attempt to admit that material so he can render his lay opinion about it is absolutely precluded

- 15 -

under the foregoing Rules of Evidence.  See also Bonton v. City of N.Y., 2004 U.S. Dist. LEXIS

22105, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (the District Court must act as "a

gatekeeper to exclude invalid and unreliable expert testimony") (citations omitted).

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PLAINTIFF'S

PROPOSED TRIAL EXHIBITS 18, 34, 38, 47, 48, 49, 50, 52, 54, 58, 60, 62, 63, and 64,  BE

EXCLUDED, AS INADMISSIBLE MATERIAL LACKING REQUISITE EXPERT

FOUNDATION.

**Category 8**  (Request for Accommodation)

Plaintiff's proposed trial exhibits 16, 36, 38-40, 43, 46, 53-57, 59-61, 63, 65, 67-69, 71-72,

and 74, all consist of documents in which Beljakovic requests an accommodation.  Limited

examples are the following: a request to receive a so-called "late vacation" after he previously

requested a cash out of his entire vacation time for that year, which defendant had provided at his

request (Ex. 16) a request for a different work schedule, which would take morning shifts away

from Julio Peralta, an employee with a longer period of service (Exs. 36, 38-40); a request to be

excused from performing the snow removal duty performed by each doorman (Ex. 49); a request for

a heavy coat which he asked would be provided free of charge (Ex. 54); a request that he alone

would be permitted to change into his work clothes in the package room in the lobby even though

all other doormen were required to change into work clothes using the basement locker room (Ex.

63); a request for a replacement hat (Ex. 59 and 61); a request for a special fan (Ex. 72) (see other

exhibits cited hereinabove and described in the discussion in Category 5, *supra*).  Even if it were

assumed that plaintiff's said requests were denied by defendant, they do not constitute actionable

age discrimination under the ADEA.  In order to advance such a claim, a plaintiff must prove

tangible employment adversities such as demotion, diminution in wages, or other tangible loss.

E.g., Castro v. New York City Bd. of Educ. Personnel Dir., 1998 U.S. Dist. LEXIS 2863 (S.D.N.Y.

Mar. 11, 1998). Absent an actual, tangible, adverse job consequence, circumstances which fairly

may be characterized as job disappointments, such as those alleged by plaintiff Beljakovic and

reflected in the foregoing exhibits, cannot form the basis of an age discrimination claim under the

ADEA. Carmellino v. District 20 of the New York City Dep't of Educ., 2006 U.S. Dist. LEXIS

63705 (S.D.N.Y. Sept. 6, 2006). None of the alleged job disappointments reflected in those

exhibits evince any federally-actionable age discrimination. As the Second Circuit held in Galabya

v. New York City Bd. of Educ., 202 F. 3d 636 (2d Cir. 2000):

> A plaintiff sustains an adverse employment action if he or she endures a "materially
> adverse change" in the terms and conditions of employment. *See Richardson v. New*
> *York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d Cir. 1999) (relying on
> *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F. 2d 132, 136 (7th Cir. 1993)). To be
> "materially adverse" a change in working conditions must be "more disruptive than a
> mere inconvenience or an alteration of job responsibilities." *Crady*, 993 F.2d at 136.
> "A materially adverse change might be indicated by a termination of employment, a
> demotion evidenced by a decrease in wage or salary, a less distinguished title, a
> material loss of benefits, significantly diminished material responsibilities, or other
> indices . . . unique to a particular situation." *Id.*; see *Wanamaker v. Columbian Rope*
> *Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (ADEA protects the employee against "less
> flagrant reprisals" than termination or a reduction in wages and benefits).

Id. at 640 (citations and footnotes omitted).

Thus, plaintiff Beljakovic must prove he experienced an adverse employment circumstance

because of his age, meaning, a "materially adverse change 'in the terms and conditions of

employment'." Galabya v. New York City Board of Education, 202 F.3d 636 (2d Cir. 2000). In

Galabya, the Second Circuit found:

> Appellant, appearing *pro se*, does not identify with precision what he considers the
> adverse employment action to have been, but his argument may reasonably be read as
> contending that he was denied assignment to the P.S. 4 computer lab, not assigned for
> the start of the 1993-94 school year, mis-assigned to Sarah Hale, and then ultimately
> assigned to Van Arsdale where he was forced to teach outside his area of expertise
> (special education) and at a school with inferior facilities to P.S. 4. We agree with
> Judge Nickerson that this series of events does not constitute an adverse employment

action.

202 F.3d at 639-40.

> A materially adverse change might be indicated by a termination of employment, a
> demotion evidenced by a decrease in wage or salary, a less distinguished title, a
> material loss of benefits, significantly diminished material responsibilities, or other
> indices . . . unique to a particular situation.

Id. , referring to Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). However,

any reading of Wanamaker which leads the reader to conclude in error that an ADEA claim may be

predicated on changes in the terms and conditions of employment which are not substantial, is

refuted by controlling law other than Wanamaker (already discussed by defendant MPI in this

Brief), and is not supported by the court's own determination in Wanamaker, which held:

> [W]anamaker's claim falters. We cannot say that, for someone in Wanamaker's
> position, the loss of a phone and office is sufficiently deleterious to constitute adverse
> employment action prohibited by the ADEA. Blacklisting and refusing to recommend
> an individual tend to besmirch his reputation. But barring a terminated employee from
> using an office and phone to conduct a job hunt presents only a minor, ministerial
> stumbling block toward securing future employment. We are not moved by
> Wanamaker's conclusory, unsupported claims that the loss of these services had an
> injurious effect on his reputation in the legal community.[5]

---

[5]  Zelnik v. Fashion Institute of Technology, 464 F.3d 217 (2d Cir. 2006), *cert. denied*, 127 S.Ct. 2062, 167
L.Ed.2d 769 (2007), is not to the contrary, as it treats a wholly different employment scenario. In Zelnik, in
which the plaintiff employee claimed he suffered retaliation and an adverse employment action for having
**exercised his first amendment right of free speech**, the Second Circuit confirmed that the standard for
determining whether the employer's action is an adverse employment action is more liberal when the protected
conduct is an exercise of first amendment rights. 464 F.3d at 225. Under the more liberal standard, the Second
Circuit has held retaliatory conduct that would deter a similarly situated person of ordinary firmness from
exercising his constitutional right (free speech) may constitute an adverse employment action. Under the more
stringent standards applicable to an ADEA claim not involving an infringement of constitutional rights, the
standard has been that an adverse employment action will not be found absent a materially adverse change in
the terms and conditions of employment which have been held to include: discharge, demotion, decrease in
wage or salary, less distinguished title, material loss of benefits, diminished material responsibilities or other
indices unique to a particular situation. Zelnik, 464 F.3d at 225 (citing Galabya, 202 F.3d at 640) (emphasis
added).

- 18 -

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PLAINTIFF'S PROPOSED TRIAL EXHIBITS 16, 36, 38-40, 43, 46, 53-57, 59-61, 63, 65, 67-69, 71-72, and 74, BE EXCLUDED, AS INADMISSIBLE MATERIAL WHICH DOES NOT SUPPORT THE SUBSTANTIVE ELEMENTS FOR A CLAIM UNDER THE ADEA AND, THUS, NOT WITHIN THE BOUNDS OF EVIDENTIARY RELEVANCY.

While it is clear, beyond doubt, that none of the referenced materials can be said to fall within the bounds of relevance (Fed. R. Evid. 401). In addition, because these materials do not bear on any of the legally recognized elements supportive of such a claim, at a bare minimum, their introduction to a jury would, in light of their non-supportive character, give rise to "unfair prejudice, confusion of the issues, or misleading [of] the jury" sufficient to warrant their inadmissibility under Rule 403 of the Federal Rules of Evidence. A jury would be have to be asked to receive such evidence with an eye toward segregating out anything (*i.e.*, everything) which does not support actionable age claims under the ADEA. We respectfully submit that the possibly inflammatory and emotional effect which those materials are capable of, simply outweigh any possible evidentiary usefulness, given the fact that those materials do nothing more than highlight plaintiff's non-actionable dissatisfaction with his job – a perceived misfortune as to which no cause of action lies under the ADEA or otherwise.

### Plaintiff's Proposed "Introductory Remarks"

Plaintiff included a cover page to his proposed trial exhibit binder entitled "Introductory Remarks," to which the Court is respectfully referred. A perusal of this unauthorized material reveals that it contains plaintiff's self-account history of his life, and other unsworn, uncorroborated, hearsay statements. Needless to say, this material warrants exclusion, among all the other proposed exhibits submitted under its cover and treated hereinabove. Apart from their patent irrelevance

- 19 -

(Fed. R. Evid. 401) and their patent inflammatory and prejudicial nature (such as statements like:

"My work record included: Teaching High School, in Kragujevac, Serbia, before escaping from the

Communist regime (1955-1958)") (Fed. R. Evid. 403), they are not "evidence." Nor should such

materials be allowable in the form of opening, as they have no bearing on the substantive elements

for *prima facie* ADEA claims. Accordingly, the "Introductory Remarks," which are thinly disguised

verbal testimony by plaintiff Beljakovic, in their entirety should be excluded from admissibility at

trial.

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PLAINTIFF'S

PROPOSED "INTRODUCTORY REMARKS," WHICH APPEAR NEAR THE FRONT OF HIS

TRIAL BINDER, SHALL BE EXCLUDED, AS INADMISSIBLE MATERIAL WHICH, IN

ADDITION TO BEING HEARSAY, DOES NOT SUPPORT THE SUBSTANTIVE ELEMENTS

FOR A CLAIM UNDER THE ADEA AND, THUS, IS NOT WITHIN THE BOUNDS OF

EVIDENTIARY RELEVANCY.

### Unidentified Pages at End of Plaintiff's
### Binder of Intended Trial Exhibits

Plaintiff inserted at the end of his binder of intended trial exhibits a hodgepodge of pages,

none of which bear any proposed trial exhibit number (in the upper right hand corner, these pages

run from 93- 104, and the first of these pages (93) bears at the top the following title: "Several cases

of transgression by the Defendants"). These documents are in contravention of the statements of

plaintiff in the JPTO, which did not mention any of these pages. In addition, the absence of a

proposed trial exhibit number for any page within this group of documents appears to coincide with

the fact that these pages almost entirely consist of rambling personal notes of the Plaintiff. The

final two pages in this group (103-104) are the only ones which contain any date. A perusal of this

unauthorized material reveals that it is replete with unsworn, uncorroborated, hearsay statements, and appear to violate many other evidentiary rules (categories 2, 3, 4, 5 7, and 8 identified by defendant, *supra*).  All of this material warrants exclusion, among all the other proposed exhibits submitted under its cover and treated hereinabove.  Apart from their patent irrelevance (Fed. R. Evid. 401) and their patent inflammatory and prejudicial nature, these pages are not "evidence."

ACCORDINGLY, IT IS RESPECTFULLY REQUESTED THAT PAGES 93- 104 WHICH APPEAR NEAR THE BACK OF PLAINTIFF'S BINDER WITH PROPOSED TRIAL EXHIBITS, SHALL BE EXCLUDED, AS INADMISSIBLE MATERIAL WHICH, IN ADDITION TO BEING HEARSAY, INCLUDE MATTERS PREVIOUSLY DETERMINED, TIME-BARRED MATTERS AND SELF-DIAGNOSIS OF ALLEGED MEDICAL CONDITION, AND DO NOT SUPPORT THE SUBSTANTIVE ELEMENTS FOR A CLAIM UNDER THE ADEA AND, THUS, ARE NOT WITHIN THE BOUNDS OF EVIDENTIARY RELEVANCY.

## II.  INADMISSIBLE TESTIMONY<br>WHICH SHOULD BE EXCLUDED

The Joint Pre-Trial Order includes an outline by the parties setting forth, at viii thereof, their lists of witnesses and summary of the nature of their anticipated testimony.  Virtually all of plaintiff's designations under this category are improper, inadmissible, proffered evidence for many of the reasons briefed hereinabove in connection with his proposed trial exhibits.  The following discussion points out and specifies the particular witnesses and testimony which should be disallowed as inadmissible.

**"Alphonse Melohn, son of Martha Melohn"** (JTPTO, § viii, at 8):

Plaintiff states, *inter alia*:

> . . . [O]rdering extra duties for Plaintiff . . .; encouraging animosity and mistrust amongst employees; change of work hour schedules.

- 21 -

As explained above with regard to Categories 5 and 8, and pursuant to the authorities cited therein (*see, supra*), the alteration of work duties and other difficulties associated with one's employment are not actionable under the ADEA. Any testimony in that nature is both irrelevant to plaintiff's claims (Fed. R. Evid. 401) and/or inflammatory and prejudicial to the point where they warrant exclusion (Fed. R. Evid. 403). Such proposed testimony should be excluded at trial.

**"Joseph Helmreich, Manager of Melohn Properties, Inc."** (JPTO, § viii, at 8):

Plaintiff states:

> [W]orking conditions in the building; surreptitious inquiries about Plaintiff's claims, possible lawyers, etc; attempts to prevent Plaintiff from complaining about threatened termination for refusing to sign letters against tenants; receipt of numerous letters of complaint from Plaintiff and his lack of response to them.

As explained above with regard to Categories 5 and 8, and pursuant to the authorities cited therein (*see, supra*), working conditions, inconveniences, perceived difficulties, and non-accommodations in the workplace which are not age-related cannot form the basis for a claim under the ADEA. Any testimony in that nature is both irrelevant to plaintiff's claims (Fed. R. Evid. 401) and/or inflammatory and prejudicial to the point where they warrant exclusion (Fed. R. Evid. 403). Therefore, proposed witness Joseph Helmreich should be excluded as a witness for the plaintiff.

**"Noe Osorio, Superintendent"** (JPTO, § viii, at 8):

Plaintiff states, *inter alia*:

> ". . . [S]hortening breaks against union contract rules; encouraging employees to avoid Plaintiff."

As explained above with regard to Categories 5 and 8, and pursuant to the authorities cited therein (*see, supra*), working conditions, inconveniences, perceived difficulties, and non-accommodations in the workplace which are not specifically age-related cannot form the basis for a claim under the ADEA. Any testimony in that nature is both irrelevant to plaintiff's claims (Fed. R.

Evid. 401) and/or inflammatory and prejudicial to the point where they warrant exclusion (Fed. R.

Evid. 403). Such proposed testimony should be excluded at trial.

**"Robert Hammer, Agent of Melohn Properties, Inc."** (JPTO, § viii, at 8-9):

Plaintiff states:

> [W]riting of reprimand letter; denial of vacation time for Plaintiff; orders regarding
> Plaintiff's letter writing to Martha Melohn; requests that Plaintiff sign letters against
> building tenants; attempt to cancel Workers' Compensation Board hearing and/or
> prevent Plaintiff from attending; public verbal humiliation.

As explained above with regard to Categories 5 and 8, and pursuant to the authorities cited

therein (*see, supra*), working conditions, inconveniences, perceived difficulties, and non-

accommodations in the workplace which are not specifically age-related cannot form the basis for a

claim under the ADEA. Any testimony in that nature is both irrelevant to plaintiff's claims (Fed. R.

Evid. 401) and/or inflammatory and prejudicial to the point where they warrant exclusion (Fed. R.

Evid. 403). In addition, as explained above with regard to Categories 1, 2, and 3, and pursuant to

the authorities cited therein (*see, supra*), matters relating to events and occurrences adjudicated and

disposed of during plaintiff's administrative proceedings concluded January 28, 2000, and

December 14, 2001, are *res judicata* and cannot be included as the gravamen of this lawsuit; and

matters as to which ADEA's statute of limitations bars any recovery similarly cannot be included as

the gravamen of this lawsuit. Therefore, proposed witnessRobert Hammer should be excluded as a

witness for the plaintiff.

**"Frank Monaco, Delegate of District 6 Union 32B&J"** (JPTO, § viii, at 9):

Plaintiff states:

> "[C]omplaints Plaintiff made to union; union attempts to assist Plaintiff."

As explained above with regard to Categories 5 and 8, and pursuant to the authorities cited

- 23 -

therein (*see, supra*), working conditions, inconveniences, perceived difficulties, and non-accommodations in the workplace which are not specifically age-related cannot form the basis for a claim under the ADEA. Any testimony in that nature is both irrelevant to plaintiff's claims (Fed. R. Evid. 401) and/or inflammatory and prejudicial to the point where they warrant exclusion (Fed. R. Evid. 403). Therefore, proposed witness Frank Monaco should be excluded as a witness for the plaintiff.

      **"Lloyd Adolton, former porter"** (JPTO, § viii, at 9):

Plaintiff states, *inter alia*:

> . . . [W]itness to Plaintiff being made to do heavy labor; witness to sanitation inspector's claim of calls regarding unclean sidewalks.

As explained above regarding to Categories 5 and 8, and pursuant to the authorities cited therein (*see, supra*), working conditions, inconveniences, perceived difficulties, and non-accommodations in the workplace which are not specifically age-related cannot form the basis for a claim under the ADEA. Any testimony in that nature is both irrelevant to plaintiff Beljakovic's claims (Fed. R. Evid. 401) and/or inflammatory and prejudicial to the point where they warrant exclusion (Fed. R. Evid. 403). Moreover, insofar as said proposed testimony is anticipated to include lay opinions on plaintiff's physical ability to perform his job functions, such testimony is similarly inadmissible for the reasons stated in Category 7 hereinabove, and pursuant to the authorities cited therein (*see, supra*), for lack of foundation (Fed. R. Evid. 701, 702). Moreover, insofar as said proposed testimony is anticipated to implicate out of court statements by non-parties, such testimony is similarly inadmissible for the reasons stated in Category 4 hereinabove, and pursuant to the authorities cited therein (*see, supra*), as inadmissible hearsay (Fed. R. Evid. 801, *et seq.*). Such proposed testimony should be excluded at trial.

**"Felix Bermudez, former porter"** (JPTO, § viii, at 9):

Plaintiff states nothing as to the summary of the substance of this proposed witness' anticipated testimony. This proposed witness should be excluded at trial by virtue of plaintiff's failure to disclose in pursuance of his obligations under the Individual Rules of Practice of this honorable Court concerning Pre-Trial Order practice.

III.    **CONCLUSION**

For all these reasons, it is respectfully requested that the Court grant defendant's instant motion *in limine* and objections to exhibits in all respects, and that it grant defendant such other and further relief as it may deem just and proper.

Dated: New York, New York
            November 12, 2007

                              **KUCKER & BRUH, LLP**
                              (Attorneys for Defendant
                              Melohn Properties, Inc.)

                              747 Third Avenue, 12th Floor
                              New York, New York 10017
                              (212) 869-5030

By: _____
                              William D. Hummell, Esq.
                              (WH-7071)

- 25 -

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 1 of 30

Page 1 of 11

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Off | [?] Help

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Dossier | History | 🗐

Service: **Get by LEXSEE®**
Citation: **2004 us dist lexis 22105**

*2004 U.S. Dist. LEXIS 22105, \**

CRAIG BONTON and GEORGIA BONTON, Plaintiffs, CITY OF NEW YORK, FRANCIS OKEKE, SHEBA RANA, PAMELA LEE, and TERRY MAYS, Defendants.

03 Civ. 2833 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 22105

November 3, 2004, Decided
November 3, 2004, Filed

**DISPOSITION:** Defendants' motion to preclude plaintiffs' expert testimony granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff parents sued defendant city and employees of the city's child services agency, under 42 U.S.C.S. § 1981, 1983, the state constitution, and state tort law, for placing their infant twins in foster care. Plaintiffs claimed that the placement was a consequence of the agency's policy or custom of singling out African-American families for such treatment. Defendants moved to prelude the testimony of plaintiff's statistical expert.

**OVERVIEW:** Plaintiffs sought to use the testimony of a statistical expert to help prove its Monell claim against the city. The expert's report claimed that there were statistical disparities between the rate at which children of African-American and white families were remanded to custody. Defendant's expert countered with a number of criticisms, including that the analysis had little, if any, probative value because it failed to account for significant explanatory variables. The court's analysis of that criticism required preclusion of the report. The expert's report was inadmissible because it would not assist the trier of fact and it would invite the jury to engage in impermissible speculation. The report's statistical evidence did not make it any more or less likely that it was agency policy or custom to discriminate against African-Americans. The statistical analysis failed to control for any nondiscriminatory explanations. As a result, for a jury to determine solely on the basis of the expert's report that a causal link existed between the observed disparity and an alleged policy of racial discrimination would have required a logical leap that amounted to mere speculation.

**OUTCOME:** The court granted defendants' motion to preclude the plaintiff's expert testimony.

**CORE TERMS:** variable, disparity, statistical, regression, foster care, expert testimony, inadmissible, statistical analysis, custom, investigated, scientific, misleading, statistics, explanatory, custody, expert's report, trier of fact, discriminate, speculation, bifurcate, child abuse, employment status, causal link, statistically, feet, civil rights, probative value,

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 2 of 30

Page 2 of 11

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105

specialized knowledge, discriminatory treatment, summary judgment

**LEXISNEXIS® HEADNOTES**       ⊟ **Hide**

Civil Rights Law > Immunity From Liability > Local Officials > General Overview
Civil Rights Law > Section 1983 Actions > Government Actions

*HN1* A municipality may be sued under 42 U.S.C.S. § 1983 only when a municipal policy or custom caused the plaintiff's injury. More Like This Headnote

Evidence > Relevance > Relevant Evidence
Evidence > Scientific Evidence > General Overview
Evidence > Testimony > Experts > General Overview

*HN2* "Fisher's exact test" is a calculation used by statisticians to determine the statistical significance of an observed value as compared to the prediction of a pre-established hypothesis. More Like This Headnote

Evidence > Testimony > Experts > General Overview

*HN3* See Fed. R. Evid. 702.

Evidence > Scientific Evidence > Daubert Standard
Evidence > Testimony > Experts > Admissibility
Evidence > Testimony > Experts > Daubert Standard

*HN4* A district court must act as a gatekeeper to exclude invalid and unreliable expert testimony. Under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharms., Inc., the trial judge must determine whether the proposed testimony both rests on a reliable foundation and is relevant to the task at hand. More Like This Headnote |
*Shepardize: Restrict By Headnote*

Evidence > Testimony > Experts > Daubert Standard

*HN5* Daubert's general holding setting forth a trial judge's gatekeeping obligation in regard to expert testimony based on scientific knowledge extends to testimony based on technical and other specialized knowledge. More Like This Headnote |
*Shepardize: Restrict By Headnote*

Evidence > Relevance > Confusion, Prejudice & Waste of Time
Evidence > Testimony > Experts > General Overview

*HN6* Fed. R. Evid. 403 states that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 exercises more control over experts than over lay witnesses. More Like This Headnote |
*Shepardize: Restrict By Headnote*

Evidence > Procedural Considerations > Burdens of Proof > General Overview
Evidence > Procedural Considerations > Preliminary Questions > General Overview
Evidence > Testimony > Experts > General Overview

*HN7* A proponent of expert evidence must establish admissibility under Fed. R. Evid. 104(a) by a preponderance of the proof. More Like This Headnote |
*Shepardize: Restrict By Headnote*

Evidence > Relevance > Relevant Evidence

Case 2:04-cv-03694-RJH-GWG   Document 41-2   Filed 11/13/2007   Page 3 of 30

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105

Page 3 of 11

Evidence > Scientific Evidence > General Overview 🔍

    Evidence > Testimony > Experts > General Overview 🔍

HN8 ⭐ A "multiple regression analysis" is a statistical tool for determining the effect of two or more explanatory variables on a variable to be explained, called the dependent variable. This tool allows an expert to determine the causal relationship, if any, between the explanatory variables and the dependent variable. More Like This Headnote

    Evidence > Relevance > Relevant Evidence 🔍

    Evidence > Testimony > Experts > General Overview 🔍

HN9 ⭐ Statistical analyses that fail to control for any nondiscriminatory explanations are inadmissible. More Like This Headnote

**COUNSEL:** **[*1]** For Plaintiffs: Martha M. McBrayer, Esq., Benedict P. Morelli & Associates, P.C., New York, NY.

For Defendants: Theresa Crotty, Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** SHIRA A. SCHEINDLIN

**OPINION**

OPINION AND ORDER

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Craig and Georgia Bonton, are suing individual employees of the New York City Administration of Child Services ("ACS") as well as the City of New York under 42 U.S.C. §§ 1981, 1983. [1] The Bontons have demanded a jury trial. [2] The Bontons allege that in July, 2001, the individual defendants sought and obtained a court order from the Family Court placing the Bontons' infant twins, Rosella and Craig, Jr., in foster care for approximately a year and three months in violation of the Bontons' civil rights and further allege that this violation is a consequence of ACS's policy or custom of singling out African-American families for such treatment. Defendants have moved to preclude the testimony of the Bontons' statistical expert, Dr. Harriet Zellner, who has provided an opinion to support the contention that ACS discriminates against African-Americans. For **[*2]** the reasons stated below, this proposed expert testimony is inadmissible and, therefore, must be precluded.

**FOOTNOTES**

[1] The Bontons also bring claims under the New York State Constitution's Bill of Rights as well as state law claims of false arrest, false imprisonment and negligence. *See* Complaint PP 63-106.

[2] *See id.* at 1.

**I. BACKGROUND**

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 4 of 30
Page 4 of 11
Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105

## A. Dr. Zellner's Report

The Bontons propose to use the testimony of Dr. Harriet Zellner ("Zellner"), who holds a Ph.D. in economics from Columbia University, to assist in proving its *Monell* claim [3] against the City. [4] The purpose of the report is "to determine whether there were statistically significant disparities in 2000 and 2001 in the rate at which children of African American and white families investigated by [the] City of New York Administration for Children's Services . . . were remanded to ACS custody." [5] Zellner based her report on two sets of data, both of which were supplied by ACS: "(1) the racial identity of parents investigated [*3] by ACS in 2000 and 2001 and (2) the number of children -- by race -- remanded to the custody of the agency." [6] The report displays a selection of this data in a table, according to which 90.4% of all children remanded to ACS custody in 2000 were African-American even though only 79.8% of all cases involved African-Americans . [7] By contrast, in the same year, White children accounted for 9.6% of all children remanded, while 20.2% of all cases involved White parents. [8] The report displays similar data for 2001. [9] Zellner uses Fisher's exact test [10] to calculate the probability that the disparity in remand rates is due purely to chance. [11] She determines that the likelihood is less than one in 1,000 and, consequently, concludes that "the observed disparity is highly significant statistically." [12]

## FOOTNOTES

3 *See* *Monell v. Department of Soc. Servs. of the City of New York*, 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978) (holding that HN1⊼a municipality may be sued under section 1983 only when a municipal policy or custom caused the plaintiff's injury).

4 *See* 4/1/04 Report of Dr. Harriet Zellner ("Zellner Report"), Ex. S to 10/8/04 Declaration of Theresa Crotty in Support of Defendants' Motion to Preclude Plaintiffs' Expert and to Bifurcate the Trial ("Crotty Decl."). [*4]

5 *Id.* at 2.

6 *Id.*

7 *See* Table 1, Zellner Report. In fact, the table omits data for parents whose race was identified by ACS as Hispanic or "Other," thus skewing upwards the percentages for both African-Americans and Whites. *See* 4/13/04 Report of Dr. Philip Bobko ("Bobko Report"), Ex. T to Crotty Decl. at 5-6. This omission has no effect, however, on the disparity in remand rates between African-Americans and Whites, which is the focus of Zellner's report as well as the Bontons' claim against the City.

8 *See* Table 1, Zellner Report. It should be noted that Plaintiffs' Memorandum of Law egregiously misstates the data contained in Dr. Zellner's report. According to the Bontons' attorney, David S. Ratner, "in 2000, only 9.6% of the White families investigated by ACS had their children remanded to ACS custody whereas 90.4% of the African-American families investigated by ACS had their children placed in foster care." Affirmation in Opposition to Defendant's Motion to Preclude the Testimony of Plaintiffs' Statistical Expert and To Bifurcate the Trial ("Pl. Opp.") at 5-6. According to the data in Zellner's table, the correct percentages are 2.7% with respect to Whites and 6.5% with respect to African-Americans. The question arises whether Mr. Ratner is intentionally trying to deceive the Court or if he simply cannot grasp the findings of his own expert's report. [*5]

9 *See* Table 1, Zellner Report.

10 HN2⊼Fisher's exact test is a calculation used by statisticians to determine the statistical significance of an observed value as compared to the prediction of a pre-established

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105

hypothesis. *See* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 83, 164, 172-73 (Federal Judicial Center 2000).

11 *See* Zellner Report at 3.

12 *Id.* at 4.

Zellner acknowledges, however, a shortcoming in her analysis that bears on her conclusion:

> The reader will note that -- with only the data provided -- we can not control statistically for any existing between-race differences in factors like family income or parents' employment status that might generally influence the ACS decision. In effect, our statistical analysis assumes that such differences were either non-existent or unimportant to ACS. The greater their actual importance to ACS decision-making . . . the less insight the simple analysis we have reported above can provide . . . . As regards the issues under analysis here, controls [*6] for variables such as family income, parents' education, parents' occupation, parents' employment status and the number of times ACS has investigated the family over the last several years would be very useful. 13

**FOOTNOTES**

13 *Id.*

**B. Dr. Philip Bobko's Response**

The defendants have provided a response to Zellner's report by Dr. Philip Bobko ("Bobko"), who has a Ph.D. in economics and social statistics from Cornell University. 14 While Bobko does not perform his own statistical analysis, he presents a number of criticisms of Zellner's report. *First*, he challenges the way Zellner presents the data in the table appended to her report. 15 *Second*, Bobko asserts that Zellner states the result of her statistical significance test "in a potentially misleading and exaggerated manner." 16 *Third*, Bobko contends that "counting problems" in regard to the number of cases referred to ACS during 2000 and 2001 affect the validity of Zellner's data. 17 *Fourth*, and most significantly, Bobko argues [*7] that Zellner's analysis has little, if any, probative value because it fails to account for significant explanatory variables. 18

**FOOTNOTES**

14 *See* Bobko Report at 2.

15 *See id.* at 5-6.

16 *Id.* at 6.

17 *Id.* at 9. According to Bobko, the numbers that Zellner considers as *cases* in fact refer to *reports* of child abuse or neglect. Bobko argues that because there may be several reports of child abuse involving the same family over the course of a given year, Zellner's data -- as well as the resulting analysis -- are flawed. *See id.* at 7-9.

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105

**18** *See id.* at 9-11. I do not discuss any of Bobko's first three criticisms as my analysis of the fourth criticism requires preclusion of the report.

## II. LEGAL STANDARD

Rule 702 of the Federal Rule of Evidence states the following requirements for the admission of expert testimony into evidence:

> *HN3*If scientific, technical, or other specialized knowledge will assist the trier of fact **[*8]** to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. **19**

*HN4*A district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." **20** Under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, **21** the trial judge must determine whether the proposed testimony "both rests on a reliable foundation and is relevant to the task at hand." **22**

### FOOTNOTES

**19** Fed. R. Evid. 702.

**20** *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999) (quotation omitted).

**21** 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).

**22** *Id.* at 597. *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999) (extending *HN5*Daubert's general holding setting forth the trial judge's gatekeeping obligation in regard to expert testimony based on scientific knowledge to testimony based on "technical" and "other specialized" knowledge).

**[*9]** In addition, *HN6*Rule 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." **23** "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." **24**

### FOOTNOTES

**23** Fed. R. Evid. 403.

**24** *Daubert*, 509 U.S. at 595, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (quotation omitted).

*HN7*The proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof. **25**

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 7 of 30

Page 7 of 11

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105

**FOOTNOTES**

25 See *Bourjaily v. United States*, 483 U.S. 171, 175-76, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987).

## [*10] III. DISCUSSION

Zellner's report is inadmissible because it will not assist the trier of fact. The Court does not doubt, nor do defendants challenge, Zellner's qualifications as an expert in statistics. The Court also commends Zellner for acknowledging the limitations of her methodology and confining her conclusion accordingly. Nonetheless, I find that Zellner's conclusion -- that the disparity in remand rates for African-Americans and Whites cannot be attributed to chance -- will be of no assistance to a jury charged with determining whether it is ACS's policy or custom to place African-American children in foster care on account of their race. In the absence of any other evidence in the record suggesting that ACS followed a discriminatory policy, Zellner's testimony would invite the jury to engage in impermissible speculation. 26

**FOOTNOTES**

26 See *Bickerstaff, 196 F.3d at 448* (noting that in determining whether evidence is admissible for purpose of summary judgment motion, courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture").

[*11] There is no question that the data in Zellner's report are troubling. As noted earlier, in 2000, 6.5% of investigations of African-American families resulted in the children being placed in foster care, whereas the figure for White families is only 2.7%. That means African-American children are over twice as likely to be removed from their parents as the result of an investigation by ACS as are White children. This disparity points to a sad state of affairs in New York City. In and of itself, however, it does not say anything about whether ACS discriminates against African-Americans.

The plaintiffs argue that Zellner's testimony is relevant to their allegation that their civil rights were violated "as a consequence of ACS' routine practice of singling out African-American families for . . . discriminatory treatment." 27 Plaintiffs contend that "Dr. Zellner's statistical analysis of ACS' discriminatory actions does have a tendency to make the fact that the Bontons were discriminated against [on account of race] more probable." 28 This contention is incorrect.

**FOOTNOTES**

27 Pl. Opp. at 7.

28 *Id.* at 8.

[*12] Zellner's own conclusion is that "the data strongly support the charge that African-American children were more likely than White children to be placed by ACS in foster care over the 2000-2001 period." 29 Zellner expresses no opinion as to whether African-American children were more likely to be placed in foster care *on account of their race.* 30 The distinction is critical. In order to succeed in their *Monell* claim against the City, the Bontons

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 8 of 30

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105                    Page 8 of 11

must show a causal link between the violation of their constitutional rights and an impermissibly race-based official municipal policy or custom. [31] However, Zellner's statistical evidence does not make it any more or less likely that it is ACS's policy or custom to discriminate against African-Americans.

### FOOTNOTES

[29] Zellner Report at 4-5.

[30] Zellner's only opinion as to causation is that the disparity in remand rates cannot be attributed to chance. See id. at 4.

[31] See Monell, 436 U.S. at 694, 56 L. Ed. 2d 611, 98 S. Ct. 2018.

The reason for this is that other factors [*13] may account for the disparity. [32] Zellner readily acknowledges as much. She identifies a number of factors generally revolving around socio-economic status that might influence the outcome of an ACS investigation. [33] Although she does not speculate on whether these factors are related to race, she does admit that controlling for such variables would be "very useful." [34] Bobko goes farther, insisting that a correlation between race and potential socio-economic control variables is clear. [35] He argues that such variables may explain the disparity in remand rates. [36]

### FOOTNOTES

[32] See Kaye & Freedman, supra note 10, at 138 ("The association between two variables may be driven largely by a 'third variable' that has been omitted from the analysis. For an easy example, among school children, there is an association between shoe size and vocabulary. However, learning more words does not cause feet to get bigger, and swollen feet do not make children more articulate. In this case, the third variable is easy to spot -- age.").

[33] See Zellner Report at 4.

[34] Id.

[35] See Bobko Report at 11 n.2 ("Even a cursory perusal of data readily available on the Internet indicates that potential control variables such as income or living below the poverty level are related to race in New York City."). [*14]

[36] See id. at 10-11.

To determine whether there is causal link between race and the observed disparity in remand rates, it is necessary to conduct a multiple regression analysis to control for explanatory variables such as parents' income level or employment status. [37] While Bobko does not demonstrate the effect of controlling for such variables by means of his own regression analysis, [38] it is impossible for the Court to agree with Zellner's assumption that these factors are "unimportant" to an analysis of the outcomes of ACS investigations. [39] As a result, for a jury to determine solely on the basis of Zellner's report that a causal link exists between the observed disparity and an alleged policy of racial discrimination would require a logical leap that amounts to mere speculation.

### FOOTNOTES

Case 2:04-cv-03694-RJH-GWG     Document 41-2     Filed 11/13/2007     Page 9 of 30

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105                          Page 9 of 11

37 *HN8* A multiple regression analysis is a statistical tool for determining the effect of two or more explanatory variables on a variable to be explained, called the dependent variable. This tool allows the expert to determine the causal relationship, if any, between the explanatory variables and the dependent variable. *See* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 179, 181 (Federal Judicial Center 2000). **[*15]**

38 *Cf. Sobel v. Yeshiva Univ., 839 F.2d 18, 34 (2d Cir. 1988)* (holding that an attack on the omission of variables from a regression analysis need not consist of a competing regression, as long as the attack shows the relevance of the particular variables that ought to have been included).

39 Zellner Report at 4.

Courts have repeatedly held that *HN9* statistical analyses that fail, as Zellner's does, to control for *any* nondiscriminatory explanations are inadmissible. 40 Although multiple regression analysis is not a prerequisite for the admission of statistical reports in discrimination cases, 41 the complexity of the social and economic forces at play in the etiology of child abuse and neglect necessitates the use of regression analysis in this instance. I conclude, therefore, that Zellner's proposed expert testimony would only confuse, rather than assist, the trier of fact.

## FOOTNOTES

40 *See, e.g., Bickerstaff, 196 F.3d at 450* (holding that assumption that race bias tainted professor's course evaluation scores is untenable without attempting to control for other causes for low score); *Smith v. Xerox Corp., 196 F.3d 358, 370-71 (2d Cir. 1999)* (holding that plaintiff's statistical analysis failed on its own to support an inference of discriminatory treatment sufficient to withstand a summary judgment motion because the analysis did not account for any other causes for the fact that older workers were more likely to be terminated); *Hollander v. American Cyanamid Co., 172 F.3d 192, 203 (2d Cir. 1999)* (holding that expert report is inadmissible because its "inference of [age] discrimination solely on the basis of the raw numbers is impermissible in the absence of any attempt to account for other causes of the . . . anomaly"); *Raskin v. Wyatt Co., 125 F.3d 55, 67-68 (2d Cir. 1997)* (holding that expert report was inadmissible in part because it "assumed any anomalies in the . . . data must be caused by age discrimination, and [made] no attempt to account for other possible causes"). *See also Bazemore v. Friday, 478 U.S. 385, 400 n.10, 92 L. Ed. 2d 315, 106 S. Ct. 3000 (1986)* (stating, in dicta, that "there may, of course, be some regressions so incomplete as to be inadmissible as irrelevant"). **[*16]**

41 *See EEOC v. Venator Group, 2002 U.S. Dist. LEXIS 1724, No. 99 Civ. 4758, 2002 WL 181771, at *2 (S.D.N.Y. Feb. 5, 2002)* (reminding that "statistics come in infinite varieties and their usefulness depends on the surrounding facts and circumstances").

Finally, I reject the plaintiffs' contention that Zellner's failure to control for any other factors should be laid at defendants' feet. According to the plaintiffs' affirmation opposing the motion to preclude, "when the plaintiffs requested information beyond the basic racial breakdown, per the plaintiff's statistical expert, the defendants claimed that producing such documents 'would be significantly more complicated.'" 42 This statement is misleading. Plaintiffs applied to the court to compel production of data needed to produce a statistical analysis only days

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 10 of 30

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105                    Page 10 of 11

before the close of discovery. [43] That letter to the Court did not specify, however, what kind of data was required. [44] At a follow-up conference before Magistrate Judge Dolinger, plaintiffs revealed that they had not yet consulted a statistical expert to determine what data would be needed aside [*17] from a racial breakdown of ACS investigations and of cases where children were placed in foster care. [45] Plaintiffs subsequently produced an affidavit from Zellner, who indicated that additional demographic information would be "very useful" to her analysis. [46] Judge Dolinger declined to compel defendants to produce this additional information "since plaintiffs had never requested such production from defendants and the deadline for discovery [had] passed." [47] Plaintiffs have only themselves to blame for the unavailability of the data required to conduct a regression analysis.

## FOOTNOTES

[42] Pl. Opp. at 13.

[43] See *Bonton v. City of New York*, No. 03 Civ. 2833 (S.D.N.Y. March 11, 2004) (Dolinger, J.), Ex. A to Pl. Opp. at 1 ("3/11/04 Order").

[44] See 2/27/04 Letter from Ratner to the Court, Ex. C to Pl. Opp., at 1.

[45] See 3/11/04 Order at 2.

[46] 3/10/04 Affidavit of Dr. Harriet Zellner, Ex. B to Pl. Opp., at 4.

[47] 3/11/04 Order at 3.

## IV. CONCLUSION

For the foregoing [*18] reasons, the defendants' motion to preclude Dr. Zellner's expert testimony is granted. This opinion does not address defendants' motion to bifurcate the claims against the individual defendants from the *Monell* claim asserted against the City.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

November 3, 2004

Service: **Get by LEXSEE®**
Citation: **2004 us dist lexis 22105**
View: Full
Date/Time: Tuesday, November 13, 2007 - 10:50 AM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 22105

 - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

LexisNexis®    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 12 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705    Page 1 of 56

**LexisNexis**® *Total Research System*    Switch Client | Preferences | Sign Off | [?] Help

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Dossier | History | ⌐

Service: **Get by LEXSEE®**
Citation: **2006 us dist lexis 63705**

*2006 U.S. Dist. LEXIS 63705, \**

MARIAN CARMELLINO, JOHN CASCIATO, JILL GOLDBERG, ROBIN KESSLER, MARIE MAGALDI, DEBORA MAUSKOPF, SARA LEE L. MELENDI, C.H.E., EILEEN MILLARES, ARTHUR MILLER, ELLEN O'LEARY, JOSEPHINE PASCUCCI, BARBARA POCINO, VICTOR SANDS, DEBORAH SCHWARTZ, MARSHA SILVERSTEIN, ALICE STERNBERG, ELIZABETH DE MAIRO STINGO, KATHERINE WEBER-WOLF, and MARY YIALOURIS PAPASMIRIS, Plaintiffs, -against- DISTRICT 20 OF THE NEW YORK CITY DEPARTMENT OF EDUCATION, THE NEW YORK CITY DEPARTMENT OF EDUCATION, VINCENT GRIPPO, in his official capacity as Superintendent of District 20 of the New York City Department of Education, JOANN ASCUITTO, in her official capacity as the Principal of Public School 180K, HOWARD MEDNICK, Principal of Public School 180K, LOUISE VERDEMARE, in her official capacity as the Principal of Public School 112K, KATHLEEN LE DONNI, in her official capacity as the Principal of Public School 247K, MARGARET DE GAETA, in her official capacity as the Principal of Public School 176K, ELIZABETH CULKIN, in her official capacity as the Assistant Principal and Acting Interim Principal of Public School 176K, PATRICK MARANO, in her official capacity as the Principal of Public School 163K, JO N. ROSSICONE, in her individual capacity as the Principal of Intermediate School 220K, MARIE DI BELLA, in her official capacity as the Principal of Public School 104K, SYLVIA LA CERRA, in her official capacity as the Principal of Public School 200K, THERESA DOVI, in her official capacity as the Principal of Elementary School 102K, and DIANE PICUCCI, in her official capacity as the Principal of Public School 48K, Defendants.

03 Civ. 5942 (PKC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 63705

September 6, 2006, Decided
September 6, 2006, Filed

**PRIOR HISTORY:** Carmellino v. Dist. 20 of the N.Y. City Dep't of Educ., 2004 U.S. Dist. LEXIS 5754 (S.D.N.Y., Apr. 5, 2004)

**CORE TERMS:** retaliation, summary judgment, teacher, come forward, reasonable jury, teaching, lesson, age discrimination, protected activity, rating, unsatisfactory, prima facie, school year, sabbatical, discriminatory, discrimination claims, constructive discharge, nondiscriminatory reasons, prong, disciplinary, retirement, materially, deposition, discharged, opposing, termination, quotation, undisputed, classroom, limitations period

**COUNSEL:** [\*1] For Marian Carmellino, John Casciato, Robin Kessler, Debora Mauskopf, Sara Lee L. Melendi, Che Eileen Millares, Ellen O'Leary, Barbara Pocino, Victor Sands, Marsha Silverstein, Elizabeth De Mairo Stingo, Katherine Weber-Wolf, Mary Yialouris Papasmiris, Plaintiffs: Joseph Anthony Turco, Kira Repetto-Cruz, Spar & Bernstein, PC, New York, NY.

For Jill Goldberg, Marie Magaldi, Josephine Pascucci, Deborah Schwartz, Alice Sternberg, Plaintiffs: Joseph Anthony Turco, Kira Repetto-Cruz, Spar & Bernstein, PC, New York, NY.

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 13 of 30
Page 2 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

For Arthur Miller, Plaintiff: Kira Repetto-Cruz, Spar & Bernstein, PC, New York, NY.

For District 20 of the New York City Department of Education, The New York City Department of Education, Vincent Grippo, in his official capacity as Superintendent of District 20 of the New York City Department of Education, JoAnn Asciutto, in her official capacity as the Principal of Public School 186k, Howard Mednick, in his official capacity as the Principal of Public School 180k, Louise Verdemare, in her official capacity as the Principal of Public School 112k, Kathleen Le Donni, in her official capacity as the Principal of Public School 247k, Asst. Margaret De Gaeta, [*2] in her official capacity as the Principal of Public School 176k, Asst. Director Elizabeth Culkin, in her official capacity as the Assistant Principal and Acting Interim Principal of Public School 176k, Patrick Marano, in his official capacity as the Principal of Public School 163k, Jo N. Rossicone, in her individual capacity and official capacity as the Principal of Intermediate School 220k, Marie Di Bella, in her official capacity as the Principal of Public School 104k, Theresa Dovi, in her official capacity as the Principal of Elementary School 102k, Diane Picucci, in her official capacity as the Principal of Public School 48k, Defendants: Alex Ali Ayazi, NYC Law Department, Office of the Corporation Counsel, New York, NY.

For Labor & Employment, Defendant: Alex Ali Ayazi, NYC Law Department, Office of the Corporation Counsel, New York, NY; Norma A. Cote ▾, Corporation Counsel of the City of New York, New York, NY.

**JUDGES:** P. Kevin Castel, United States District Judge.

**OPINION BY:** P. Kevin Castel

**OPINION**

**MEMORANDUM AND ORDER**

| Table of Contents | |
|---|---|
| I. Summary Judgment Standard | |
| II. Legal Standards: Discrimination and Retaliation Claims | |
| A. Age Discrimination Under the ADEA | |
| 1. First Prong: Within Protected Age Group | |
| 2. Second Prong: Qualified for Position | |
| 3. Third Prong: Adverse Employment Action | |
| 4. Fourth Prong: Inference of Discrimination | |
| 5. Legitimate, Nondiscriminatory Reasons | |
| 6. Pretext | |
| 7. Statute of Limitations and the Continuing Violation Doctrine | |
| B. Retaliation for Exercising ADEA-Based Rights | |
| 1. Protected Activity | |
| 2. Materially Adverse Action | |
| 3. Causal Connection | |
| III. Individual Claims | |
| A. Sara Lee Melendi | |
| 1. Discrimination | |
| 2. Retaliation | |
| B. Robin Kessler | |
| 1. Discrimination | |
| 2. Retaliation | |
| C. Eileen Millares | |
| 1. Discrimination | |
| 2. Retaliation | |
| D. Marsha Silverstein | |
| 1. Discrimination | |

Case 2:04-cv-03694-RJH-GWG     Document 41-2     Filed 11/13/2007     Page 14 of 30

Page 3 of 56

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

| | 2. Retaliation |
|---|---|
| E. John Casciato | |
| | 1. Discrimination |
| | 2. Retaliation |
| F. Elizabeth DeMairo-Stingo and Mary Yiatouris-Papasmiras | |
| | 1. Common Facts |
| | 2. Elizabeth DeMairo-Stingo's Claims |
| | a. Discrimination |
| | b. Retaliation |
| | 3. Mary Yiatouris-Papasmiras' Claims |
| | a. Discrimination |
| | b. Retaliation |
| G. Marie Magaldi | |
| | 1. Discrimination |
| | 2. Retaliation |
| H. Barbara Pocino | |
| | 1. Discrimination |
| | 2. Retaliation |
| I. Katherine Weber-Wolf | |
| | 1. Discrimination |
| | 2. Retaliation |
| J. Ellen O'Leary | |
| | 1. Discrimination |
| | b. Retaliation |
| K. Debora Mauskopf | |
| | 1. Discrimination |
| | 2. Retaliation |
| L. Marian Carmellino | |
| | 1. Discrimination |
| | 2. Retaliation |
| IV. False Arrest and Abuse of Process Claims of Victor Sands | |
| A. Facts | |
| B. Discussion | |
| V. Conclusion | |

**[*3]** P. KEVIN CASTEL, District Judge:

The 14 remaining plaintiffs in this action are former or current teachers employed by the New York City Department of Education ("DOE"), all but one of whom complain of age discrimination in the workplace. Although each plaintiff's factual allegations differ, the claims center upon the conduct of the Superintendent of District 20 of defendant DOE, Vincent Grippo, or a school principal within District 20. Plaintiffs assert claims of age discrimination and unlawful retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq. One plaintiff, Victor Sands, does not assert claims of age discrimination or ADEA retaliation but asserts claims of false arrest and abuse of process.

Plaintiffs filed their complaint on August 7, 2003. (Docket No. 1) The case was originally assigned to the Honorable Harold Baer, Jr., U.S.D.J., and reassigned to me on December 4, 2003. (Docket Nos. 2, 12) On April 6, 2004, I issued an order granting in part and denying in part defendants' motion for summary judgment. See Carmellino v. District 20 of the N.Y. City Dep't of Educ., 2004 U.S. Dist. LEXIS 5754, 2004 WL 736988 (S.D.N.Y. Apr. 6, 2004) **[*4]** . ¹ In the April 6, 2004 Memorandum and Order, I granted summary judgment to defendants as to the claims of five plaintiffs: Jill Goldberg, Arthur Miller, Josephine Pascucci, Deborah Schwartz and Alice Sternberg. Id. Familiarity with this opinion is assumed.

**FOOTNOTES**

1 This order addressed a motion by defendants to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., or, in the alternative, to grant summary judgment pursuant to

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 15 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705    Page 4 of 56

Rule 56(b). Carmellino, 2004 U.S. Dist. LEXIS 5754, 2004 WL 736988, at *2. I considered the motion as one for summary judgment because plaintiffs were on notice that summary judgment was possible, and plaintiffs responded to defendants' motion by submitting evidence to the Court. Id.

Discovery is closed, and defendants have moved for summary judgment on all of the remaining claims. On June 30, 2006, I issued an Order seeking clarification as to whether defendants are moving for summary judgment on the ground that no reasonable [*5] jury could find the defendants' asserted nondiscriminatory reasons for the employer conduct at issue to be pretextual. (Docket No. 77) In addition, with regard to plaintiff Melendi's retaliation claim, the Order directed the defendants to address whether they were moving for summary judgment on the ground that no reasonable jury could find that there existed a causal connection between Melendi's protected activity and the adverse employer conduct. (Id.) The Order also directed the parties to address the Supreme Court's recent decision in Burlington N. & Santa Fe Ry. v. White, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). (Id.) Finally, I gave the plaintiffs an opportunity to make a further submission of evidence of the type contemplated by Rule 56(e), Fed. R. Civ. P.

In compliance with the June 30, 2006 Order, defendants submitted letters on July 14, 2006 ("Def. 7/14/06 Supp. Mem.") and July 21, 2006 ("Def. 7/21/06 Supp. Mem."). (Docket No. 79) Plaintiffs filed two memoranda with attached exhibits on July 17, 2006 ("Pl. 7/17/06 Supp. Mem.") and July 24, 2006 ("Pl. 7/24/06 Supp. Mem."). (Docket Nos. 80-81)

For the reasons explained below, [*6] defendants' motion is denied as to the claims of plaintiff Melendi and otherwise granted. In this Memorandum and Order, I will first set forth the applicable legal standards and then analyze each plaintiff's claims in the context of those standards insofar as a position is asserted in defendants' motion.

I. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. [*7] Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed. R. Civ. P. 56(e). In order to defeat summary judgment, the non-movant carries only "a limited burden of production," but "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 16 of 30

Page 5 of 56

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

inferences [*8] in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (quotations and citations omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Fed. R. Civ. P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. Id. Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996) (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). See also Anderson, 477 U.S. at 249-50 (noting that summary judgment should be granted if the evidence is "merely colorable" or "not significantly probative").

Although discrimination and retaliation claims usually involve issues of intent, which are often ill-suited to resolution at the [*9] summary judgment stage, the Second Circuit has gone "out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994)), cert. denied, 540 U.S. 811, 124 S. Ct. 53, 157 L. Ed. 2d 24 (2003). See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ("[T]rial courts should not treat discrimination differently from other ultimate questions of fact." (internal quotations omitted)).

II. Legal Standards: Discrimination and Retaliation Claims

I will first set forth certain background legal principles applicable to plaintiffs' age discrimination and retaliation claims. Then, I will analyze plaintiffs' individual claims in the context of defendants' motion.

A. Age Discrimination Under the ADEA

The Second Circuit recently restated its approach to ADEA discrimination claims in the context of summary judgment:

> To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part [*10] burden-shifting laid out by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). In a nutshell, a plaintiff first bears the minimal burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 2006 U.S. App. LEXIS 17739, (2d Cir. 2006) (internal citations and quotations omitted). A prima facie case of discrimination requires a plaintiff to show that: "1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Terry v. Ashcroft, 336 F.3d 128, 137-138 (2d Cir. 2003) (internal quotation omitted). If the defendant comes forward with evidence of a legitimate, nondiscriminatory reason for the adverse employment action at issue, [*11] a plaintiff will not overcome a motion for summary judgment unless his or her "admissible evidence . . . show[s] circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Id. at 138.

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 17 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705
Page 6 of 56

1. First Prong: Within Protected Age Group

The first prong of a prima facie case of discrimination under ADEA requires a plaintiff to demonstrate that he or she is in the protected age group. 29 U.S.C. § 631(a) (limiting the ADEA to individuals over the age of 40). Defendants do not dispute that each plaintiff claiming discrimination is over 40.

2. Second Prong: Qualified for Position

The second prong of a prima facie case of discrimination under the ADEA requires that the employee be qualified for the position at issue. Terry, 336 F.3d at 137-138. ADEA protects the rights of both employees and prospective employees, 29 U.S.C. § 623(a)(1), and the plaintiff need only show that he or she was minimally qualified for the position. Owens v. N.Y. City Hous. Auth., 934 F.2d 405, 409 (2d Cir. 1991), [*12] cert. denied, 502 U.S. 964, 112 S. Ct. 431, 116 L. Ed. 2d 451 (1991).

3. Third Prong: Adverse Employment Action

As to the third prong, a plaintiff must demonstrate that he or she was subjected to adverse employment action, which, for purposes of a discrimination claim, is a "materially adverse employment change in the terms and conditions of employment." Fairbrother v. Morrison, 412 F.3d 39, 56 (2d Cir. 2005), abrogated on other grounds, Burlington Northern, 126 S. Ct. at 2405 (internal quotation omitted). This change must be one that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation omitted). "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Fairbrother, 412 F.3d at 56 (quoting Galabya, 202 F.3d at 640). A decision not to promote an employee to an open [*13] and available position for which the person has applied may constitute an adverse employment action. See Terry, 336 F.3d at 139. However, a negative performance evaluation -- without more -- does not ordinarily constitute an adverse employment action for purposes of a discrimination claim. See Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001), abrogated on other grounds, Nat'l R.R. Passengers Corp. v. Morgan, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ("It hardly needs saying that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.").

Where a plaintiff claims that he or she was constructively discharged, "the actionable conduct is not a discrete, identifiable act on the part of the defendant." Flaherty v. Metromail Corp., 235 F.3d 133, 138 (2d Cir. 2000). "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Terry, 336 F.3d at 151-152. "[W]orking conditions [*14] are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id. at 152 (internal quotation omitted). See Pa. State Police v. Suders, 542 U.S. 129, 137, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004) (noting that the question of whether working conditions are intolerable is an objective inquiry).

These conditions often involve "pervasive, unabated harassment" by one's supervisors. See, e.g., Terry, 336 F.3d at 152 (reversing district court's grant of summary judgment, in part, due to such comments, including "your days are numbered," plaintiff's "life's over with" and "you're going to be brought up on more charges"). However, a constructive discharge claim does not arise simply because an employee is dissatisfied with work assignments, feels that his or her work has been unfairly criticized or was subjected to unpleasant working

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 18 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705
Page 7 of 56

conditions. See <u>Stetson v. Nynex Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993)</u>; see also <u>Martin v. Citibank, N.A., 762 F.2d 212, 221 (2d Cir. 1985)</u> (affirming grant of motion for directed verdict on employee's constructive **[*15]** discharge claim under Title VII, despite evidence of supervisor's loud and unnecessary announcement to coworkers that the plaintiff had been polygraphed regarding missing money at another branch of the bank and unfounded complaints about the plaintiff's attitude). Several courts have held that an employee is not constructively discharged when he or she resigns rather than respond to disciplinary charges. See, e.g., <u>Silverman v. New York, 216 F. Supp. 2d 108, 115-16 (E.D.N.Y. 2002)</u>, aff'd, <u>64 Fed. Appx. 799 (2d Cir. 2003)</u>; <u>Stembridge v. City of N.Y., 88 F. Supp. 2d 276, 284-85 (S.D.N.Y. 2000)</u>, aff'd, <u>2000 U.S. App. LEXIS 38697 (2d Cir. Dec. 18, 2000)</u>.

In their July 24, 2006 supplemental memorandum opposing defendants' motion, plaintiffs appear to argue that <u>Burlington N. & Santa Fe Ry. v. White, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)</u> (discussed below at I.B.2) altered not only the prima facie case of retaliation under Title VII, but the prima facie case of discrimination as well. Specifically, plaintiffs argue that Burlington Northern broadened the definition of an "adverse employment action" for purposes of a Title **[*16]** VII or ADEA discrimination claim. See, e.g., Pl. 7/21/06 Supp. Mem. at 4-7 (applying Burlington Northern to plaintiff Magaldi's allegations of age discrimination). However, the Supreme Court explicitly restricted its holding to the retaliation provision of Title VII, which contains identical relevant language to the retaliation provision in the ADEA. See <u>Burlington Northern, 126 S. Ct. at 2410-14</u>. Specifically, the Court stated:

> . . . [T]he anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.

> . . . [W]e do not accept the . . . view that it is "anomalous" to read the statute to provide broader protection for victims of retaliation than for those whom Title VII primarily seeks to protect, namely, victims of race-based, ethnic-based, religion-based, or gender-based discrimination.

> . . . Title VII's substantive provision and its anti-retaliation provision are not coterminous. The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.

<u>Id. at 2412-14</u>. **[*17]** See also <u>Kessler, 2006 U.S. App. LEXIS 21530, 2006 WL 2424705, at *8-*9</u> (discussing such distinctions). In much of their supplemental briefing, plaintiffs erroneously apply Burlington Northern to both discrimination and retaliation claims. The rationale of Burlington Northern applies to the ADEA retaliation claims, not the discrimination claims.

4. Fourth Prong: Inference of Discrimination

The last prong of a prima facie case of age discrimination is that the plaintiff suffered an adverse employment action under "circumstances giving rise to an inference of discrimination." <u>Terry, 336 F.3d at 138</u>. "Direct evidence of discrimination is not necessary because proof is seldom available with respect to an employer's mental processes. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence . . . ." <u>Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)</u>, cert. denied, <u>530 U.S. 1261, 120 S. Ct. 2718, 147 L. Ed. 2d 983 (2000)</u> (internal citations omitted). For example, the Supreme Court has held that the fact that a plaintiff in an age discrimination case was replaced by someone "substantially younger" is sufficient **[*18]** to satisfy this prong. <u>O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996)</u>. In the analogous context of a prima facie case of

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 19 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

Page 8 of 56

discrimination under Title VII, the Second Circuit has provided a non-exclusive list of circumstances from which a reasonable jury could infer discriminatory motive:

> Circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, and, in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees, or a pattern of recommending the plaintiff for positions for which he or she is not qualified and failure to surface plaintiff's name for positions for which he or she is well-qualified. A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, or, more generally, upon the timing or sequence of events leading to the plaintiff's termination.

Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996) **[*19]** (citations omitted). If a plaintiff asserts a claim of discrimination based upon a theory of constructive discharge, the plaintiff must come forward with evidence that the discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in [a protected] class." Id.

Relevant evidence for this prong includes an "employer's criticism of the plaintiff's performance in ethnically degrading terms . . . or . . . invidious comments about others in the employee's protected group." Abdu-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 468 (2d Cir. 2001), cert. denied, 534 U.S. 993, 122 S. Ct. 460, 151 L. Ed. 2d 378 (2001) (citations omitted). However, a court may not -- without more -- impute the bias of one supervisor to a different supervisor who was actually responsible for the adverse employment action. See McLee v. Chrysler Corp., 109 F.3d 130, 137 (2d Cir. 1997) (affirming summary judgment in favor of the employer on the ground that plaintiff had failed to come forward with evidence to satisfy the fourth prong of a prima facie case of discrimination). Moreover, courts have generally held that a reasonable jury cannot **[*20]** infer discrimination merely from "isolated and ambiguous" statements of an employer. See, e.g., Pasha v. William M. Mercer Consulting, Inc., 2004 U.S. Dist. LEXIS 1226, 2004 WL 188077, *5 (S.D.N.Y. Feb. 2, 2004), aff'd, 135 Fed. Appx. 489 (2d Cir. 2005), cert. denied, 126 S. Ct. 1148, 163 L. Ed. 2d 1001 (2006); Douglas v. Dist. Council 37 Mun. Emples. Educ. Fund Trust, 207 F. Supp. 2d 282, 291 (S.D.N.Y. 2002).

5. Legitimate, Nondiscriminatory Reasons

"[O]nce a plaintiff has established a prima facie case [of discrimination under the ADEA], the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." Terry, 336 F.3d at 138 (citing Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000)). The Supreme Court has emphasized that the evidence produced by the defendant need not be persuasive in order to rebut the legal presumption of discrimination raised by the plaintiff's prima facie case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("By producing evidence (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained **[*21]** their burden of production, and thus placed themselves in a better position than if they had remained silent."). In addition, the Second Circuit has instructed that the legitimacy of an employer's rationale for the adverse employment action at issue does not depend on the reliability of the evidence supporting that rationale. See McPherson, 2006 U.S. App. LEXIS 17739, ("In a discrimination case . . ., we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer [to engage in the adverse employment action]; the factual validity of the underlying imputation against the employee is not at issue." (emphasis in original)). "'[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 20 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                 Page 9 of 56

the plaintiff.'" St. Mary's Honor Ctr., 509 U.S. at 507 (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

6. Pretext

"If the employer articulates a non-discriminatory reason for its employment decision, the presumption of discrimination raised by the prima facie case 'simply [*22] drops out of the picture.'" Carlton, 202 F.3d at 134-135 (quoting St. Mary's Honor Ctr., 509 U.S. at 510-11). "'[T]o defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" Terry, 336 F.3d at 138 (quoting Stern, 131 F.3d at 312).

Such evidence may include the statements of a person involved in the adverse employment action at issue. See, e.g., Reeves, 530 U.S. at 151 (including, as permissible evidence of pretext, supervisor's comments to employee that employee "was so old [he] must have come over on the Mayflower" and that he "was too damn old to do [his] job"). However, "stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination." Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) (citing Woroski v. Nashua Corp., 31 F.3d 105, 109-10 (2d Cir. 1994)). When such [*23] remarks are accompanied by "other indicia of discrimination," they can no longer be considered "stray" and thus may allow a reasonable jury to conclude that the employer's nondiscriminatory reasons are pretextual. Id. On a motion for summary judgment on an ADEA claim, the court must examine "the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Schnabel, 232 F.3d at 90 (internal quotation omitted).

7. Statute of Limitations and the Continuing Violation Doctrine

As I noted in my earlier opinion, Carmellino, 2004 U.S. Dist. LEXIS 5754, 2004 WL 736988, at * 11, the ADEA requires that a plaintiff asserting claims under the statute must first file a charge with the Equal Employment Opportunity Commission ("EEOC"). 29 U.S.C. § 626(d). Under this statutory scheme, a plaintiff in New York must file the EEOC charge within 300 days of the alleged discriminatory incident. See Holowecki v. Fed. Express Corp., 440 F.3d 558, 562 & n.1 (2d Cir. 2006) (noting that the 300-day, instead of the alternative 60-day, [*24] limit applies because New York maintains an agency for remedying age discrimination claims and thus is a so-called "deferral state"). In the context of Title VII, the Supreme Court has instructed that time limits for federal discrimination claims "are not to be disregarded by courts out of a vague sympathy for particular litigants." Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 152, 104 S. Ct. 1723, 80 L. Ed. 2d 196 (1984).

The Supreme Court considered the application of the continuing violation doctrine to Title VII claims in Morgan, 536 U.S. at 113. For the doctrine to apply, separate incidents must be part of one unlawful employment practice, such as the maintenance of a hostile work environment. Id. at 114, 117. Any acts that occur within the 300-day period preceding the plaintiff's filing of her EEOC charge will implicate related acts otherwise outside that period. Id. at 117-18.

"To invoke the doctrine, a plaintiff must show either (1) 'specific ongoing discriminatory policies or practices,' or (2) 'specific and related instances of discrimination [that] are permitted by the employer to continue unremedied for so long as to amount to [*25] a discriminatory policy or practice.'" Weeks, 273 F.3d at 82 (quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998)). See also Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993), cert. denied, 511 U.S. 1052, 114 S. Ct. 1612, 128 L. Ed. 2d 339 (1994) ("Multiple incidents of discrimination, even similar ones, that are not the result of a

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 21 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705    Page 10 of 56

discriminatory policy or mechanism do not amount to a continuing violation."). Although the Supreme Court has not specified what practices other than the creation of a hostile work environment may constitute a continuing violation, it noted in Morgan that "termination, failure to promote, denial of transfer, [and] refusal to hire" were discrete acts not covered by the doctrine. 536 U.S. at 114. See also Marinelli v. Chao, 222 F. Supp. 2d 402, 413 (S.D.N.Y. 2002) (categorizing a "job transfer or discontinuance of a particular job assignment" as a discrete act to which the doctrine does not apply). "[A] continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act. Nor can an otherwise [*26] barred claim be rendered timely by the mere continuation of the claimant's employment." Harris v. City of N.Y., 186 F.3d 243, 250 (2d Cir. 1999) (rejecting such arguments in the context of discrimination claims brought under the Americans with Disabilities Act ("ADA"), the Rehabilitation Act and the Fourteenth Amendment).

A continuing violation must be "clearly asserted both in the EEOC filing and in the complaint." Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 25 (2d Cir. 1985), cert. denied, 474 U.S. 851, 106 S. Ct. 148, 88 L. Ed. 2d 122 (1985). "As a general matter, the continuing violation doctrine 'is heavily disfavored in the Second Circuit' and courts have been 'loath' to apply it absent a showing of 'compelling circumstances.'" Trinidad v. N.Y. City Dep't of Corr., 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006) (collecting cases). In all events, facts occurring outside the limitations period may be relevant as "background evidence" to claims arising within the limitations period. See Morgan, 536 U.S. at 101, 113. See also Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 176-77 (2d Cir. 2005) ("[R]elevant background [*27] evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act.").

B. Retaliation for Exercising ADEA-Based Rights

All plaintiffs except, plaintiff Sands, assert claims of retaliation for their alleged exercise of rights protected by the ADEA. (Compl. PP 473-74) The ADEA prohibits an employer from retaliating against an employee for the mere exercise of such rights:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act.

29 U.S.C. § 623(d).

The Second Circuit applies the McDonnell Douglas burden-shifting framework to claims of retaliation for the alleged exercise of ADEA-protected rights. Terry, 336 F.3d at 141. Under this framework, a prima facie case of retaliation requires the plaintiff "to show '[1] [*28] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Id. (quoting Quinn, 159 F.3d at 769). "[T]he burden of proof that must be met to establish a prima facie case is minimal." Schnabel, 232 F.3d at 87 (internal quotation omitted).

As with discrimination claims brought under the ADEA, an employer may rebut a prima facie case of retaliation based upon the exercise of ADEA-protected rights with evidence of a "legitimate, nondiscriminatory business reason" for its conduct. Id. If the employer offers such evidence, the employee has the burden of showing that such a rationale is pretextual and that his or her age was the real reason for the adverse employment action. Id.

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 22 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705    Page 11 of 56

1. Protected Activity

As to the first prong of a prima facie case, the plaintiff must show that he or she engaged in protected activity. One way in which an employee may engage in protected activity is to file a charge with the EEOC under the ADEA. 29 U.S.C. § 623(d) (prohibiting discrimination **[\*29]** because an employee "has made a charge . . . under this Act"). Once an employee has filed a charge with the EEOC under the ADEA, statute requires the EEOC to "promptly notify all persons named in such charge as prospective defendants in the action . . . ." 29 U.S.C. § 626 (d). All plaintiffs in this action asserting retaliation claims filed charges with the EEOC.

2. Materially Adverse Action

As part of the prima facie case, a plaintiff asserting a claim of retaliation under the ADEA must come forward with evidence of "an employment action disadvantaging the plaintiff." Terry, 336 F.3d at 141. The Supreme Court's recent ruling in Burlington Northern, 126 S. Ct. at 2405, construes the employer action requirement in the context of a retaliation claim. See Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 2006 U.S. App. LEXIS 21530, 2006 WL 2424705, \*8-\*11 (2d Cir. Aug. 23, 2006). Although Burlington Northern only addressed the construction of the Title VII retaliation provision, the standards used in the Second Circuit to analyze claims under that provision apply equally to those under the ADEA retaliation provision. 2006 U.S. App. LEXIS 21530, [WL] at \*8; Terry, 336 F.3d at 141.

In Burlington Northern, the Supreme Court resolved a split among the circuits regarding what kind of employer conduct is required to establish a prima facie case of retaliation under Title VII. 126 S. Ct. at 2410. Previously, several circuits required a Title VII plaintiff to show that he or she suffered an "adverse employment action," which the Second Circuit defined as a "materially adverse change in the terms and conditions of employment." Id. (collecting cases). See Sanders, 361 F.3d at 756 (requiring evidence of an "adverse employment action" to support a retaliation claim under Title VII); Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465-66 (2d Cir. 1997) (requiring an "adverse employment action" to support an ADEA retaliation claim and holding that the denial of an office and telephone did not satisfy this standard).

Although the Court affirmed the Sixth Circuit in upholding the jury award for the employee, it resolved the circuit split by adopting a more expansive interpretation of the retaliation provision. Id. at 2414. Specifically, the Court held that a plaintiff asserting **[\*31]** a retaliation claim under Title VII now "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 2415 (citations and quotations omitted). The Court stated that this is an "objective standard" but noted that "the significance of any given act of retaliation will often depend upon the particular circumstances." Id. ("Context matters.").

Since Burlington Northern, the Second Circuit has applied the decision to ADEA retaliation claims. See Kessler, 2006 U.S. App. LEXIS 21530, 2006 WL 2424705, at \*8-\*11. In Kessler, the plaintiff had been employed as an Assistant Commissioner of a county government agency. 2006 U.S. App. LEXIS 21530, [WL] at \*1. The court reversed a grant of summary judgment in favor of employer on the plaintiff's ADEA retaliation claim because the plaintiff had come forward with evidence from which a "rational factfinder could permissibly infer that a reasonable employee [in plaintiff's position] could well be dissuaded from making a charge of discrimination." 2006 U.S. App. LEXIS 21530, [WL] at \*11. Specifically, the plaintiff had offered **[\*32]** evidence that, after engaging in protected activity, he was transferred "to an office in which, inter alia, he would not be allowed to perform [his prior] broad discretionary and managerial functions . . ., no one would report to him, and he would be forced to do work normally performed by clerical and lower-level personnel." Id.

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 23 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 12 of 56

3. Causal Connection

"The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." Cifra v. GE, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation omitted). "In a causation analysis, the Court must look to when the defendant first became aware of the plaintiff's protected behavior." Hawana v. City of N.Y., 230 F. Supp. 2d 518, 530 (S.D.N.Y. 2002) (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)). In the context of First Amendment retaliation, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . ." Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001). [*33] See also Clark County Sch. Dist., 532 U.S. at 273 (collecting cases in which three and four-month periods between the protected activity and the adverse action were insufficient to establish a causal connection). "[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery, 248 F.3d at 95. See, e.g., Phillips v. Mt. Sinai Med. Ctr., 2006 U.S. Dist. LEXIS 2606, 2006 WL 177155, *1, *4 (S.D.N.Y. Jan. 24, 2006) (granting summary judgment to employer on retaliation claim where termination occurred three months after the filing of an EEOC charge and numerous disciplinary actions predated the filing).

III. Individual Claims

Defendants do not dispute that, for the purpose of this motion, each plaintiff claiming discrimination is within the protected age group. Nor, except as to plaintiff John Casciato, do defendants dispute that each plaintiff was minimally qualified for the position he or she held. Defendants move for summary judgment on the grounds that each plaintiff has failed to satisfy the third [*34] and fourth prongs of a prima facie case of age discrimination -- i.e., they argue that no plaintiff suffered an adverse employment action and that, in any event, the surrounding circumstances do not support an inference of discrimination. In addition, defendants offer legitimate, nondiscriminatory reasons for the alleged adverse employment actions as to each plaintiff. Finally, defendants argue that certain alleged employer actions are time-barred under the ADEA.

A. Sara Lee Melendi

Plaintiff Sara Lee Melendi was born in 1947 and began teaching home economics at Intermediate School ("I.S.") 220 in 1988. (Def. Ex. Melendi A; Resp. to 56.1 P 37) After observing one of plaintiff Melendi's classes on November 8, 2001, defendant Jo Rossicone -- the Principal of I.S. 200 -- wrote a detailed letter to Melendi in which she rated the lesson as unsatisfactory because the class was talking and no work was taking place. (Def. Ex. Melendi O; Resp. to 56.1 P 49) On November 13, 2001, Assistant Principal Loretta Witek sat in on Melendi's class and, in a letter to Melendi, reported that she had observed a "disruptive situation" that she found to be an "unsafe environment [*35] for . . . students." (Def. Ex. Melendi P; Resp. to 56.1 P 50) On November 19, 2001, Witek again attended a class taught by Melendi and reported that she had observed a disruptive environment. (Def. Ex. Melendi Q; Resp. to 56.1 P 51) Each of these letters to Melendi closed with the same sentence:

> You are hereby informed that this unsatisfactory performance may lead to additional disciplinary action including an unsatisfactory rating and disciplinary charges that can lead to your termination.

(Def. Exs. Melendi O, P, Q) Witek recommended that Melendi visit other classrooms to observe how other teachers maintain order and discipline. (Def. Ex. Melendi Q) Witek later gave Melendi a schedule for observing other teachers. (Def. Ex. Melendi R, Resp. to 56.1 P

Case 2:04-cv-03694-RJH-GWG   Document 41-2   Filed 11/13/2007   Page 24 of 30
Page 13 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

54)

On November 29, 2001, Assistant Principal Linda Alfred received a complaint from an employee of the neighboring Maimonides Hospital. (Def. Ex. Melendi S; Resp. to 56.1 P 52) According to the employee, during plaintiff Melendi's class, students yelled profanities at hospital employees from the classroom. (Def. Ex. Melendi S) Plaintiffs do not dispute that Melendi **[*36]** explained to Alfred that she had rebuked the students for their conduct but that they ignored her. (Resp. to 56.1 P 52) Alfred wrote a letter to Melendi evaluating her conduct and noting, in particular, her failure to inform the students' parents of their behavior. (Def. Ex. Melendi S) This letter also warned Melendi that this "unsatisfactory performance" could lead to "additional disciplinary charges," which might result in termination. (Def. Ex. Melendi S)

On March 27, 2002, plaintiff Melendi was accused by one of her students of having administered corporal punishment. (Def. Ex. Melendi T; Resp. to 56.1 P 55) Assistant Principal Witek investigated the incident by interviewing Melendi and witnesses to the incident. (Def. Ex. Melendi T; Resp. to 56.1 P 55) After her investigation, Witek concluded that Melendi had indeed pushed the student, thus violating school district regulations. (Def. Ex. Melendi T; Resp. to 56.1 P 55) Witek stated her findings in a letter to Melendi and warned her that "further incidents like this may lead to additional disciplinary charges that can lead to your termination." (Def. Ex. Melendi T) Also on the **[*37]** date of this incident, plaintiff Melendi applied for a Study Sabbatical for the 2002-2003 school year. (Def. Ex. Melendi U; Resp. to 56.1 P 56) On April 8, 2002, defendant Rossicone approved Melendi's application. (Def. Ex. Melendi U; Resp. to 56.1 P 56)

In her affidavit and in her deposition, plaintiff Melendi has sworn that defendant Rossicone made certain remarks during her employment in reference to Melendi's age. At some point in the fall of 2001, Rossicone allegedly told Melendi that she was "too old for the building" and had "outlived [her] usefulness." (Melendi Dep. at 153; Melendi Aff't P 9) In May of 2002, Rossicone told Melendi that Melendi's salary could fund the combined salaries of two younger teachers. (Melendi Dep. at 127, 131; Melendi Aff't PP 5, 8) On August 29, 2002, Melendi filed a charge with the EEOC alleging age discrimination. (Def. Ex. Melendi A; Resp. to 56.1 P 57)

On an undetermined date during the 2002-03 school year (and while plaintiff Melendi was on sabbatical), defendant Rossicone decided to "excess" -- i.e., eliminate -- the subject of home economics from the curriculum of I.S. 220. (Rossicone Dep. at 158; **[*38]** Resp. to 56.1 P 59) I.S. 220 had not met standards in either math or literacy. (Melendi Dep. at 130-31; Rossicone Dep. at 158-59) Rossicone testified that she cut the subjects of physical education, health and home economics from the curriculum in order to bolster teaching in math and literacy. (Rossicone Dep. at 158) Rossicone informed Melendi, upon her return to I.S. 220 in September 2003, that her position had been excessed. (Rossicone Dep. at 159) Melendi testified that she then worked in the main office of I.S. 220 for approximately the next five weeks doing what she described as secretarial work -- specifically, answering phones and filing paperwork. (Melendi Dep. at 166-67) In October 2003, Melendi was transferred to another school where she has been teaching to the present day. (Def. Ex. Melendi C; Melendi Dep. at 167, 170; Resp. to 56.1 P 60)

1. Discrimination

Plaintiff Melendi swears that defendant Rossicone's threatened to give her a "U" rating for the 2001-02 academic year unless she went on sabbatical. In her deposition, Melendi testified:

> [Rossicone] called me to her office and told me if you go on sabbatical, I will give you **[*39]** an S rating[.] [I]f you stay here[,] I will give you a U rating and kill your teaching license. She said, when you come back from sabbatical, I have made arrangements with Mr. Reiskin and Mr. Grippo to remove you from the

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 25 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 14 of 56

building because you outlived your usefulness, and I can replace you with two
baby teachers.

(Melendi Dep. at 126-27) Plaintiffs contend that this coerced sabbatical amounted to adverse
employment action. (Pl. Mem. at 32)

The Second Circuit has emphasized that the question of whether a specific employment
action is materially adverse for purposes of a discrimination claim under Title VII depends on
what effect, if any, that action has on the terms and conditions of the plaintiff's employment.
See Fairbrother, 412 F.3d at 56. Here, I conclude that there is a disputed issue of fact
whether the alleged conditional and coercive threat to give Melendi U-rating if, but only if,
she did not go on sabbatical amounted to adverse employment action.

There is an important distinction between the impact of the receipt of a U-rating (which, for
the reasons discussed below at page 44, may not in some instances amount to adverse
employment action) [*40] and a threat to have a teacher's rating for the past year turn on
whether she agrees to refrain from teaching for the forthcoming year. While on sabbatical,
Melendi's job as a home economics teacher was "excessed". The sabbatical and the
"excessing" of the position could be viewed as two separate adverse employment actions or
they could be viewed as one ongoing act. (See, e.g., Melendi Dep. at 127: ". . . when you
come back from sabbatical, I have made arrangements . . . to remove you from the
building . . . ."). Viewing the facts in a light most favorable to Melendi, the trier of fact could
view them as part of the same adverse employment action.

The timing of a sabbatical may have consequences to a teacher who is eligible to take it. It
may prove more useful if it coincides with an educational or travel program in which the
teacher desires to participate. It may be that a spouse would be able to join the teacher on
sabbatical in one year but not in another. It is also true that a school may have legitimate
needs in the timing of a sabbatical lest multiple teachers in the same discipline take their
sabbaticals at the same time.

Plaintiff Melendi has made out a prima facie case [*41] of discrimination. She was within
the protected age category and possessed the requisite minimal qualifications to serve in her
teaching position. The coercive (and successful) effort to obtain Melendi's consent to an
immediate sabbatical with the evaluative rating for the period already worked hanging in the
balance presents, at minimum, a triable issue of fact as to whether it amounts to adverse
employment action. The hotly disputed comments regarding age included those directly
related to Melandi's own continued employment (see, e.g., Melendi Dep. at 127: ". . . I can
replace you with two baby teachers."), if believed, are sufficient to raise an inference of
discrimination. Because defendants vehemently deny the threats and the age-related
comments, they have not endeavored to offer a legitimate non-discriminatory reason for
defendants' actions with respect to the sabbatical beyond the disputed claim that it was a
voluntary decision of Melendi.

Viewing the facts in a light most favorable to Melendi, summary judgment is denied to
defendants on plaintiff Melendi's claim of age discrimination under the ADEA.

2. Retaliation

Melendi filed her charge with the EEOC on August 29, 2002. (Def. [*42] Ex. Melendi A;
Resp. to 56.1 P 57) Plaintiffs assert that the decision to eliminate home economics as a
course meant that plaintiff Melendi "was forced to find employment elsewhere" and this
amounted to adverse employment action taken because she filed a complaint with the EEOC.
(Pl. Mem. at 32)

As discussed above, the Supreme Court recently held that a prima facie case of retaliation

Case 2:04-cv-03694-RJH-GWG   Document 41-2   Filed 11/13/2007   Page 26 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

Page 15 of 56

"must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 126 S. Ct. at 2415 (internal quotations omitted). Viewing the facts in the light most favorable to plaintiffs, there is a triable issue of fact as to whether plaintiff Melendi experienced materially adverse employer action after filing her EEOC charge. It is undisputed that plaintiff Melendi taught the school's home economics and that defendant Rossicone eliminated this class from the school's curriculum during the 2002-03 school year. (Rossicone Dep. at 158; Resp. to 56.1 P 59) As a result, when plaintiff Melendi returned from **[*43]** her sabbatical in September 2003, there was no longer any subject for her to teach. Defendant DOE eventually arranged a transfer for plaintiff Melendi (Melendi Dep. at 167, 170), but plaintiffs have come forward with evidence that, in the meantime, her job consisted largely of answering phones and paperwork. (Melendi Dep. at 166-67) A reasonable jury could conclude that the decision to "excess" plaintiff Melendi's course -- thereby requiring plaintiff Melendi to do what amounted to secretarial work, albeit temporarily, and later to transfer to another school -- meets the Burlington Northern standard of adverse employer action. Plaintiffs have established a prima facie case of retaliation under the ADEA.

Defendants have come forward with evidence of their legitimate, nondiscriminatory reasons for the alleged adverse conduct. As discussed above, defendant Rossicone testified that she decided to "excess" home economics because I.S. 220 had not met standards in math and literacy. (Melendi Dep. at 130-31; Rossicone Dep. at 158) Defendant Rossicone testified that she also cut the subjects of physical education, health and home economics from the curriculum in order to bolster teaching **[*44]** in math and literacy. (Rossicone Dep. at 158) When the decision to eliminate the course in home economics is viewed in isolation as a separate, post-protected activity, adverse employer action, defendants have met their burden of coming forward with a legitimate, nondiscriminatory reason for their action.

I view it as a close question whether plaintiffs have come forward with evidence sufficient to raise a triable issue of fact as to the legitimate, nondiscriminatory reason proffered by defendants for the elimination of the position. Plaintiffs appear to rely on the fact that health education and physical education (but not home economics) are mandatory parts of the school curriculum. This appears to be somewhat of a non-sequitur in relation to the decision to eliminate home economics. Nevertheless, given the sequence of events -- the alleged coercion in connection with the sabbatical that took place prior to the EEOC filing, the EEOC filing in August 2002, and the elimination of the position on the heels of Melendi's September 2003 return from sabbatical -- I will deny summary judgment on the retaliation claim and allow the issue to go to the jury.

Summary judgment is denied to **[*45]** defendants on plaintiff Melendi's claim of unlawful retaliation under the ADEA.

B. Robin Kessler

Plaintiff Robin Kessler was born in 1955. (Def. Ex. Kessler A; Resp. to 56.1 P 61) She began teaching at P.S. 247 in February 1991 and remained employed at that location during the relevant period. (Def. Ex. Kessler A; Resp. to 56.1 P 61)

On January 31, 2002, plaintiff Kessler was walking her class down a flight of stairs to the school lunch room at P.S. 247. (Def. Ex. Kessler C; Resp. to 56.1 P 62) According to a subsequent investigation report by the school district, a student from another class was walking down the stairs ahead of them. (Def. Ex. Kessler C; Resp. to 56.1 P 62) This student suffered from weight and respiratory problems and was walking more slowly than other students. (Def. Ex. Kessler C; Resp. to 56.1 P 62) In her deposition, Kessler described the student as "struggling very badly" at that time. (Kessler Dep. at 24) The investigation report states that Kessler became impatient with the student and yelled at her and her teacher.

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 27 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 16 of 56

(Def. Ex. Kessler C; Resp. to 56.1 P 62) The report states **[\*46]** that Kessler then grabbed the student's ankles to demonstrate how the student should walk more quickly (Def. Ex. Kessler C; Resp. to 56.1 P 62); Kessler contends that she merely tapped the student's foot (Kessler Dep. at 25). The student began to cry, lost her balance and fell down the stairs. (Def. Ex. Kessler C; Resp. to 56.1 P 62)

On February 1, 2002, the parent of the student contacted defendant Kathleen Le Donni, the Principal of P.S. 247, to complain about plaintiff Kessler. (Def. Ex. Kessler C; Resp. to 56.1 P 63) It is undisputed that school district regulations require the principal in such a situation to contact the Office of Special Investigations ("OSI") for defendant DOE. (Def. Ex. Kessler C; Resp. to 56.1 P 63) The OSI investigation included interviews of Le Donni, teacher Jennifer DeLessio and the student. (Def. Ex. Kessler C; Resp. to 56.1 P 64) Investigators requested an interview with Kessler, but she refused. (Def. Ex. Kessler C; Resp. to 56.1 PP 64, 66)

On April 1, 2002, OSI concluded that plaintiff Kessler did, in fact, commit an act of corporal punishment against the student in question on January 31, 2002. (Def. **[\*47]** Ex. Kessler C; Resp. to 56.1 P 67) The matter was then forwarded to the Office of Legal Services ("OLS") to determine whether a Technical Assistance Conference should be held. (Def. Ex. Kessler C; Resp. to 56.1 P 67) Plaintiffs dispute the findings of this investigation on the grounds that OSI failed to interview Ivy Bursic, a teacher's aide that plaintiffs claim was the "only adult witness present when the alleged incident occurred." (Kessler Dep. at 25-26; Resp. to 56.1 PP 62, 67)

On May 13, 2002, defendant Vincent Grippo wrote to plaintiff Kessler to schedule a meeting to address the corporal punishment charge brought against her. (Def. Ex. Kessler F; Resp. to 56.1 P 68) Kessler then met with Grippo and Marvin Reiskin, plaintiff Kessler's representative from the United Federation of Teachers ("UFT"). (Def. Ex. Kessler G; Kessler Dep. at 47; Resp. to 56.1 P 69) At this meeting, plaintiff Kessler reported that, on the advice of her attorney, she denied the charges against her and declined to give further explanation. (Def. Ex. Kessler G; Kessler Dep. at 48-49; Resp. to 56.1 P 70) On June 7, 2002, Grippo sent Kessler **[\*48]** a letter in which he informed her that he was adopting the findings in the OSI report. (Def. Ex. Kessler H; Resp. to 56.1 P 71) On June 21, 2002, Kessler received a "U" rating for her annual performance evaluation. (Def. Ex. Kessler I; Resp. to 56.1 P 72)

Thereafter, on August 29, 2002, plaintiff Kessler filed an EEOC age discrimination charge against the DOE. (Def. Ex. Kessler A; Resp. to 56.1 P 73) On October 1, 2002, defendant Grippo sent Kessler a letter informing her that she was being charged with misconduct for an incident during the preceding school year under Education Law 3020-a. (Def. Ex. Kessler K; Resp. to 56.1 P 75)

Through her counsel, plaintiff Kessler and the DOE negotiated an agreement to settle the charges against her. (Kessler Dep. at 54) On November 20, 2002, a DOE attorney faxed a draft of the settlement agreement to plaintiff Kessler's attorney. (Def. Ex. Kessler L; Resp. to 56.1 P 77) Kessler's attorney acknowledged receipt of the draft agreement and responded with proposed changes. (Def. Ex. Kessler M, Resp. to 56.1 P 77) On November 21, 2002, the DOE forwarded a revised version **[\*49]** of the agreement to Kessler's attorney. (Resp. to 56.1 P 78) On November 26, 2002, Kessler and her attorney signed a post-charge stipulation and a letter of irrevocable resignation, effective December 1, 2002. (Def. Ex. Kessler N, Resp. to 56.1 P 79)

1. Discrimination

In moving for summary judgment, defendants argue that plaintiff Kessler's written agreement with the DOE precludes her claim of discrimination. (Def. Mem. at 12-14) In opposing summary judgment, plaintiffs argue that the purported waiver of claims fails to satisfy the requirements of the Older Worker Benefits Protection Act ("OWBPA"), 29 U.S.C. §

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 28 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                Page 17 of 56

626(f). (Pl. Mem. at 17-18)

"The OWBPA sets up its own regime for assessing the effect of ADEA waivers, separate and apart from contract law." Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427, 118 S. Ct. 838, 139 L. Ed. 2d 849 (1998). "[I]n settlements of ADEA-EEOC charges or lawsuits, [a waiver] 'may not be considered knowing and voluntary unless at a minimum' the first five factors listed in Section 626(f)(1) are met and the employee 'is given a reasonable period of time within which to consider the settlement agreement.' Hodge v. N.Y. Coll. of Podiatric Med., 157 F.3d 164, 166 (2d Cir. 1998) [*50] (quoting 29 U.S.C. §§ 626(f)(1)(A)-(E), (f)(2)). Those five factors in section 626(f)(1) are:

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

> (B) the waiver specifically refers to rights or claims arising under this Act;

> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement.

29 U.S.C. § 626(f)(1). In Oubre, the Supreme Court held that a purported waiver must comply with the "stringent safeguards" of section 626(f) in order to be effective. 522 U.S. at 427-28 (considering whether a pre-dispute waiver complied with such safeguards). Moreover, "the party asserting the validity of a waiver shall have the burden of proving in a court [*51] of competent jurisdiction that a waiver was knowing and voluntary . . . ." 29 U.S.C. § 626(f)(3).

It is undisputed that, on November 22, 2002, plaintiff Kessler signed an agreement with defendant DOE to resign from her position, effective December 1, 2002. (Def. Ex. Kessler N, Resp. to 56.1 P 79) Regarding the then-pending charge before the EEOC, the agreement provides, in relevant part, as follows:

> The parties to this Stipulation of Settlement knowingly waive their rights to make any legal, contractual or equitable claims or to initiate legal proceedings of any kind against each other or any employee thereof, relating to or arising out of this disciplinary matter, including claims for costs, expenses and attorney's fees, except to enforce this Stipulation of Settlement. Respondent [Robin Kessler] further agrees to withdraw any such claims or actions that already may have been commenced in any forum whatsoever, specifically the EEOC claim filed on or about August 29, 2002 under charge number 160A202016 and agrees to withdraw said action within fifteen (15) days of the execution of this stipulation. Respondent [Kessler] further agrees [*52] not to file [a complaint in any] forum whatsoever in the future arising out of the facts and circumstances of this case."

(Def. Ex. Kessler O P 12)

Paragraph 12 of the settlement agreement between plaintiff Kessler and defendant DOE meets all of the statutory requirements to constitute an effective waiver of her ADEA claims. To satisfy the first requirement, an agreement purporting to release ADEA claims must be

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 29 of 30
Page 18 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

written clearly and in plain language. In opposing defendants' motion, Kessler has not come forward with an affidavit claiming that she did not understand the language in the settlement agreement. Having examined the language myself, I conclude that it is written in a clear and plain manner readily capable of being understood. See, e.g., Bachiller v. Turn On Prods., Inc., 2003 U.S. Dist. LEXIS 6164, 2003 WL 1878416, *4 (S.D.N.Y. Apr. 14, 2003), aff'd, 86 Fed.Appx. 465 (granting summary judgment on ADEA claims because the language of the release "clearly and plainly inform[ed] Plaintiff that if she signs the Release, she will be barred from bringing any claim against Defendants based on the conditions or termination of her employment"). In addition, a plaintiff's [*53] education and work experience may weigh in favor of concluding that plaintiff understood the agreement. See, e.g., Hseuh v. Bank of N.Y., 2005 U.S. Dist. LEXIS 25791, 2005 WL 2842069, *4 (S.D.N.Y. Oct. 31, 2005) (considering, inter alia, plaintiff's education and ten years of business experience in concluding that plaintiff understood the ADEA release); Bachiller, 2003 U.S. Dist. LEXIS 6164, 2003 WL 1878416, at *4 (concluding that plaintiff was "capable of understanding" the ADEA release because she had a high school equivalency diploma and worked as an accounts payable clerk at the time she signed it). Here, plaintiff Kessler likely has a better understanding of English than the "average individual" of section 626(f)(1)(A) because she has a master's degree in education. (Def. Ex. Kessler G; Kessler Dep. at 8) Taking account of all evidence of record, I conclude that the release satisfies the first requirement of section 626(f).

Second, the agreement refers specifically to the claims that plaintiff filed with the EEOC asserting age discrimination. (Def. Ex. Kessler O P 12) Indeed, Paragraph 12 identifies these claims by the charge number and the date on which her charge was filed with the EEOC. ( [*54] Id.) Third, the language of the agreement restricts the waiver only to claims that had arisen "out of the facts and circumstances of this case." (Id.) The agreement does not bar plaintiff from asserting claims against defendants that might arise after November 22, 2002. Plaintiffs do not argue that any portion of any claim pertaining to plaintiff Kessler arose after that date. (Pl. Mem. at 17-21)

The agreement meets the fourth and fifth requirements of section 626(f) as well. The second paragraph of the agreement provides, "[i]n consideration of the above, the Superintendent of CSD # 20 agrees to withdraw the charges, with prejudice, that were voted on or about October 1, 2002." (Def. Ex. Kessler O P 2) This promise constitutes adequate consideration for plaintiff Kessler's promise to withdraw her EEOC charge and any related claims because, as required by section 626(f)(1), it was not something to which Kessler was already entitled. Fifth, the agreement itself advises Kessler to consult with an attorney and states that she has done so:

> 6. ROBIN KESSLER affirms that she has had access to counsel in reaching this agreement and has consulted with counsel regarding the [*55] terms of this Stipulation of Settlement and has entered into this agreement with advice and consent.

(Def. Ex. Kessler O P 6) In addition, Kessler's attorney signed the document. (Def. Ex. Kessler O)

With regard to the last requirement of section 626(f), "Congress did not specify how a court should determine what constitutes a 'reasonable period of time.'" Manning v. N.Y. Univ., 2001 U.S. Dist. LEXIS 12697, 2001 WL 963982, *7 (S.D.N.Y. Aug. 22, 2001), aff'd, 299 F.3d 156, cert. denied, 538 U.S. 1035, 123 S. Ct. 2092, 155 L. Ed. 2d 1065 (quoting 29 U.S.C. § 626(f)(2)(B)). The Federal Regulations promulgated under section 626(f) simply state that "the term 'reasonable time within which to consider the settlement agreement' means reasonable under all the circumstances, including whether the individual is represented by counsel." 29 C.F.R. § 1625.22(g)(4). In Manning, Judge Buchwald observed that courts must

Case 2:04-cv-03694-RJH-GWG    Document 41-2    Filed 11/13/2007    Page 30 of 30

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705          Page 19 of 56

engage in case-specific analysis of whether a plaintiff had a "reasonable time" to consider an agreement. 2001 U.S. Dist. LEXIS 12697, 2001 WL 963982, at *7 (noting that "[h]ad Congress wished courts to apply a specific set of standards, it would have [*56] enumerated them" as it did in section 626(f)(1)(F)-(H) for waivers signed outside of lawsuits and EEOC proceedings).

In this case, plaintiff Kessler and her attorney actively negotiated the settlement agreement, a draft of which they received on November 20, 2002. (Def. Ex. Kessler L; Resp. to 56.1 P 77) The next day, plaintiff Kessler's attorney proposed several changes to the agreement, and the DOE then modified the draft document. (Def. Exs. Kessler M, O; Resp to 56.1 PP 77, 78) Five days after receiving the final version of the agreement, plaintiff Kessler's attorney returned to defendant DOE the agreement with his and plaintiff Kessler's signatures. (Def. Ex. Kessler N; Resp. to 56.1 P 79) On these facts, no reasonable fact finder could conclude that Kessler or her attorney had insufficient time to review the settlement agreement, and therefore the document operates as a valid waiver of plaintiff Kessler's EEOC charge.

Summary judgment is granted to defendants on plaintiff Kessler's claim of age discrimination under the ADEA.

2. Retaliation

Plaintiff Kessler's retaliation claim is premised upon the fact that defendants initiated formal disciplinary [*57] charges against Kessler approximately one month after she filed her EEOC charge. (Pl. 7/24/06 Supp. Mem. at 22-23) Among other reasons, defendants move for summary judgment on the ground that plaintiff Kessler has not come forward with evidence of a causal relationship between her protected activity and adverse employer conduct. (Def. Mem. at 16)

To establish a causal relationship between protected activity and adverse employer conduct, a plaintiff must, at a minimum, introduce evidence that the protected activity in question occurred before the adverse employment action. See, e.g., Buompane v. Citibank, N.A., 2002 U.S. Dist. LEXIS 6692, 2002 WL 603036, *15-*16 (S.D.N.Y. Apr. 18, 2002) (granting summary judgment to employer where request for employee's termination predated his protected activity by six weeks). Where there is evidence that the employer was considering the adverse employment action before any protected activity, the Supreme Court has held that an employer's "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Clark County Sch. Dist., 532 U.S. at 272 (addressing the causation prong in the [*58] analogous context of Title VII retaliation claims).

Here, there is no evidence that plaintiff Kessler engaged in any protected activity other than the filing of an EEOC charge on August 29, 2002. (Def. Ex. Kessler A; Resp. to 56.1 P 73) Defendant DOE's misconduct charge against Kessler, of which she was informed on October 1, 2002, was the culmination of an internal investigation that began as early as February 1, 2002. (Def. Ex. Kessler C; Resp. to 56.1 P 63) On April 1, 2002, OSI concluded that Kessler had, in fact, committed an act of corporal punishment against a student (Def. Ex. Kessler C; Resp. to 56.1 P 67), and OSI then forwarded the matter on to the defendant DOE's Office of Legal Services. (Def. Ex. Kessler C; Resp. to 56.1 P 67) Plaintiffs concede in a supplemental memorandum that Kessler did not file her EEOC charge until after the charges were "preferred" against her. See Pl. 7/24/06 Supp. Mem. at 24 ("Once the charges were preferred . . ., Ms. Kessler filed an EEOC Charge . . . ."). Furthermore, Kessler testified in her deposition that she was aware that disciplinary charges were pending against her when she filed [*59] her EEOC charge. (Kessler Dep. at 51) There is no other evidence in the record relating to when defendant Grippo or any other official actually decided that the DOE would formally charge Kessler. Therefore, the only available evidence indicates that Kessler knew that such charges would be brought against her on August 29, 2002. Based upon the

evidence in the record, no reasonable jury could conclude that Kessler's EEOC charge caused the DOE to file these charges, and thus plaintiff Kessler cannot make out a prima facie case of ADEA retaliation.

Summary judgment is granted to defendants on plaintiff Kessler's claim of retaliation under the ADEA.

C. Eileen Millares

Plaintiff Eileen Millares was born in 1942. (Def. Ex. Millares A; Resp. to 56.1 P 82) Millares began working as a teacher for defendant DOE in 1986. (Def. Ex. Millares B; Resp. to 56.1 P 82) During the relevant period, Millares was employed at P.S. 247. (Def. Ex. Millares B; Resp. to 56.1 P 82)

On March 16, 1999, plaintiff Millares administered a standardized examination to her students, and Assistant Principal Bonnie Ferretti claims to have observed Millares helping her students [*60] with some answers. (Def. Ex. Millares D; Resp. to 56.1 P 84) In investigating the matter, Assistant Principal Ferretti heard from several students that Millares had indeed assisted them in taking the examination. (Def. Ex. Millares D; Resp. to 56.1 P 84) On March 30, 1999, defendant Le Donni wrote to Millares to direct her to review the examination procedures booklet and not to improperly assist students in taking an examination. (Def. Ex. Millares D; Resp. to 56.1 P 84) Le Donni noted that she had reported the matter to the school district, and the school was now required to have a proctor observe Millares's administration of a later examination. (Def. Ex. Millares D; Resp. to 56.1 P 84) Despite this incident, Millares received a satisfactory evaluation in her annual performance review at the end of the 1998-1999 school year. (Def. Ex. Millares E; Resp. to 56.1 P 85)

On October 8, 1999, Principal Le Donni observed plaintiff Millares teaching a class. (Def. Ex. Millares G; Resp. to 56.1 P 86) Le Donni wrote to Millares to provide a critique of Millares's performance. (Def. Ex. Millares G; Resp. to 56.1 P 86) [*61] Specifically, Le Donni wrote that "students were not engaged in any activity," there was "incorrect grammar on the board," and "no reference was ever made to the aim of the lesson." (Def. Ex. Millares G; Resp. to 56.1 P 86) Le Donni characterized Millares's lesson plans as "inadequate" and the observed lesson as "unsatisfactory" and noted that a copy of the letter would be placed in Millares's file. (Def. Ex. Millares G; Resp. to 56.1 P 86) In addition, Millares agreed to supply Le Donni with her lesson plans each Monday. (Def. Ex. Millares G; Resp. to 56.1 P 86)

On December 20, 1999, defendant Le Donni observed another class of plaintiff Millares and again rated the lesson as "unsatisfactory". (Def. Ex. Millares H; Resp. to 56.1 P 87) In a letter to Millares, Le Donni wrote that "students had nothing but notebooks on their desks" and "[t]here was no motivation, no activity for the students." (Def. Ex. Millares H; Resp. to 56.1 P 87) Le Donni also noted that Millares had not submitted her lesson plans on Mondays, as previously agreed. (Def. Ex. Millares H; Resp. to 56.1 P 87).

On March 14, 2000, plaintiff [*62] Millares applied for a sabbatical. (Def. Ex. Millares I; Resp. to 56.1 P 88) The application stated that Millares was seeking leave for September 2000 to June 2001 and that the purpose of the sabbatical was designated as "Study". (Def. Ex. Millares I; Resp. to 56.1 P 88) On March 15, 2000, Le Donni approved Millares's application for leave.

On March 21, 2000, defendant Le Donni observed plaintiff Millares teaching a class. (Def. Ex. Millares J; Resp. to 56.1 P 89) In a letter to Millares, Le Donni stated that, despite her previous evaluations, the lesson plan did not include "a motivation, an aim, a developmental procedure, use of materials, an activity, [or] a follow up assignment." (Def. Ex. Millares J; Resp. to 56.1 P 89) Le Donni noted that Millares had received assistance from a district staff developer and suggested that Millares seek the assistance of Assistant Principal Michelle

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 2 of 19
Page 21 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

Fuerst. (Def. Ex. Millares J; Resp. to 56.1 P 89) On March 27, 2000, Le Donni again conducted an observation of Millares's teaching and wrote a negative evaluation because, in teaching a lesson on capitalization, Millares incorrectly **[*63]** capitalized two words on the board. (Def. Ex. Millares K; Resp. to 56.1 P 90)

On May 15, 2000, defendant Le Donni noticed that plaintiff Millares had not arrived when the 8:40 a.m. school bell rang and that Millares's students were lined up, unattended, outside their classroom. (Def. Ex. Millares M; Resp. to 56.1 P 92) Millares arrived a few minutes later, and Le Donni wrote to her stating that "leaving a class unsupervised poses a serious threat to the safety and welfare of students." (Def. Ex. Millares M; Resp. to 56.1 P 92)

On May 31, 2000, Assistant Principal Fuerst observed plaintiff Millares's teaching and noted, in a letter to Millares, her use of incorrect terms, meanings and incomplete sentences. (Def. Ex. Millares N; Resp. to 56.1 P 93) Fuerst noted two instances in which students misread words and Millares failed to correct them. (Def. Ex. Millares N; Resp. to 56.1 P 93) In addition, Fuerst stated that the homework assignment did not support the learning activities that took place in class. (Def. Ex. Millares N; Resp. to 56.1 P 93) On that day, Le Donni observed Millares's leading her class to **[*64]** another part of the building and neglecting to notice that two students lagged behind. (Def. Ex. Millares O, Resp. to 56.1 P 94) Le Donni wrote a letter to Millares about the incident in which she stated that such neglect "jeopardizes the students' safety and poses a serious danger to their welfare." (Def. Ex. Millares O, Resp. to 56.1 P 94)

On June 19, 2000, plaintiff Millares received an unsatisfactory rating for the 1999-2000 school year. (Def. Ex. Millares P; Resp. to 56.1 P 95) During the following school year, Millares was on sabbatical, per Le Donni's approval of her request. In September 2001, Millares returned to P.S. 247. (Millares Dep. at 32-33)

On November 9, 2001, Assistant Principal Lillian Catalano found plaintiff Millares eating in the lunchroom during a class period that she was scheduled to cover. (Def. Ex. Millares R; Resp. to 56.1 P 98) Defendant Le Donni wrote to Millares about the incident, noting that this was the second time that she had forgotten to cover a scheduled class and was late. (Def. Ex. Millares R; Resp. to 56.1 P 98)

On November 26, 2001, defendant Le Donni wrote to plaintiff Millares **[*65]** directing her to submit her lesson plans for the coming week so that Le Donni could confirm that they contained necessary components, including "aim, motivation, materials, procedure/ assignment, evaluation and summary." (Def. Ex. Millares S; Resp. to 56.1 P 99) In the letter, Le Donni invited Millares to bring a union representative with her to a meeting with Le Donni. (Def. Ex. Millares S; Resp. to 56.1 P 99) According to a November 28, 2001, letter memorializing the meeting, Millares attended the meeting with Le Donni, Assistant Principal Catalano, and two union representatives. (Def. Ex. Millares T; Resp. to 56.1 P 100) It is undisputed that, during this meeting, Millares was directed to submit her lesson plans, each week, to Le Donni. (Def. Ex. Millares T; Resp. to 56.1 P 100)

The day following the meeting, November 29, 2001, was the last day plaintiff Millares worked for defendant DOE. (Millares Dep. at 61) On January 31, 2002, defendant Le Donni contacted Millares to inquire about her status because she had been absent from work. (Def. Ex. Millares R; Resp. to 56.1 P 102) It is undisputed that Millares refused **[*66]** to answer Le Donni's questions. (Def. Ex. Millares R; Resp. to 56.1 P 102) On February 1, 2002, Le Donni referred Millares to the DOE Medical Bureau to determine whether she was medically fit to return to work. (Def. Ex. Millares U; Resp. to 56.1 P 103). On February 26, 2002, the DOE Medical Bureau examined Millares and concluded that she was unfit to return to work. (Def. Ex. Millares V; Resp. to 56.1 P 104) On June 13, 2002, Millares received an unsatisfactory rating for her annual performance evaluation, in part, because she had been absent for more than fifty days. (Def. Ex. Millares W; Resp. to 56.1 P 106)

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 3 of 19

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705    Page 22 of 56

On August 19, 2002, plaintiff Millares applied for a leave of absence without pay for restoration of health from September 3, 2002 to January 31, 2003. (Def. Ex. Millares X; Resp. to 56. P 107) On August 20, 2002, Dr. Audrey Jacobsen of the DOE Medical Bureau approved Millares's request. (Def. Ex. Millares X; Resp. to 56.1 P 107) Thereafter, Millares filed her charges of age discrimination with the EEOC on August 29, 2002. (Def. Ex. Millares Y at 1; Resp. to 56.1 P 108)

On December 9, 2002, plaintiff [*67] Millares filed a disability claim with the union in which she certified that the illness from which she suffered was not job-related. (Def. Ex. Millares A; Resp. to 56.1 P 109) On January 15, 2003, Millares applied for and received a leave of absence without pay from February 1, 2003 to June 30, 2003. (Def. Ex. Millares Z; Resp. to 56.1 P 110) On February 26, 2003, Millares submitted her application for an "Ordinary Disability Retirement." (Def. Ex. Millares AA; Resp. to 56.1 P 111) On June 18, 2003, Millares retired under the "Ordinary Disability Retirement" pension plan. (Def. Ex. Millares AA: Resp. to 56.1 P 112)

1. Discrimination

In moving for summary judgment on plaintiff Millares's discrimination claim, defendants argue that the statute of limitations bars any claim that arose more than 300 days prior to the August 29, 2002 EEOC filing, i.e. November 2, 2001. (Def. Mem. at 24-25) Prior to November 2, 2001, plaintiff Millares received several negative lesson evaluations, critical letters to her file and a "U" rating for the 1999-2000 school year. (Def. Exs. Millares C-P; Resp. to 56.1 PP 83-95) To the extent that plaintiffs [*68] are invoking the continuing violation doctrine, there is no evidence in the record of any actual or constructive "specific[,] ongoing discriminatory policies or practices" on the part of defendant DOE. See Weeks, 273 F.3d at 82 (quoting Quinn, 159 F.3d at 766). At most, these are unconnected events that, viewed most favorably to Millares, do not amount to ongoing policy or practice. True, pre-November 2, 2001 events may be relevant to her claim, including her assertion that she was constructively discharged, but no pre-November 2, 2001 occurrence in this record sheds significant light upon post-November 2 occurrences. See Jute, 420 F.3d at 176-77.

As to the constructive discharge theory, defendants argue that plaintiff Millares's health -- not her employer's conduct -- was the reason she decided to stop working at P.S. 247 and eventually retire. In her deposition, Millares testified that she had applied for "Ordinary Disability Retirement" due to her health problems (Millares Dep. at 90), but she also testified that she believed these problems resulted from work-related stress (Id. at 91). Viewing the evidence in the record [*69] most favorably to the non-movant, I will assume for purposes of defendants' motion that a reasonable jury could find that there existed at least some connection between plaintiff Millares's health and her job. But establishing a connection between her health and her job is not all that is needed to establish a constructive discharge claim.

In Spence v. Maryland Cas. Co., 995 F.2d 1147 (2d Cir. 1993), the Second Circuit addressed the question of whether a former employee could assert an ADEA discrimination claim based upon the allegation that the employee was constructively discharged due to work-related health problems. The court stated:

A constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health. See, e.g., Meyer v. Brown & Root Construction Co., 661 F.2d 369, 371-72 (5th Cir. 1981) (constructive discharge in violation of Title VII where pregnant employee transferred to position requiring heavy manual labor). But an employer is entitled to insist on as high a standard of work performance as it deems appropriate, and the fact that [*70] an employee develops stress-related ill

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 4 of 19

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 23 of 56

health from the demands of his voluntarily undertaken position or from criticisms of his performance, and as a result determines that health considerations mandate his resignation, does not normally amount to a constructive discharge by the employer.

Id. at 1156. In Spence, the Second Circuit noted evidence that the employee had been ridiculed by his supervisor, blamed for not knowing about certain changes in company practice of which no one had notified him, written up and criticized for poor performance, threatened with termination, and placed on probation; eventually, the employee suffered high blood pressure as a result of his supervisor's treatment. Id. at 1149-54. However, the court also observed that the employer's criticism were "quite concrete", that the employee tried to meet them, that there was no evidence of any intolerable employer conduct during the six months preceding the employee's cessation of work and that the employee had a "quite effective alternative to resignation" -- specifically, lodging a complaint. Id. at 1157. "Unless the evidence is sufficient to permit a rational trier of fact to find that [*71] the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, a claim of constructive discharge should be dismissed as a matter of law . . . ." Id. at 1156.

The evidence in the record before me describes a work environment far less severe than that which was deemed not actionable in Spence. Plaintiff Millares did not experience constant criticism or ridicule from her superiors, but rather received letters providing detailed feedback on specific lessons she had taught or instances in which she fell short in her responsibilities. In addition, the Second Circuit questioned the severity of the work environment for the employee in Spence because there was no evidence that he experienced anything relevant to his discrimination claim in the six months preceding his departure. Here, Millares sought and received a sabbatical for the 2000-01 school year, which ended only a few months before her last day at work. (Millares Dep. at 32-33) When she returned, Millares forgot, for the second time, to cover a scheduled class, and defendant Le Donni memorialized this incident [*72] in a letter placed in Millares's file. (Def. Ex. Millares R; Resp. to 56.1 P 98) Le Donni also directed Millares to submit her lesson plans to her in advance. (Def. Ex. Millares S; Resp. to 56.1 P 99) Indeed, Millares stopped coming to work only a few days after this direction. (Millares Dep. at 61) Viewing the facts most favorably to plaintiff Millares, there is no evidence from which a reasonable jury could conclude that her working conditions, "viewed as a whole, [were] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Terry, 336 F.3d at 152 (internal quotations omitted).

Even if plaintiff Millares had come forward with evidence that she had been constructively discharged, there is no evidence that this occurred in circumstances from which a reasonable jury could infer discriminatory motive. See Chertkova, 92 F.3d at 91. In her deposition, Millares testified in general, non-specific and vague terms of defendant Le Donni's "not being nice" to her. (Id. at 111) Specifically, Millares stated:

> It was a constant battle practically every [*73] single day, either eye contact, frequent depravation of supplies, depravation of supplies, calling into the office for nonsense, verbal abuse, child abuse, dirty looks . . . .

> Job assignments, lack of niceties towards me during the day, which she would have done to the other teachers that were younger. Mentoring, just common understanding, coming to talk to me about something instead of just writing me up in a letter. Just basic humanity and kindness.

(Millares Dep. at 110-11) As to what Millares meant by "job assignments," she testified that the younger teacher who had used her room previously had a better desk and supplies, but

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 5 of 19
Page 24 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

Millares also testified that she never requested a different desk or supplies because she "should not have had to ask." (Millares Dep. at 111-12). There is no evidence that defendant Le Donni or any other defendant had any involvement in deciding which desk or supplies be given to plaintiff Millares. While such assertions may give rise to a reasonable inference that Le Donni was gruff, neglectful or perhaps even rude in her interactions with Millares, they do not support a finding that Millares's alleged constructive discharge resulted from discriminatory **[*74]** animus.

Summary judgment is granted to defendants as to plaintiff Millares's claim of age discrimination under the ADEA.

2. Retaliation

Even though plaintiff Millares's theory of constructive discharge does not survive as an ADEA discrimination claim, I will separately consider whether it survives in the context of her retaliation claim. (Pl. Mem. at 22-23) In moving for summary judgment on Millares's retaliation claim, defendants argue that plaintiffs "cannot show that [Millares] was retaliated against for engaging in any protected activity . . . [because] she did not work even one day following the date her charge was filed." (Def. Mem. at 26) In opposing defendants' motion, plaintiffs argue that Millares experienced "constant harassment" by defendant Le Donni, which led her to become ill, seek disability leave, then seek unpaid leave and eventually retire. (Pl. Mem. at 22-23)

After plaintiff Millares filed her charge with the EEOC, she applied for and received unpaid leave (Def. Ex. Millares Z; Resp. to 56.1 P 110), and then applied for and retired under the "Ordinary Disability Retirement" plan. (Def. Ex. Millares AA: Resp. to 56.1 P 112) There **[*75]** is no other evidence in the record of interaction between Millares and defendant DOE after she engaged in protected activity. No reasonable jury could find that defendant DOE's mere cooperation and compliance with plaintiff Millares's requests amounted to adverse employment action, even under the standard articulated in <u>Burlington Northern,</u> <u>126 S. Ct. at 2405</u>.

Plaintiffs cite no authority for the proposition that unpaid leave requested by the employee constitutes an "intolerable work atmosphere" for purposes of a constructive discharge claim. To the extent that plaintiff Millares is arguing that this Court should consider the circumstances leading to her filing her EEOC charge in the context of her retaliation claim, the Supreme Court in Burlington Northern instructed precisely the opposite. <u>126 S. Ct. at</u> <u>2416.</u> "Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." Id. No reasonable jury could conclude that plaintiff Millares's work atmosphere had become "so intolerable that [s]he [was] forced to quit involuntarily." <u>Terry, 336 F.3d at 151-52.</u> **[*76]**

Summary judgment is granted in favor of defendants as to plaintiff Millares's claims.

D. Marsha Silverstein

Plaintiff Marsha Silverstein was born in 1948 and, in 1969, was hired as a teacher with a so-called Common Branch license. (Def. Exs. Silverstein A, B; Resp. to 56.1 P 113) In 1988, Silverstein began working as a tenured teacher at P.S. 247. (Def. Ex. Silverstein B; Resp. to 56.1 P 113) In February 2000, Silverstein relinquished her tenured position and became an English as a Second Language ("ESL") teacher at P.S. 247 on a probationary status. (Def. Ex. Silverstein B; Resp. to 56.1 P 114) In September 2001, Silverstein was "excessed" to P.S. 48 because another, more senior ESL teacher was returning from sabbatical. (Def. Ex. Silverstein B; Resp. to 56.1 P 123)

On November 26, 2001, defendant Diane Picucci, the Principal of P.S. 48, observed plaintiff

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 6 of 19
Page 25 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

Silverstein teaching a class. (Def. Ex. Silverstein J; Resp. to 56.1 P 125) In writing her observation report, Picucci stated that the "aim" of the lesson was not realized and that Silverstein's time management was poor. (Def. Ex. Silverstein J; Resp. to 56. **[\*77]** 1 P 125) Picucci rated the lesson "unsatisfactory". (Def. Ex. Silverstein J; Resp. to 56.1 P 125) Assistant Principal Richard Ogno rated a class taught by Silverstein soon thereafter as "unsatisfactory" for similar reasons. (Def. Ex. Silverstein K; Resp. to 56.1 P 126)

On November 30, 2001, plaintiff Silverstein received a letter from defendant Grippo, stating as follows:

> Dear Ms. Silverstein:
>
> This is to inform you in accordance with Section 2573 Subdivision I of the State Education Law, I am denying your Certification of Completion of Probation in Community School District Twenty.
>
> Under the Collective Bargaining Agreement between the Board of Education and the United Federation of Teachers, you are entitled to the review procedures as prescribed in Article 5, Section 5.3.4.C of the Bylaws of the Board of Education.
>
> Please be advised that your service under this appointment shall terminate as of the close of business January 31, 2002.

(Pl. Ex. AA)

Plaintiff Silverstein was assigned a "buddy teacher" and a "Staff Developer" from the District Office to assist her with her teaching. (Def. Ex. Silverstein K; Resp. to **[\*78]** 56.1 P 126) Subsequent to Silverstein receiving this assistance, defendant Picucci rated as "unsatisfactory" a January 15, 2002, class taught by Silverstein. (Def. Ex. Silverstein L; Resp. to 56.1 P 127) In addition, Picucci wrote to Silverstein that the motivation and directions of the lesson were unclear and that Silverstein appeared to be unaware of the students' names and ability levels. (Def. Ex. Silverstein L; Resp. to 56.1 P 127)

On January 23, 2002, Bina Mancini, the Director of Bilingual Programs for defendant DOE, observed plaintiff Silverstein teaching a class. (Def. Ex. Silverstein M; Resp. to 56.1 P 128) Mancini rated Silverstein's lesson "unsatisfactory" for the following stated reasons: attendance was not taken; Silverstein did not collaborate with other teachers in planning the lesson; Silverstein did not fully develop each activity before proceeding to the next one; and Silverstein did not implement a writing exercise. (Def. Ex. Silverstein M; Resp. to 56.1 P 128) Silverstein received an unsatisfactory performance evaluation for the period of September 4, 2001 to January 31, 2002. (Def. Ex. Silverstein **[\*79]** N; Resp. to 56.1 P 129)

On February 1, 2002, plaintiff Silverstein was transferred to P.S. 105 and taught a third grade class until March 1, 2002. (Def. Exs. Silverstein B, O; Resp. to 56.1 PP 130-31) Silverstein received the same salary as she had at P.S. 247, and she received a satisfactory performance rating for this period. (Def. Exs. Silverstein B, O; Resp. to 56.1 PP 130-31) Silverstein then went on sick leave for approximately one year. (Def. Exs. Silverstein O, P, R; Resp. to 56.1 PP 132, 134) During the period of such leave, Silverstein filed a charge of age discrimination with the EEOC on August 29, 2002. (Def. Ex. Silverstein Q at 1)

On March 31, 2003, plaintiff Silverstein returned to teaching at a different school, P.S. 69. (Def. Ex. Silverstein B; Resp. to 56.1 P 135) On April 10, 2003, Principal Maria Bromme observed Silverstein's teaching. (Def. Ex. Silverstein S; Resp. to 56.1 P 136) Bromme rated the lesson "unsatisfactory" because Silverstein did not conduct a shared reading activity, even though the materials for such activity had been provided to her beforehand and had

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 7 of 19
Page 26 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

been discussed at the pre-observation conference. (Def. **[*80]** Ex. Silverstein S; Resp. to 56.1 P 136) Bromme stated in her letter to Silverstein that the "aim" of the lesson had not been realized and that several students were not engaged in the lesson. (Def. Ex. Silverstein S; Resp. to 56.P 136) In addition, Bromme noted that one student was attempting to place a pencil into an electrical socket while two other students watched and laughed, that two female students attempted to unravel the hem of another student's pants, and that Silverstein failed to intervene in either of these incidents. (Def. Ex. Silverstein S) On May 22, 2003, Silverstein left one of her students unsupervised in the hallway. (Def. Ex. Silverstein T; Resp. to 56.1 P 137)

On June 18, 2003, plaintiff Silverstein completed an application for retirement from employment with defendant DOE. (Def. Ex. Silverstein A; Resp. to 56.1 P 139) On June 26, 2003, Silverstein received an unsatisfactory performance evaluation from P.S. 69 for the 2002-03 school year. (Def. Ex. Silverstein U; Resp. to 56.1 P 138) On July 1, 2003, Silverstein retired. (Def. Ex. Silverstein A; Resp. to 56.1 P 139)

1. Discrimination

**[*81]** In moving for summary judgment, defendants argue that portions of plaintiff Silverstein's discrimination claim must be dismissed on the ground that they predate November 2, 2001, which is 300 days before she filed her August 29, 2002 charge with the EEOC. (Def. Mem. at 27) See Holowecki, 440 F.3d at 558 (citing 29 U.S.C. §§ 626(d), 633 (b)) Specifically, defendants identify the following as time-barred: the denial by defendants Grippo and Le Donni of an ESL license to Silverstein (Def. Ex. Silverstein G; Resp. to 56.1 PP 119-21), the fact that her course was "excessed" (Def. Exs. Silverstein B, H; Resp. to 56.1 P 123), and several negative evaluations and letters to file (Def. Exs. Silverstein C-F, I; Resp. to 56.1 PP 115-18, 124). In opposing defendants' motion, plaintiffs have come forward with no evidence from which a reasonable jury could conclude that the defendants' conduct constituted a continuing practice for this claim. (Pl. Mem. at 24-26) I will consider only those portions of Silverstein's claim that arose after November 2, 2001 -- i.e. negative evaluations and her transfer from P.S. 48 to P.S. **[*82]** 105 -- as potential adverse employment actions but will consider pre-November 2, 2001 events, where appropriate, as relevant "background evidence". See Jute, 420 F.3d at 176-77.

As to post-November 2, 2001 events, defendants argue that plaintiffs have come forward with no evidence from which a reasonable jury could conclude that plaintiff Silverstein suffered an adverse employment action. (Def. Mem. at 27-28) Defendants also argue that plaintiffs have not met the fourth prong of their prima facie burden -- that the alleged adverse employment action occurred in circumstances giving rise to an inference of discrimination. (Id. at 28) Defendants further argue that, even if a prima facie case had been made, they have come forward with evidence of their legitimate, nondiscriminatory reasons for their action (Id.) and plaintiffs have offered no evidence that such reasons are pretextual (Def. 7/14/06 Supp. Mem. at 7).

I will first address the adverse employment action prong of the prima facie case. In opposing summary judgment, plaintiffs have come forward with no evidence that any negative performance evaluation -- whether of a specific lesson or of an entire school **[*83]** year's performance -- caused any materially adverse change in the terms or conditions of plaintiff Silverstein's employment. As noted above, the Second Circuit has held that a negative performance evaluation -- without more -- is not an adverse employment action. Sanders, 361 F.3d at 756. See also Weeks, 273 F.3d at 86 ("It hardly needs saying that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."). As to the negative lesson evaluations, plaintiffs simply dispute the views set forth in those evaluations by introducing a letter written by a different principal generally commending Silverstein on her teaching. (Pl. Ex. Z) Whether the criticism was warranted or not, there is no evidence that any lesson

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 8 of 19

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 27 of 56

evaluation had any tangible impact on the terms or conditions of plaintiff Silverstein's employment.

It is undisputed that plaintiff Silverstein received a "U" rating for the period of September 4, 2001 to January 31, 2002. (Def. Ex. Silverstein N; Resp. to 56.1 P 129) Plaintiffs argue that such a rating constitutes an adverse **[*84]** employment action because it "has several adverse consequences including ineligibility for salary step increases; inability to renew a temporary license; extinguishing the retention rights for regular substitutes; ineligibility for per session assignments that require satisfactory ratings in the postings; and the basis to proceed with termination." (Pl. Mem. at 9, citing Pl. Ex. F at 37; Pl. 7/24/06 Supp. Mem. at 17) However, in support of their argument, plaintiffs direct this Court to only one piece of evidence, a document entitled "Frequently Asked Questions," apparently authored by the Office of Labor Relations of defendant DOE. (Pl. Ex. F) In explaining the significance of a "U" rating, the document states that such an evaluation has "several potential adverse consequences," including the those by plaintiffs in their memorandum. (Id. at 37) The Second Circuit has not held that employer conduct is materially adverse merely because it has the potential to cause negative results. Rather, the Second Circuit has required evidence of actual "negative ramifications for the plaintiff's job conditions." Fairbrother, 412 F.3d at 56 (noting, as examples, **[*85]** "'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation"). Plaintiffs have had a full and fair opportunity to conduct discovery. If there had been evidence that a "U" rating, in fact, precluded "step" increases or caused similar negative changes in a teacher's employment, it would have been a simple matter to point to such evidence. Plaintiffs have not. No reasonable jury could conclude, based upon the evidence in the record before me, that any evaluation of Silverstein's performance constituted an adverse employment action for purposes of her discrimination claim.

Plaintiff Silverstein argues that her transfer from P.S. 48 to P.S. 105 -- the only transfer during the limitations period -- is an adverse employment action. She argues that the transfer is actionable because she was assigned to teach third grade students instead of ESL students. (Pl. Mem. at 25) Silverstein testified that this meant that she was teaching "outside her license area," which, if true, would arguably constitute a materially **[*86]** adverse change in the terms or conditions of her employment. (Silverstein Dep. at 156) Silverstein concedes that, as an ESL teacher, she was in a probationary status. (Def. Ex. Silverstein B; Resp. to 56.1 PP 114, 123) Plaintiff also testified that she "didn't feel like [she] was unable to teach the third grade." (Silverstein Dep. at 158)

The facts relevant to this claim closely resemble those of Galabya, 202 F.3d at 636. In that case, the Second Circuit affirmed the district court's grant of summary judgment to the defendant -- as here, the DOE -- because the plaintiff had not come forward with any evidence from which a reasonable jury could find that his reassignment to teach outside his expertise caused a "materially adverse change in the terms and conditions of employment." Id. at 640-42 (citations and quotations omitted). In doing so, the Second Circuit distinguished the case from Rodriguez v. Bd. of Educ., 620 F.2d 362 (2d Cir. 1980), in which the plaintiff had been reassigned from teaching junior high art classes to elementary school art classes. Galabya, 202 F.3d at 640-42. In that case, the plaintiff had **[*87]** proffered evidence that she had tailored her master's and doctoral coursework to prepare her for teaching junior high students and that "the two jobs were 'profoundly different,' so different, in fact, as to render her twenty years of experience 'useless.'" Id. at 640-41 (quoting Rodriguez, 620 F.2d at 366).

Viewed in a light most favorable to plaintiffs, the evidence relating to plaintiff Silverstein's assertion that her transfer to P.S. 105 constituted an adverse employment action is closer to Galabya than Rodriguez. While plaintiff undoubtedly preferred not to teach a third grade class at a different school, there is no evidence that plaintiff lacked the skills for the position. Cf.

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 9 of 19

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                                           Page 28 of 56

Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp. 2d 249, 265 (E.D.N.Y 1999), aff'd, 201 F.3d 432 (2d Cir. 1999) (granting summary judgment to employer because employee produced "no material evidence that her transfer [from teaching first grade to pre-kindergarten] obliged her to perform tasks that were less appropriate for her skills than her prior position or adverse to her in any other legally cognizable way"). In [*88] addition, there is no evidence here -- as there was in Rodriguez, 620 F.3d at 366 -- that Silverstein had previously undertaken substantial professional development in order to prepare for her specialty, only then to be transferred to a less distinguished position. "Without a real change in the conditions of employment, a transfer is only a mere inconvenience or an alteration of job responsibilities, and hence not materially adverse." Fairbrother, 412 F.3d at 56 (quotations omitted) (affirming summary judgment to employer where transfer of employee resulted in an occasionally longer walk and emotional losses, but no change in "wages, retirement credits, benefits, or overtime opportunities"). Plaintiffs have failed to come forward with evidence from which a reasonable jury could conclude that Silverstein's transfer from a position as an ESL teacher at P.S. 48 to a third grade teacher at P.S. 105 constituted an adverse employment action.

Finally, defendants move for summary judgment on the ground that plaintiff was not constructively discharged. (Def. Mem. at 27-28) Specifically, defendants argue that "unsatisfactory ratings, increased scrutiny [by [*89] supervisors] and allegations made against [plaintiff Silverstein]" do not constitute a constructive discharge. (Id.) In opposing defendants' motion, plaintiffs argue that defendants' failure to allow Silverstein to teach ESL students at P.S. 105 and their increased scrutiny of Silverstein at P.S. 69 constitute a constructive discharge. (Pl. Mem. at 24-25)

I have already rejected the argument that either plaintiff Silverstein's transfer from P.S. 48 to P.S. 105 or the failure of defendant DOE to assign her to teach ESL students was an adverse employment action. As to plaintiff Silverstein's complaints about the increased scrutiny of her work at P.S. 69, the only incident about which she testified in her deposition was the fact that defendant Bromme conducted a classroom observation shortly after her arrival. (Silverstein Dep. at 179-82) A supervisor observing the work of an employee and providing constructive criticism is not an adverse employment action. Sanders, 361 F.3d at 756; Weeks, 273 F.3d at 86. Other than this incident, the only evidence in the record regarding Silverstein's experience at P.S. 69 -- her last place of work while employed [*90] by defendant DOE -- was a letter from Bromme noting that Silverstein had left one of her students unsupervised in the hallway. (Def. Ex. Silverstein T; Resp. to 56.1 P 137) A few weeks later, Silverstein applied for retirement. (Def. Ex. Silverstein A; Resp. to 56.1 P 139)

Finally, plaintiff Silverstein testified that these events resulted in her developing a stress disorder. (Silverstein Dep. at 162) As with plaintiff Millares's similar claim, the evidence in the record regarding Silverstein's work experiences falls far short of an actionable constructive discharge claim. See Spence, 995 F.2d at 1147-54, 1157 (affirming summary judgment to employer, despite evidence that employer's "constant criticisms" led to employee's high blood pressure).

Viewed as a whole and in a light most favorable to Silverstein, the evidence, taken as a whole, would not support an inference that Silverstein's working conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Chertkova, 92 F.3d at 89.

Even if plaintiffs had come forward with evidence from which a jury could [*91] conclude that plaintiff Silverstein had suffered an adverse employment action, they have failed to come forward with any evidence that could support an inference of discrimination. In their memorandum, plaintiffs direct this Court to no evidence that these class evaluations or the unsatisfactory ratings were motivated by a discriminatory animus. Instead, plaintiffs only cite evidence of allegedly unfair actions by defendant DOE and its supervisory employees.

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 10 of 19
Page 29 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

Specifically, plaintiffs state as follows:

> Plaintiff had began [sic] to receive negative letters in her file; she was given an empty classroom with no materials; she was forced to undergo evaluations after extremely minimal time on the job (not enough time to become familiar with the curriculum, let alone learn the students' names); she was not sent to ESL meetings with other ESL teachers; and another teacher was coerced into writing a negative letter against her.

(Pl. Mem. at 25, citing Silverstein Dep. at 179, 181, 189). There is no evidence that this conduct -- assuming arguendo that it occurred -- resulted from any discriminatory motive. A plaintiff claiming age discrimination may not rely solely on his or [*92] her status as a member of a protected class and the fact that he or she experienced what might constitute an adverse employment action. Terry, 336 F.3d at 137-138 (stating the elements of a claim of age discrimination under the ADEA).

Lacking any evidence to support a prima facie case of discrimination, plaintiff Silverstein's discrimination claim fails as a matter of law.

2. Retaliation

In moving for summary judgment on plaintiff Silverstein's retaliation claim, defendants argue that plaintiffs cannot show that Silverstein was constructively discharged. (Def. Mem. at 28-29) Furthermore, even if a reasonable jury could find that Silverstein was constructively discharged, defendants argue that there exists no evidence of a causal connection between her protected activity and any actions by defendant DOE. (Def. Mem. at 29) In opposing summary judgment, plaintiffs argue that defendants retaliated against Silverstein by giving her an unsatisfactory rating for the 2002-2003 school year in June 2003, ten months after she filed her EEOC charge. (Pl. 7/24/06 Supp. Mem. at 26)

With regard to the allegation of constructive discharge, plaintiffs have failed to come forward [*93] with any evidence from which a reasonable jury could find that any of the defendants "intentionally create[d] a work atmosphere so intolerable" that plaintiff Silverstein was "forced to quit involuntarily." Terry, 336 F.3d at 151-52. An employer's criticisms of an employee's work, without more, do not give rise to a claim for constructive discharge. Spence, 995 F.2d at 1156. Unlike the plaintiffs in Terry, plaintiffs here have failed to identify any specific comments made by supervisors or co-workers in the employment of defendant DOE that would allow a reasonable jury to find that Silverstein's working conditions had become intolerable for purposes of her constructive discharge claim.

Instead, the only evidence in the record is that plaintiff Silverstein received a negative evaluation of her April 10, 2003 lesson (Def. Ex. Silverstein S; Resp. to 56.1 P 136), received an unsatisfactory rating for the 2002-03 school year (Def. Ex. Silverstein U; Resp. to 56.1 P 138) and then applied for retirement (Def. Ex. Silverstein A; Resp. to 56.1 P 139). No reasonable jury could conclude that the negative lesson evaluation [*94] and the negative annual evaluation made Silverstein's working conditions intolerable, particularly given that her employer made special arrangements for Silverstein to receive additional professional development. (Def. Ex. Silverstein K; Resp. to 56.1 P 126)

Whether these evaluations themselves constitute adverse employer conduct for purposes of a retaliation claim is another matter. In Burlington Northern, the Supreme Court required that such conduct be "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 126 S. Ct. at 2415 (internal quotations omitted). After Burlington Northern, Judge Rakoff reconsidered a grant of summary judgment to an employer and concluded that no reasonable

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 11 of 19
Page 30 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

jury could find that a Title VII plaintiff's negative job evaluations met the Supreme Court's arguably broader standard due to the absence of "evidence in the record that any negative consequences resulted from those evaluations." Jackson v. City Univ. of N.Y., 2006 U.S. Dist. LEXIS 43338, *3 (S.D.N. Y. June 26, 2006). See also Langer v. Sec'y of the Treasury, 2006 U.S. Dist. LEXIS 50751, 2006 WL 2076577, **[*95]** *2 (E.D. Wis. July 24, 2006) ("[A]bsent some tangible job consequence, negative performance evaluations generally do not constitute adverse employment actions." (internal citation and quotation omitted)). I find Judge Rakoff's reasoning persuasive. Here, plaintiffs have similarly failed to produce such evidence of any negative consequences resulting from the evaluations of either plaintiff Silverstein's April 10, 2003 lesson or the 2002-03 school year. In the context of other plaintiffs' retaliation claims, plaintiffs argue that receiving an unsatisfactory annual rating meant that the teacher could not receive "per session" work. See, e.g., Pl. 7/24/06 Supp. Mem. at 18 (discussing plaintiff Yialouris-Papasmiras' discrimination claim). However, as with those claims, there is no evidence in the record that Silverstein was otherwise eligible for such work, that such work was available, or that Silverstein actually applied for and was denied such work. Therefore, Silverstein's claim of ADEA retaliation fails as a matter of law.

Summary judgment is granted as to plaintiff Silverstein's claim of retaliation under the ADEA.

E. John Casciato

Plaintiff John Casciato was born in **[*96]** 1952. (Def. Ex. Casciato A; Resp. to 56.1 P 140) In October 2001, Casciato was hired as a part-time, non-certified art teacher at P.S. 112. (Casciato Dep. at 13, 20) At first, Casciato worked two days per week. (Casciato Dep. at 18) At some point early in his employment, Casciato requested a third day of work, and defendant DOE -- with defendant Grippo's personal involvement -- approved the request. (Casciato Dep. at 16-18) This enabled Casciato to receive health benefits immediately. (Casciato Dep. at 17)

At some point during the 2001-2002 school year, P.S. 112 advertised for a teacher for an Art Cluster position. (Def. Ex. Casciato E; Resp to 56.1 P 146) It is undisputed that this position required the applicant to pass two certification exams and to attend various seminars and complete substantial paperwork. (Casciato Dep. at 66; 56.1 P 147) In May 2002, plaintiff Casciato took one of the two exams, the ATSW exam. (Casciato Dep. at 64) Casciato was lacking the results of one of the exams, but had all other paperwork completed:

> By the end of the school year[,] I had everything I needed to qualify as a certified New York State teacher **[*97]** other than my results from [the] ASTW [exam], which was still out there in the mail, and I had them all in front of me, all the little papers that I needed. I just hadn't sent them in because I was waiting for the final one to send in to the State.

(Casciato Dep. at 66)

In June 2002, plaintiff Casciato applied for the Art Cluster position, despite the fact that he was not yet certified for the position. (Casciato Dep. at 93) Principal Verdemare told Casciato that he was not eligible because he was not certified. (Casciato Dep. at 93) In addition, the Verdemare told Casciato that P.S. 112 did not have a need for a part-time art teacher the following school year because the school was hiring for a full-time Art Cluster position. (Casciato Dep. at 74) In a letter dated June 14, 2002, defendant Grippo thanked Casciato for his work in the 2001-2002 school year and informed Casciato that he anticipated "a need for per diem substitutes for the 2002-2003 school year." (Def. Ex. Casciato F; Resp. to 56.1 P 150) In July 2002, Casciato was notified that he failed the ATSW exam. (Casciato Dep. at 67)

Plaintiff Casciato filed his EEOC charge on September 26, 2002. (Def. Ex. **[*98]** Casciato A

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 12 of 19

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 31 of 56

at 1) Casciato did not become certified to teach art classes until February 2004. (Casciato Dep. at 20) Upon completing certification, Casciato applied and was hired for a full-time position teaching art at P.S. 212. (Casciato Dep. at 100) In September 2004, Casciato began working at P.S. 212. (Casciato Dep. at 100-01)

1. Discrimination

In moving for summary judgment on plaintiff Casciato's claim, defendants argue that plaintiffs have failed to come forward with evidence that Casciato meets the second prong of a prima facie case of age discrimination -- that he was qualified for the position in question. (Def. Mem. at 37) In opposing summary judgment, plaintiffs argue that Casciato was qualified because he had the "same pending certificate" as the teacher eventually hired for the position. (Pl. Mem. at 13)

It is settled law that a plaintiff must have been qualified for the position that forms the basis of his or her claim under the ADEA. Terry, 336 F.3d at 137-138. Although a prima facie case of unlawful discrimination requires only that the plaintiff show that he or she was minimally qualified, Owens, 934 F.2d at 409, such minimal [*99] qualifications must have existed at the time the plaintiff applied for the position at issue. In the field of education, courts have held that a teacher lacking the requisite certification to teach cannot complain of a school board's failure to hire. See, e.g., Frazier v. Garrison I.S.D., 980 F.2d 1514, 1522, 1527-28 (5th Cir. 1993) (affirming district court's denial of class certification for teachers' ADEA claims where there existed uncontroverted evidence that teachers applied for certified teaching positions after failing state certification exam); White v. Camden City Bd. of Educ., 251 F. Supp. 2d 1242 (D.N.J. 2003), aff'd, 90 Fed. Appx. 437 (3d Cir. 2004) (recognizing the plaintiff's lack of qualification despite evidence that she had been provisionally certified, a status inadequate for a permanent position). Indeed, the Second Circuit has recognized the appropriateness of an employer's consideration of whether an employee meets licensure or certification requirements:

> Employers frequently seek to hire people who have and can maintain a status conferred by some other agency (certified teachers, off-duty police, licensed [*100] pilots), where that status serves as an imprimatur of training, character, or necessary physical or mental condition. The ADEA does not outlaw such considerations.

Johnson v. New York, 49 F.3d 75, 83 (2d Cir. 1995).

In opposing summary judgment, plaintiffs do not argue that requiring state certification was beyond the authority of defendant DOE or otherwise unreasonable. In his deposition, plaintiff Casciato testified that, even though he was not fully certified when he applied for the position, he anticipated becoming certified by September 2002. (Casciato Dep. at 93) However, the federal employment discrimination statutes do not protect those who may at some point in the future become qualification for a position; qualified is measured at the time the position is sought. See Johnson, 49 F.3d at 83. The undisputed evidence is that Casciato failed the ATSW exam and, therefore, was not qualified for the position he sought.

Plaintiffs assert that lack of certification ought not be dispositive in this case because defendants hired a much younger individual, Anya Tucker, for the same position who was also not certified at the time she applied. [*101] (Pl. Mem. at 13, citing Pl. Ex. EE) If the contention were supported by evidence of the type contemplated by Rule 56(c), Fed. R. Civ. P., it might create a triable issue of fact as to whether Casciato was qualified, despite his lack of certification. See Farmer v. Dothan City Sch., 2006 U.S. Dist. LEXIS 9270, 2006 WL 354323, *33-*34 (M.D. Ala. Jan. 11, 2006) (rejecting plaintiff's lack of certification as a basis for summary judgment in favor of school district where district had previously hired plaintiff

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 13 of 19

Page 32 of 56

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

for the position for which school district argued he was not qualified). However, defendants have come forward with evidence (that plaintiffs have not disputed) that Tucker was a certified elementary school art teacher in Florida (Def. Supp. Ex. Casciato H) and was therefore certified in New York based upon a reciprocity agreement between New York and Florida (Def. Supp. Ex. Casciato I). There is no evidence that Tucker took and failed the ATSW exam; indeed, the evidence of record is that, by reason of reciprocity, she was certified without the necessity of taking the exam. Defendant Verdemare testified that Frances Ferrier, the District Cultural Arts [*102] Director, had informed her that Tucker's Florida certification meant that Tucker was certified in New York. (Verdemare Dep. at 150) In opposition to the motion, plaintiffs refer this Court to what appears to be an internal office document providing "credentials information" about Tucker. (Pl. Ex. EE; Pl. Mem. at 14) Plaintiffs apparently rely solely on language in the sparse document that simply states "Type: CNDTNL PROV" (Pl. Ex. EE) to argue that Tucker was not certified when defendants were considering applications. (Pl. Mem. at 14) Despite having additional opportunities to submit evidence in opposition to defendants' motion, plaintiffs rely solely upon this notation in a single document and do not respond directly to defendants' evidence that a teacher who is certified in Florida is certified in New York by reason of reciprocity. Defendants' evidence stands unchallenged.

Based upon the evidence in the record, no reasonable jury could find that plaintiff Casciato, who failed the ATSW exam and was uncertified, was qualified as a teacher for the Art Cluster position. Defendant DOE's decision not to hire plaintiff Casciato for this position is the only alleged adverse employment [*103] action, and plaintiffs have failed to establish a prima facie case for this claim. Summary judgment is granted to defendants on plaintiff Casciato's claim of discrimination.

2. Retaliation

Plaintiff Casciato filed an EEOC charge on September 26, 2002. (Def. Ex. Casciato A at 1) In moving for summary judgment on Casciato's claim of retaliation under the ADEA, defendants argue that he has neither alleged nor provided any supporting evidence that he suffered an adverse employment action after filing his EEOC charge. (Pl. Mem. at 39) Plaintiffs assert that Casciato was not considered for a permanent position in retaliation "for supporting the senior teachers." (Pl. 7/24/06 Supp. Mem. at 14) However, plaintiffs have come forward with no evidence of any support Casciato gave to such teachers. Instead, in his deposition, Casciato testified that defendant Verdemare had advised him, on multiple occasions, that "it would not be in [his] best interest to continue to associate with" certain teachers, some of whom are plaintiffs in this action. (Casciato Dep. at 26) According to this testimony, Verdemare characterized these individuals as "bad apples". (Id.) Even assuming that Verdemare [*104] made these statements and viewing the facts most favorably to plaintiffs, there is no evidence of any tangible action by Casciato on behalf of other plaintiffs. To the contrary, despite Verdemare's alleged comment, the only evidence is that Casciato socialized with these individuals. (Casciato Dep. at 25-29)

The only protected activity relevant to plaintiff Casciato's retaliation claim is his filing a charge with the EEOC, and there is no evidence in the record that Casciato experienced anything resembling an adverse employment action thereafter. Rather, the evidence is that, upon completing his certification to teach art classes in February 2004, Casciato applied for and was hired for a full-time art teacher position. (Casciato Dep. at 100) In September 2004, Casciato began working at P.S. 212 in this capacity. (Casciato Dep. at 100-01)

Summary judgment is granted to defendants on plaintiff Casciato's retaliation claim.

F. Elizabeth DeMairo-Stingo and Mary Yialouris-Papasmiras

1. Common Facts

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 14 of 19

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 33 of 56

Plaintiff Elizabeth DeMairo-Stingo was born in 1951 (Def. Ex. DeMairo-Stingo A; Resp. to 56.1 P 157), began teaching at P.S. 112 in February 1987 and received tenure [*105] in 1990 (DeMairo-Stingo Dep. at 14). Plaintiff Mary Yialouris-Papasmiras was born in 1959 (Def. Ex. Yialouris A; Resp. to 56.1 P 169), began teaching at P.S. 112 on September 2, 1994, and received tenure on September 1, 1997 (Def. Ex. Yialouris B; Resp. to 56.1 P 169).

In June 2002, plaintiffs DeMairo-Stingo and Yialouris-Papasmiras -- and another teacher Becky Dweck -- acted as chaperones for a senior class trip to Baltimore. (DeMairo-Stingo Dep. at 72) On the return trip, DeMairo-Stingo and Yialouris-Papasmiras directed the bus drivers to make an unplanned stop. (DeMairo-Stingo Dep. at 72-74; Yialouris Dep. at 96) DeMairo-Stingo's bag and belongings were on a second bus and not on the one on which she was riding. (DeMairo-Stingo Dep. at 73; Yialouris-Papasmiras Dep. at 96) Yialouris-Papasmiras also testified that three parents exited the bus on which DeMairo-Stingo was riding and entered the bus on which Yialouris-Papasmiras was a passenger. (Yialouris-Papasmiras Dep. at 97) After the buses resumed the trip, DeMairo-Stingo met with several parents at which time they criticized defendant Verdemare. (Yialouris-Papasmiras Dep. at 97, 103) Specifically, the [*106] parents discussed Verdemare's alleged failure to discipline a student named Mohammed who had assaulted other students. (Yialouris-Papasmiras Dep. at 99) Yialouris-Papasmiras used the public address system of the bus to poll students about whether they had ever been hit by Mohammed. (Yialouris-Papasmiras Dep. at 99-100) Yialouris-Papasmiras testified that she "probably said that [she does not] like" Verdemare at some point during this episode. (Yialouris-Papasmiras Dep. at 107)

After the bus trip, at least five parents who had served as chaperones wrote letters to Verdemare complaining of the behavior of DeMairo-Stingo and Yialouris-Papasmiras, leading Verdemare to investigate the complaints. (Def. Ex. DeMairo-Stingo E; Resp. to 56.1 PP 161-62) According to these letters, DeMairo-Stingo and Yialouris-Papasmiras told parents that plaintiff Casciato had been fired because he was gay, that Verdemere was an "evil person, a sneak, liar . . . ." and that "parents had to start petitions and pass all this on to other parents." (Def. Ex. DeMairo-Stingo E at 2-3)

On June 25, 2002, Yialouris-Papasmiras was interviewed by Verdemare about the bus trip. (Def. Ex. Yialouris D; Resp. to 56.1 P 171) [*107] DeMairo-Stingo also met with her union representative and Verdemare. (Verdemare Dep. at 52; Resp. to 56.1 P 163)

After conducting her investigation, defendant Verdemare concluded that an incident took place on this trip that, in her words, threatened the safety and well-being of the students. (Verdemare Dep. at 59; Resp. to 56.1 P 165) According to the union representative, Marvin Reiskin, the incident was "blown up as a major situation where the parties [-- i.e., the teachers in question --] felt that it would probably be to their best interests not to remain at the school under the principal . . . ." (Reiskin Dep. at 75) During the summer of 2002, DeMairo-Stingo and Yialouris-Papasmiras -- as well as the other teacher, Dweck -- were given the option of transferring out of P.S. 112. (Reiskin Dep. at 75; Resp. to 56.1 P 166) After being given the choice of three schools, DeMairo-Stingo transferred to P.S. 48 on September 3, 2002. (DeMairo-Stingo Dep. at 90; Def. Ex. DeMairo-Stingo G; Resp. to 56.1 P 167) There is no evidence that Yialouris-Papasmiras sought a transfer and she remained at P.S. 112.

On September 10, 2002, there [*108] was a fire drill at P.S. 112 that plaintiff Yialouris-Papasmiras claimed was inaudible. (Def. Ex. Yialouris G; Resp. to 56.1 P 172) After the fire drill, Yialouris-Papasmiras directed her students to write letters to defendant Verdemare to the effect that they did not hear the fire alarm. (Def Ex. Yialouris G; Yialouris-Papasmiras Dep. at 166) After receiving these letters, Verdemare called Yialouris-Papasmiras to a meeting and told her that her conduct rose to the level of misconduct. (Def. Ex. Yialouris G; Resp. to 56.1 P 172)

On September 20, 2002, defendant Verdemare wrote a letter to plaintiff Yialouris-Papasmiras regarding the bus incident and noting:

> This misconduct which was made apparent after the issuance of annual ratings will lead to a reversal of your satisfactory rating for the 2001-2002 school year to unsatisfactory and may lead to further disciplinary action.

(Def. Ex. Yialouris D at 2; Resp. to 56.1 P 173) On September 24, 2002, Verdemare changed Yialouris-Papasmiras's 2001-2002 annual performance evaluation to unsatisfactory. (Def. Ex. Yialouris I; Resp. to 56.1 P 174) Both DeMairo-Stingo and Yialouris-Papasmiras **[*109]** filed their EEOC charges on September 26, 2002. (Def. Ex. DeMairo-Stingo A at 1; Def. Ex. Yialouris A at 1; Resp. to 56.1 PP 168, 175)

On October 30, 2002, draft Verdemare observed plaintiff Yialouris-Papasmiras raise her voice to a student. (Def. Ex. Yialouris J; Resp. to 56.1 P 177) In her letter to Yialouris-Papasmiras memorializing the incident, Verdemare stated that Yialouris-Papasmiras had been "screaming". (Def. Ex. Yialouris J; Resp. to 56.1 P 177) Verdemere also observed Yialouris-Papasmiras sitting in the back of her class calling out exam answers and writing letters to parents. (Yialouris-Papasmiras Dep. at 205) Sitting in the back of class while teaching violated the rules set forth in a teacher handbook written by Verdemere. (Id. at 204) In her deposition, Yialouris-Papasmiras described the handbook as "self-serving" and contended that she did not violate any rules contained therein because she "wasn't teaching at that moment." (Id. at 204) On December 4, 2002, Yialouris-Papasmiras filed a complaint of discrimination against defendants Grippo and Verdemare with the Office of Equal Employment of defendant DOE. **[*110]** (Def. Ex. Yialouris L; Resp. to 56.1 P 178)

On February 3, 2003, defendant Verdemare conducted a classroom observation of plaintiff Yialouris-Papasmiras teaching a class. (Def. Ex. Yialouris M; Resp. to 56.1 P 179) Verdemare noted that Yialouris-Papasmiras had not written the "aim" or "focus" of the lesson she was teaching on the board and that the activity in which she was engaged was not in her lesson plan. (Def. Ex. Yialouris M; Resp. to 56.1 P 179) On May 7, 2003, Verdemare observed another lesson and noted that Yialouris-Papasmiras again failed to write the "aim" or "focus" on the board. (Def. Ex. Yialouris N; Resp. to 56.1 P 180) In her post-observation report to Yialouris-Papasmiras, Verdemare also stated that Yialouris-Papasmiras had used confusing writing models and that the students had not been given sufficient time to complete the lesson. (Def. Ex. Yialouris N; Resp. to 56.1 P 180)

On May 13, 2003, plaintiff Yialouris-Papasmiras applied for a transfer to another school for medical reasons. (Yialouris-Papasmiras Dep. at 39) On May 23, 2003, Verdemare observed Yialouris-Papasmiras filling out report cards **[*111]** during class time. (Def. Ex. Yialouris P; Resp. to 56.1 P 182) Verdemare wrote a letter to Yialouris-Papasmiras stating that this was an inappropriate use of instructional time. (Def. Ex. Yialouris P; Resp. to 56.1 P 182) On June 26, 2003, Verdemare issued an unsatisfactory rating for Yialouris-Papasmiras for the 2002-2003 school year. (Def. Ex. Yialouris Q; Resp. to 56.1 P 183) In September 2003, Yialouris-Papasmiras was transferred to P.S. 127 pursuant to her May 2003 request. (Def. Ex. Yialouris B; Resp. to 56.1 P 184)

On October 20, 2003, Pauline Frank, the Principal of P.S. 127, conducted a classroom observation of plaintiff Yialouris-Papasmiras. (Def. Ex. Yialouris R; Resp. to 56.1 P 185) In her post-observation letter to Yialouris-Papasmiras afterwards, Frank stated that the lesson plan was inadequate, classroom management was insufficient and the class was a poor learning environment. (Def. Ex. Yialouris R; Resp. to 56.1 P 185) Frank rated plaintiff Yialouris-Papasmiras' lesson as unsatisfactory. (Def. Ex. Yialouris R; Resp. to 56.1 P 185) Frank suggested several ways in which plaintiff **[*112]** Yialouris-Papasmiras could improve

Case 2:04-cv-03694-RJH-GWG    Document 41-3    Filed 11/13/2007    Page 16 of 19

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

Page 35 of 56

her teaching skills. (Def. Ex. Yialouris R; Resp. to 56.1 P 185) Despite these suggestions, Frank observed three other lessons taught by plaintiff Yialouris-Papasmiras during the remainder of the school year and rated them all unsatisfactory. (Def. Exs. Yialouris T, U, V; Resp. to 56.1 PP 187-89) In June 2004, Yialouris-Papasmiras received an unsatisfactory rating for the 2003-2004 school year. (Def. Ex. Yialouris W; Resp. to 56.1 P 190)

2. Elizabeth DeMairo-Stingo's Claims

a. Discrimination

In moving for summary judgment on plaintiff DeMairo-Stingo's claim of age discrimination, defendants argue that she has failed to come forward with evidence that she suffered adverse employment action. (Def. Mem. at 10-11) Specifically, defendants argue that, at most, DeMairo-Stingo was given the choice of transferring from P.S. 112 to P.S. 48. (Def. Mem. at 11, citing Reiskin Dep. at 75) Since this transfer involved no loss in salary or diminished benefits or responsibilities, defendants contend that it was a lateral transfer and thus not an adverse employment action. (Def. Mem. at 11) In response, plaintiffs argue that this **[*113]** transfer was not voluntary and that it meant the loss of "building seniority," which, in turn, caused the loss of "certain employment entitlements." (Pl. Mem. at 10-11)

Based on the evidence in the record, no reasonable jury could conclude that plaintiff DeMairo-Stingo's transfer from P.S. 112 to P.S. 48 was involuntary. DeMairo-Stingo's union representative testified that he had arranged the transfer because DeMairo-Stingo and the other two teachers involved "felt that it would probably be to their best interests not to remain at the school." (Reiskin Dep. at 75) In responding to defendants' statement of facts as required by Local Rule 56.1, plaintiffs conceded that DeMairo-Stingo was "given the option of transferring out of P.S. 112." (Resp. to 56.1 P 166) In support of their argument that this transfer was not voluntary, plaintiffs cite the deposition testimony of DeMairo-Stingo in which she testified that Reiskin had told her that defendant Verdemare was "coming after" her and advised her to transfer. (Pl. Mem. at 10, citing DeMairo-Stingo Dep. at 88) However, there is no evidence that any disciplinary charges had been considered, let alone initiated, against DeMairo-Stingo **[*114]** regarding the bus incident. Despite having the opportunity to supplement their opposition to defendants' motion with supporting evidence, plaintiffs have failed to come forward with evidence -- not merely assertions or conjecture -- to dispute defendants' evidence that the transfer was voluntary.

Viewing the evidence in the record most favorably to plaintiffs, plaintiff DeMairo-Stingo elected to transfer rather than remain in a work environment where her superior had concluded that she had used poor judgment and placed students at risk. See Pellier v. British Airways, PLC, 2006 U.S. Dist. LEXIS 3219, 2006 WL 132073, *15 (E.D.N.Y. Jan. 17, 2006) (granting summary judgment where there was no evidence that the employer "intentionally created conditions so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to accept the transfer"). Given such facts, no reasonable jury could find that plaintiff DeMairo-Stingo suffered an adverse employment action. Cf. Silverman, 216 F. Supp. 2d at 115-16 (holding that an employee is not constructively discharged when he resigns rather than respond to disciplinary charges); Stembridge, 88 F. Supp. 2d at 284-85 **[*115]** (same).

True, the Second Circuit has recognized that a transfer may, in certain circumstances, constitute an adverse employment action, even if requested by the plaintiff. See Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 444 n.4 (2d Cir. 1999), abrogated on other grounds, Burlington Northern, 126 S. Ct. at 2405. In Richardson, however, there was evidence that the plaintiff was qualified for -- but was not offered -- a more desirable, lateral position that was open at the time of her transfer. Id. Plaintiffs have come forward with no evidence that more desirable position for which she was qualified was available, but not disclosed, to DeMairo-Stingo. In the absence of such evidence, other courts

Case 2:04-cv-03694-RJH-GWG     Document 41-3     Filed 11/13/2007     Page 17 of 19

Page 36 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

have routinely granted or affirmed grants of summary judgment in favor of defendants. See, e.g., Simpson v. Borg-Warner Auto., Inc., 196 F.3d 873, 876-78 (7th Cir. 1999) (applying "constructive discharge" analysis to hold that voluntary transfer was not an adverse employment action where the work environment was not intolerable); Pellier, 2006 U.S. Dist. LEXIS 3219, 2006 WL 132073 at *4 ("It is clear that Pellier's transfer cannot [*116] serve as an adverse employment action because she voluntarily requested and accepted it."). I note that, in Richardson, the Court observed that an employee's request to be transferred may be a legitimate, nondiscriminatory reason for the transfer. 180 F.3d at 444 n.4.

Even if the plaintiffs had come forward with evidence from which a reasonable jury could conclude that plaintiff DeMairo-Stingo's transfer was involuntary, there is no evidence that the transfer resulted in "significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Galabya, 202 F.3d at 640. "'[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action.'" Fairbrother, 412 F.3d at 56 (quoting Williams, 368 F.3d at 128).

In opposing defendants' motion, plaintiffs argue that a loss in "building seniority" jeopardized DeMairo-Stingo's influence in "picking certain classes . . . [*117] ; being on committees; having input into students' graduation activities, etc." (Pl. Mem. at 11) Plaintiffs have come forward with no evidence that plaintiff DeMairo-Stingo actually experienced any diminished influence in this or any other regard. DeMairo-Stingo testified that the transfer did not affect her salary and she was not aware of any negative letters being placed in her file after the transfer. (DeMairo-Stingo Dep. at 92-93) Despite having the opportunity to supplement their submissions in opposition to defendants' motion, plaintiffs have failed to come forward with any evidence that this transfer caused any "significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Galabya, 202 F.3d at 640. No reasonable jury could conclude that DeMairo-Stingo suffered an adverse employment action due to this transfer.

Plaintiffs have failed to come forward with any evidence from which a reasonable jury could conclude that they have satisfied either the third or fourth prongs of a prima facie case of age discrimination against plaintiff DeMairo-Stingo. Summary judgment is granted to defendants with regard to this claim.

[*118] b. Retaliation

In moving for summary judgment on plaintiff DeMairo-Stingo's ADEA retaliation claim, defendants argue that plaintiffs have failed to come forward with any evidence that DeMairo-Stingo suffered an adverse employment action after she filed her EEOC charge on September 26, 2002. (Def. Mem. at 11) In opposing summary judgment, plaintiffs argue that DeMairo-Stingo first engaged in protected activity as early as spring 2002 as a member of the P.S. 112 Consultation Committee. (Pl. 7/24/06 Supp. Mem. at 11-12) According to plaintiffs, DeMairo-Stingo "verbally presented complaints on behalf of the school's teachers[,] including Ms. Yialouris, to Defendant Verdemare." (Id. at 11) However, plaintiffs do not argue that any of these complaints pertained to age-related discrimination. Rather, plaintiffs only argue that these complaints included those involving "the condescending tone and beratement by Defendant Verdemare" and "a problem child in the school." (Id.) There is no evidence in the record to support any claim that the complaints presented to the Committee and then to Verdemare involved age-related bias. Plaintiffs have come forward with no evidence of DeMairo-Stingo [*119] engaging in any activity protected by the ADEA other than the filing of the September 26, 2002 charge with the EEOC. Moreover, there is no evidence in the record that DeMairo-Stingo suffered any adverse employer action after she filed her EEOC charge. (Def. Ex. DeMairo-Stingo A at 1; Resp. to 56.1 P at 175) To the contrary, DeMairo-Stingo testified that she has a high opinion and good working relationship with the principal

Case 2:04-cv-03694-RJH-GWG     Document 41-3     Filed 11/13/2007     Page 18 of 19

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 37 of 56

of P.S. 48, defendant Picucci. (DeMairo-Stingo Dep. at 86-87) Based on the evidence in the record, no reasonable jury could conclude that DeMairo-Stingo experienced any materially adverse employer conduct after she engaged in protected activity by filing her EEOC charge. Therefore, summary judgment is granted to defendants as to DeMairo-Stingo's claim of retaliation under the ADEA.

3. Mary Yialouris-Papasmiras' Claims

a. Discrimination

Plaintiffs assert that the retroactive change in plaintiff Yialouris-Papasmiras' 2001-2002 annual performance rating from satisfactory to unsatisfactory was adverse employment action motivated by age-related animus. (Pl. Mem. at 15, citing Def. Ex. Yialouris D; Pl. 7/24/06 Supp. Mem. at 16-19) Although plaintiff [*120] dispute the specific allegations made by defendant Verdemare about Yialouris-Papasmiras' actions on the bus trip, they do not dispute that those alleged actions were the reason why the rating was changed. (Def. Ex. Yialouris D at 2; Resp. to 56.1 P 173)

Regardless, a negative performance evaluation, without more, is not an adverse employment action. Sanders, 361 F.3d at 756 (affirming judgment as a matter of law for defendant because plaintiff had failed to come forward with any evidence that the evaluation had any effect on her job conditions); Weeks, 273 F.3d at 86. Plaintiffs have failed to point to any evidence that any evaluations of plaintiff Yialouris-Papasmiras had any actual impact on her. Instead, plaintiffs merely argue that these negative evaluations "deny the teacher[] the ability to perform per session employment." (Pl. Mem. at 15) However, there is no evidence that Yialouris-Papasmiras was qualified for any available per session positions or that she submitted an application for such work. Lacking any evidence that these evaluations had any effect on Yialouris-Papasmiras' job conditions, no reasonable jury could find [*121] that she suffered any adverse employment action.

Even if plaintiff Yialouris-Papasmiras had suffered an adverse employment action, no reasonable jury could infer, based upon the available evidence, that such employer conduct resulted from discriminatory animus on the basis of age. It is undisputed that defendant Verdemare wrote several negative lesson evaluations for Yialouris-Papasmiras and that Verdemare reprimanded -- at least informally -- both Yialouris-Papasmiras and DeMairo-Stingo for their behavior on the senior bus trip. Courts have generally held that an employer's legitimate and constructive criticism of an employee or personal friction between two individuals does not give rise to an ADEA discrimination claim unless there is evidence of discriminatory animus. See, e.g., Pasha, 2004 U.S. Dist. LEXIS 1226, 2004 WL 188077, at *5; Douglas, 207 F. Supp. 2d at 291. Plaintiffs have failed to come forward with any evidence from which a reasonable jury could infer age discrimination based upon the evidence in the record.

Summary judgment is granted to defendants on plaintiff Yialouris-Papasmiras' claim of age discrimination.

b. Retaliation

In this case, the only evidence [*122] of plaintiff Yialouris-Papasmiras having engaged in any protected activity is her filing a charge with the EEOC on September 26, 2002. (Def. Ex. Yialouris-Papasmiras A at 1; Resp. to 56.1 P 175) It is undisputed that Yialouris-Papasmiras received several negative performance evaluations for individual lessons she taught after this date. (Def. Exs. Yialouris-Papasmiras J, M, P, R, T, U, V; Resp. to 56.1 PP 177, 179, 182, 185, 187-89) In addition, Yialouris-Papasmiras received an unsatisfactory rating for the 2003-04 school year at her new school, P.S. 127. (Def. Ex. Yialouris-Papasmiras W; Resp. to 56.1 P 190)

Plaintiff Yialouris-Papasmiras began receiving negative feedback from defendant Verdemare before she filed her EEOC charge. See, e.g., Def. Ex. Yialouris-Papasmiras G (fire alarm incident); Def. Ex. Yialouris-Papasmiras D (school bus trip incident). In addition, Verdemare retroactively changed the annual rating for Yialouris-Papasmiras for the 2001-2002 school year from satisfactory to unsatisfactory two days before Yialouris-Papasmiras filed her EEOC charge, thus precluding a reasonable jury from finding that the filing led her to make the change. **[*123]** (Def. Ex. Yialouris-Papasmiras I; Resp. to 56.1 P 174) The Second Circuit has instructed that "where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery, 248 F.3d at 95. See also Phillips, 2006 U.S. Dist. LEXIS 2606, 2006 WL 177155, at *4 (granting summary judgment to employer on retaliation claim where termination occurred three months after the filing of an EEOC charge and numerous disciplinary actions predated the filing). Yialouris-Papasmiras began to receive "gradual adverse job actions" before she engaged in any protected activity.

Moreover, the employer conduct at issue does not rise to the level of adverse employment action. As noted, one court in this District has rejected the argument that a negative job evaluation, standing alone, meets the Burlington Northern standard. Jackson, 2006 U.S. Dist. LEXIS 43338 (S.D.N.Y. June 26, 2006). As in Jackson, plaintiffs here have identified no "evidence in the record that any negative consequences resulted from" the negative evaluations. **[*124]** 2006 U.S. Dist. LEXIS 43338, at *3. As noted above, plaintiffs argue that receiving an unsatisfactory annual rating meant that the teacher could not receive "per session" work. (Pl. 7/24/06 Supp. Mem. at 18) However, there is no evidence in the record that Yialouris-Papasmiras was otherwise eligible for such work, that such work was available, or that Yialouris-Papasmiras actually applied for and was denied such work.

Summary judgment is granted to defendants as to plaintiff Yialouris-Papasmiras' claim of retaliation under the ADEA.

G. Marie Magaldi

1. Discrimination

I addressed plaintiff Marie Magaldi's claims of age discrimination in my earlier opinion in this case. See Carmellino, 2004 U.S. Dist. LEXIS 5754, 2004 WL 736988, at *11-*15. Specifically, I concluded that the continuing violation doctrine does not apply to Magaldi's claims. 2004 U.S. Dist. LEXIS 5754, [WL] at *12-*13. Magaldi filed her EEOC charge on August 29, 2002. (Def. Ex. Magaldi A at I) Therefore, under the 300-day statute of limitations, any claims arising on or after November 2, 2001, are timely and any claims arising before that date are time-barred. See Holowecki, 440 F.3d at 558 (citing 29 U.S.C. §§ 626(d), 633(b) **[*125]** ).

The evidence identifies only one event within the limitations period that could give rise to a claim of age discrimination -- plaintiff Magaldi's retirement on November 16, 2001. (Magaldi Dep. at 113) Plaintiffs argue that Magaldi's retirement was not voluntary and that she was constructively discharged. (Pl. Mem. at 30) The Second Circuit has held that a constructive discharge claim under the AEDA accrues when the plaintiff gives "definite notice of her intention to retire." Flaherty, 235 F.3d at 138-39. On March 28, 2001, a date prior to the limitations period, Magaldi and her attorney signed a stipulation in which she agreed to retire from her employment with defendant DOE and that this retirement would become effective on October 16, 2001. (Def. Ex. Magaldi M P 1; Resp. to 56.1 P 214) In my earlier opinion, I considered whether this stipulation provided "definite notice of her intention to retire," given that Magaldi actually retired a month later than the date specified in the stipulation. See Carmellino, 2004 U.S. Dist. LEXIS 5754, at *14-*15. At that time, I denied defendants' motion for summary judgment on this claim. 2004 U.S. Dist. LEXIS 5754, Id. **[*126]** at

Case 2:04-cv-03694-RJH-GWG   Document 41-4   Filed 11/13/2007   Page 1 of 24

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705                    Page 39 of 56

*15. In doing so, I stated that "[f]urther factual development will help determine whether the Stipulation constituted an effective communication of Magaldi's intention to resign, or perhaps something less." Id.

Discovery is now closed, and there is no evidence that the March 28, 2001 stipulation is anything other than an effective communication of plaintiff Magaldi's full intention to retire from her job. In Flaherty, the Second Circuit addressed the question presented here -- at which point does an employee's constructive discharge claim arise under the ADEA for purposes of the statute of limitations? 235 F.3d at 137 (noting that the question was one of first impression in the Second Circuit). The court rejected the defendant's argument that the claim arises as soon as the plaintiff's working conditions become intolerable. Id. at 138. Instead, the court held that a constructive discharge claim does not accrue until the employee gives her employer "definite notice of her intention to retire":

> This is essentially the converse of the discriminatory discharge case where the date the employer gives notice of termination to the employee **[*127]** is controlling for purposes of accrual. In the case of constructive discharge, it is only the employee who can know when the atmosphere has been made so intolerable by the discrimination-motivated employer that the employee must leave . . . . "The fact that the actual act of terminating employment is initiated by the employee, who concludes that she is compelled to leave as a result of the employer's actions, rather than by the employer directly does not change the fact that the employee has been discharged."

Id. at 138-39 (quoting Draper v. Coeur Rochester, 147 F.3d 1104, 1110 (9th Cir. 1998)). It was uniquely within Magaldi's personal knowledge when her working atmosphere had become so intolerable that she must leave. Once Magaldi arrived at that point, she provided definite notice to defendant DOE of her intention to retire. It was then, on March 28, 2001, a date beyond the 300-day limitations period, that the statute of limitations began to run on Magaldi's claim.

The fact that plaintiff Magaldi's date of actual retirement was different from the specific date contained in her stipulation is of no moment. The rule articulated in Flaherty **[*128]** does not turn on whether all provisions of an employee's agreement with an employer to retire are performed as originally agreed. Rather, the Second Circuit focused on the definiteness of the employee's expression of her intent to retire. Id. at 138. In signing the March 28, 2001 stipulation, Magaldi performed, inter alia, two acts: (1) she unilaterally expressed her clear, definite intention to retire, and (2) she agreed with defendant DOE as to the date on which she would retire. I will assume arguendo that, after this stipulation became effective, Magaldi and the DOE agreed to change Magaldi's retirement date. [2] There is no evidence that, in the almost eight months between Magaldi's signing the stipulation and her actual retirement, Magaldi expressed to any defendant the desire to cancel her planned retirement and continue working for DOE. The fact that one or more defendant allowed Magaldi to work a month beyond the date originally set is nothing more than a mutual modification of the original agreement. In agreeing to this modification, Magaldi never altered her definite intention -- originally expressed in the March 28, 2001 stipulation -- to retire from her position **[*129]** with DOE.

### FOOTNOTES

2 On October 16, 2001, plaintiff Magaldi submitted her application for retirement. (Def. Ex. Magaldi S; Resp. to 56.1 P 218) On November 16, 2001, Magaldi actually retired from her job with defendant DOE. (Magaldi Dep. at 113; Resp. to 56.1 P 219) For purposes of defendants' motion, I will assume favorably to the non-movant that Paragraph 1 of the March 28, 2001 stipulation specified October 16, 2001 as the date of Magaldi's actual

retirement, not the date that she would file her application for retirement. (Def. Ex. Magaldi N)

As plaintiff Magaldi signed the stipulation prior to the 300-day period preceding her filing an EEOC charge, her discrimination claim based upon her alleged constructive discharge is barred by the AEDA statute of limitations. Id. at 139. Summary judgment is granted to defendants on Magaldi's claim of age discrimination.

2. Retaliation

Plaintiff Magaldi retired approximately nine months prior to filing her EEOC charge, and there [*130] is no evidence of her having engaged in any other activity protected by the ADEA. (Magaldi Dep. at 113; Def. Ex. Magaldi A at 1) There is no evidence of Magaldi having experienced an adverse employer action after filing her EEOC charge. Therefore, summary judgment is granted to defendants on Magaldi's retaliation claim.

H. Barbara Pocino

Plaintiff Pocino was born in 1947 and began working for defendant DOE in September 1988 at P.S. 189. (Def. Exs. Pocino A, B; Resp. to 56.1 P 222) During the relevant period, Pocino was employed as a tenured teacher at P.S. 176K. (Def. Ex. Pocino B; Resp. to 56.1 P 222)

Plaintiff Pocino testified that, in October 2001, she fell and hit her head on the leg of a table and suffered a head injury. (Pocino 11/29/04 Dep. at 66) Although she was advised to go to the hospital, Pocino testified that she did not do so because she does not like hospitals. (Id.) Pocino went to school the next day and met defendant Margaret De Gaeta, the Principal of P.S. 176K. (Id. at 68) In her deposition, Pocino testified:

> A. . . . . When I came in [to work,] Mrs. DeGaeta was at the front door. She saw that I had a head injury, [*131] and she said to me, [y]ou could have a concussion. You should go home.
>
> Q. Is there any reason why she told you this?
>
> A. She saw the injury on the top of my head. There was a big hole on the top of my head . . . .

(Id.) After returning to school, Pocino began to notice things missing from her home and office. In her deposition, Pocino testified:

> [M]y desk just wasn't the same way that I left it from day-to-day. It seemed to me that someone was going through my things. In addition to that, the tires on my car had been slashed four times that year, and my car was broken into that year, and the following year. The following year personal things were stolen from the car; a leather jacket. Some other things that were in the trunk.

(Id. at 48-49) Pocino testified that she reported her observations to De Gaeta:

> I told Mrs. DeGaeta that I was afraid for my own safety, because my keys had gone missing, and since things were missing in my classroom and my car was vandalized, maybe my home would be next, and I said to her maybe it already had happened. I have a pen here. I thought I left this pen at home, but it's in my desk. So, I said that. [*132]

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 3 of 21

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

(Id. at 83)

On October 25, 2001, defendant De Gaeta wrote to defendant Grippo requesting a medical examination of plaintiff Pocino pursuant to Section 2568 of the New York State Education Law. (Def. Exs. Pocino H, I; Resp. to 56.1 P 229) In this correspondence, De Gaeta asserted that Pocino "had acted erratically over the past several days" and had made "unusual statements." (Def. Ex. Pocino I; Resp. to 56.1 P 229) Specifically, De Gaeta wrote:

> Ms. Pocino has repeated unconfirmed claims that items are missing from her locked closets. She further states that items have been removed from her home and have been brought to school by persons unknown. This is an undocumented claim.

(Def. Ex. Pocino I)

On October 26, 2001, defendant Grippo wrote a memorandum to Yvonne Joseph, the Administrator of defendant DOE's Medical Bureau, to direct the Bureau to conduct a medical examination of Pocino. (Def. Ex. Pocino J; Resp. to 56.1 P 230) On October 31, 2001, De Gaeta wrote a letter to Joseph in which she detailed the behavior of Pocino during the previous several days. (Def. Ex. Pocino K; Resp. to 56.1 P 231) In the [*133] letter, De Gaeta repeated her statements about Pocino's claims to have items stolen and also stated that Pocino had, "on several occasions[,] called in excessively late to say that she would not be coming to school." (Def. Ex. Pocino K; Resp. to 56.1 P 231) Pocino testified that, on or about November 3, 2001, De Gaeta informed her that she should be examined by the Medical Bureau. (Pocino 11/29/04 Dep. at 74) After that date, De Gaeta wrote to Pocino twice about Pocino's absences from work. (Def. Exs. Pocino L, N; Resp. to 56.1 PP 232, 234)

On November 16, 2001, plaintiff Pocino appeared at defendant DOE's Medical Bureau for an examination conducted by Dr. Audrey Jacobson. (Def. Ex. Pocino P; Resp. to 56.1 P 235) According to the examining physician's notes, Pocino told her that "things [were] being mysteriously moved around or missing or move[d] from her home to school [and] vice versa. She reports that over the past 2-3 months she has noticed things missing from her home and has heard 'strange noises' as if someone's in the house." (Def. Ex. Pocino P; Resp. to 56.1 P 235) The examining physician concluded that Pocino was suffering from [*134] paranoid delusions and was "not fit at present" to return to work. (Def. Exs. Pocino P, Q; Resp. to 56.1 PP 235-36) As a result, Pocino was not allowed to return to teaching at P.S. 176K for an unspecified period. (Pocino 11/29/04 Dep. at 98-99) Pocino testified that, during the period following this examination when she was not working, defendant DOE deducted approximately 40-50 days from her accumulated sick time. (Pocino 12/8/04 Dep. at 96-97)

As a result of the November 16, 2001 examination by Dr. Jacobson, plaintiff Pocino was scheduled to have a second examination on January 9, 2002 by Richard Shuster, Ph.D., a psychologist employed by defendant DOE. (Def. Ex. Pocino T; Resp. to 56.1 P 239) Plaintiff told Dr. Shuster that she had suffered a head injury in October 2001 and that her physician told her that she may have had a seizure. (Def. Ex. Pocino T; Resp. to 56.1 P 239) It is undisputed that plaintiff never had a neurological consultation after suffering the head injury. (Def. Ex. Pocino T; Resp. to 56.1 P 239) After preparing a psychological evaluation of plaintiff Pocino (Def. Ex. Pocino T), Dr. Shuster wrote to defendant DOE's Medical [*135] Division and defendant Grippo to inform them that he found Pocino was fit to return to service. (Def. Exs. Pocino U; Resp. to 56.1 PP 240-41) Pocino returned to work at P.S. 176K on January 31, 2002. (Def. Ex. Pocino V; Resp. to 56.1 P 242)

On February 6, 2002 and March 6, 2002, plaintiff Pocino did not attend mandatory faculty conferences at P.S. 176K. (Pocino 12/8/04 Dep. at 67; Def. Ex. Pocino W; Resp. to 56.1 PP 243, 245) On April 16, 2002, Pocino learned from her students that one student had a box-

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 4 of 21
Page 42 of 56

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

cutter at school. (Pocino 12/8/04 Dep. at 42; Def. Ex. Pocino X; Resp. to 56.1 P 246) Shortly thereafter, Pocino went to the main office of P.S. 176K, but neither defendant De Gaeta nor defendant Assistant Principal Elizabeth Culkin were in the office. (Def. Ex. Pocino X; Resp. to 56.1 P 246) It is undisputed that Pocino then went home without informing anyone else -- including the secretaries in the main office or the school security guard -- about the box-cutter. (Def. Ex. Pocino X; Resp. to 56.1 P 246)

On May 29, 2002, plaintiff Pocino's attorney wrote to defendant Grippo informing him that he had been retained by Pocino and explaining **[*136]** the nature of Pocino's allegations. (Pl. Ex. SS) Although this letter details several examples of defendant De Gaeta's alleged "harassing conduct," there is no reference to Pocino's age or any discriminatory animus on the part of De Gaeta. (Id.) In addition, the attorney requested, on behalf of Pocino, that she be transferred to an elementary school on Staten Island. (Id.) There is no evidence in the record as to what effect this letter had on Pocino's employment. On June 18, 2002, Pocino received a satisfactory rating for her 2001-2002 annual performance evaluation. (Def. Ex. Pocino Z; Resp. to 56.1 P 248) Pocino filed her EEOC charge on September 18, 2002. (Def. Ex. Pocino A at 1; Resp. to 56.1 P 249) There is no other evidence in the record regarding Pocino's employment by defendant DOE since that date.

1. Discrimination

In moving for summary judgment, defendants argue that the statute of limitations bars any of plaintiff Pocino's claims that arose before November 22, 2001, i.e. more than 300 days before the September 18, 2002 filing of charges with the EEOC. (Def. Mem. at 16) Specifically, defendants argue that the following assertions **[*137]** are time-barred: Pocino's allegation that, in April 2000, she had applied, but was not hired, for a reading teacher position and her claim that, on November 16, 2001, she was wrongfully removed from her teaching duties. (Id.)

Plaintiffs have come forward with no evidence that the facts surrounding Pocino's alleged application for a reading teacher position in April 2000 was part of a continuing practice or policy on the part of any defendant. Therefore, this claim is barred by the statute of limitations.

It is a closer question whether the statute of limitations bars plaintiff Pocino's discrimination claim based upon her November 16, 2001 removal from classroom duties. Plaintiffs argue that this claim did not arise until January 9, 2002, the date on which Pocino received a second medical examination and the examining physician concluded that Pocino was fit to return to duty. (Id.) It was only then, plaintiffs argue, that Pocino "discovered the initial DOE evaluation was bogus and she was in fact fit to continue teaching." (Id.) In response, defendants direct this Court to Harris v. City of N.Y., 186 F.3d 243, 247 (2d Cir. 1999), which holds that the statute **[*138]** of limitations for claims under the ADA, the Rehabilitation Act and the Fourteenth Amendment begins to run once the plaintiff "knows or has reason to know of the injury serving as the basis of his claim." (Def. Repl. Mem. at 13) Defendants argue that Pocino "knew on November 16, 2001, that she was being removed from her teaching position because she was medically unfit for duty." (Id.) Thus, defendants contend that any claim arising from her removal from teaching duties is time-barred. (Id.)

The statute of limitations for ADEA claims ordinarily begins to run "on the date the allegedly discriminatory decision was made and communicated to the employee" -- i.e., the day on which the employee receives "definite notice" of the unlawful act. Economu v. Borg-Warner Corp., 829 F.2d 311, 315 (2d Cir. 1987) (citing Delaware State Coll. v. Ricks, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980)). However, in affirming a grant of summary judgment for an employer on a wrongful discharge claim brought under the ADEA, the Second Circuit recognized that the statute of limitations should be tolled in certain circumstances. See Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 24 (2d Cir. 1985), **[*139]**

Case 2:04-cv-03694-RJH-GWG     Document 41-4     Filed 11/13/2007     Page 5 of 21
Page 43 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

cert. denied, <u>474 U.S. 851, 106 S. Ct. 148, 88 L. Ed. 2d 122 (1985)</u>. The court stated:

> The foregoing time periods commence upon the employer's commission of the discriminatory act and are not tolled or delayed pending the employee's realization that the conduct was discriminatory unless the employee was actively misled by his employer, he was prevented in some extraordinary way from exercising his rights, or he asserted his rights in the wrong forum, in which event tolling of the time bar might be permitted as a matter of fairness. An "extraordinary" circumstance permitting tolling of the time bar on equitable grounds might exist if the employee could show that it would have been impossible for a reasonably prudent person to learn that his discharge was discriminatory.

Id. (citing <u>Smith v. Am. President Lines, Ltd., 571 F.2d 102, 109 (2d Cir. 1978)</u>. Here, plaintiff Pocino testified that employees of defendant DOE informed her on November 16, 2001, that she would receive a second medical examination at a then-unspecified future date. (Pocino 11/29/04 Dep. at 98) On November 29, 2001, a date within the limitations period, Joseph, the Medical Bureau Administrator, **[\*140]** wrote to Pocino to inform her of her second examination date. (Def. Ex. Pocino R) Viewed most favorably to the non-movant, it was only on November 29, 2001 that Pocino received "definite notice" that she would be not allowed to work until she underwent the second medical examination. <u>Economu, 829 F.2d at 315</u>. I conclude that Pocino's claim based upon defendant DOE's conclusion that she was medically unfit for duty either arose during the limitations period, or, in the alternative, should be equitably tolled to a date within that period.

Nevertheless, defendants have come forward with evidence of a legitimate, nondiscriminatory reason for the allegedly adverse employment action. It is undisputed that plaintiff Pocino suffered a significant head injury, received advice to go to a hospital, did not go to a hospital, and instead went to work the next day. (Pocino 11/29/04 Dep. at 66) Pocino testified, in detail, about her post-injury suspicions that someone had removed things from her office and home and sometimes from one place to the other. (Id. at 48-49) Pocino shared her suspicions with defendant De Gaeta and told her that she was "afraid for [her] own safety." **[\*141]** " (Id. at 83) Under the circumstances, it was entirely reasonable for De Gaeta to require Pocino -- a teacher responsible for the safety and well-being of dozens of children -- to submit to a medical examination. The first examination by Dr. Jacobson concluded that she was medically unfit for the classroom. Defendants have met their burden of producing evidence of their legitimate, nondiscriminatory reasons for barring her from the classroom until receiving the results of the second medical examination.

Plaintiffs have come forward with no evidence that defendants' legitimate, nondiscriminatory reasons for this conduct are pretextual. (Pl. Mem. at 28-29; Pl. 7/24/06 Supp. Mem. at 27-28) First, plaintiff Pocino testified that defendant De Gaeta had told her, "Mr. Grippo sends me lists of people he wants me to get rid of." (Pocino 11/29/04 Dep. at 118) Second, Pocino testified that defendant Culkin had told her, "I can't take Grippo anymore. He wants to get rid of the older teachers who came in." (Pocino 12/8/04 Dep. at 87-88) In the context of the pretext prong of the <u>McDonnell Douglas</u> framework, these statements **[\*142]** -- without more -- are stray remarks and insufficient for Pocino to meet her burden. See <u>Danzer, 151 F.3d at 56</u>. No reasonable jury could conclude, based upon these statements above, that defendants' legitimate, nondiscriminatory reason for barring Pocino from the classroom based upon the first medical examination conducted by Dr. Jacobson was pretextual.

Plaintiff Pocino also asserts that negative letters placed in her file during the limitations period were adverse employment actions. Specifically, these letters addressed Pocino's failure to attend faculty conferences (Pl Exs. Pocino P, W), failure to report a student who

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 6 of 21
Page 44 of 56

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

brought a box-cutter to school (Pl. Ex. Pocino X) and a lesson given on May 21, 2002 (Pl. Ex. Pocino Y). Plaintiffs argue that these letters are a "permanent record" that prevents Pocino "from advancing as a guidance counselor and/or transferring to another school." (Pl. Mem. at 28, citing Pocino Dep. at 80-81) When asked about the actual effect of these letters during her deposition, however, Pocino testified that defendant De Gaeta "encouraged [her] to apply for a guidance counselor position repeatedly." (Pocino Dep. at 81) However, Pocino **[*143]** did not do so "because I cannot go into another school with these letters in my file." (Id.) In Pocino's view, "[n]o one [was] going to hire [her] with these letters in [her] file." (Id.) If there were evidence that these letters hindered Pocino from obtaining a different position, it might raise an issue of fact of whether they amounted to adverse employment actions. See Fairbrother, 412 F.3d at 56 (holding that a prima facie case of discrimination requires evidence of a "materially adverse change in the terms and conditions of employment" (internal quotations omitted)). Instead of coming forward with such evidence, plaintiffs rest their discrimination claim on Pocino's speculation as to what would likely have happened if she had sought a different position. Conjecture or speculation is insufficient to resist a motion for summary judgment. Kulak, 88 F.3d at 71. The discovery period in this case was more than ample for plaintiffs to have uncovered such evidence if there had been any.

Summary judgment is granted as to plaintiffs' claim of age discrimination suffered by plaintiff Pocino.

2. Retaliation

In moving for summary judgment **[*144]** on plaintiff Pocino's ADEA retaliation claim, defendants argue that plaintiffs have failed to come forward with any evidence that Pocino suffered adverse employment action after she filed her EEOC charge on September 18, 2002. (Def. Mem. at 18) In opposing summary judgment, plaintiffs do not address this assertion. (Pl. Mem. at 27-29)

"[A]n individual has engaged in protected activity if he 'has opposed any practice made unlawful by this section' or has 'participated in any manner in an investigation, proceeding, or litigation under this chapter.'" Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1569-1570 (2d Cir. 1989) (quoting 29 U.S.C. § 623(d)). For Title VII claims, the Second Circuit has repeatedly held that informal, as well as formal, complaints about unlawful discrimination constitute protected activity. Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). Moreover, district courts have applied this principle to the similarly worded retaliation provision for the ADEA contained in § 623(d). See, e.g., Khan v. HIP Centralized Lab. Servs., 2006 U.S. Dist. LEXIS 19641, 2006 WL 842916, *3, *10 (E.D.N.Y. Mar. 27, 2006) **[*145]** (denying summary judgment on retaliation claim to employer due to evidence that employee, prior to his suspension, spoke with supervisor about alleged age discrimination and told supervisor that he "was going to take action," thereby engaging in protected activity); Booker v. Fed. Reserve Bank of N.Y., 2003 U.S. Dist. LEXIS 3955, 2003 WL 1213148, *9 (S.D.N.Y. Mar. 17, 2003).

Here, plaintiff Pocino's attorney wrote to defendant Grippo on May 29, 2002 to inform him that Pocino sought a transfer to a different school and the reasons why Pocino was seeking this action. (Pl. Ex. SS) The letter makes no reference to the ADEA or even to age discrimination, but it does complain about defendant De Gaeta's "harassing conduct" and recites some of the factual allegations relevant to this claim. (Id.) In Grant, the Second Circuit held that a reasonable jury could find that the employee had engaged in protected activity by refusing to destroy a letter signed by the company president in which he stated that he sought a "young man . . . between 30 and 40 years old" for a position. 880 F.2d at 1567, 1569-70 (reversing the district court's grant of judgment n.o.v. for the employer on employee's **[*146]** retaliation claim). Viewed most favorably to the non-movant, a reasonable jury could conclude that Pocino, through her attorney's letter, was acting under a

Case 2:04-cv-03694-RJH-GWG   Document 41-4   Filed 11/13/2007   Page 7 of 21
Page 45 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

"reasonable, good faith belief" that a violation of discrimination laws had occurred, was working to oppose such a violation and was therefore engaging in protected activity.

Assuming, for purposes of defendants' motion, that this letter constituted protected activity, there is no evidence that plaintiff Pocino experienced any adverse employer conduct after its transmittal to defendant Grippo. The only evidence in the record is that Pocino received a satisfactory rating for the 2001-02 school year on June 18, 2002, approximately three weeks after sending the letter to Grippo. (Def. Ex. Pocino Z; Resp. to 56.1 P 248) Despite having the opportunity to supplement the record, plaintiffs have failed to come forward with any evidence that Pocino experienced any other employer conduct -- adverse or otherwise -- at any later point. Such a lack of evidence compels summary judgment in favor of the defendants.

Summary judgment is granted to defendants on plaintiff Pocino's retaliation claim.

1. Katherine Weber-Wolf

Plaintiff **[*147]** Katherine Weber-Wolf was born in 1949 (Def. Ex. Weber-Wolf A; Resp. to 56.1 P 250), and, during the limitations period, she worked as a tenured teacher at P.S. 102 (Def. Ex. Weber Wolf B; Resp. to 56.1 P 250).

On October 26, 2001, defendant Theresa Dovi, the Principal of P.S. 102, observed plaintiff Weber-Wolf's classroom presentation and evaluated it as unsatisfactory because she had failed to follow the lesson plan. (Def. Ex. Weber-Wolf M; Resp. to 56.1 P 261) Subsequently, on November 28, 2001, Assistant Principal Reka Monoki observed Weber-Wolf's classroom lesson and evaluated it as unsatisfactory because the "aim" of the lesson was not achieved, there was no sequential development of skills and the lesson did not engage all of the students. (Def. Ex. Weber-Wolf N; Resp. to 56.1 P 262) Monoki placed a negative performance evaluation in Weber-Wolf's file after observing Weber-Wolf talking on a telephone for 15 minutes of her class period on December 14, 2001. (Def. Ex. Weber-Wolf O; Resp. to 56.1 P 263) Dovi wrote a negative performance evaluation of Weber-Wolf's classroom presentation on January 30, 2002, and Monoki **[*148]** wrote another negative evaluation based upon Weber Wolf's April 29, 2002 lesson. (Def. Exs. Weber-Wolf Q, S; Resp. to 56.1 PP 265, 274)

In the first half of 2002, plaintiff Weber-Wolf met with staff developers employed by defendant DOE on several occasions in an effort to improve her teaching. (Def. Exs. Weber-Wolf P, YY; Resp. to 56.1 PP 264, 266-68, 270-72) On May 23, 2002, the DOE's Office of Legal Services ("OLS") held a Technical Assistance Conference regarding Weber-Wolf's teaching. (Def. Ex. Weber-Wolf T; Resp. to 56.1 P 275) Based on this conference and the record of her teaching, the OLS decided on or before May 28, 2002, to pursue charges of incompetence against Weber-Wolf. (Def. Ex. Weber-Wolf T; Resp. to 56.1 P 275)

On June 14, 2002, defendant Dovi issued an unsatisfactory performance evaluation for plaintiff Weber-Wolf for the 2001-2002 school year. (Def. Ex. Weber-Wolf V; Resp. to 56.1 P 277) On June 19, 2002, Neal Opromalla, a Special Assistant to defendant Grippo, observed Weber-Wolf's lesson and rated it unsatisfactory. (Def. Ex. Weber-Wolf U; Resp. to 56.1 P 276) Weber-Wolf filed her EEOC charge on July 19, 2002. (Def. **[*149]** Ex. Weber-Wolf A; Resp. to 56.1 P 278)

On August 30, 2002, defendant Grippo notified plaintiff Weber-Wolf by letter that she would be reassigned to the District 20 Office, effective September 3, 2002. (Def. Ex. Weber-Wolf W; Resp. to 56.1 P 279) Weber-Wolf was informed that this reassignment would continue while disciplinary action against her was pending. (Id.) On September 30, 2002, Weber-Wolf was served with disciplinary charges for insubordination, neglect of duty, conduct unbecoming a teacher, and unfitness; her actions and inaction were alleged to be "just

cause" for termination. (Def. Ex. Weber-Wolf X; Resp. to 56.1 P 281)

In November 2002, an arbitration proceeding was commenced to adjudicate the disciplinary charges. (Def. Ex. Weber-Wolf Y; Resp. to 56.1 P 282) On May 14, 2003, the arbitrator issued a decision in which he found plaintiff Weber-Wolf guilty of seven specifications, fined her $ 5,000 and ordered her transferred to another district. (Def. Ex. Weber-Wolf Z; Resp. to 56.1 P 283) On September 8, 2003, Weber-Wolf was assigned to P.S. 177 in District 21. (Def. Ex. Weber-Wolf AA; Resp. to 56.1 P 284)

**[*150]** 1. Discrimination

In moving for summary judgment, defendants argue that the ADEA statute of limitations bars any claims asserted by plaintiff Weber-Wolf that arose before September 22, 2001, which was 300 days before she filed her EEOC charge on July 19, 2002. (Def. Mem. at 20) Prior to this date, Weber-Wolf received numerous negative lesson evaluations and a "U" rating for the 1997-98 and 2000-01 school years. (Def. Weber-Wolf Exs. C, D, F, G, H, I, J, K, L; Resp. to 56.1 PP 251-52, 254-60) There is no evidence in the record from which a reasonable jury could find the existence of a continuing practice or policy of any defendant. Accordingly, those portions of Weber-Wolf's claim that arose before September 22, 2001 are time-barred. However, evidence of facts prior to that date may still serve as relevant "background evidence" to her claim. See <u>Jute, 420 F.3d at 176-77</u>.

As noted, negative evaluations, without more, are not adverse employment actions. <u>Sanders, 361 F.3d at 756</u>. However, the decision by defendant DOE to reassign plaintiff Weber-Wolf to the district office and to pursue charges of incompetence based upon those evaluations may constitute **[*151]** an adverse employment action.

Defendants assert that there is no evidence in the record from which a reasonable jury could infer that such adverse action resulted from discriminatory animus. In opposing defendants' motion, plaintiffs identify two statements from Weber-Wolf's deposition that they claim illustrate the discriminatory animus of defendants. (Pl. Mem. at 35) Specifically, defendant Dovi allegedly told Weber-Wolf that "she looks good for her age" and that Weber-Wolf "should stay home" due to her asthma and knee trouble. (Wolf Dep. at 127) At most, these are "isolated and ambiguous" comments from which no reasonable jury could infer discriminatory animus. See, e.g., <u>Pasha, 2004 U.S. Dist. LEXIS 1226, 2004 WL 188077, at *5</u>; <u>Douglas, 207 F. Supp. 2d at 291</u>. In addition, Weber-Wolf testified that she generally "was being treated differently from other teachers," but this statement referred only to negative performance evaluations and does not reflect any age-related animus. (Wolf Dep. at 133-35) Plaintiffs have come forward with no evidence that any defendant sought to pursue charges of incompetence against Weber-Wolf but not against other younger teachers with similar levels **[*152]** of unsatisfactory classroom performance.

Summary judgment is granted to defendants on plaintiff Weber-Wolf's discrimination claim.

2. Retaliation

It is undisputed that plaintiff Weber-Wolf filed her charge of age discrimination with the EEOC on July 19, 2002. (Def. Ex. Weber-Wolf A; Resp. to 56.1 P 278) Weber-Wolf was notified of the decisions to transfer her to the district office and to pursue charges of incompetence against her on August 30, 2002. (Def. Ex. Weber-Wolf W; Resp. to 56.1 P 279) From this chronology, plaintiff argues that adverse employment action was taken in response to her protected activity. Here, defendants have come forward with evidence that these decisions were reached, at the latest, on May 28, 2002. (Def. Ex. Weber-Wolf T) Specifically, this evidence consists of an e-mail message sent on that date from Theresa Europe, the Deputy Counsel to the Chancellor of Education, to Neal Opromalla, a Special Assistant to defendant Grippo, regarding plaintiff Weber-Wolf. (Id.) The message stated:

This is to confirm that based on the information received at the Technical Assistance Conference (TAC) held on May 23, 2002, the Office [*153] of Legal Services will be proceeding against Ms. Weber-Wolff on the charges of incompetence.

. . . Ms. Weber-Wolff is to remain in her assignment until the end of the school year, rated U in June and reassigned to the District in September in anticipation of 3020-a charges.

(Id.) Despite having the full opportunity to conduct discovery, plaintiffs have come forward with no evidence that the decision to transfer and charge her was made after she filed her EEOC charge. The evidence that the decision was made before she engaged in protected activity is unrebutted. Viewing the facts in a light most favorable to plaintiffs, defendants decided to transfer Weber-Wolf and pursue charges of incompetence against her approximately six weeks before she filed her EEOC charge. There is no evidence of Weber-Wolf engaging in any other protected activity. No reasonable jury could conclude that there existed a causal connection between the protected activity and the adverse employment action. See Clark County Sch. Dist., 532 U.S. at 272 (holding that, for purposes of a Title VII retaliation claim, an employer's "proceeding along lines previously contemplated, though [*154] not yet definitively determined, is no evidence whatever of causality"); Buompane, 2002 U.S. Dist. LEXIS 6692, 2002 WL 603036, at *15-*16 (granting summary judgment to employer where request for employee's termination predated his protected activity by six weeks). Weber-Wolf's retaliation claim fails as a matter of law.

Summary judgment is granted to defendants on plaintiff Weber-Wolf's retaliation claim.

J. Ellen O'Leary

Plaintiff Ellen O'Leary was born in 1944. (Def. Ex. O'Leary A; Resp. to 56.1 P 285) During the relevant period, O'Leary worked as a special education teacher at P.S. 104. (Def. Ex. O'Leary B; Resp. to 56.1 P 285)

In the fall of 2001, defendant DOE's Office of Special Investigations ("OSI") examined allegations that plaintiff O'Leary inappropriately had marked as absent from class over 120 students. (Def. Ex. O'Leary G; Resp. to 56.1 P 304) On October 19, 2001, while the OSI investigation was pending, O'Leary was reassigned from her teaching duties to the district office. (O'Leary Dep. at 18, 230) On October 31, 2001, O'Leary was reassigned to the Committee on Special Education ("CSE"), a division within the DOE. (O'Leary Dep. at [*155] 230) On November 26, 2001, defendant Grippo wrote to O'Leary regarding the results of the OSI investigation. (Def. Ex. O'Leary N; Resp. to 56.1 P 309) Specifically, Grippo informed O'Leary that the investigation had concluded that O'Leary "knowingly engaged in theft of services by misrepresenting information on official Board of Education documents." (Def. Ex. O'Leary N; Resp. to 56.1 P 309) The letter recited that O'Leary had presented her rebuttal to Grippo. (Def. Ex. O'Leary N; Resp. to 56.1 P 309)

On January 8, 2002, defendant Grippo initiated disciplinary proceedings against plaintiff O'Leary on the grounds of incompetence, insubordination, conduct unbecoming a teacher and neglect of duty. (Def. Ex. O'Leary O; Resp. to 56.1 P 311) After meeting with her union-provided attorney on several occasions (O'Leary Dep. at 232, 244), O'Leary signed a settlement agreement with defendant DOE on March 7, 2002. (Def. Ex. O'Leary P; Resp. to 56.1 P 316) This agreement recited that O'Leary would "irrevocably retire from her employment" with the DOE on July 1, 2002. (Def. Ex. O'Leary P P 1) O'Leary, in fact, retired on that date [*156] (Def. Ex. O'Leary P P 1; Resp. to 56.1 P 318) and filed her EEOC charge on August 29, 2002 (Def. Ex. O'Leary A at 1; Resp. to 56.1 P 319).

1. Discrimination

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 10 of 21
Page 48 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

In moving for summary judgment, defendants argue that the ADEA statute of limitations bars any portion of plaintiff O'Leary's claim that arose before November 2, 2001, which was 300 days before she filed her EEOC charge on August 29, 2002. (Def. Mem. at 32-33) There is no evidence in the record from which a reasonable jury could find the existence of a continuing practice or policy of any defendant. Those assertedly adverse employment actions that arose before November 2, 2001 are time-barred.

Here, the institution of disciplinary charges was within the limitations period, as was the agreement to settle the charges through an agreement to retire. However, the initial transfer to the district office and the subsequent transfer twelve days later to the CSE were both outside the 300-day limitations period. Nevertheless, I will consider whether these transfers - - had they not been time-barred -- amounted to adverse employment actions, and I will consider plaintiff O'Leary's assertion that the retirement [*157] decision, which occurred within the limitations period, amounted to a constructive discharge. Plaintiff O'Leary argues that she was constructively discharged because the only other option available to her was to contest the disciplinary charges, which plaintiffs contend were groundless. (Pl. Mem. at 38-39)

Under state law, plaintiff O'Leary could have demanded a hearing before a neutral arbitrator to challenge the charges:

> [At the arbitration hearing, the] employee shall have a reasonable opportunity to defend himself or herself and an opportunity to testify in his or her own behalf. The employee shall not be required to testify. Each party shall have the right to be represented by counsel, to subpoena witnesses, and to cross-examine witnesses.

NY CLS Educ. § 3020-a(3)(c)(i). Faced with similar charges, other plaintiffs in this litigation have pursued their arbitration rights. See, e.g., Def. Exs. Weber-Wolf X, Y, Z; Resp to 56.1 PP 281-83. Instead of doing so, O'Leary met with her attorney several times and negotiated the agreement with defendant DOE settling the disciplinary charges. (O'Leary Dep. at 232, 236, 244)

The initiation of disciplinary proceedings [*158] alone does not constitute an adverse employment action if it has not resulted in any "materially adverse change in the terms or conditions of employment." Fairbrother, 412 F.3d at 56. Although plaintiff O'Leary was reassigned to the district office while these proceedings were pending (O'Leary Dep. at 18), she also testified that this change did not affect her salary in any way (Id. at 218) In their memorandum, plaintiffs assert that "[g]enerally, when teachers are sent to these administrative offices pending investigations[,] they are either sitting around doing nothing or asked to perform menial clerical tasks." (Pl. Mem. at 39) Plaintiffs cite no evidence in support of this general assertion or its application to O'Leary. On the contrary, O'Leary testified that she spent, at most, twelve days in the district office before her reassignment to the CSE, a division of defendant DOE that apparently utilized her expertise in special education, albeit in a different capacity than at P.S. 104. (O'Leary Dep. at 18, 230) Therefore, as with plaintiff Silverstein's discrimination claim based upon her transfer, no reasonable jury could find that O'Leary's reassignment [*159] resulted in a "real change in the conditions of employment." Fairbrother, 412 F.3d at 56 (affirming summary judgment to employer because, in the absence of such a change, a transfer is "only a mere inconvenience or an alteration of job responsibilities, and hence not materially adverse"). See also Ticali, 41 F. Supp. 2d at 265 (granting summary judgment to employer because employee produced "no material evidence that her transfer [from teaching first grade to pre-kindergarten] obliged her to perform tasks that were less appropriate for her skills than her prior position or adverse to her in any other legally cognizable way"). Unlike in Rodriguez, 620 F.3d at 362,

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 11 of 21
                                                                            Page 49 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

O'Leary's change in job responsibilities was not "profoundly different" and did not render useless her experience as a teacher of special education.

As to the specific claim that plaintiff O'Leary was constructively discharged, no reasonable jury could find that the mere fact that defendant DOE had accused O'Leary of incompetence, insubordination, conduct unbecoming and neglect of duty (Def. Ex. O'Leary O) created a "work atmosphere so intolerable that [she has] forced [*160] to quit involuntarily." Terry, 336 F.3d at 151-52. Several courts have held that an employee is not constructively discharged when he or she resigns rather than respond to disciplinary charges. See, e.g., Silverman, 216 F. Supp. 2d at 115-16; Stembridge, 88 F. Supp. 2d at 284-85. In opposing defendants' motion for summary judgment, plaintiffs have failed to come forward with any evidence from which a reasonable jury could conclude that O'Leary was constructively discharged, and therefore her claim of age discrimination fails.

Summary judgment is granted to defendants as to plaintiff O'Leary's claim of age discrimination.

2. Retaliation

It is undisputed that plaintiff O'Leary retired from her job with defendant DOE on July 1, 2002, nearly two months before filing her EEOC charge on August 29, 2002. (Def. Exs. O'Leary A at 1, P P 1; Resp. to 56.1 PP 318-19) There is no evidence in the record as to what, if any, interactions existed between O'Leary and the DOE after her retirement. O'Leary testified that her retaliation claim was based upon an insubordination charge that resulted from her signing the March 2002 agreement. (O'Leary [*161] Dep. at 254-55) O'Leary also testified that, since filing her EEOC charge, she has "applied for numerous jobs at the Board of Education, and [she has] received no response." (O'Leary Dep. at 267) However, there is no evidence in the record as to the positions for which O'Leary submitted applications, whether she was actually qualified for such positions and whether the alleged rejections of her applications occurred under circumstances giving rise to an inference of age discrimination. As a result, no reasonable jury could conclude, based on the available evidence, that the DOE engaged in any employer conduct that could be considered materially adverse to O'Leary, even under the standard articulated in Burlington Northern, 126 S. C. at 2415-16. Therefore, summary judgment is granted to defendants on O'Leary's claim of retaliation under the ADEA.

K. Debora Mauskopf

Plaintiff Debora Mauskopf was born in 1952. (Def. Ex. Mauskopf A; Resp. to 56.1 P 320) Mauskopf had been working as a tenured teacher at P.S. 163 until at least June 1997, but she did not return to work in September 1997. (Def. Exs. Mauskopf S, T; Resp. to 56.1 PP 340-42) On October 20, 1997, Mauskopf [*162] applied for a Restoration of Health Sabbatical. (Def. Exs. Mauskopf U; Resp. to 56.1 P 343) In her application, Mauskopf requested that the sabbatical run from September 19, 1997 to January 31, 1998. (Id.) Mauskopf testified that, on December 8, 1997, defendant Patrick Marano -- the Principal of P.S. 163 -- contacted her and informed her that her sabbatical application had been denied. (Mauskopf Dep. at 44; Resp. to 56.1 P 344) Defendants assert that Marano also sent Mauskopf a letter to this effect (Def. Ex. Mauskopf W), but Mauskopf testified that she did not receive it. (Mauskopf Dep. at 46)

On September 7, 1999, defendant DOE deemed plaintiff Mauskopf to have resigned due to the abandonment of her position. (Def. Ex. Mauskopf B) Mauskopf testified that defendant DOE did not inform her of this fact, and indeed she requested leaves of absence before and after this date. (Mauskopf Dep. at 78; Pl. Ex. NNN) In December 2001, Mauskopf contacted a representative of her union regarding her requests for leave and her appeal of an unsatisfactory rating she had received for the 1996-1997 school year. (Mauskopf Dep. at

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 12 of 21
Page 50 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

109; Resp. to 56.1 PP 338, 347) The union [*163] representative informed Mauskopf that the DOE considered her to be on unauthorized leave. (Mauskopf Dep. at 109) A different union representative later informed Mauskopf that this meant that she had no valid basis to assert the right to work in the school to which she had been last assigned. (Mauskopf Dep. at 120; Def. Ex. Mauskopf Z)

On March 20, 2002, defendant DOE held a hearing with respect to plaintiff Mauskopf's unsatisfactory rating for the 1996-1997 school year. (Def. Ex. Mauskopf Y; Resp. to 56.1 P 348) On April 17, 2002, the DOE denied Mauskopf's appeal of the rating. (Def. Ex. Mauskopf Y; Resp. to 56.1 P 348)

On June 3, 2002, plaintiff Mauskopf sent defendant Marano a letter in which she indicated that she was ready to return to work on September 1, 2002. (Def. Ex. Mauskopf AA; Resp. to 56.1 P 351) Marano contacted a personnel director for the DOE about the letter, who told Marano that Mauskopf could not return to P.S. 163 because she had abandoned her position. (Def. Ex. Mauskopf BB; Resp. to 56.1 P 352) In late June 2002, Marano's union representative informed her that she was no longer an employee of the DOE. (Mauskopf [*164] Dep. at 123-24) On August 29, 2002 -- over five years after she last taught a class for the DOE, Mauskopf filed her EEOC charge alleging age discrimination. (Def. Ex. Mauskopf DD; Resp. to 56.1 P 355)

1. Discrimination

I addressed plaintiff Mauskopf's claim of age discrimination based upon her discharge from employment in my earlier opinion in this case. Carmellino, 2004 U.S. Dist. LEXIS 5754, 2004 WL 736988, at *15-*18. Specifically, I concluded that the continuing violation doctrine does not apply to Mauskopf's claims and that those portions of her claim arising before November 2, 2001 are barred by the ADEA statute of limitations. 2004 U.S. Dist. LEXIS 5754, [WL] at *15-*17. However, I also concluded -- based upon the facts in the record and viewed in a light most favorable to the non-movants -- that Mauskopf was informed of her discharge from employment with defendant DOE in June 2002, within the 300-day statute of limitations. 2004 U.S. Dist. LEXIS 5754, [WL] at *17.

In moving for summary judgment, defendants argue, for a second time, that the ADEA statute of limitations bars any claim asserted by plaintiff Mauskopf that she was wrongfully discharged because, in defendants' view, such discharge should be deemed to have [*165] occurred long before June 2002. (Def. Mem. at 23-34) Although defendants' memorandum does not specify the precise date on which they contend Mauskopf's discharge should be considered by this Court to have occurred, it does not matter for purposes of their motion. As noted in my prior opinion, the statute of limitations for a wrongful discharge claim "begins to run on the date that the employer gives definite notice of the discharge decision to the employee . . . ." Carmellino, 2004 U.S. Dist. LEXIS 5754, 2004 WL 736988, at *15 (citing Chardon v. Fernandez, 454 U.S. 6, 8, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981)).

Despite having had the opportunity for further discovery, defendants have failed to come forward with any evidence that defendant DOE communicated the fact of termination to plaintiff Mauskopf at any point prior to June 2002. Instead, defendants simply argue that it is "absurd" for plaintiff to have assumed that she was not terminated after having failed to show up for work or contact anyone at her school about her job status for nearly five years. (Def. Mem. at 23) Absurd or not, defendants have offered no evidence to dispute plaintiff's version of the facts -- i.e., that she did not know that she had [*166] been discharged. Whether Mauskopf's version is credible is not appropriately resolved on a motion for summary judgment. See Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Therefore, I abide by my earlier decision that the statute of limitations does not bar Mauskopf's claim of wrongful

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 13 of 21
Page 51 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

discharge under the ADEA.

Defendants also move for summary judgment on plaintiff Mauskopf's discrimination claim on the ground that plaintiffs have come forward with no evidence from which a reasonable jury could infer discriminatory animus. (Def. Mem. at 24) In response, plaintiffs argue that a reasonable jury could infer discrimination based on the fact that Mauskopf was not informed until June 2002 that she had been terminated. (Pl. Mem at 36-37) No reasonable jury could find that defendants harbored bias or prejudice against her based upon her age solely due to defendants' failure to inform Mauskopf of her job status. Based upon the evidence in the record, such a conclusion would be premised upon speculation and conjecture. **[*167]** "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Kulak, 88 F.3d at 71 (citing Matsushita Elec. Indus. Co., 475 U.S. at 587). Despite having the opportunity to supplement their submissions in opposing defendants' motion, plaintiffs have failed to come forward with any evidence of age-related bias on the part of any defendant.

Summary judgment is granted in favor of defendants on plaintiff Mauskopf's claim of age discrimination.

### 2. Retaliation

Defendants move for summary judgment on plaintiff Mauskopf's retaliation claim on the grounds that there is no evidence that she suffered any adverse employment action after filing her EEOC charge. (Def. Mem. at 24) There is evidence in the record pertaining to Mauskopf's relationship with defendant DOE after she filed her charge, but it does not support an actionable claim of retaliation. On April 10, 2003, the DOE heard and denied a second appeal regarding Mauskopf's unsatisfactory rating for the 1996-1997 school year. (Def. Ex. Mauskopf EE; Resp. to 56.1 PP 357-58) I have already concluded that such a rating, without any accompanying **[*168]** evidence of negative consequences, is not adverse employer conduct actionable in the context of an ADEA retaliation claim, even under the standard articulated in Burlington Northern, 126 S. Ct. at 2405. For the same reasons, the denial of an appeal of such a rating cannot satisfy this standard.

Summary judgment is granted to defendants on plaintiff Mauskopf's claim of retaliation under the ADEA.

### L. Marian Carmellino

Plaintiff Marian Carmellino was born in 1954. (Def. Ex. Carmellino A; Resp. to 56.1 P 359) During the limitations period, Carmellino worked as a substitute teacher on twelve occasions in 2002. (Def. Ex. Carmellino E; Resp. to 56.1 P 372) Carmellino filed her EEOC charge on September 18, 2002. (Def. Ex. Carmellino A at 1; Resp. to 56.1 P 373) During the summer of 2003, Carmellino submitted an online employment application with defendant DOE. (Def. Ex. Carmellino F; Resp. to 56.1 P 374)

### 1. Discrimination

In moving for summary judgment, defendants argue that the ADEA statute of limitations bars any portion of plaintiff Carmellino's claim that arose before November 28, 2001. (Def. Mem. at 39) **[*169]** Plaintiffs have failed to come forward with any evidence from which a reasonable jury could conclude that conduct of any of the defendants constituted a continuing practice. As a result, I will consider only those portions of her claim that arose after November 28, 2001. Nevertheless, events prior to November 28, 2001 may be relevant "background evidence". See Jute, 420 F.3d at 176-77.

Defendants move for summary judgment on the ground that plaintiff has failed to come

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 14 of 21
Page 52 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

forward with evidence that she suffered adverse employment action during the relevant period (Def. Mem. at 39) and on the ground that there is no evidence that defendants' legitimate, nondiscriminatory reasons for any relevant conduct were pretext (Def. 7/14/06 Supp. Mem. at 9-10). In opposing defendants' motion, plaintiffs appear to characterize her claim as an alleged failure to hire. (Pl. Mem. at 41) The documentary evidence indicates that plaintiff Carmellino applied on two dates: September 21, 2001, which is outside the limitations period, and an unspecified date during the summer of 2003, which is within the limitations period. (Def. Exs. Carmellino D, F; Resp. to 56.1 PP 370-71, 374) Plaintiff [*170] Carmellino also testified that she applied for a full-time reading teacher position in District 20 in 2002. (Carmellino Dep. at 110) There is no evidence in the record in support of the claimed 2002 application other than Carmellino's testimony. However, I will assume, for purposes of defendants' motion, that plaintiffs have come forward with evidence from which a reasonable jury could find that there is a prima facie case of age discrimination against Carmellino in connection with the failure to hire in 2002 and 2003.

As to the claimed 2002 application for a full-time reading position, defendants have come forward with evidence of a legitimate, nondiscriminatory reason for not hiring plaintiff Carmellino -- specifically, other candidates who were hired had full-time teaching experience and Carmellino had none. Andrea Maffeo, the current Principal of P.S. 200, worked as the Director of Literacy for District 20 of defendant DOE from 1998 to 2003. (Id. PP 1-2) In this position, Maffeo interviewed and hired teachers for vacant reading teacher positions in District 20. (Id. P 4) In her sworn declaration, Maffeo stated:

> . . . In selecting teachers for these position[s], [*171] I preferred candidates with at least three to five years of prior full time teaching experience. Although I do not recall selecting a candidate with less than three years of prior full time teaching experience, I am certain that every teacher selected for reading teacher positions in [District] 20, between 1998 through 2003, had at least one year of full time teaching experience.

(Id. P 4) Defendants have met their burden of production of a legitimate, nondiscriminatory reason for DOE's hiring decision.

In addition, defendants have come forward with evidence of a legitimate, nondiscriminatory reasons for the decision not to hire plaintiff Carmellino in the summer of 2003. Carmellino, who lived in Westchester County, does not dispute that, on the application form, she ranked the Borough of the Bronx as her top choice for a teaching assignment and the Borough of Brooklyn as her second choice. (Def. Ex. Carmellino F; Resp. to 56.1 P 374) Given the size of the workforce of defendant DOE, it is reasonable for such an employer to require job applicants to state their preferences for job locations. Furthermore, it is equally reasonable for District 20 of the DOE, [*172] in turn, to give a higher priority to those applicants who ranked Brooklyn as their top choice. Defendants have met their burden of producing evidence of a legitimate, nondiscriminatory reason for failing to hire Carmellino after she applied during the summer of 2003.

In response to defendants' evidence, plaintiffs have failed to come forward with any evidence that defendants' reason was pretextual. Despite a full and fair opportunity to conduct discovery, there is no evidence in the record of any other job applicant who had applied for a full-time teaching position with defendant DOE, ranked Brooklyn as their second-choice, but was actually hired. Instead, plaintiff has only her own testimony:

> I really have to feel that it is more age related than anything else, because it is the only factor. I mean, are you telling me that 30 plus principals wouldn't hire someone who finished first in their class, not once, but twice, if it were up to them[?] . . . What other reason could there possibly be? I have every credential.

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 15 of 21

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705    Page 53 of 56

(Carmellino Dep. at 127) A plaintiff's subjective and conclusory belief that she is the most qualified candidate for a job is insufficient to demonstrate [*173] that an employer's legitimate, nondiscriminatory reason was pretextual. See Holt v. KMI-Cont'l, 95 F.3d 123, 130 (2d Cir. 1996), cert. denied, 520 U.S. 1228, 117 S. Ct. 1819, 137 L. Ed. 2d 1027 (1997) (affirming a grant of summary judgment).

Summary judgment is granted to defendants as to plaintiff Carmellino's claim of age discrimination.

2. Retaliation

It is undisputed that laintiff Carmellino filed her EEOC charge on September 18, 2002. (Def. Ex. Carmellino A at 1; Resp. to 56.1 P 373) After that date, the only evidence in the record is that Carmellino submitted an online employment application with defendant DOE during the summer of 2003, which did not result in her being hired. (Def. Ex. Carmellino F; Resp. to 56.1 P 374)

Plaintiffs have come forward with no evidence that this failure to hire was causally connected to her EEOC charge. There is simply no evidence in the record that any person involved in the decision not to hire Carmellino after she applied online did so with any knowledge of her EEOC charge. Indeed, Carmellino testified that she had applied for full-time teaching positions several times from 1998 to present (Carmellino Dep. at 21, [*174] 24, 29, 46, 71, 75), although documentary evidence in the record only exists as to the occasions in 2001 and 2003 discussed above. However, if Carmellino is correct that she had applied multiple times prior to September 2002, then defendant DOE repeatedly had decided against hiring Carmellino on a full-time basis -- each prior to her engaging in protected activity. Therefore, it is not surprising that the DOE would decide not to do so again in the summer of 2003, regardless whether plaintiff had filed a charge with the EEOC. Despite having a full opportunity to conduct discovery and an opportunity to supplement their submissions in opposing defendants' motion, plaintiffs have failed to offer any additional evidence to raise a triable issue of fact on this claim. The decision not to hire Carmellino in the summer of 2003 was made at least nine months after she filed her charge, a gap in time that is too long -- without more -- for a reasonable jury to infer a causal relationship. See generally Clark County Sch. Dist., 532 U.S. at 273 (collecting cases in which three and four-month periods between the protected activity and the adverse action were insufficient to establish [*175] a causal connection). Finally, in her deposition, Carmellino testified that she did not think that any of the defendants retaliated against her. (Carmellino Dep. at 134)

Summary judgment is granted to defendants as to plaintiff Carmellino's claim of retaliation under the ADEA.

IV. False Arrest and Abuse of Process Claims of Victor Sands

A. Facts

From 1985 to June 2001, plaintiff Victor Sands taught at I.S. 220K. (Resp. to 56.1 P 19) On May 4, 2001, plaintiff Sands submitted his application for retirement, which would become effective on July 1, 2001. (Sands Dep. at 12; Def. Ex. Sands A)

In September 2001, plaintiff Sands anonymously sent defendant Jo Rossicone -- the principal of I.S. 220K -- a newspaper article discussing the present lawsuit pending before me. (Sands Dep. at 7; Def. Ex. Sands C) Sands attached a note to the article that stated, "You're next sweet cheeks." (Def. Ex. Sands D; Resp. to 56.1 P 22) In his deposition, Sands testified that his intent, in sending the article and note, "was to be the first one to make her aware of some bad news coming her way." (Sands Dep. at 15) In addition, Sands testified, "this was [his] little [*176] way to spoil her day." (Sands Dep. at 16)

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 16 of 21
Page 54 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

Defendant Rossicone testified that she felt "shocked" and "threatened" when she received the anonymous note, and she called the police. (Rossicone Dep. at 168-69) On September 17, 2002, Detective John Ryan interviewed Rossicone about the matter. (Ryan Dep. at 12) Rossicone speculated that plaintiff Sands had written the note because she recognized his handwriting. (Ryan Dep. at 14) After comparing handwriting samples of Sands, Ryan agreed that they were similar to the handwriting on the note. (Ryan Dep. at 15)

On October 26, 2002, Detective Ryan went to plaintiff Sands' residence, presented Sands with the article and attached note, and asked Sands whether he sent the items to defendant Rossicone. (Ryan Dep. at 45-46) Sands admitted that he had done so. (Sands Dep. at 33) Ryan then scheduled an appointment for October 30, 2002 with Sands for further investigation of the matter. (Ryan Dep. at 47-48) However, Sands did not appear for the appointment. (Ryan Dep. at 48)

On October 31, 2002, Detective Ryan was contacted by plaintiff Sands' attorney. (Ryan Dep. at 48) Sands' attorney asked Ryan to close the investigation because the correspondence [*177] sent to defendant Rossicone represented Sands' opinion. (Ryan Dep. at 48) Ryan then contacted the Legal Bureau of the New York Police Department as well as the Office of the Kings County District Attorney ("DA") to determine whether this matter should be prosecuted. (Ryan Dep. at 49) On November 6, 2002, the DA's Office advised Ryan that Sands' actions rose to the level of a crime and that the matter could be prosecuted. (Ryan Dep. at 51)

On January 17, 2003, Detective Ryan contacted plaintiff Sands' attorney to arrange a meeting with Sands. (Ryan Dep. at 53) On February 11, 2003, Sands met with Ryan at the police station. (Ryan Dep. at 54) On that date, Sands was issued a Desk Appearance Ticket ("DAT"), which directed Sands to appear in Kings County Criminal Court on March 17, 2003. (Def. Ex. Sands H; Resp. to 56.1 P 34) On March 5, 2003, the DA's Office declined to prosecute the matter. (Def. Ex. Sands I; Resp. to 56.1 P 35)

B. Discussion

Plaintiff Sands asserts two claims against defendants Rossicone, Grippo, District 20, and DOE under 42 U.S.C. § 1983. (Compl. P 492) First, Sands alleges that Rossicone induced Detective Ryan [*178] to arrest him and thus is liable for false arrest. (Compl. P 492) Second, Sands alleges that the "conduct and actions of . . . Rossicone[,] in causing charges to be filed against [him,] even though she knew he had committed no crime" were an abuse of process. (Compl. P 487) Sands argues that the other defendants should be liable for the actions of Rossicone because she acted in her official capacity as principal of I.S. 220K. (Compl. PP 487, 492)

"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). "Under New York state law, to prevail on a claim of false arrest a plaintiff must show that '(1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged.'" Id. at 134-35 (quoting Broughton v. State, 37 N.Y.2d 451, 456, 335 N.E.2d 310, 373 N.Y.S.2d 87 (1975), cert. [*179] denied sub nom. Schanbarger v. Kellogg, 423 U.S. 929, 96 S. Ct. 277, 46 L. Ed. 2d 257 (1975)). It is "well established that the existence of probable cause is an absolute defense to a false arrest claim . . . ." Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002) (applying New York law). See also Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (noting that this "privilege" to arrest applies regardless "whether that action is brought under state law or under Section 1983"). "[T]he issue of probable cause is a question of law to be

Case 2:04-cv-03694-RJH-GWG   Document 41-4   Filed 11/13/2007   Page 17 of 21
Page 55 of 56

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

decided by the court only where there is no real dispute as to the facts or the proper inferences to be drawn from such facts." Parkin v. Cornell Univ., Inc., 78 N.Y.2d 523, 529, 583 N.E.2d 939, 577 N.Y.S.2d 227 (1991) (citing Veras v. Truth Verification Corp., 87 AD2d 381, 384, 451 N.Y.S.2d 761 (1st Dep't 1982), aff'd 57 N.Y.2d 947, 443 N.E.2d 489, 457 N.Y.S.2d 241 (1982)).

"For false imprisonment liability to attach to one who causes or directs an arrest or imprisonment in New York, 'the defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to [*180] the point where the officer is not acting of his own volition.'" Curley v. AMR Corp., 153 F.3d 5, 13-14 (2d Cir. 1998) (quoting 59 N.Y.Jur.2d False Imprisonment § 37 (1987)). However, "[a] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution." Levy v. Grandone, 14 A.D.3d 660, 661, 789 N.Y.S.2d 291 (2d Dep't 2005), lv. to appeal denied, 5 N.Y.3d 746, 833 N.E.2d 711, 800 N.Y.S.2d 376 (2005).

Plaintiffs have failed to come forward with any evidence that defendant Rossicone acted with any "undue zeal to the point where the officer [was] not acting of his own volition." Curley, 153 F.3d at 13-14. The only evidence plaintiffs offer regarding Rossicone's influence over this matter is a single statement by Detective Ryan in his deposition. After receiving a lukewarm response from the NYPD Legal Bureau and the DA's Office about the criminality of plaintiff Sands' conduct, Ryan contacted Rossicone to inquire whether "she still wanted [*181] to pursue this." (Ryan Dep. at 52) Ryan testified in his deposition that Rossicone responded that she did, and Ryan then later issued a DAT to Sands. (Id. at 52; Def. Ex. Sands H) Plaintiffs have had a full and fair opportunity to conduct discovery. The fact that Rossicone responded affirmatively to Ryan's inquiry as to whether she wished to pursue the matter cannot reasonably be interpreted as "undue zeal" or active participation in bringing about Sands' arrest. No reasonable jury could conclude, based on the evidence in the record, that Ryan did not act of his own volition in deciding to issue a DAT to Sands.

A claim of abuse of criminal process brought under section 1983 must be analyzed under state law. Cook v. Sheldon, 41 F.3d 73, 79-80 (2d Cir. 1994). The New York Court of Appeals has articulated three elements of an abuse of process claim: "(1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." Curiano v. Suozzi, 63 N.Y.2d 113, 116, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (1984). In addition, "the process used must involve [*182] 'an unlawful interference with one's person or property.'" Id. (quoting Williams v. Williams, 23 N.Y.2d 592, 596, 246 N.E.2d 333, 298 N.Y.S.2d 473 (1969)). In applying these requirements, the Court of Appeals held that merely filing and serving a summons does not constitute such an interference. Id. "[T]he 'gist of the action for abuse of process' . . . is 'the improper use of process after it is issued.'" Id. at 117 (quoting Williams, 23 N.Y.2d at 596). A viable claim must offer evidence of such improper use, and a "malicious motive alone . . . does not give rise to a cause of action for abuse of process." Id.

Here, plaintiff Sands received a DAT from Detective Ryan on February 11, 2003. (Ryan Dep. at 54) It is undisputed that the DAT directed him to appear in criminal court. (Def. Ex. Sands H; Resp. to 56.1 P 34) On March 5, 2003, the DA's Office declined to prosecute the matter. (Def. Ex. Sands I; Resp. to 56.1 P 35) There is no evidence in the record as to anything else that occurred before this date, let alone any evidence to support a finding that the issuance of this DAT resulted in any improper interference with plaintiff Sands' [*183] person or property. See Curiano, 63 N.Y.2d at 116. Based upon the evidence in the record, no reasonable jury could find that plaintiff Sands experienced anything more than the bare initiation of a criminal prosecution predicated on his admission that he had anonymously sent defendant Rossicone what could reasonably be considered a threatening note. Lacking

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 18 of 21
Page 56 of 56
Get a Document - by Citation - 2006 U.S. Dist. LEXIS 63705

evidence that the conduct of defendant Rossicone or any other defendant reflected "an intent to do harm without excuse or justification" or used criminal process "in a perverted manner to obtain a collateral objective," id., plaintiff Sands has no evidence to support a claim of abuse of process.

As to plaintiff Sands' claims of false arrest and abuse of process, summary judgment is granted in favor of defendants.

V. Conclusion

Defendants' motion for summary judgment is denied as to plaintiff Melendi's claims of discrimination and retaliation and is otherwise granted.

SO ORDERED.

P. Kevin Castel

United States District Judge

Dated: New York, New York

September 6, 2006

Service: **Get by LEXSEE®**
Citation: **2006 us dist lexis 63705**
View: **Full**
Date/Time: **Tuesday, November 13, 2007 - 10:52 AM EST**

* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
(A) - Citing Refs. With Analysis Available
(i) - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 **LexisNexis®**  About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 19 of 21

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863
Page 1 of 13

LexisNexis® *Total Research System*

Switch Client ¦ Preferences ¦ Sign Off ¦ ?¦Help

My Lexis™ ¦ Search ¦ Research Tasks ¦ Get a Document ¦ Shepard's® ¦ Alerts ¦ Total Litigator ¦ Dossier ¦ History ¦

Service: **Get by LEXSEE®**
Citation: **1998 U.S. dist. LEXIS 2863**

*1998 U.S. Dist. LEXIS 2863, \**

AUGUSTA CASTRO, Plaintiff, -against- NEW YORK CITY BOARD OF EDUCATION PERSONNEL DIRECTOR, Defendant.

96 Civ. 6314 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1998 U.S. Dist. LEXIS 2863

March 11, 1998, Decided
March 12, 1998, Filed

**DISPOSITION:** **[\*1]** Board's motion for summary judgment granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant school board filed a motion for summary judgment in plaintiff teacher's discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq., and state and local employment discrimination provisions.

**OVERVIEW:** Defendant school board moved for summary judgment in plaintiff teacher's cause of action alleging employment discrimination and intentional infliction of emotional distress. The court first held that plaintiff failed to bear the burden of producing sufficient evidence to support a prima facie case of discrimination under the McDonnell Douglas framework applicable to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq., the New York Human Rights Law, N.Y. Exec. Law § 209 et seq. (1993), and the New York City Human Rights Law, N.Y. City, N.Y., Admin. Code § 8-101 et seq. The court concluded that her dismissal resulted from the failure to obtain the required education, not from discrimination. Also, plaintiff did not experience a materially adverse change in the conditions of employment when she received negative ratings without a demotion or pay cut. Further, plaintiff failed to offer sufficient evidence of retaliation or the intentional infliction of emotional distress claim. The court granted defendant's motion for summary judgment.

**OUTCOME:** The court granted defendant school board's motion for summary judgment in plaintiff teacher's action brought under state law and Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act. Plaintiff failed to establish a prima facie case of discrimination, or to provide sufficient evidence of retaliation or intentional infliction of emotional distress.

**CORE TERMS:** teacher, rating, unsatisfactory, prima facie case, materially, school year, per diem, teaching, demotion, grade, grievance, protected activity, bilingual, intentional infliction of emotional distress, adverse change, causal connection, discriminated,

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 20 of 21

Page 2 of 13

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

kindergarten, appointed, classroom, subjected, teach, summary judgment, national origin, retaliation, lesson, adverse action, theater, salary, refused to sign

**LEXISNEXIS® HEADNOTES**    ⊟**Hide**

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964
Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices >
Discharges & Failures to Hire

HN1 Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., makes it unlawful for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin. 42 U.S.C.S. § 2000e-2(a)(1). More Like This Headnote

Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions >
General Overview
Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices >
Discharges & Failures to Hire

HN2 The Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq., makes it unlawful for any employer to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C.S. § 623 (a) (1). More Like This Headnote | Shepardize: Restrict By Headnote

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964
Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions >
General Overview
Labor & Employment Law > Discrimination > Age Discrimination > Federal & State Interrelationships >

HN3 Section 296(1)(a) of the New York Human Rights Law, N.Y. Exec. Law § 209 et seq. (1993), and § 8-107 of the New York City Human Rights Law, N.Y. City, N.Y., Admin. Code § 8-101 et seq., contain provisions comparable to those contained in Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq. More Like This Headnote | Shepardize: Restrict By Headnote

Civil Rights Law > Civil Rights Acts > Civil Rights Act of 1964
Labor & Employment Law > Discrimination > Age Discrimination > Federal & State Interrelationships >
Labor & Employment Law > Discrimination > Age Discrimination > Proof > Burdens of Proof

HN4 Courts decide cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq., using the McDonnell Douglas three-step analytical framework. This same framework applies to lawsuits brought under the New York Human Rights Law, N.Y. Exec. Law § 209 et seq. (1993), and the New York City Human Rights Law, N.Y. City, N.Y., Admin. Code § 8-101 et seq. More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview

HN5 Under the McDonnell Douglas framework, the plaintiff bears the initial burden of producing evidence sufficient to support a prima facie case of discrimination. If the plaintiff carries this burden, the employer must produce evidence showing some legitimate, nondiscriminatory reason for the adverse employment action. If the employer makes such a showing, the case will be dismissed unless a rational finder of fact could find that the employer's proffered reason is pretextual and that the employer was more likely motivated, in whole or in part, by

Case 2:04-cv-03694-RJH-GWG    Document 41-4    Filed 11/13/2007    Page 21 of 21
Page 3 of 13
Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

discrimination.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview 🔖
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview 🔖
HN6🔖To establish a prima facie case of discrimination under Title VII of the Civil Rights
Act of 1964, 42 U.S.C.S. § 2000e et seq., a plaintiff must present evidence that:
(1) she belongs to a protected class; (2) her job performance was satisfactory;
(3) she suffered an adverse employment action; and (4) the action occurred
under conditions giving rise to an inference of discrimination.  More Like This Headnote
| *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > General Overview 🔖
HN7🔖The burden of proving a prima facie case of employment discrimination under Title
VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., is not
onerous.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Age Discrimination > Federal & State Interrelationships 🔖
Labor & Employment Law > Discrimination > Disparate Treatment > General Overview 🔖
Labor & Employment Law > Discrimination > Retaliation > Statutory Application 🔖
Age Discrimination in Employment Act 🔖
HN8🔖Establishing a prima facie case under Title VII of the Civil Rights Act of 1964, 42
U.S.C.S. § 2000e et seq., or the Age Discrimination in Employment Act, 29
U.S.C.S. § 621 et seq., requires a plaintiff to show that her employer's
discriminatory actions caused a "materially adverse change" in the terms and
conditions of her employment.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Age Discrimination > Federal & State Interrelationships 🔖
Labor & Employment Law > Discrimination > Disparate Treatment > General Overview 🔖
HN9🔖A materially adverse change in the terms and conditions of employment is one
that has an attendant negative result, a deprivation of a position or an
opportunity, and is typically indicated by dismissal, demotion, diminution of
wages, or diminished opportunities for professional growth.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Age Discrimination > Federal & State Interrelationships 🔖
Labor & Employment Law > Discrimination > Disparate Treatment > General Overview 🔖
HN10🔖Negative evaluations that are unattended by a demotion, diminution of wages, or
other tangible loss do not materially alter employment
conditions.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices >
Interference With Protected Activities 🔖
Labor & Employment Law > Discrimination > Retaliation > General Overview 🔖
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview 🔖
HN11🔖To establish a prima facie case of retaliation, a plaintiff must show that: (1) she
was engaged in an activity protected under the discrimination laws; (2) the
employer was aware of this fact; (3) the employer subjected her to an adverse
employment action; and (4) there is a causal connection between these
events.  More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices >
Interference With Protected Activities 🔖
Labor & Employment Law > Discrimination > Retaliation > General Overview 🔖

Case 2:04-cv-03694-RJH-GWG    Document 41-5    Filed 11/13/2007    Page 1 of 21
Page 4 of 13
Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

HN12⬇ The lodging of grievances that do not include charges of discrimination does not constitute a "protected activity" within the meaning of the discrimination laws and, therefore, does not give rise to a claim of retaliation. More Like This Headnote |
*Shepardize:* Restrict By Headnote

Civil Rights Law > Practice & Procedure > Civil Rights Commissions > Complaints 📑
Labor & Employment Law > Discrimination > Retaliation > General Overview 📑
HN13⬇ A plaintiff may establish a causal connection between a protected activity and retaliatory conduct through either direct or indirect evidence, the latter usually consisting of proof that the exercise of a protected right was followed closely in time by an adverse employment action. More Like This Headnote

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements 📑
HN14⬇ Under New York law, a claim for intentional infliction of emotional distress requires proof of acts so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Courts generally will not permit such a claim absent a deliberate and malicious campaign of harassment or intimidation. More Like This Headnote

**COUNSEL:** DAVID M. FISH, ESQ., New York, NY, for Plaintiff.

PAUL A. CROTTY, ESQ., Corporation Counsel of the City of New York, KERRI L. JEW, ESQ., Assistant Corporation Counsel, New York, NY, for Defendant.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION & ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Augusta Castro, a former public school teacher, sues the New York City Board of Education (the "Board") for violation of her federal rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq. (1994), and § 4(a) of the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621, et seq. (1994), and for violation of her state rights under New York's Human Rights Law (the "State Human Rights Law"), N.Y. Executive Law § 209, et seq. (McKinney 1993), New York City's Human Rights Law (the "City Human Rights Law"), Administrative Code of the City of New York § 8-101, et seq., and the common law doctrine of intentional infliction of emotional distress. The Board moves for summary judgment dismissing the complaint under Fed. R. Civ. P. 56(c).
   **[*2]** For the reasons stated below, this motion is granted.

I.

The following facts, viewed in the light most favorable to plaintiff, are relevant to this motion: Plaintiff is a female of Puerto Rican descent born in 1937. (Compl. P 5) ¹ In 1982, she was hired to teach on a substitute, or "per diem," basis at Public School 207 in Manhattan. (*Id.* P 9) In 1983, she transferred to Public School 192 ("P.S. 192") in Manhattan, where she began

Case 2:04-cv-03694-RJH-GWG     Document 41-5     Filed 11/13/2007     Page 2 of 21
Page 5 of 13
Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

teaching in the second grade as a per diem bilingual teacher in Spanish. (Compl. P 10; Castro Dep. at 19) The school district in which P.S. 192 is located has a large Latino population. (Amato Dep. at 43)

**FOOTNOTES**

₁ "Compl." refers to the amended complaint filed on April 15, 1997.

On October 1, 1987, after taking and passing a licensing examination, plaintiff was certified as an appointed bilingual teacher in Spanish. (Jew Decl. Ex. A) The certificate stated that her appointment was contingent on plaintiff's fulfillment of certain post-graduate education requirements by October 1, 1992. **[*3]** (*Id.*) These requirements consisted of 24 credits in six specified areas of bilingual education, to be completed at a college or university with a bilingual program approved by the New York State Education Department ("Department of Education"). (*Id.* Ex. B) At the time plaintiff obtained her certificate, she had received 21 credits from the City College of New York, whose bilingual program had been approved by the Department of Education, and three from Boricua College, whose program had not. (*Id.* Exs. C-E) Plaintiff states that Board personnel told her at the time she received her certificate that she had satisfied all the necessary education requirements. (Castro Dep. at 25, 140)

Beginning in 1992 or 1993, Lydia Silva took over as principal of P.S. 192. (*Id.* at 28) Like plaintiff, Silva is of Puerto Rican descent, although, unlike plaintiff, she was not born in Puerto Rico. (Castro Dep. at 28) As principal, Silva was responsible for assigning teachers to grade levels at the beginning of each school year. (Amato Dep. at 38) These assignments were based on preferences expressed by the teachers, who were guaranteed to receive one of their top three choices of class assignments. **[*4]** (Amato Dep. at 38; Def. 56.1 Statement P 21) In practice, teachers generally received their first choice, although a principal could assign a teacher to her second or third choice upon finding that she was better suited to that grade level. (Amato Dep. at 38)

Plaintiff listed kindergarten as her first choice of class assignment for the 1993-94 school year. (Jew Decl. Ex. I) However, Silva assigned plaintiff to teach second grade, plaintiff's third choice. (*Id.*) Plaintiff claims that the teacher whom Silva assigned to teach kindergarten was younger and less experienced than plaintiff. (Castro Dep. 182) Plaintiff claims also that Silva placed a disproportionate number of special education and hyperactive children into this second grade class and into other classes that plaintiff taught, something Silva did not do in classes taught by non-Latino teachers. (Castro Dep. at 183-93) In response to a grievance submitted by plaintiff in objection to her class assignment, Silva explained that plaintiff's first preference "had been honored for the past three years" and that she "was assigned her third preference because her skills and experience [were] commensurate with the academic needs **[*5]** of the second grade bilingual class." (Jew Decl. Ex. I)

At the end of the 1993-94 school year, Silva gave plaintiff a "U," or "unsatisfactory," rating on her annual performance evaluation. (Jew Decl. Ex. L) Such evaluations were completed for each teacher based on information gathered during both scheduled and unannounced observations. (Castro Dep. at 49, 136) The evaluations contained a signature line on which the evaluated teacher could acknowledge receipt. (Jew Decl. Exs. L, M) Plaintiff refused to acknowledge receipt of Silva's evaluation on the ground that it was untrue. (Castro Dep. at 50)

Plaintiff's unsatisfactory rating was the first such rating she had received while working for the Board. She claims that the rating was the product of Silva's hostility toward her, a hostility Silva also expressed by yelling at her in front of her class on one occasion (*id.* at 32) and by frequently sending administrators to monitor her classes. (*Id.* at 136-37) However,

Case 2:04-cv-03694-RJH-GWG   Document 41-5   Filed 11/13/2007   Page 3 of 21
Page 6 of 13
Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

because plaintiff was still an appointed teacher in 1993-94, the unsatisfactory rating did not affect her employment status.

In May 1994, the Board notified plaintiff that the Department of Education had not accepted [*6] her credits from Boricua College and, therefore, that she had not completed the necessary educational requirements. (Jew Decl. Exs. C, D) Accordingly, it revoked plaintiff's teaching appointment, effective July 1994. (*Id.* Ex. F) The revocation did not affect plaintiff's ability to work as a substitute teacher, and, in November 1994, the Board authorized her to resume teaching on a per diem basis. (*Id.* Ex. G) However, per diem teachers receive smaller salaries than appointed teachers (Castro Dep. at 94), and plaintiff's salary was reduced accordingly. At least five other bilingual teachers who had not completed the education requirements also were demoted to per diem status and received a corresponding pay decrease. (*Id.* at 37) Plaintiff attributes her demotion and subsequent pay decrease to Silva, who, plaintiff claims, told the teaching staff at P.S. 192 that she "only wanted teachers that were from 18 to 30 [years old] working in the school." (*Id.* at 104)

On April 27, 1995, plaintiff filed a complaint with the New York City Commission on Human Rights ("Human Rights Commission") alleging that Board officials, and Silva in particular, had discriminated against her [*7] on the basis of her age and national origin by "reducing [her] salary and downgrading her classroom assignments." (Jew Decl. Ex. J) In a November 16, 1995, decision, the Commission concluded that there was no probable cause to sustain these allegations and that the Board had "provided ample documentation that [its] employment decisions were made pursuant to state law." (*Id.*) The Commission found that, despite having received several extensions of time, plaintiff had "failed to obtain the necessary certification and credentials to maintain her status as [an appointed] bi-lingual teacher." (*Id.*) This decision was upheld on appeal. (*Id.* Ex. K)

During the 1994-95 school year, while Silva was principal, plaintiff resumed teaching kindergarten, her first choice. (Castro Dep. at 201) At the end of that year, Silva gave plaintiff a second unsatisfactory evaluation. (Jew Decl. Ex. M) Plaintiff again refused to sign the evaluation, noting in the margin that the evaluation was "all lies" and that she had heard that Silva would give her similar ratings until she left P.S. 192. (*Id.*; Castro Dep. at 67) Plaintiff successfully challenged this second unsatisfactory evaluation [*8] on administrative appeal when Silva failed to provide the office of appeals with the proper supporting documentation. (Jew Decl. Ex. N)

Sometime during the 1995-96 school year, Lorraine Pacheco took over as principal of P.S. 192. (Castro Dep. at 30; Jew Decl. Ex. Q) Pacheco, who is also of Puerto Rican descent, conducted a scheduled observation of plaintiff's kindergarten classroom on April 1, 1996. (Jew Decl. Ex. Q) In her observation report, Pacheco criticized plaintiff for ineffectively planning her lesson, and for failing to emphasize the principal themes of the storybook she had read to the students or to relate the story to previous material. (*Id.*) Plaintiff refused to sign Pacheco's report on the ground that it was inaccurate. (*Id.*; Castro Dep. at 80) In response to the report, plaintiff filed another grievance with the teachers' union. (Castro Dep. at 82)

On May 16-17, 1996, Sandra Litrico, an assistant principal at P.S. 192, also observed plaintiff's classroom performance. (Jew Decl. Ex. R) In her observation report, Litrico found that plaintiff had not created a lesson plan or established proper "classroom management routines." (*Id.*) Litrico also criticized [*9] plaintiff for continuing to read aloud from a storybook after the students had stopped paying attention. (*Id.*) She advised plaintiff that "despite the help that [plaintiff had] received from other supervisors and staff developers, as well as unsatisfactory lesson observations, problems persist." (*Id.*) She also warned plaintiff that "failure to correct these deficiencies could lead to further disciplinary action, and a U rating." (*Id.*) Plaintiff refused to sign Litrico's report, in part because she claimed to have prepared a lesson plan that had been erased from the chalkboard (Castro Dep. at 86; Pl.

Case 2:04-cv-03694-RJH-GWG    Document 41-5    Filed 11/13/2007    Page 4 of 21
Page 7 of 13
Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

Rule 56.1 statement P 11), and again filed a grievance with the teachers' union. (Castro Dep. at 87)

By the end of the 1995-96 school year, Steven Buchsbaum had replaced Pacheco as supervisor-in-charge of P.S. 192. (Jew Decl. Ex. S) On June 19, 1996, Buchsbaum sent a letter to plaintiff expressing his concern about plaintiff's "unprofessional and inappropriate conduct on the morning of June 3, 1996." (*Id.*) He stated that, on that date, plaintiff had been seen asking her kindergarten class to sign a petition concerning one of the lessons Litrico had observed, and had been **[*10]** heard calling Litrico a "maldita," or bad woman, and an "habladora," or chatterbox, in front of the class. (*Id.*) Buchsbaum noted that plaintiff had refused to assure him that she would leave her students out of any future employment disputes. (*Id.*) Accordingly, he found it necessary to reassign plaintiff to non-teaching duties in the school library. (*Id.*) Plaintiff refused to sign Buchsbaum's letter, and claims that she never used the term "habladora" to describe Litrico. (Castro Dep. at 96)

In a performance evaluation issued at the end of the 1995-96 school year, Buchsbaum gave plaintiff an unsatisfactory rating, her third such rating. (*Id.* Ex. O) Because plaintiff was teaching on a per diem basis at the time, and because per diem teachers could be fired for receiving one unsatisfactory rating (Castro Dep. at 66), Buchsbaum informed plaintiff in a separate letter that she was dismissed effective June 26, 1996. (Jew Decl. Ex. T) Nevertheless, plaintiff, acting on the advice of a teachers' union representative, returned to P.S. 192 at the beginning of the 1996-97 school year. (Castro Dep. at 116) When she remained at the school after being instructed to leave, school **[*11]** officials called police to escort her off school grounds. (*Id.*)

In a right-to-sue letter issued following plaintiff's dismissal on August 26, 1996, the Equal Employment Opportunity Commission ("EEOC") informed plaintiff that it had reviewed the charges raised before the Human Rights Commission and had found that the evidence "did not establish violations of the statutes." Thereafter, plaintiff filed the present action.

In her complaint, plaintiff alleges that the Board, through the officials at P.S. 192, subjected her to adverse employment actions, including demotion and dismissal, in violation of her federal rights under Title VII and the ADEA, and her state rights under the State and City Human Rights Laws. (Compl. PP 20-39) Plaintiff alleges also that Board officials retaliated against her for filing grievances with her union and a complaint with the Human Rights Commission. (*Id.* PP 40-42) Finally, she claims that officials at P.S. 192 subjected her to intentional infliction of emotional distress by fostering a humiliating work environment and calling police to escort her off school grounds. (*Id.* P 43-46) The Board moves for summary judgment dismissing the entire action **[*12]** under Rule 56(c).

II.

A. *Discrimination*

Plaintiff argues first that the Board discriminated against her on the basis of her age and national origin. *HN1* Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1) (1994). *HN2* The ADEA makes it unlawful for any employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623 (a)(1) (1994). *HN3* Section 296(1)(a) of the State Human Rights Law and § 8-107 of City Human Rights Law contain provisions comparable to those contained in Title VII and the ADEA. See *Alie v. Nynex Corp.*, 158 F.R.D. 239, 244 n.2 (E.D.N.Y. 1994); see also *Pace College v. Commission on Human Rights*, 38 N.Y.2d 28, 33,

Case 2:04-cv-03694-RJH-GWG    Document 41-5    Filed 11/13/2007    Page 5 of 21
Page 8 of 13
Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

377 N.Y.S.2d 471, 474, 339 N.E.2d 880 (1975).

HN4⊼Courts decide cases under Title VII and the ADEA using the three-step analytical framework set forth [*13] in _McDonnell Douglas Corp. v. Green_, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) and refined in later cases. See _St. Mary's Honor Ctr. v. Hicks_, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); _see also Stern v. Trustees of Columbia University_, 131 F.3d 305, 311-12 (2d Cir. 1997). This same framework applies to lawsuits brought under the State and City Human Rights laws. See _Song v. Ives Laboratories, Inc._, 957 F.2d 1041, 1046 (2d Cir. 1992); _Alie_, 158 F.R.D. at 244. HN5⊼Under _McDonnell Douglas_, the plaintiff bears the initial burden of producing evidence sufficient to support a prima facie case of discrimination. 411 U.S. at 802. If the plaintiff carries this burden, the employer must produce evidence showing "some legitimate, nondiscriminatory reason" for the adverse employment action. _McDonnell Douglas_, 411 U.S. at 802. If the employer makes such a showing, the case will be dismissed unless a rational finder of fact could find that the employer's proffered reason is pretextual and that the employer was more likely motivated, in whole or in part, by discrimination. _Hicks_, 509 U.S. at 515-16; _Stern_, 131 F.3d at 312. The familiar [*14] principles governing motions for summary judgment apply at each step of this analysis. See _Rule 56(c)_; _Stern_, 131 F.3d at 312.

HN6⊼To establish a prima facie case of discrimination under Title VII, a plaintiff must present evidence that: (1) she belongs to a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. See _McDonnell Douglas_, 411 U.S. at 802; _Stern_, 131 F.3d at 311-12. The Supreme Court has recognized that HN7⊼the burden of proving a prima facie case is "not onerous." See _Texas Dep't of Community Affairs v. Burdine_, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).

In this case, the Board does not dispute that plaintiff is a member of a protected class or that she suffered certain adverse employment actions, including her demotion to per diem status and her eventual dismissal. (Def. Mem. at 15) However, it argues that plaintiff has failed to establish a prima facie case because these adverse employment actions either resulted from plaintiff's own poor job performance or did not take place under conditions giving [*15] rise to an inference of discrimination. (_Id._ at 15-16) I agree with this argument as far as it goes.

Drawing all reasonable inferences and resolving all ambiguities in plaintiff's favor, the evidence shows that the only official at P.S. 192 who even arguably discriminated against plaintiff on the basis of age or national origin was Silva. However, Silva played no part in the two main adverse employment actions that plaintiff claims to have suffered -- her demotion from appointed to substitute teacher and her eventual dismissal. With respect to her demotion, plaintiff concedes that the Department of Education, not Silva or other Board officials, determines whether a teacher has satisfied the necessary educational requirements. (Castro Dep. 38; see also Amato Dep. at 15) She also acknowledges that teachers whose licenses were revoked for failure to obtain the minimum number of credits automatically received a lower salary if they chose to stay on in a per diem capacity. (_Id._ at 94) Plaintiff concedes that these policies were not enforced on a subjective basis, but rather in accordance with objective regulations over which Silva had no control. (_Id._ at 39, 41) Indeed, [*16] plaintiff's entire argument appears to be based on a belief that she was discriminated against because someone at the Board -- not Silva -- allegedly misinformed her that she had completed all the educational requirements necessary to maintain her appointed status. It suffices to point out that there is absolutely no evidence to support such a belief.

Similarly, Silva played no part in plaintiff's eventual dismissal. At the time plaintiff was dismissed, Buchsbaum was serving as supervisor in charge of the school, and it was Buchsbaum who reassigned plaintiff to non-teaching duties and eventually terminated her employment. Moreover, Buchsbaum took these actions, not on the basis of any criticisms

Case 2:04-cv-03694-RJH-GWG    Document 41-5    Filed 11/13/2007    Page 6 of 21

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

Page 9 of 13

previously voiced by Silva, but rather because of the negative observation reports issued by Pacheco and Litrico, and because plaintiff had told Buchsbaum that she would not leave her students out of her employment dispute. Notwithstanding the above, plaintiff argues that, if permitted to confront and cross-examine Board officials such as these administrators, she "will conceivably be able to show to a jury that [they] engaged in unlawful discrimination." (Pl. Mem. at 11) However, this sort [*17] of speculation, unsupported by concrete particulars, is not enough to satisfy even the minimal burden of proving a prima facie case. See Meiri v. Dacon, 759 F.2d 989, 997-98 (2d Cir.) ("to allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases"), cert. denied, 474 U.S. 829, 88 L. Ed. 2d 74, 106 S. Ct. 91 (1985); see also Lediju v. New York City Dep't of Sanitation, 173 F.R.D. 105, 114 (S.D.N.Y. 1997) ("plaintiff's speculation and generalities . . . [are] insufficient even to state a prima facie case" of discrimination).

Thus, the Board is correct in observing that plaintiff has failed to establish a prima facie case that her demotion and dismissal were motivated by discrimination. However, plaintiff's complaint includes more than those claim. Plaintiff also argues that Silva subjected her to less salient forms of discrimination when Silva was principal of P.S. 192 by, for example, assigning her to teach second grade during the 1993-94 school year and placing a disproportionate number of special education and hyperactive children [*18] in her classroom. She argues that these actions also give rise to a claim of discrimination.

The difficulty with this argument is that HN8★establishing a prima facie case under Title VII or the ADEA requires a plaintiff to show that her employer's discriminatory actions caused a "materially adverse change" in the terms and conditions of her employment. Davis v. City University of New York, 1996 U.S. Dist. LEXIS 6345, No. 94 Civ. 7277, 1996 WL 243256, at *7 (S.D.N.Y. May 9, 1996) (Title VII); see also Monica v. New York City Off-Track Betting Corp., 1995 U.S. Dist. LEXIS 3350, No. 93 Civ. 6371, 1995 WL 117879, at *3 (S.D.N.Y. Mar. 20, 1995) (Title VII, ADEA, and retaliation claims), aff'd, 100 F.3d 941 (2d Cir. 1996) (table). HN9★A materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity," Campbell v. Grayline Air Shuttle, Inc., 930 F. Supp. 794, 802 (E.D.N.Y. 1996) (quotations omitted), and is typically indicated by dismissal, demotion, diminution of wages, or diminished opportunities for professional growth. See id.; see also Preda v. Nissho Iwai American Corp., 128 F.3d 789, 791 (2d Cir. 1997) (materially adverse change occurred where employer excluded plaintiff [*19] from meetings, reduced his job duties and gave him largely clerical tasks); de La Cruz v. New York City Human Resources Admin. D.S.S., 82 F.3d 16, 21 (2d Cir. 1996) (plaintiff "arguably" experienced materially adverse chance when employer transferred him from elite position to less prestigious position); Monica, 1995 WL 117879, at *4 (forcing employee to move to undesirable location or transferring employee to isolated corner of workplace may constitute materially adverse change).

Measured by these principles, Silva's actions did not cause a materially adverse change in the conditions of plaintiff's employment. Silva's decision to assign plaintiff to teach second grade and to place students with special needs in her class neither deprived plaintiff of an opportunity nor caused her to suffer any attendant negative result such as demotion, suspension or loss of wages. Nor did Silva's actions force plaintiff to perform duties outside the scope of her teaching contract or mark her as a less capable teacher. In this respect, it is important to note two things: first, plaintiff was not transferred to a stigmatizing or less prestigious position but merely given a class assignment [*20] that she had listed last among her top three choices; and second, to the extent Silva placed difficult students in plaintiff's classes, plaintiff concedes that Silva did this at least in part because plaintiff had done "so well" teaching such students in the past. (Castro Dep. at 90) At bottom, it appears that what plaintiff really resents is the responsibilities and inconveniences that came with being required to teach second grade at a time when she had adjusted to kindergarten and with being asked to cope with troubled students who, in her own words, almost made her

Case 2:04-cv-03694-RJH-GWG    Document 41-5    Filed 11/13/2007    Page 7 of 21

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863    Page 10 of 13

"crazy." (*Id.* at 183) However, in order to be materially adverse, a change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady*, 993 F.2d 132 at 136; *accord Campbell, 930 F. Supp.* at 802; *Monica*, 1995 WL 117879, at *4.

Similarly, that Silva may have given plaintiff unsatisfactory ratings, reprimanded her on one occasion, or closely monitored her classroom performance does not support an inference that the conditions of plaintiff's employment were materially changed. "While adverse employment actions extend beyond readily quantifiable **[*21]** losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *see also Taylor v. Federal Deposit Insurance Corp.*, 328 U.S. App. D.C. 52, 132 F.3d 753, 764 (D.C. Cir. 1997) ("the federal courts cannot be wheeled into action for every workplace slight"). Courts have held that HN10☞negative evaluations -- like those given by Silva -- that are unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions. *See Smart*, 89 F.3d at 442-43; *see also Angara v. Illinois Masonic Med. Ctr.*, 1997 U.S. Dist. LEXIS 11496, No. 96 C 6207, 1997 WL 441319, at *7 (N.D. Ill. July 30, 1997). In this case, where plaintiff received a negative evaluation even after Silva had left P.S. 192, that rule operates with particular clarity. Moreover, although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions. *See Henriquez v. Times Herald Record*, 1997 U.S. Dist. LEXIS 18760, No. 97 Civ. 6176, 1997 WL 732444, at *6 (S.D.N.Y. Nov. 25, 1997) (plaintiff subject to criticism and threats of disciplinary action); *Angara*, 1997 **[*22]** WL 441319, at *7 (reprimand not a materially adverse action even if it is "undeservedly negative" or "humiliating"); *Davis*, 1996 WL 243256, at *8 (plaintiff experienced anxiety when her tenure application delayed). This rule too operates with particularly force here, where plaintiff admits that no one at P.S. 192 ever made derogatory comments to her about her age or ethnicity and no claim has been made that the Board created a hostile work environment under Title VII. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996). Accordingly, because plaintiff has failed to establish a prima facie case that the Board discriminated against her on the basis of either her age or national origin, her discrimination claims under Title VII, the ADEA, the State and City Human Rights Laws are dismissed.

### B. *Retaliation*

Plaintiff claims next that the Board violated Title VII and the State and City Human Rights Laws by retaliating against her for engaging in protected activity. (Compl. PP 40-42; Pl. Mem. at 13) HN11☞To establish a prima facie case of retaliation, a plaintiff must show that: (1) she was engaged in an activity protected under the discrimination laws; (2) **[*23]** the employer was aware of this fact; (3) the employer subjected her to an adverse employment action; and (4) there is a causal connection between these events. *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996); *see also Garber v. New York City Police Dep't*, 1997 U.S. Dist. LEXIS 12590, No. 95 Civ. 2516, 1997 WL 525396, at *6 (S.D.N.Y. Aug. 22, 1997) (applying same standard to claims under State and City Human Rights Laws); *King v. Metropolitan Life Ins. Co.*, 1997 U.S. Dist. LEXIS 8636, No. 96 Civ. 0476, 1997 WL 337472, at *6 (S.D.N.Y. June 19, 1997) (applying same standards to claim under State Human Rights Law).

In this case, plaintiff claims that she engaged in protected activity by submitting multiple grievances to the teachers' union and by filing a discrimination claim with the Human Rights Commission on April 27, 1995. (Pl. Mem. at 12-13) She argues that officials at P.S 192 knew of these activities and retaliated against her by "harassing" her, giving her unsatisfactory evaluations and negative observation reports, and eventually dismissing her. (Compl. PP 40-42; Pl. Mem. at 13)

This claim fails for two reasons. First, contrary to plaintiff's argument, the only "protected

Case 2:04-cv-03694-RJH-GWG    Document 41-5    Filed 11/13/2007    Page 8 of 21

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863

Page 11 of 13

activity" in which she **[\*24]** engaged was the filing of the complaint with the Human Rights Commission. It is true that plaintiff sent grievances to her union representative on at least one occasion before and two occasions after complaining to the Commission. However, it appears that none of plaintiff's union grievances included charges of discrimination. (Castro Dep. at 174) Accordingly, *HN12* the lodging of these grievances does not constitute a "protected activity" within the meaning of the discrimination laws and, therefore, does not give rise to a claim of retaliation. See Walden v. Georgia-Pacific Corp., 126 F.3d 506, 512 n.4 (3rd Cir. 1997), cert. denied, 118 S. Ct. 1516, 140 L. Ed. 2d 669 (U.S. 1998); Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995); see also Brands-Kousaros v. Banco Di Napoli S.P.A., 1997 U.S. Dist. LEXIS 20345, No. 97 Civ. 1673, 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997) ("the protected activity must involve some sort of complaint about a type of discrimination that Title VII forbids").

Second, plaintiff has failed to demonstrate a causal connection between the one protected activity in which she did engage -- her complaint to the Human Rights Commission **[\*25]** on April 27, 1995 -- and the conduct about which she now sues. Generally speaking, *HN13* a plaintiff may establish a causal connection through either direct or indirect evidence, the latter usually consisting of proof that the exercise of a protected right was followed closely in time by an adverse employment action. See DeCintio v. Westchester County Medical Ctr., 821 F.2d 111, 115 (2d Cir.), cert. denied, 484 U.S. 965, 98 L. Ed. 2d 395, 108 S. Ct. 455 (1987). Here, plaintiff does not purport to have direct evidence of retaliation. Rather, she claims that indirect evidence of a causal connection exists because the filing of her complaint with the Human Rights Commission was followed closely by the adverse employment actions to which she was subjected. The facts do not support her.

As the Board correctly points out, Silva gave plaintiff her first unsatisfactory rating, denied her the first choice in class assignment, and placed a large number of challenging students in her class all beginning in or during in the 1993-94 school year, at least a full year before plaintiff filed her complaint with the Commission. Similarly, although plaintiff claims that Silva generally "treated [her] **[\*26]** bad" (Castro Dep. at 32), she testified that this poor treatment began in Silva's second year at P.S. 192, before plaintiff complained to the Commission. (Id.) Although plaintiff received a second unsatisfactory rating from Silva in June 1995, by then Silva was dissatisfied with plaintiff or her teaching abilities, or both. It is unreasonable to infer that the continuation of behavior that had preceded the filing of the plaintiff's complaint was somehow motivated by that complaint. Moreover, assuming arguendo that this second rating was causally connected to plaintiff's complaint to the Commission, that rating was overturned on administrative appeal and therefore did not cause a "materially adverse change" in the terms of plaintiff's employment. See Mattern v. Eastman Kodak Co., 104 F.3d 702, 708 (5th Cir.), cert. denied, 139 L. Ed. 2d 260, 118 S. Ct. 336 (1997); Smart v. Ball State Univ., 89 F.3d 437, 442 (7th Cir. 1996); see also Angara, 1997 WL 441319, at *7 ("A negative evaluation, by itself, cannot constitute an actionable adverse action.").

Further, the filing of plaintiff's complaint is not causally connected with either the negative observation reports **[\*27]** issued by Pacheco and Litrico or with Buchsbaum's ultimate decision to give plaintiff her third and final unsatisfactory rating. Each of these events took place over a year after plaintiff filed her complaint. Such a long delay between protected conduct and adverse action precludes an inference of causal connection. See Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990) (no causal connection even though only three and one-half months passed between protected activity and adverse employment action); see also Zenni v. Hard Rock Cafe Int'l, Inc., 903 F. Supp. 644, 656 (S.D.N.Y. 1995) (plaintiff failed to establish prima facie case of discrimination when "full year passed between the filing of the charge and this allegation of retaliatory conduct"); Fitch v. R.J. Reynolds Tobacco Co., 675 F. Supp. 133, 138 (S.D.N.Y. 1987) (that plaintiff received lowest performance evaluation seven months after he filed EEOC charge "is insufficient to make out a prima facie case of retaliatory discrimination"). Accordingly, plaintiff's claim for retaliatory

Case 2:04-cv-03694-RJH-GWG    Document 41-5    Filed 11/13/2007    Page 9 of 21

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863                           Page 12 of 13

discrimination is dismissed.

C. *Intentional Infliction of Emotional Distress*

Plaintiff's final claim is for intentional **[*28]** infliction of emotional distress. She alleges that officials at P.S. 192 subjected her "to a work environment wherein she [was] humiliated, degraded, and ultimately fired and forced out of her place of employment by police officers . . . . ." (Compl. P 44) This claim is meritless.

*HN14*Under New York law, a claim for intentional infliction of emotional distress requires proof of acts "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Products Corp., 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86 (1983)* (quotations omitted). Courts generally will not permit such a claim "absent a 'deliberate and malicious campaign of harassment or intimidation.'" *Herlihy v. Metropolitan Museum of Art, 214 A.D.2d 250, 263, 633 N.Y.S.2d 106, 114* (1st Dep't 1995) (quoting *Nader v. General Motors Corp., 25 N.Y.2d 560, 569, 307 N.Y.S.2d 647, 654, 255 N.E.2d 765 (1970)).*

The facts in this case fall far short of these standards. As noted, the only official at P.S. 192 who even arguably discriminated against plaintiff was Silva. However, **[*29]** Silva's acts, viewed in a light most favorable to plaintiff, did not rise to the level of extreme and outrageous conduct necessary to support a claim for intentional infliction of emotional distress. See *Spence v. Maryland Cas. Co., 995 F.2d 1147, 1158 (2d Cir. 1993)* (rejecting claim based on allegations that employer criticized, harassed, intimidated and threatened to fire plaintiff on the basis of his age); *Martin v. Citibank, N.A., 762 F.2d 212, 220 (2d Cir. 1985)* (rejecting claim based on allegations that employer forced plaintiff, on the basis of her race, to take a polygraph in connection with investigation into stolen property); *see generally Mariani v. Consolidated Edison Co. of New York, 982 F. Supp. 267, 277-79 (S.D.N.Y. 1997)* (collecting cases rejecting such claims, almost all of which involve facts more egregious than those alleged here).

Nor does the fact that the police escorted plaintiff off school grounds support her claim. By plaintiff's own admission, school officials summoned the police only after she refused to comply with their requests to leave. (Castro Dep. at 116) Under similar circumstances, New York courts have rejected claims for intentional **[*30]** infliction of emotional distress. See *Navarro v. Federal Paper Bd. Co., 185 A.D.2d 590, 593-94, 586 N.Y.S.2d 381, 384 (3rd Dep't 1992)* (former employee handcuffed and arrested in front of former co-workers after failing to comply with requests to leave place of business); *Murphy v. American Home Products Corp., 112 Misc. 2d 507, 447 N.Y.S.2d 218, 220 (Sup. Ct. New York County)* (former employee "placed under guard, barred from saying goodbye to his colleagues, told that his belongings had been taken from his desk . . . and publicly escorted out of building"), *aff'd in relevant part, 88 A.D.2d 870, 871, 451 N.Y.S.2d 770, 771 (1st Dep't 1982), aff'd in relevant part, 58 N.Y.2d at 303, 461 N.Y.S.2d at 236; see also Impastato v. Hellman Enterprises, Inc., 147 A.D.2d 788, 789, 537 N.Y.S.2d 659, 661 (3rd Dep't 1989)* (theater patrons arrested and scoffed at by theater crowd after they refuse to comply with theater employee's lawful requests to leave theater). Moreover, even if school officials acted hastily in calling the police, their action was neither part of a campaign of harassment and intimidation nor so outrageous or extreme "as to go beyond all bounds of decency." **[*31]** *Murphy, 58 N.Y.2d at 303, 461 N.Y.S.2d at 236.* Accordingly, this claim too is dismissed.

For the above reasons, the Board's motion for summary judgment is granted.

SO ORDERED:

Dated: New York, New York

Case 2:04-cv-03694-RJH-GWG    Document 41-5    Filed 11/13/2007    Page 10 of 21

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 2863    Page 13 of 13

March 11, 1998

Michael B. Mukasey,

U.S. District Judge

Service: **Get by LEXSEE®**
Citation: **1998 U.S. dist. LEXIS 2863**
View: Full
Date/Time: Tuesday, November 13, 2007 - 10:58 AM EST

\* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

\* Click on any *Shepard's* signal to *Shepardize*® that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 LexisNexis®

About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**LexisNexis®** *Total Research System*

Switch Client ¦ Preferences ¦ Sign Off ¦ ? Help

*My Lexis™* ¦ Search ¦ Research Tasks ¦ Get a Document ¦ *Shepard's®* ¦ Alerts ¦ Total Litigator ¦ Dossier | History | 🖆

Source: Legal > States Legal - U.S. > New York > Find Cases > **NY Federal & State Cases, Combined** ⓘ
Terms: **same w/3 claim and prior w/6 dismissed and ADEA** (Edit Search | Suggest Terms for My Search)

✔Select for FOCUS™ or Delivery
☐

*2006 U.S. Dist. LEXIS 23460, ***

YAOHUA DENG, Plaintiff, - against - ARAMARK EDUCATION GROUP, INC.; CHARTWELLS
COMPANY; and MR. DENNIS LESTRANGE, Defendants.

04 Civ. 4536 (DRH) (MLO)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 23460

March 23, 2006, Decided

**CORE TERMS:** res judicata, collateral estoppel, summary judgment, dishwasher, national
origin, time-barred, factual allegations, prior suit, prior action, legal theory, judicata,
newly, res, present suit, claims asserted, discovered evidence, failure to state a claim,
previous action, previous proceeding, subsequent action, relitigating, quotation, litigated,
lawsuit, notice, food, discriminated, comparable, present action, employment
discrimination

**COUNSEL:** **[*1]** YAOHUA DENG, Plaintiff, Pro se, NY.

BRYAN CAVE, Attorney for Defendant, New York, New York, By: Steven M. Stimell, Esq.

**JUDGES:** Denis R. Hurley, United States District Judge.

**OPINION BY:** Denis R. Hurley

**OPINION**

**MEMORANDUM & ORDER**

**HURLEY, District Judge:**

**INTRODUCTION**

Plaintiff Yaohua Deng ("Plaintiff") filed a lawsuit on January 18, 2000, entitled *Yaohua Deng
v. Aramark Education Group, Inc.,* 00 CIV. 354 ("*Deng I*"), alleging age and national origin
discrimination against Defendant Aramark Educational Group ("Aramark"). In a Memorandum
and Order dated September 22, 2004 ("Sept. 22 Order"), this Court granted Defendant's
motion for summary judgment and the case was closed.

One month later, on October 21, 2004, Plaintiff filed the present lawsuit against Defendants

Aramark, Chartwells Company ("Chartwells"), and Dennis Lestrange ("Lestrange") alleging race, age, and national origin discrimination pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(e) ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 623 et seq. ("**ADEA**"), and **[*2]** New York Human Rights Law, § 296. Plaintiff's factual allegations are essentially the same as those posed in his prior suit. Defendants now move to dismiss. For the reasons set forth herein, Defendants' motions are GRANTED.

## BACKGROUND

The following summary of facts is drawn from the complaint and this Court's Sept. 22 Order in _Deng I_. Plaintiff is a naturalized citizen of the United States, born in China, now residing in Stony Brook, New York, and at all times relevant to this action was over 55 years of age. Defendant Aramark is a corporation with its principal place of business in Philadelphia. Defendant Chartwells is a corporation with its principal place of business in Charlotte, North Carolina. Defendant LeStrange is the Resident Director for Defendant Chartwells on the campus of the State University of New York at Stony Brook ("the University").

From 1991 to 1998, Plaintiff was employed by Defendant Aramark, at the dining halls of the University. When Aramark first obtained the contract to service the University, Plaintiff was employed in the dining halls as a union dishwasher at a wage of $ 6 per hour. According to Plaintiff, in January 1992, Aramark, without notice, **[*3]** reclassified him as a "student" employee, even though he was never a student at the University. Plaintiff continued to work as a dishwasher until September 1993, when he began to receive assignments as a cook, albeit at the same wage he was earning as a dishwasher.

He was a cook, receiving small wage increases, until November 1996, when he returned to dishwashing. On February 6, 1997, Plaintiff learned that his wage had been cut from $ 7.50 per hour to $ 6.50 per hour. Plaintiff was allegedly told that the reduction was necessary because his classification as a "student" in 1993 excluded him from the terms of the union contract, and that his reappointment to the union dishwasher position required him to begin at the bottom of the pay scale again. In addition, Plaintiff contends that he was routinely denied overtime pay, did not receive raises or pay comparable to that of other employees in the same position, and was denied sick leave, vacation time, and other benefits to which he was entitled.

During the period from September 1993 to November 1996, Plaintiff was employed as a cook at the Chinese food station in the Kelly Cafeteria at Stony Brook. Pursuant to the collective bargaining **[*4]** agreement in place at that time, cooks were not members of the union. In November 1996, the Kelly Cafeteria was renovated and the Chinese food station where Plaintiff worked was closed. Plaintiff then began working as a dishwasher. Plaintiff's status as a dishwasher required him to become a union member. Because Plaintiff switched from a non-union position as a cook to a union position as a dishwasher, he was classified as a new employee under the union's collective bargaining agreement ("CBA"). Plaintiff was paid according to the CBA pay schedule in effect at that time. According to Dennis LeStrange, Plaintiff's manager, Plaintiff's decrease in pay was attributable to his switch in position from a cook to a dishwasher.

On January 4, 1999, the Plaintiff wrote to the United States Department of Justice, complaining about the treatment he received from Aramark. The Department of Justice forwarded his letter to the Equal Employment Opportunity Commission ("EEOC"), who treated the correspondence as a charge of discrimination filed on January 4, 1999. On October 8, 1999, the EEOC wrote to the Plaintiff, explaining that the acts he complained of were outside the 300-day statute of limitations **[*5]** period preceding his charge, and issued him a "right-to-sue" letter.

Plaintiff then commenced his initial action by filing an employment discrimination complaint, alleging violations of Title VII and the **ADEA**. According to the complaint, Plaintiff alleged that Aramark discriminated against him on the basis of his age and his national origin. In his statement of facts, Plaintiff extensively recounted his employment history, focusing primarily on disparities in his wages.

In 2001, Aramark moved to dismiss Plaintiff's complaint. By order dated February 11, 2002, the Court dismissed Plaintiff's age discrimination claim, finding that Plaintiff had failed to state a claim. Plaintiff's national origin discrimination claim survived, but Defendant Aramark was ultimately granted summary judgment as to that claim on September 22, 2004.

In July 2004, while *Deng I* was still pending, Plaintiff filed another charge of discrimination with the EEOC. He set forth the same facts as in his prior charge, but alleged that the new charge was based upon evidence discovered in October and November 2003. The EEOC dismissed the second charge as untimely. Nearly four months later, and just one month after **[*6]** *Deng I* was closed, Plaintiff commenced the present lawsuit. The factual allegations in the present suit trace those of the first.

## DISCUSSION

Defendants Aramark, Chartwells, and LeStrange all move to dismiss the present complaint. Because Aramark was a defendant in *Deng I*, the grounds for its motion are factually and procedurally distinct from those of Defendants Chartwells and LeStrange. The Court considers each of their arguments in turn.

### I. Aramark's Motion to Dismiss

Aramark moves to dismiss the complaint on the basis of (1) *res judicata*; (2) collateral estoppel; and (3) the fact that the claims are time-barred. Because the Court finds that Plaintiff's claims are precluded by the doctrine of *res judicata*, it does not consider collateral estoppel or whether the claims are time-barred.

*Res judicata* is a proper basis for dismissal under Rule 12(b)(6). *See Thompson v. County of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994) ("Res judicata challenges may properly be raised via a motion to dismiss for failure to state a claim under Rule 12(b)(6)."); *see also Southard v. Southard*, 305 F.2d 730, 732 n.1 (2d Cir. 1962) **[*7]** (noting that a claim of res judicata is properly raised on a motion under Rule 12(b)(6)). In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *See Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999). The court must accept the factual allegations contained in the complaint as true, and view the pleadings in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).

The defense of *res judicata* may be upheld on a Rule 12(b)(6) motion without requiring an answer "where all the relevant facts are shown by the court's own records." *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992). "Moreover, this Court may take judicial notice of the relevant pleadings, orders and judgments in the prior action without converting Plaintiff['s] motion to one for summary judgment." *Marchon Eyewear, Inc. v. Tura LP*, 1999 U.S. Dist. LEXIS 22993, No. 98-CV-1932 (SJ), 1999 WL 184107, **[*8]** *2 (E.D.N.Y. March 28, 1999). Dismissal under Rule 12(b)(6) is appropriate only if it appears beyond doubt that a plaintiff can prove no set of facts entitling it to relief in support of its claim. *See Zerilli-Edelglass v. N. Y. City Transit Auth.*, 333 F.3d 74, 79 (2d Cir. 2003). "Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (internal

quotation omitted).

The doctrine of *res judicata* bars a party from asserting claims that either (i) are duplicative of the claims between the parties that were previously decided on the merits, or (ii) claims that arise out of the **same** facts as **claims** between the **same** parties that were previously decided on the merits. See *N. Assur. Co. of Am. v. Square D. Co.,* 201 F.3d 84, 87 (2d Cir. 2000). "Whatever legal theory is advanced, when the factual predicate upon which claims are based are substantially identical, the claims are deemed to be duplicative for purposes of *res judicata.*" *Berlitz Schools of Languages of Am., Inc. v. Everest House,* 619 F.2d 211, 215 (2d Cir. 1980). **[*9]** Thus, *res judicata* not only bars parties from relitigating the same cause of action, but also "prevents litigation of a matter that could have been raised and decided in a previous suit, whether or not it was raised." *Murphy v. Gallagher,* 761 F.2d 878, 879 (2d Cir. 1985); *see also Perez v. Danbury Hosp.* 347 F.3d 419, 426 (2d Cir. 2003) ("Res judicata precludes parties from litigating issues that were or could have been raised in a prior proceeding.") (internal quotation marks and citations omitted); *Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 284-85 (2d Cir.2000); *L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.,* 198 F.3d 85, 87-88 (2d Cir. 1999).

To determine whether *res judicata* applies to preclude later litigation, a court must find that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir.2001); *see also Fogel v. Secretary of Air Force,* 351 F. Supp. 2d 47, 50 (E.D.N.Y. 2005). **[*10]**

As to the first element, there was a final judgment on the merits in the first proceeding. A grant of summary judgment is a decision on the merits, *see Rodriguez by Rodriguez v. Abbott Labs.,* 151 F.R.D. 529, 532 (S.D.N.Y. 1993), as is a dismissal on the grounds that a claim is time-barred, *see PRC Harris, Inc. v. Boeing Co.,* 700 F.2d 894, 896 (2d Cir. 1983) ("The longstanding rule in this Circuit . . . is that a dismissal for failure to comply with the statute of limitations will operate as an adjudication on the merits, unless it is specifically stated to be without prejudice."). This Court specifically held (1) that "Plaintiff's claims which occurred prior to March 10, 1998 are time-barred" (*See* Sept. 22 Order at 8), and (2) that "Plaintiff has failed to meet his burden of establishing a prima facie case of [national origin] employment discrimination" regarding the events that occurred between March 10, 1998 and June 1998, thereby granting Defendant Aramark's motion for summary judgment (*see id.* at 12). Thus, there was an adjudication of the merits of Plaintiff's claims in the prior suit.

As to the second factor, the previous action involved **[*11]** the same parties, *i.e.* Plaintiff and Aramark.

The third and final consideration is whether the claims asserted in the subsequent action were, or could have been, raised in the prior action. The Second Circuit applies a transactional analysis to determine whether there is sufficient identity of issues to justify the dismissal of the subsequent claim. *See Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38-39 (2d Cir. 1992). "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Id.* at 38. It is this identity of facts surrounding the occurrence that constitutes the cause of action, not the legal theory upon which the plaintiff chooses to frame his complaint. *See id.* at 39.

Plaintiff's claims in the present action are identical to those raised and decided in *Deng I.* In *Deng I,* Plaintiff alleged violations of Title VII and the **ADEA,** arguing that Defendant Aramark discriminated against him on the **[*12]** basis of his national origin and age. Plaintiff extensively recounted his employment history, focusing primarily on disparities in his wages.

(See Deng I, Mem. & Order, dated Feb. 11, 2004 ("Feb. 11 Order") at 3.) Specifically, Plaintiff alleged that Aramark discriminated against him by: (1) changing his employment status from union to non-union in or about early 1992; (2) failing to pay him at a reasonably comparable rate to union employees and to provide him with other benefits from 1993 to 1995; (3) failing to pay him at a reasonably comparable rate to other cooks from 1993 to 1996; and (4) lowering his wage rate in February 1997. The claims relating to these factual allegations were dismissed by this Court as time-barred. (See Sept. 22 Order at 1-2, 8.)

The factual allegations in Plaintiff's present complaint are no different. Plaintiff admits as much when he writes, "In my prior complaint I presented this claim. However . . . such claim was dismissed by the Court . . . ." (See Compl., "Notice of Charge of Discrimination," at 6). Plaintiff then articulates that there is "newly discovered evidence" that he received from Aramark on "10/24/03 and 11/14/03," indicating [*13] that he had been fired and then re-hired without his knowledge. (Id. at 6.) What Plaintiff fails to mention, however, is that this "newly discovered evidence" was received in the course of discovery during Deng I, nearly a year before the Court granted summary judgment. In fact, Plaintiff sought to add an unlawful discharge claim in his prior suit based upon the "newly discovered evidence" by a motion to amend. (See Stimell Aff., Ex. 5, Pl.'s Mot. to Am. at 4 ("On 11/14/03 I received one page profile dated 9/21/21/96 . . . which indicates I was newly hired as a full-time food service worker on 9/20/96.").) That motion was denied. (See Sept. 22 Order at 13.) Because it is precisely the same set of facts found inadequate in the prior suit, the Court's denial of the motion to amend is a final decision for res judicata purposes. See United States v. McGann, 951 F. Supp. 372, 382-83 (E.D.N.Y. 1997). As a result, the doctrine of res judicata precludes the unlawful discharge claim in the present suit.

As for Plaintiff's claims that Aramark applied a different seniority system to him and harassed and retaliated against him, those claims arise [*14] out of the same facts and allegations set forth in the Deng I Complaint. Plaintiff's assertion that he is the victim of a "continuing violation" was **dismissed** in the **prior** suit on the grounds that the Plaintiff had not been the victim of any adverse employment action by Aramark since March 1998 when Aramark ceased to be his employer. (See Sept. 22 Order at 13 n.3.) As such, Plaintiff's allegation of a "continuing violation" has already been decided and dismissed by this Court.

Ultimately, there is nothing substantively different about Plaintiff's complaint in the present case other than his reliance on new legal theories, e.g. his § 1981 claim. New legal theories do not amount to a new cause of action so as to defeat res judicata. See Norman v. Niagara Mohawk Power Corp., 873 F.2d 634, 638 (2d Cir. 1989); see also In re Teltronics Services, Inc., 762 F.2d 185, 193 (2d Cir. 1985) ("New legal theories do not amount to a new cause of action so as to defeat the application of the principle of res judicata."). All of the allegations that form the crux of Plaintiff's complaint were identical to the facts before the Court in Deng I. As [*15] such, the claims asserted in the present action were, or could have been, raised in the prior action and are precluded by res judicata. See Pike v. Freeman, 266 F.3d 78, 91 (2d Cir.2001); see also Fogel v. Secretary of Air Force, 351 F. Supp. 2d 47, 50 (E.D.N.Y. 2005). Accordingly, the Court grants Defendant Aramark's motion to dismiss.

## II. Defendants Chartwells's and LeStrange's Motion to Dismiss

Defendants Chartwells and LeStrange move to dismiss the complaint on the basis of (1) collateral estoppel; (2) failure to state a claim; (3) the fact that the claims are time-barred; (4) the fact that individuals are not proper defendants under Title VII or the **ADEA**; and (5) Plaintiff's failure to exhaust his administrative remedies. Because the issue of collateral estoppel is dispositive, the Court does not consider the merits of the alternative theories for dismissal.

"The doctrine of collateral estoppel, or issue preclusion, precludes a party from relitigating in a subsequent action an issue that was clearly raised in a prior action and decided against that

party." _Washington v. U.S. Tennis Ass'n, Inc._ 290 F. Supp. 2d 323, 326 (E.D.N.Y. 2003) **[*16]** (citation and internal quotation marks omitted). An issue is barred if "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" _Interoceanica Corp. v. Sound Pilots, Inc._, 107 F.3d 86, 91 (2d Cir.1997); see also _Purdy v. Zeldes_, 337 F.3d 253, 258 (2d Cir. 2003). Under non-mutual collateral estoppel, third parties unrelated to the original action can bar the litigant from relitigating the same issue in a subsequent suit. See _United States v. Ustica_, 847 F.2d 42, 49 n.14 (2d Cir. 1988).

Defendants Chartwells and LeStrange have established each of the four elements. The charges against them--discrimination on the basis of race and age--are identical to those litigated in the first suit. These issues were "actually litigated and decided" in the Sept. 22 Order. Plaintiff had a "full and fair opportunity" **[*17]** to litigate these issues, evidenced by the fact that Plaintiff engaged in full-discovery in the prior case with regard to the very facts alleged in the present suit. And, finally, the resolution of the issue was "necessary to support a valid and final judgment on the merits" in the prior case as any finding of discrimination would have prevented a finding of summary judgment in favor of Aramark in the first suit. Satisfying all of the elements of collateral estoppel, Plaintiff is precluded from raising these issues against Defendants Chartwells and LeStrange.

It also bears mentioning that Plaintiff admits that Defendant Chartwells committed no wrongdoing: "I do not charge Chartwells with its [sic] discriminatory practice against me in my current action." (Pl.'s Opp'n Mem. at 12.) Thus, there is no basis for any charges against it. As for Defendant LeStrange, it is well-settled that individual supervisors are not liable under Title VII. See _Mandell v. County of Suffolk_, 316 F.3d 368, 377 (2d Cir. 2003) (holding that "individual supervisors are not subject to liability" under Title VII); see also _Patterson v. County of Oneida, N.Y._, 375 F.3d 206, 221 (2d Cir. 2004); **[*18]** _Wrighten v. Glowski_, 232 F.3d 119, 120 (2d Cir. 2000). Individuals are similarly not liable under the **ADEA**. See _Lennon v. NYC_, 392 F. Supp. 2d 630, 640 (S.D.N.Y. 2005); see also _Seils v. Rochester City Sch. Dist._, 192 F. Supp. 2d 100, 123-24 (W.D.N.Y. 2002); _Parker v. Metro. Transp. Auth._, 97 F. Supp. 2d 437, 452 (S.D.N.Y. 2000). As a result, even if Plaintiff's claims against Defendants Chartwells and LeStrange were not barred by collateral estoppel, they would warrant dismissal on other grounds.

## CONCLUSION

In sum, Plaintiff's claims against Defendant Aramark are barred by the doctrine of _res judicata_ and his claims against Defendants Chartwells and LeStrange are barred by collateral estoppel. Accordingly, Defendants' motions to dismiss the complaint are GRANTED. The Clerk of the Court is directed to close this case.

## SO ORDERED.

Dated: Central Islip, New York

March 23, 2006

/s/

Denis R. Hurley,

United States District Judge

Source: Legal > States Legal - U.S. > New York > Find Cases > **NY Federal & State Cases, Combined** 
Terms: **same w/3 claim and prior w/6 dismissed and ADEA** (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, November 12, 2007 - 2:09 PM EST

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

**LexisNexis**®     About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

Get a Document - by Citation - 1998 U.S. App. LEXIS 12674

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Off | [?] Help

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Dossier | History | ⌐

Service: **Get by LEXSEE®**
Citation: **1998 U.S. app. LEXIS 12674**

*1998 U.S. App. LEXIS 12674, \**

Frank X. Lo Sacco, Plaintiff-Appellant, -v.- Louis Tosto, I/O, police officer for City of Middletown; Gregory Sneed, I/O, police officer, City of Middletown; William Hertler, I/O, police officer, City of Middletown; Brian Flaherty, I/O, police officer, City of Middletown; William Clayton, I/O, police officer, City of Middletown; William Dexter, Sgt., I/O, police officer, City of Middletown; Thomas Serra, Mayor, I/O, City of Middletown; George Aylward, I/O, Chief of Police, City of Middletown; City of Middletown, Defendants-Appellees.

No. 97-7916

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

1998 U.S. App. LEXIS 12674

May 11, 1998, Decided

**NOTICE: [\*1]** RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: <u>1998 U.S. App. LEXIS 25340</u>.

**PRIOR HISTORY:** This cause came on to be heard on the transcript of record from the United States District Court for the District of Connecticut (Wiseman, J., sitting by designation), and was submitted.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff arrestee appealed an order of the United States District Court for the District of Connecticut, which denied plaintiff's motions for new trial and to amend judgment under <u>Fed. R. Civ. P. 59</u> after plaintiff was awarded $ 1 in damages in his <u>42 U.S.C.S. § 1983</u> suit.

**OVERVIEW:** Plaintiff arrestee brought suit under <u>42 U.S.C.S. § 1983</u> against defendants, city and its police officers, mayor, and chief of police, after plaintiff was excluded and then arrested when he refused to leave a called executive session of the city's board of ethics. The jury found for plaintiff against defendant police officers and awarded damages of $ 1 but found for defendants on all other claims. The trial denied plaintiff's motions to set aside and amend the judgment under <u>Fed. R. Civ. P. 59</u>. On appeal, the court affirmed, holding that the trial court properly refused to inform the jury that a state commission had found the board's decision to convene the executive session was without legal basis, that the evidence was irrelevant to plaintiff's <u>U.S. Const. amend. I</u> claim, and that the evidence was, therefore, inadmissible under <u>Fed. R. Evid. 402</u>.

**OUTCOME:** The court affirmed denial of motions to set aside and amend judgment because violation of state law was not cognizable in plaintiff arrestee's federal civil rights

suit; thus, trial court properly excluded evidence of illegality under state law of city board's decision to convene executive session.

**CORE TERMS:** executive session, convene, arrest, state law, new trial, inter alia, freedom of assembly, evidentiary rulings, amend

**LEXISNEXIS® HEADNOTES**                                              ⊟**Hide**

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
HN1⬇️Appellate courts review a district court's evidentiary rulings for abuse of discretion. An erroneous evidentiary ruling will not lead to reversal unless affirmance would be inconsistent with substantial justice. Fed. R. Civ. P. 61, 103 (a). More Like This Headnote

Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview
Evidence > Relevance > Relevant Evidence
HN2⬇️Under Fed. R. Evid. 402, relevant evidence is generally admissible; irrelevant evidence, inadmissible. More Like This Headnote

Civil Rights Law > Section 1983 Actions > Scope
HN3⬇️A violation of a state law is not cognizable under 42 U.S.C.S. § 1983. More Like This Headnote

**COUNSEL:** APPEARING FOR APPELLANT: Frank X. Lo Sacco, pro se, Middletown, CT.

APPEARING FOR APPELLEES: Matthew D. Gordon, Skelly & Rottner, West Hartford, CT.

**JUDGES:** PRESENT: Thomas J. Meskill, Jos A. Cabranes, Circuit Judges, Whitman Knapp, District Judge. *

∗ Of the United States District Court for the Southern District of New York, sitting by designation.

**OPINION**

SUMMARY ORDER

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the order of said District Court be and it hereby is affirmed.

Frank Lo Sacco appeals from the July 1, 1997 order of the district court denying his motions for a new trial and to amend judgment. In January 1995, Lo Sacco commenced an action pursuant to 42 U.S.C. § 1983 against Louis Tosto, Gregory Sneed, William Hertler, Brian Flaherty, William [*2] Clayton, and William Dexter, all of whom were police officers for the City of Middletown, Connecticut ("the City") (collectively as "the defendant officers"); Thomas Serra, the mayor of the City; George Aylward, the chief of police for the City; and the City. Lo Sacco claimed violations of his First, Fourth, Fifth, Ninth, and Fourteenth Amendment rights, false arrest, and conspiracy, when defendants improperly declared an executive

session during a public meeting of the City's Board of Ethics ("the Board") on August 16, 1994 and excluded as well as arrested him when he refused to leave the meeting.

A jury trial was held and the jury found that defendant officers Tosto, Sneed, and Dexter violated Lo Sacco's Eight Amendment rights by denying bail without just cause and/or inflicting cruel and unusual punishment on Lo Sacco, and awarded Lo Sacco one dollar in compensatory damages. The jury found in favor of the defendants on all remaining claims. Judgment was entered on March 26, 1997.

On April 4, 1997, Lo Sacco moved for a new trial and to amend the judgment pursuant to Fed. R. Civ. P. 59, arguing, inter alia, that the court erred by failing to inform the jury that the Board's [*3] decision to convene in executive session was without legal basis under the Connecticut statute, as found by the Connecticut Freedom of Information Commission in July 1995 ("FOIC Decision"). The district court denied Lo Sacco's motions, finding, inter alia, that the FOIC decision was irrelevant to the question of whether the defendant officers had probable cause to arrest Lo Sacco at the time of his arrest.

On appeal, Lo Sacco argues that the district court erred in excluding at trial the FOIC decision, which was relevant to his First Amendment freedom of assembly claim. He contends that the jury would have found a violation of his First Amendment freedom of assembly rights had they known that the Board's decision to convene in executive session violated a Connecticut statute.

This HN1 Court reviews a district court's evidentiary rulings for abuse of discretion. Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir. 1997); see Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 620 (2d Cir. 1991). "An erroneous evidentiary ruling will not lead to reversal unless affirmance would be inconsistent with substantial justice." Perry, 115 F.3d at 150 (citing Fed. R. Civ. P. 61, [*4] 103(a)) (internal quotations omitted). In this case, the district court properly precluded the introduction of the evidence of the FOIC decision before the jury because that evidence is irrelevant to Lo Sacco's First Amendment claim. See HN2 Fed. R. Evid. R. 402 (relevant evidence generally admissible; irrelevant evidence inadmissible).

To the extent that Lo Sacco's First Amendment claim is predicated on the violation of a Connecticut statute, it is well settled that HN3 "a violation of a state law is not cognizable under Section 1983." Pollnow v. Glennon, 757 F.2d 496, 501 (2d Cir. 1985) (citing Davis v. Scherer, 468 U.S. 183, 194, 82 L. Ed. 2d 139, 104 S. Ct. 3012 (1984)). Thus, evidence showing the illegality under state law of the Board's decision to convene in executive session is irrelevant to Lo Sacco's First Amendment claim.

Moreover, regardless of whether or not any First Amendment rights of appellant might have been violated by the appellee police officer' conduct in arresting him, they cannot be held liable in a subsequent civil action unless it could be shown that they acted unreasonably in light of circumstances of which they were then aware. Since the FOIC decision [*5] was not in existence at the time of the appellees' actions, the district court's ruling that it was irrelevant is plainly correct.

For the reasons set forth above, the order of the district court is hereby **AFFIRMED**.

Service: **Get by LEXSEE®**
Citation: **1998 U.S. app. LEXIS 12674**
View: **Full**
Date/Time: Tuesday, November 13, 2007 - 10:56 AM EST

* Signal Legend:

Get a Document - by Citation - 1998 U.S. App. LEXIS 12674

- 🕷 - Warning: Negative treatment is indicated
- Q - Questioned: Validity questioned by citing refs
- ⚠ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- Ⓐ - Citing Refs. With Analysis Available
- ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.



*My Lexis™* | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.